IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

*MEAGHAN DOHERTY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

## DECLARATION OF MICHAEL BARONE, MD, IN SUPPORT OF DEFENDANT'S OPPOSED EMERGENCY MOTION TO STAY INJUNCTION PENDING APPEAL

Robert A. Burgoyne
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744
Facsimile: 202.624.9548

Eric B. Wolff
Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

145382257.2

# DECLARATION OF MICHAEL BARONE, MD

I, Michael Barone, MD, hereby declare as follows:

1.     I am employed by the National Board of Medical Examiners (NBME) as Vice President, Licensure Programs. I am over 18 years of age and have personal knowledge of the matters addressed in this Declaration based upon my job responsibilities, general familiarity with NBME's operations, prior experience in medical education, or review of NBME records.

2.     NBME is a nonprofit organization that, in conjunction with the Federation of State Medical Boards, administers the United States Medical Licensing Examination (USMLE) program. Other than the Step 2 Clinical Skills exam, the USMLE consists of standardized, multiple-choice examinations taken on a computer in testing centers operated by a third-party vendor, Prometric. Licensing authorities across the country rely on the results of these examinations as part of their licensure process to ensure the minimum qualifications of prospective physicians.

3.     Examinees take the USMLE under the same testing conditions, unless they have a documented disability

145382257.2

within the meaning of the Americans with Disabilities Act. NBME's Disability Services staff conscientiously evaluates each request for accommodations, with the goal of ensuring that individuals who need accommodations receive them, while individuals without a documented disability do not.

4. After an examinee takes one of the USMLE Steps, including the Step 2 Clinical Knowledge exam (Step 2 CK), which I understand to be the subject of the lawsuit captioned above, the exam is scored. Examinees receive their scores through their web-based USMLE accounts.

5. It is my understanding that Meaghan Doherty took the Step 2 CK exam on August 6 and August 7, 2019. I also understand that her score from that administration will be posted to her USMLE account on September 4, 2019.

6. Once Ms. Doherty receives her Step 2 CK score, she can request that the score be submitted, among other records and credentials, as part of her application to residency programs in which she wishes to continue her graduate medical education.

7. Medical school students and graduates apply to ACGME-accredited residency programs through the Electronic Residency Application Service (ERAS).

8. ERAS transmits residency applications, letters of recommendation, Medical Student Performance Evaluations, medical school transcripts, USMLE transcripts, and other supporting credentials to residency program directors through the Internet. The ERAS system is operated by the Association of American Medical Colleges (AAMC), an entity that is not related to NBME.

9. NBME is responsible for transmitting USMLE transcripts to residency programs through ERAS on behalf of U.S. medical students and graduates. USMLE transcripts contain the complete USMLE examination history for the applicant.

10. When an applicant for a residency position submits a request to have his or her USMLE transcript transmitted through ERAS, NBME transmits the transcript within five business days.

11. According to the timeline provided by the AAMC, individuals who apply for residency positions as part of the

2020 national residency "Match" will be able to submit their applications through ERAS and request that their USMLE transcripts be sent to residency programs as early as September 5, 2019. That means Ms. Doherty can request that her USMLE transcript—including her Step 2 CK score—be sent to residency programs of her choice as soon as September 5, 2019. NBME will then have five business days after receiving any such request to submit her USMLE transcript to ERAS.

12.     Residency programs can begin reviewing applications from ERAS on September 15, 2019, and generally will invite applicants for interviews on a rolling basis.

13.     Thus, if Ms. Doherty's Step 2 CK score is released on September 4, and she promptly requests that NBME transmit her USMLE transcript to residency programs through ERAS on September 5, NBME would submit her score to ERAS by September 10. Residency programs will receive, and may begin reviewing her applications and credentials, including her recent Step 2 CK score, as soon as September 15, 2019. From that day forward, residency programs can use her Step 2 CK score to help inform their decisions.

145382257.2

I declare under penalty of perjury under the laws of the United States that the information provided above is true and correct.

Dated: August 28, 2019

_____
Michael Barone, MD

145382257.2

## CERTIFICATE OF SERVICE

On August 29, 2019, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

Dated: August 29, 2019      /s/ Eric B. Wolff
                                      Eric B. Wolff

145382257.2

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

*MEAGHAN DOHERTY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

**DECLARATION OF ALISON R. CADITZ IN SUPPORT
OF DEFENDANT'S OPPOSED EMERGENCY
MOTION TO STAY INJUNCTION PENDING APPEAL**

Robert A. Burgoyne
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744
Facsimile: 202.624.9548

Eric B. Wolff
Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# DECLARATION OF ALISON R. CADITZ

I, Alison R. Caditz, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct:

1.      I am an attorney with the law firm Perkins Coie LLP, counsel for Defendant National Board of Medical Examiners ("NBME") in the above-captioned proceeding.

2.      I submit this declaration in support of Defendant's Opposed Emergency Motion to Stay Injunction Pending Appeal. I have personal knowledge of the facts stated below and am competent to testify regarding the same.

3.      On August 14, 2019, five days after NBME filed its Notice of Appeal with the district court, I called the Clerk's Office at the United States Court of Appeals for the Fifth Circuit to request information about NBME's appeal. I spoke with Allison G. Lopez, Deputy Clerk, who informed me that no Fifth Circuit case number had been assigned because the district court had failed to submit NBME's Notice of Appeal. Ms. Lopez informed me that the Clerk's Office would contact the district court and request that it submit the Notice. Later that day, Ms. Lopez informed me that the two

individuals at the district court who would submit the Notice were out and would do so the following day, on August 15.

4.     NBME was later required to request to leave to have a transcript prepared as part of its appeal based on the sealing order.

5.     Attached as **Exhibit A** is a true and correct copy of the district court's order denying NBME's Motion to Clarify and, If Necessary, for a Stay Pending Appeal, signed August 27, 2019.

6.     Attached as **Exhibit B** is a true and correct copy of the district court's order granting Plaintiff Meaghan Doherty's request for a preliminary injunction, signed August 5, 2019.

7.     Attached as **Exhibit C** is a true and correct copy of Plaintiff's request to NBME for accommodations on the Step 2 Clinical Knowledge examination ("Step 2 CK").

8.     Attached as **Exhibit D** is a true and correct copy of the NBME's letter denying Plaintiff's request for accommodations on the Step 2 CK, dated July 15, 2019.

145493417.1

9.     Attached as **Exhibit E** is a true and correct copy of the Dr. M. Patricia Brockman's "Psychological Evaluation," dated March 31, 2017.

10.    Attached as **Exhibit F** is a true and correct copy of Dr. Brockman's "Addendum" to the "Psychological/ Educational Evaluation of March 31, 2017," dated April 19, 2019.

11.    Attached as **Exhibit G** is a true and correct copy of Plaintiff's 2010 ACT score report.

12.    Attached as **Exhibit H** is a true and correct copy of Plaintiff's 2010 SAT score report.

13.    Attached as **Exhibit I** is a true and correct copy of Plaintiff's MCAT score report, based on tests administered between January 2012 and September 2014.

14.    Attached as **Exhibit J** is a true and correct copy of Plaintiff's April 2018 Step 1 score report.

15.    Attached as **Exhibit K** is a true and correct copy of excerpts from the August 1, 2019 preliminary injunction hearing transcript.

16.    Attached as **Exhibit L** is a true and correct copy of the National Resident Matching Program's 2020 Main Residency Match Calendar.

17.    Attached as **Exhibit M** is a true and correct copy of an excerpt from the Tulane University School of Medicine Handbook.

Dated: August 29, 2019

/s/ Alison R. Caditz
Alison R. Caditz

145493417.1

**CERTIFICATE OF SERVICE**

On August 29, 2019, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

Dated: August 29, 2019        /s/ Eric B. Wolf
                              Eric B. Wolff

145493417.1

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

MEAGHAN DOHERTY                                          CIVIL ACTION

VERSUS                                                    NO: 19-11790

NATIONAL BOARD OF MEDICAL                                SECTION: T
EXAMINERS

## ORDER

Before the Court are the following: (1) Motion to Clarify and, If Necessary, for a Stay Pending Appeal filed by Defendant National Board of Medical Examiners ("NBME");[1] (2) Defendant NBME's Motion to Expedite Consideration of its Motion to Clarify and, If Necesssary, for a Stay Pending Appeal;[2] (3) Plaintiff Meghan Doherty's response/memorandum in opposition to Defendant's Motion to Clarify and, If Necessary, for a Stay Pending Appeal;[3] (4) Plaintiff's Motion to Clarify Order of August 5, 2019;[4] and (5) Plaintiff's Motion for Expedited Consideration of her Motion to Clarify Order of August 5, 2019.[5]

**IT IS ORDERED** that the Defendant's Motion to Clarify and, If Necessary, for a Stay Pending Appeal[6] is hereby DENIED for the following reasons. Defendant NBME states that it has complied fully with the Court's Order of August 5, 2019,[7] by permitting Plaintiff to take the Step 2 CK Examination on August 6 and 7, 2019, with extra testing time. However, Defendant now asks the Court to clarify whether it also intended to order Defendant to release Plaintiff's score on the Step 2 CK Examination in ordinary course, which is expected to be released to

---

[1] R. Doc. 30.
[2] R. Doc. 31.
[3] R. Doc. 32.
[4] R. Doc. 33.
[5] R. Doc. 35.
[6] R. Doc. 30.
[7] R. Doc. 20.

Plaintiff on or before September 4, 2019, as well as to the Electronic Residency Application Service ("ERAS") and other third parties thereafter at the request of Plaintiff. Otherwise, Defendant suggests that it has already fully complied with the Court's order and need not release Plaintiff's score to her or anyone she may in future authorize to receive it.

This Court finds the premise of Defendant's Motion to Clarify to be rather disingenuous, because the Court in its Order of August 5, 2019, specifically found that Plaintiff had demonstrated through uncontroverted evidence and testimony the irreparable harm she would suffer if she were not allowed to take the Step 2 CK Examination with accommodations on August 6, 2019. The Court found *inter alia* that, if Plaintiff were to take the exam any later than August 6, 2019, she would be at an irreparable disadvantage in securing residency interviews and obtaining a match, and she would incur a permanent blemish on her academic record, which could not be removed.[8] Plaintiff explained at length during her testimony[9] the importance of participating in the residency matching program at the earliest opportunity, that is, when ERAS begins sending out assembled applications and accompanying documents, including USMLE transcripts, to residency programs starting on or about September 15, 2019. Plaintiff testified in detail regarding the harm and disadvantages she would suffer if she were not permitted to take the examination, with accommodations, in enough time to participate in the earliest round of the residency application process. Defendant NBME has not demonstrated any basis for disturbing the Court's previous finding of irreparable harm, which harm would in effect be virtually certain to occur if the Court were to grant Defendant's motion to clarify in the manner sought by Defendant, or alternatively to grant Defendant's motion for a stay pending appeal.

---

[8] R. Doc. 20, p. 8.
[9] R. Doc. 34.

Furthermore, the Court does not believe clarification of its order is necessary because that order obviously requires that Plaintiff's test score must be released in the same manner and at the same time as those of all other examinees taking the Step 2 CK Examination on or about August 6 and 7, 2019. It is the Court's view that the Defendant would be in violation of the Order of August 5, 2019, if it does otherwise. Accordingly, Defendant's Motion to Clarify and, If Necessary, for a Stay Pending Appeal is DENIED.

**IT IS FURTHER ORDERED** that Defendant's Motion to Expedite Consideration of the Motion to Clarify and, If Necessary, for a Stay Pending Appeal[10] is DENIED as MOOT.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Clarify the Order of August 5, 2019,[11] is hereby DENIED for the following reasons. Essentially, Plaintiff contends the score should be released to her by email by 4:00 p.m. on August 30, 2019, on the basis there was a posting by the NBME on its website that there could be delays in the posting of scores of examinees taking the examination between July 1, 2019, and August 8, 2019. However, Plaintiff has not demonstrated that release of her score to her any earlier than in ordinary course, that is, on or before September 4, 2019, as indicated by Defendant in its Motion to Clarify, would be necessary to prevent any irreparable harm. Accordingly, Plaintiff's Motion to Clarify is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Expedite Consideration of her Motion to Clarify[12] is DENIED as MOOT.

**New Orleans, Louisiana**, on this 27th day of August, 2019.

_Greg Gerard Guidry_
_____
**GREG GERARD GUIDRY**
**UNITED STATES DISTRICT JUDGE**

---

[10] R. Doc. 31.
[11] R. Doc. 33.
[12] R. Doc. 35.

# EXHIBIT B



**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

MEAGHAN DOHERTY                                    CIVIL ACTION

VERSUS                                                    NO: 19-11790

NATIONAL BOARD OF MEDICAL                    SECTION: T
EXAMINERS

## ORDER

Before the Court is an application for a preliminary injunction[1] filed by Meaghan Doherty ("Plaintiff") seeking an order directing the National Board of Medical Examiners ("NBME") to grant Plaintiff's request for reasonable testing accommodations of time and a half when she takes the Step 2 CK Examination on Tuesday, August 6, 2019. For the following reasons, the Plaintiff's application for a preliminary injunction is **GRANTED.**

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a medical student at Tulane University School of Medicine who has been diagnosed with Specific Learning Disorder with impairment in reading rate, Attention-Deficit/Hyperactivity Disorder ("ADHD") Combined Type, and Generalized Anxiety Disorder. Plaintiff is required to pass the Step 2 CK Examination as a condition of graduation and to participate in residency placement in September 2019. Plaintiff applied to take the exam and requested test-taking accommodations of additional time. The NBME denied Plaintiff's request for accommodations reasoning, in part, that the Plaintiff did not demonstrate a "substantial limitation in a major life activity as compared to most people."[2] Plaintiff is scheduled to take the examination without accommodations on August 6, 2019.

---

[1] R. Doc. 1.
[2] R. Doc. 1-5, p. 6.

On July 22, 2019, Plaintiff filed under seal an Application for Temporary Restraining Order with Equitable Relief and Order to Show Cause Why a Preliminary Injunction Should Not Issue.[3] On July 26, 2019, the Court denied Plaintiff's request for a temporary restraining order and set the request for preliminary injunction for hearing,[4] which was conducted on August 1, 2019. The Court allowed the parties to file post-hearing briefs by 12:30 p.m. on August 2, 2019.

Plaintiff claims she is entitled to additional time in taking the Step 2 CK Examination because she is an individual with a disability as defined by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.* Plaintiff testified that she was first diagnosed with dyslexia and dysgraphia in 2003 when she was ten years old.[5] In 2006, Plaintiff was diagnosed with ADHD and prescribed Adderall.[6] Although she struggled with her disability from elementary school through college, Plaintiff worked hard to excel in school without requesting any testing accommodations because she was concerned with the stigma associated with her disabilities. Plaintiff testified that, rather than accept direct accommodations, she worked hard to overcome her dyslexia and ADHD issues, and that she continues to take Adderall to this day for her ADHD.

In 2017, Plaintiff was evaluated by a licensed psychologist, Dr. Patricia Brockman, who diagnosed Plaintiff, pursuant to criteria in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V), with Learning Disorder with Impairment in Reading: rate (DSM-V 315.00 ICD-10 F81.0), Attention Deficit/Hyperactivity Disorder – Combined Type (DSM-V 314.01 ICD-10 F*), and Generalized Anxiety Disorder (DSM-V 300.02 ICD-10 F41.1).[7] Dr. Brockman determined that "timed measures consistently underestimate" Plaintiff's skills, and

---

[3] R. Doc. 1.
[4] R. Doc. 6.
[5] R. Doc. 1-6, p. 6.
[6] R. Doc. 1-5, p. 14.
[7] R. Doc. 1-5, pp. 31-32.

that Plaintiff "needed accommodation of extended time to produce fair and unbiased measures" of her skills.[8] Dr. Brockman's testing established that Plaintiff's reading speed is slower than 90% of students her age and that her reading "decoding" speed was slower than 75% of students against the general population. On the timed portion of the Nelson Denny Reading Test, Plaintiff's reading speed fell in the borderline or slow learner range at the 6th percentile of all readers.[9] Although the NBME in its post-hearing brief has challenged the reliability of that specific test, Dr. Brockman had explained in an addendum to her original report, prepared in response to the NBME's rejection of Plaintiff's request for accommodations, that "the NDRT is one of the most widely administered reading tests in the nation and is used by many medical schools to gauge reading ability."[10]

Plaintiff's treating physician, Dr. James Barbee, explained in a 2017 letter submitted in evidence that he diagnosed Plaintiff in 2014 with ADHD, predominately hyperactivity-impulsivity presentation (DSM-V F-90.1) based on the criteria in the DSM-V. He opined that Plaintiff was diagnosed with ADHD in 2003, that she continues to have difficulty sustaining concentration when studying and during tests, and that she is currently prescribed Adderall XR, 30 mg twice per day.[11]

Plaintiff started at Tulane University School of Medicine in 2016, and first applied for testing accommodations on written tests at the start of her second semester in January 2017. Based on Dr. Brockman's evaluation and Dr. Barbee's diagnoses, as well as her 2003 and 2004 evaluations, Tulane University granted her request and provided her accommodations on written tests of time and a half. Plaintiff testified that her testing performance on written exams, like the NBME's Step 1 and 2 Examinations, dramatically improved by 20% once she received additional time for testing. In 2018, Plaintiff requested additional time for testing during the Step 1

---

[8] R. Doc. 1-4, pp.18-35.
[9] R. Doc. 1-5, p. 32.
[10] R. Doc. 1-5, p. 40.
[11] R. Doc. 1-4, p. 47.

Examination, but the NBME denied her request. Plaintiff took the examination without accommodations and scored a 200. Plaintiff testified that a minimum passing score for the Step 1 Examination is a 194 and that the mean score was 228. She testified in detail that she did not believe her score on the Step 1 Examination without the requested accommodations reflected her knowledge of the material, but instead reflected her disability.[12] She further explained that her score, albeit a passing one, would negatively impact her ability to obtain a residency in obstetrics/gynecology, her preferred field, because it was far below the range of scores of students who ultimately obtained residencies in obstetrics/gynecology.[13]

The Step 2 CK Examination is a nine-hour multiple choice test divided into eight 60-minute blocks. Once the time for each section has expired, the examinee cannot return to complete the section. Each question is a written passage with multiple-choice options to select as the answer. Unanswered questions are counted as wrong answers. The results of the Step 2 CK Examination are a component of the criteria used in evaluating medical school candidates for interviews to participate in residency programs. Plaintiff testified that the applications are reviewed on a rolling basis between September 15, 2019, and November 30, 2019, and that obtaining a residency position is highly competitive. Plaintiff is scheduled to take the Step 2 CK Examination on August 6, 2019, without testing accommodations because the NBME denied her request for test-taking accommodations of additional time.

## LAW AND ANALYSIS

---

[12] The Step 1 Examination, like the Step 2 Examination, is a "mastery test." *See Rush v. National Bd. of Medical Examiners*, 268 F.Supp.2d 673, 675 (N.D. Texas 2003). "With a mastery test, the test taker either knows the material and passes the exam, or he does not know the tested-for material and fails the exam. Time constraints for most individuals who take this test are not of major consequence because the majority of medical students possess the reading and processing efficiency needed to work through the test and the set of possible answers within the time constraints that are allowed. *This is not true however, for individuals with reading disabilities.*" *Id.* (emphasis supplied).

[13] *See also* R. Doc. 1-8, p. 54.

A preliminary injunction is an extraordinary equitable remedy that may be granted only if a plaintiff establishes the following four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause [the] defendant[ ]; and (4) that the injunction will not disserve the public interest." [14] Mandatory preliminary relief that goes beyond maintaining the status quo is particularly disfavored and should not be issued unless the facts and law clearly favor the moving party. [15]

42 U.S.C. § 12189 requires entities that offer licensing examinations to give examinations "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12102(1)(A)-(B) defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual" or a "record of such impairment." An impairment is considered a disability under the ADA if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." [16] Major life activities include, among other activities, "learning, reading, concentrating, thinking, writing, [and] communicating." [17]

Plaintiff has demonstrated to the satisfaction of this Court a substantial likelihood of success on the merits. The totality of the evidence and testimony presented in this case establishes that Plaintiff is an individual with a disability under the ADA because she is substantially limited in the major life activities of reading when compared to most people in the general population. Plaintiff produced evidence showing that she has a history of impairment in reading based on

---

[14] *S. Co. v. Dauben Inc.*, 324 F. App'x 309, 314 (5th Cir. 2009) (quoting *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir.1999)); Fed. R. Civ. P. 65.
[15] *Exhibitors Poster Exch., Inc. v. National Screen Serv. Corp.*, 441 F.2d 560, 561–62 (5th Cir.1971)(per curiam); *Miami Beach Federal Savings & Loan Ass'n v. Callander,* 256 F.2d 410, 415 (5th Cir.1958).
[16] 28 C.F.R. § 36.105(d)(1)(v).
[17] 28 C.F.R. § 36.105(c)(1).

current professional evaluations in accordance with the accepted standard of clinical review of the DSM-V. Plaintiff was diagnosed with dyslexia and dysgraphia as early as the age of 4. Dr. Barbee diagnosed Plaintiff in 2014 with ADHD-Combined Type and has prescribed Adderall, which Plaintiff has taken since she was a girl. Dr. Brockman's testing and evaluation revealed that Plaintiff suffers from ADHD, has a specific learning disability in reading, and that she suffers from generalized anxiety disorder. Dr. Brockman made the following conclusions:

> [Plaintiff's] overall achievement fell in the superior range and it was generally consistent with her overall intelligence. When given the use of a calculator, her overall achievement was even stronger. Significant variability was noted in [Plaintiff's] educational skills, with relative strengths noted in her very superior Oral Language and superior Mathematics Composites. Her Written Expression and Reading Comprehension fell in the high average range and was stronger than the timed measures of her Reading Comprehension on the Nelson Denny. Significant variability was noted in [Plaintiff's] reading skills. The accuracy of her sight vocabulary fell in the high average range but her ability to decode words fell at the low end of the average range. The most remarkable observation was [Plaintiff's] slow reading and decoding speed. On the measure of her sight vocabulary, [Plaintiff's] reading speed was slower than 90% of students her age and her decoding speed was slower than 75% of students her age. On the timed Nelson Denny subtest, [Plaintiff's] Reading Speed fell in the borderline or slow learner range at the 6[th] percentile. This indicated a Specific Learning Disorder with Impairment in Reading: rate (DSM-V 315.00 ICD 10 F81.0). This creates a Functional Impairment for which accommodation of extended time is needed to produce fair and unbiased measures of [Plaintiff's] skills on academic and daily tasks where reading is required.[18]

Dr. Brockman's professional conclusions are consistent with Plaintiff's testimony regarding her ability to score well on standardized testing, such as the Medical College Admissions Test (MCAT). Where the questions presented were composed of vignettes, even lengthier ones, with multiple questions, as on the MCAT, she performed well. However, where the vignette was followed by a single question, such as the NBME Step Examinations, she did not perform as well as would be expected for her overall intelligence and mastery of the material. She attributed this

---

[18] R. Doc. 1-5, p. 32.

difference to the overall length of time allowed per question, with more time per question on the MCAT than on the Step Examination, and thus, to her, the testing results revealed her slow reading disability rather than demonstrating her knowledge of the material. Plaintiff testified that her performance on testing with a similar format to the Step Examination, when administered by Tulane with accommodations, was 20 percent better than her results without accommodations.

The evidence and testimony clearly support that Plaintiff has an impairment that substantially limits her in the major life activities of reading when compared to most people in the general population. Defendant, during the hearing and in its post-hearing brief, attempts to paint a portrait of the Plaintiff far different than the Court observed at the hearing of this matter. To the Defendant, Plaintiff is attempting to achieve an unfair advantage over other medical school students. As evidence of this, Defendant points out that Plaintiff has always performed well in school and yet never sought an accommodation until she became a medical student. However, Defendant ignores the record medical evidence documenting Plaintiff's disability, the description in evidence of how overcoming her disability inspired her activities, and more importantly her credible explanation for not seeking accommodations earlier in her academic career.

Plaintiff should not face discrimination, and the ADA does not countenance such discrimination, because she is intelligent and has previously performed well academically. The medical evidence in the record, which was not objected to by the Defendant, nor for that matter controverted, establishes that Plaintiff has a disability that substantially limits a major life activity, namely reading, and that her reading ability was in 2017 determined to be as low as just the 6th percentile of the general population on the Nelson Denny Reading Test. Someone who is disabled should not be penalized because they were able to compensate to some degree for their limitations or because they chose not to seek accommodations when they were first able to do so. It appears

to the Court that Plaintiff would have been entitled to accommodations as early as elementary school, but she made a conscious decision that she would rather not be seen as different by the other students.

Next, Plaintiff has shown a substantial threat that she will suffer irreparable injury if the injunction is denied. Defendant has not undermined Plaintiff's showing of irreparable harm should she not be allowed to take the August 6, 2019 Step 2 Examination with accommodations. This includes the following facts established at the hearing, if Plaintiff were to take the examination any later than August 6, 2019, or worse, take the test without accommodations and fail or score poorly: (1) she would be at an irreparable disadvantage in securing residency interviews and obtaining a match; (2) she would suffer financially having to pay for an additional year of tuition, as well as the delay in earning an income as a resident for an entire year; (3) she would incur a permanent blemish on her academic record, which could not be removed; and (4) she would be placed in very real danger of not being able to complete medical school. It is rather disingenuous of Defendant to minimize the possible and real consequences faced by Plaintiff should she not be allowed to take the Step 2 CK Examination on August 6, 2019, with the requested accommodations. Although Plaintiff acknowledged on cross-examination that there are avenues to matching available to students who do poorly on the Step 2 Examination or fail it initially, she explained that the stigma of the delay or, worse, having to take a leave of absence to sit for the exam a second time, especially coupled with her underwhelming score on the Step 1 Examination without accommodations, would be nearly insurmountable in obtaining a match with a desired or preferred residency program. The lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation.[19] With the requested reasonable accommodation of time and a half

---

[19] *Bonnette v. District of Columbia Court of Appeal*, 796 F.Supp.2d 164, 186-87 (D.D.C. 2011).

to take the Step 2 Examination, "Plaintiff will have time to either display [her] mastery of the subject matter, or show that [she] has not sufficiently mastered the tested materials. In either event, granting the injunction will allow Plaintiff to be tested on [her] medical and science knowledge and not [her] disability."[20]

Next, the Court finds the threatened injury to Plaintiff clearly outweighs any damage that granting the preliminary injunction might cause to the NBME or to the public. The cost and effort to accommodate Plaintiff is minimal. Furthermore, although Defendant suggests the integrity of the examination and licensing procedure will be compromised, the requested accommodations will not change the testing format or the time-based system as applied to students without a documented disability within the meaning of the ADA.

Finally, this Court finds the requested injunction will not disserve the public interest, but will instead further the public interest in prohibiting discrimination on the basis of disability and in fulfilling the ADA's requirement that entities offering licensing examinations provide reasonable accommodations to disabled individuals.[21] As Plaintiff points out, all she is asking for is a level playing field, and the ADA was intended to afford such to all citizens.

The Court's decision to grant the preliminary injunction today is based upon the applicable law, the facts established at the hearing of August 1, 2019, and its finding that Plaintiff was a credible witness in every respect of her testimony.

## **CONCLUSION**

Accordingly, for the foregoing reasons,

---

[20] *Rush, supra*, p. 678.
[21] Id.

**IT IS ORDERED** that the National Board of Medical Examiners allow Plaintiff Meaghan Doherty testing accommodations of time and a half when she takes the Step 2 CK Examination on Tuesday, August 6, 2019.

This preliminary injunction is binding upon the National Board of Medical Examiners, its officers, agents, servants, employees, and attorneys, and upon those persons administering the Step 2 CK Examination who are under contract with the National Board of Medical Examiners or in active concert or participation with them who receive actual notice of this Order.

**New Orleans, Louisiana**, on this 5th day of August, 2019.

**GREG GERARD GUIDRY**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT C

United States Medical Licensing Examination® (USMLE®)

## REQUEST FOR TEST ACCOMMODATIONS
*Use this form if you are requesting accommodations on USMLE for the first time*

---

### The National Board of Medical Examiners® (NBME®) processes requests for test accommodations on behalf of the USMLE program

If you have a documented disability covered under the Americans with Disabilities Act (ADA), you must notify the USMLE in writing each time you apply for a Step examination for which you require test accommodations. Submitting this form constitutes your official notification.

- Review the USMLE Guidelines for Test Accommodations at www.usmle.org for a detailed description of how to document a need for accommodations.

- Complete all sections of this request form; submit the form and all required documentation to Disability Services once you have submitted your Step exam application to your registration entity.

- NBME will acknowledge receipt of your request by e-mail and audit your submission for completeness. If you do not receive an e-mail acknowledgement within two business days of submitting your request, please contact Disability Services at 215-590-9700 or disabilityservices@nbme.org. You may be asked to submit additional documentation to complete your request.

- Requests are processed in the order in which they are received. Processing cannot begin until sufficient information is received by NBME and your Step exam registration is complete. Please allow at least 60 days for processing of your request.

- The outcome of our review will not be released via telephone. All official communications regarding your request will be made in writing. If you wish to modify or withdraw a request for test accommodations, contact Disability Services by e-mail at disabilityservices@nbme.org or by telephone at 215-590-9700.

---

As explained in the Guidelines to Request Test Accommodations (www.usmle.org), you MUST provide supporting documentation verifying your current functional impairment.

Submit the following with this form:

✓ A **personal statement** describing your disability and its impact on your daily life and educational functioning.

✓ A **complete and comprehensive evaluation** from a qualified professional documenting your disability.

✓ **Supporting documentation** such as academic records; score transcripts for previous standardized exams; verification of prior academic/test accommodations; relevant medical records; previous psycho-educational evaluations; faculty or supervisor feedback; job performance evaluations; clerkship/clinical course evaluations; etc.

Please be sure to review the Guidelines for more detailed information regarding supporting documentation.

---

## Section A: Exam Information

Place a check next to the examination(s) for which you are **currently registered** *and* requesting test accommodations: (Check all that apply)

- ☐ Step 1
- ☑ Step 2 CK (Clinical Knowledge)
- ☐ Step 2 CS (Clinical Skills)
- ☐ Step 3*

*Please be aware that additional test time for Step 3 may involve 3 to 5 days of testing, depending on the requested accommodation (See Section C1).

## Section B: Biographical Information
Please type or print.

**B1.** Name:    Doherty             Meaghan             O

                 Last                   First                Middle Initial

**B2.** Gender:   ☐ Male     ☑ Female

**B3.** Date of Birth:   08-17-1993

**B4.** USMLE #   5 - 3 9 7 - 6 7 0 - 0 (required)

**B5.** Address:   3840 Bienville Street

Street

    New Orleans                 Louisiana             70119

City                          State/Province            Zip/Postal Code

    USA

Country

    504-650-6415

Preferred Telephone Number

    mdoherty@tulane.edu

E-mail address

**B6.** Medical School Name:   Tulane University School of Medicine

Country of Medical School:   USA           Date of Medical School Graduation:   May 2020

## Section C: Accommodations Information

### C1. Step 1, Step 2 CK, or Step 3 (computer-based examinations)

Check the appropriate box to indicate the accommodations you are requesting. Check **ONLY ONE** box for the exam(s) for which you are currently registered:

**STEP 1:**

**Additional Break Time**
- ☐ Additional break time over 1 day
- ☐ Additional break time over 2 days

**Additional Testing Time**
- ☐ 25% Additional test time (Time and 1/4) over 2 days
- ☐ 50% Additional test time (Time and 1/2) over 2 days
- ☐ 100% Additional test time (Double time) over 2 days

☐ Additional break time and 50% Additional test time (Time and 1/2) over 2 days

**STEP 2 CK:**

**Additional Break Time**
- ☐ Additional break time over 2 days

**Additional Testing Time**
- ☐ 25% Additional test time (Time and 1/4) over 2 days
- ☑ 50% Additional test time (Time and 1/2) over 2 days
- ☐ 100% Additional test time (Double time) over 2 days

☐ Additional break time and 50% Additional test time (Time and 1/2) over 2 days

**STEP 3:**

**Additional Break Time**
- ☐ Additional break time over 4 days

**Additional Testing Time**
- ☐ 25% Additional test time (Time and 1/4) over 3 days
- ☐ 50% Additional test time (Time and 1/2) over 4 days
- ☐ 100% Additional test time (Double time) over 5 days

☐ Additional break time and 50% Additional test time (Time and 1/2) over 4 days

**Describe** any other accommodation(s) you are requesting for **Step 1, Step 2 CK, or Step 3**.

_____
_____

### C2. STEP 2 CS (Clinical Skills)
Review the Step 2 CS Onsite Orientation video and Step 2 CS Content Description and General Information Booklet at www.usmle.org for detailed information about the format and delivery of the Step 2 CS examination.

Describe the accommodations you are requesting for each section of Step 2 CS (i.e., patient encounter, patient note). If you are requesting additional time, state the **amount** of additional time you require in **minutes per encounter or note**.

- ☐ Patient Encounter:_____
- ☐ Patient Note:_____

C3.    Do you require wheelchair access at the examination facility? ☐ Yes ☐ No
If yes, please indicate the number of inches required from the bottom of the table to the floor: _____

## Section D: Information About Your Impairment

**D1.** List the specific DSM/ICD diagnostic code(s) and disability for which you are requesting accommodations and report the year that it was first diagnosed.

| DIAGNOSTIC CODE | DISABILITY | YEAR DIAGNOSED |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**D2.  Personal Statement**

✍ **Attach a signed and dated personal statement describing your impairment(s) and how a major life activity is substantially limited.** The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limits your current functioning in a major life activity and how the standard examination conditions are insufficient for your needs. In your own words, describe the impact of your disability on your daily life (do not confine your statement to standardized test performance) and provide a rationale for why the specific accommodation(s) you are requesting are necessary in the context of this examination.

## Section E:  Accommodation History

**E1. Standardized Examinations**

✍ **Attach copies of your score report(s) for any previous standardized examination taken.**

✍ **If accommodations were provided, attach official documentation from each testing agency confirming the test accommodations they provided.**

List the accommodations received for previous standardized examinations such as college, graduate, or professional school admissions tests and professional licensure or certification examinations (if no accommodations were provided, write NONE).

|  | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|
| ☑ SAT®, ACT® | 06/10 | none |
| ☑ MCAT® | 06/12/2014 | none |
| ☐ GRE® | | |
| ☐ GMAT® | | |
| ☐ LSAT® | | |
| ☐ DAT® | | |
| ☐ COMLEX® | | |
| ☐ Other (specify) | | |

## E2. Postsecondary Education

List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

✎ Attach copies of official records from each school(s) confirming the accommodations they provided.

✎ If you receive/received accommodations in <u>medical school and/or residency</u>, have the appropriate official at your medical school/residency complete and submit the <u>USMLE Certification of Prior Test Accommodations</u> form available at <u>www.usmle.org</u>.

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| Medical/Graduate/ Professional School | Tulane University School of Medicine | extended time 1.5x | 01/25/2017 to present |
| | | | |
| | | | |
| Undergraduate School | | | |
| | | | |

## E3. Primary and Secondary School

List each school and all formal accommodations you received, and the dates accommodations were provided:

✎ Attach copies of official records from each school listed confirming the accommodations they provided.

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| High School | | | |
| | | | |
| Middle School | | | |
| | | | |
| Elementary School | | | |
| | | | |

## Section F: Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate. I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:

- Evaluating my eligibility for accommodations. When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research. Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information. I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information, if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print): _____Meaghan Doherty_____

Signature: _____     Date:___04/22/2019_____

**E-mail (as a pdf), fax or mail your completed request form and supporting documents to the address below <u>at the same time</u> you submit your Step examination application.**

**Disability Services**
**National Board of Medical Examiners**
**3750 Market Street**
**Philadelphia, PA 19104-3190**
**Telephone: (215) 590-9700**
**Facsimile: (215) 590-9422**
**E-mail: disabilityservices@nbme.org**

MEAGHAN DOHERTY

<u>PESONAL STATEMENT REGARDING DISABILITIES</u>
<u>AND THE ACCOMODATIONS REQUESTED TO ADDRESS THEM</u>

I have been diagnosed with these disabilities:

a) Specific Learning Disorder with impairment in Reading rate (DSM-V 315.00 ICD-10 F81.0)
b) Attention Deficit/Hyperactivity Disorder-Combined Type (DSM-v 314.01 ICD-10F*)
c) Generalized Anxiety Disorder (DSM-V 300.02 ICD-10 F41.1)

I am requesting the following accommodations to address these disabilities:

1. Extended (150%) time for testing.
2. Testing room conditions that are free from distractions.

These diagnoses and accommodation requests are the result of the findings of M. Patricia Brockman, Ph.D., Louisiana Psychologist License No. 574, based on her psychological and educational evaluation in 2017 and the Addendum issued in April 2019.

Dr. Brockman's findings did not surprise me. As a child, the discrepancy between my high intellectual ability and my low reading and spelling ability was a source of serious consternation for my parents. I assumed they were overdramatic or hyper-critical because my grades were always excellent and I didn't think that my way of learning or writing was different from hat of my friends. I attributed any inadequacy that bothered me to my unique beginning and school. Specifically, I was tested and certified as gifted at the age of four. I spent kindergarten through second grade in a French Immersion program for half the day and gifted classes the other half. However, by the end of second grade my parents felt my English reading skills were not progressing adequately compared to my other abilities, so in third grade they enrolled me in a new school with the hope that I would benefit from the smaller class size. I was no longer in French Immersion or gifted. When the discrepancies in my performance on standardized tests, particularly spelling, did not improve, my parents decided to have me evaluated.

I vigorously resisted the evaluations. I was afraid I would be put in a separate program and treated differently than my classmates. I could not understand why they felt something was wrong with me even though I always made honor roll and my teachers told me I was a great student. The evaluation showed I had some learning disabilities -- dyslexia, ADHD, and low phonemic/grapheme awareness. My parents were satisfied that this accounted for the discrepancy in my performance, but oddly, minimized the impact they had on my performance. I refused all the accommodations the school offered me. I didn't think they would help. To me, the only positive result of my diagnosis was that my parents now had their answer and would leave me alone.

And this was how I continued for the next three years until I entered eight grade at Dominican High School and immediately tested into nine grade honors classes. This leap in

academic expectations was the first time I struggled in school and I was unable to keep up on my own. Though I feared I just wasn't smart enough to do well no matter how hard I tired, my parents recognized that I might be time for me to have some accommodation due to my learning disabilities. Reluctantly, I began taking Adderall for ADHD. I quickly realized it was a big help.

As a highly motivated student, accustomed to also being a top performer, my self-worth had become entwined with my academic performance. I only became comfortable admitting my diagnoses in high school when I realized that some classmates with ADHD needed accommodation in addition to their medication. I turned my learning disabilities into a badge of honor: I was smart enough to do well even without the recommended accommodations for people with ADHD. Though I didn't see it as such at the time, this was a counter-productive mentality. But it was reinforced by the skepticism I routinely encountered from people who could not understand how person with ADHD and dyslexia could also be gifted and a high achiever. I never felt comfortable asking for accommodations. To me, accommodations, and the stigma they carry, was an admission that there was something wrong with me; that I was inadequate compared to my classmates.

I have always believed in my ability to master anything and that if I just work hard enough I can improve academically without accommodation. But based on my performance on the exams in medical school, I know that it is not a lack of preparation, knowledge, or understanding, but a lack of time that is responsible for my poor performance (compared to the rest of my academic career).

The basis for my belief is the correlation between my performance on a medical school exam and the type of questions on the exam. On exams where the majority of questions were "NB<E" style (usually a paragraph long) my average score was around a 67 – which is failing. However, for exams that were mostly short questions (a sentence or two) my average score was an 85, which is the class average exam result. When I noticed this disparity in my performance, I realized that extra-time may be an accommodation that would help my academic performance and, more importantly, one that would more accurately reflect my knowledge and ability.

My testing style has always been to leave myself enough time at the end of an exam to return to the questions that may have caused me to "zone out" or become distracted. Unfortunately, with the time constrictions and question style on our exams, I wound up rushing through the whole exam and then guessing on the questions that I skipped on my first pass, simply because I have run out of time.

It took me the first semester of medical school to realize that my uncharacteristically poor performance on examination sis not due to lack of preparation or lack of knowledge of the material or poor test taking skills. I believe that I am now in a high performance educational environment in which I can no longer compensate for my ADHD on my own. Since my study habits and preparation are the same for all my exams, the disparity in my grades seems directly related to time and the type of questions on the exam. While part of me still fears that asking for accommodations may be held against me and diminish my accomplishments, I refuse to let ADHD or dyslexia stand between me and my becoming a doctor.

In January 2017, Tulane granted test taking accommodations to me. The results were positive. Based on the accommodation results and Dr. Brockman's findings, I formally requested test taking accommodation for STEP 1 from the NBME.

In January 2018, the NBME denied my request for accommodations. The results of my STEP 1 test were that I barely passed. In fact, the results jeopardized the likelihood of my obtaining an internship and residency program. Ironically, my STEP 1 results are the strongest proof of the factual validity of my original accommodations request and are the best evidence as to why the NBME should grant my present request for accommodations.

This is supported by my grades and clinical reviews during the ensuing eighteen months in medical school that have passed since I requested accommodations for STEP 1. I have attached my clinical evaluations and make them a part of my personal statement hereto.

I have been evaluated thirty-three times during the past year by faculty members and residents, based on a standard series of either seventeen or twenty-five questions, on which the possible score ranged from "excellent" to "meets expectations" to "does not meet expectations." I was evaluated by twenty-two Tulane Medical School Faculty members and ten Tulane Residents at three different hospitals.

In summary, based on these series of questions, of the twenty-three physician faculty members evaluators, twenty gave me scores of "excellent," nine gave me scores of "meets expectation," and no evaluators scored me at "does not meet expectation"; which means of the total raw questions, I received a score of "excellent" on 59% and a score of "meets expectations" on 40% of the questions. 0% were scored as "does not meet expectations."

Of the ten residents who evaluated my clinical performance, five gave me scores of "excellent," seven scored me at "meets expectations," and no evaluators scored me at "does not meet expectations." The percentage breakdown here was I received an "excellent" score on 53% of the questions and a "meets expectations" on 46%; 0% were scored as "does not" meet expectations."

These evaluations were done following two to six week rotations in which the evaluator observed and questioned me on a regular basis. These scores reflect my abilities as would be indicated by my performance on the MCAT and the ACT, which are the opposite of my score on STEP 1.

Throughout all my clerkships I have consistently performed well on the wards. More significantly, I have performed well on the end of Clerkship NBME Shelf exams, which I have taken with accommodations of 150% of time. During my third year of medical school my shelf exam scores ranged from 40th percentile to the 76th percentile. This is in stark contrast to the approximately 10th percentile I scored on STEP 1, for which I received no accommodations.

When the NBME denied my request for accommodations for the STEP 1, it could still be argued that my request was based on speculation; but a lot has changed since then. When evaluated one-on-one by medical school faculty and residents, my record is strong. The

significance of this is that it highlights both my learning style and my disability. When interacting one-on-one with my professors (or patients), I do not have to work through the barrier of mentally processing the written word in order to determine the nature of the issue at hand and how to respond to it. In contrast, the format of a STEP test question interposes the barrier (for me) of the written word, which requires extra attention and focus on my part to work my way through analyzing the issue and determining my response.

My performance on STEP 1 left me convinced that I don't have what it takes to be a doctor. However, my experience in clinical rotations and evaluations from faculty and residents lead me to see I am capable and that I can be a doctor. My shelf test results (for which I did receive accommodations) were good. I find myself in the unfortunate predicament of now having done well in my course work, clinical rotations, evaluations, and shelf exams, yet I do not perform up to that level on the STEP test question format.

So, I have asked myself again, "can I be a good doctor?" Looking at my first STEP score, one could conclude probably not. But I think that would be an inaccurate conclusion. It is also the opposite conclusion of twenty-three medical faculty members and ten practicing residents. The only difference between these two contrasting conclusions is that one is based on a standardized testing format for which my diagnoses handicaps my performance and the other is based on an evaluation format wherein my diagnoses do not come into play.

My request for accommodations is based on my diagnoses, Dr. Brockman's evaluation and addendum to her original evaluation, my STEP 1 score, my clinical evaluation scores, and my shelf exam results for which I did receive accommodations. For these reasons and the documentation I have submitted and attach hereto, I respectfully request accommodations for the STEP 2 test.


Meaghan Doherty
May 17, 2019

# EXHIBIT D

# FILED UNDER SEAL



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**

July 15, 2019

Meaghan O. Doherty
3840 Bienville
New Orleans, LA 70119

RE: USMLE Step 2 CK                    USMLE ID#: 5-397-670-0

Dear Ms. Doherty:

We have thoroughly reviewed the documentation provided in support of your request for test accommodations for the United States Medical Licensing Examination (USMLE) Step 2 Clinical Knowledge (CK). We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You report the basis of your request to be Specific Learning Disorder with impairment in reading rate, Attention-Deficit/Hyperactivity Disorder (ADHD) Combined Type, and Generalized Anxiety Disorder (GAD). In your personal statement you write, *"These diagnoses and accommodation requests are the result of the findings of M. Patricia Brockman, Ph.D., Louisiana Psychologist License No. 574, based on her psychological and educational evaluation in 2017 and the Addendum issued in April 2019. Dr. Brockman's findings did not surprise me. As a child, the discrepancy between my high intellectual ability and my low reading and spelling ability was a source of serious consternation for my parents...When the discrepancies in my performance on standardized tests, particularly spelling, did not improve, my parents decided to have me evaluated...I could not understand why they felt something was wrong with me even though I always made honor roll and my teachers told me I was a great student...Since my study habits and preparation are the same for all my exams, the disparity in my grades seems directly related to time and the type of questions on the exam...When the NBME denied my request for accommodations for the STEP 1, it could still be argued that my request was based on speculation; but a lot has changed since then. When evaluated one-on-one by medical school faculty and residents, my record is strong...The only difference between these two contrasting conclusions is that one is based on a standardized testing format for which my diagnoses handicaps my performance and the other is based on an evaluation format wherein my diagnoses do not come into play."*

In an April 19, 2019 letter, Dr. Brockman writes, *"I have reviewed the letter of February 14, 2018 in which the NBME rejected Meaghan Doherty's request for accommodations for the USMLE Step 1 test...The NBME concluded that Meaghan has no reading impairment by comparing her reading rate to the national average. The NBME based this conclusion on its view that the ADA determines disability in comparison to 'most people in the general population.' This is an outdated*

*interpretation of the ADA...she should be assessed in comparison to her fellow medical students sitting for the USMLE Step 2 Test."*

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. Dr. Brockman's assertion notwithstanding, the regulatory guidance issued by the United States Department of Justice (DOJ) explains, "An impairment is a disability within the meaning of this part if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population…" C.F.R. § 36.105(d) (v).

Accommodations are provided when there is clear documentation of functional impairment and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance. Your records show that your performances on timed standardized tests taken without accommodations have consistently been well within the average to above average range compared to the appropriate normative sample, including your 2014 MCAT where you earned a Total Score of 32 under standard test conditions, better 88% of a highly select sample of medical school applicants. Our records show that you successfully completed the USMLE Step 1 under standard test conditions in April 2018. These data do not demonstrate impaired functioning relative to most people or that standard test conditions are a barrier to your access to the USMLE.

Your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 2 CK test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

We will advise Applicant Services to process your exam application without test accommodations. You may inquire at usmlereg@nbme.org or call Applicant Services directly at (215) 590-9700 with any questions about your scheduling permit.

Sincerely,

Sarah Severino, Psy.D.
Disability Assessment Analyst, Disability Services

# EXHIBIT E

**M. Patricia Brockman, Ph.D.**
Licensed Psychologist
*Child, Adolescent, School and Family Services*

CONFIDENTIAL

The contents of this evaluation may not be released
to anyone without written permission

## PSYCHOLOGICAL EVALUATION

**NAME:** Meaghan Doherty

**D.O.B.:** August 17, 1993          **AGE:** 23 years

**HOME ADDRESS:** 5603 Hawthorne Place, New Orleans, LA 70124

**PHONE:** (CELL) 504-650-6415  (Dad) 504-236-3850

**EDUCATION:** Tulane University School of Medicine

**DATES OF EVALUATION:** March 29 – 31, 2017

**REFERRAL:** Meaghan was referred for an updated comprehensive psychological evaluation to request accommodations for medical school. Meaghan had been diagnosed with AD/HD as a young student and she received accommodations throughout her elementary and high school years. A current evaluation was requested so that she can continue to receive accommodation in medical school and during high stakes exams.

**ASSESSMENT STRATEGIES:** The current evaluation findings and impressions are based on the following assessment strategies: Review of records, Comprehensive diagnostic interview with Ms. Doherty and her father, Judge Mark Doherty, the Achenbach Adult Self-Report for Ages 18-59 years; the Wechsler Adult Intelligence Scale-Fourth Edition, the Wide Range Assessment of Memory and Learning–Second Edition (WRAML2); the Wechsler Individual Achievement Test-Third Edition (WIAT-III); the Nelson Denny Reading Test administered under standardized and extended time conditions; the Conners' Continuous Performance Test II (CPT II V.5); Brown ADD Scales (Adult Form) completed by Meaghan, her fiancé' and her father; the Behavior Rating Inventory of Executive Functioning – Adult Version (BRIEF-A) Self-Report completed by Meaghan and Informant Questionnaire completed by her fiancé; and observations during the assessment interviews and testing.

## COMPREHENSIVE INTERVIEW AND RELEVANT BACKGROUND:

Prior to the evaluation process, Meaghan and her father were interviewed about her early development, educational history, family history, and relevant medical information. Meaghan is a 23-year-old young woman who is currently enrolled in Tulane University

644 N. Carrollton Ave, New Orleans, LA 70119     Phone (504) 269-6006 Fax (504) 894-1008
5001 Highway 190, Ste B-3, Covington, LA 70433  Phone (985) 809-6577 Fax (985) 809-6576

School of Medicine. She provided a number of documents related to her early school history and diagnosis of Attention Deficit/Hyperactivity Disorder. One of these reports indicated that Meaghan's pre-natal and birth history included complications. She was born post-term at 9½ months with aspirated meconium and placed in the NICU for one week. Despite these complications, Meaghan achieved her developmental milestones within normal limits. No significant behavioral or medical problems were reported as a young child and, in fact, Meaghan was a very bright little girl.

Meaghan was initially evaluated at Mercy Family Center in July, 1998, to determine her eligibility for the gifted program in Orleans Parish. She qualified for gifted services and attended the French immersion program at Hynes Elementary School from Kindergarten through third grade. Although she was a highly motivated and bright student with exceptional communication skills, Meaghan started to experience some difficulties with her early reading skills. She commented during the interview that the French immersion program where she was taught both French and English may have placed less emphasis on the phonemic skills necessary for fluent reading of English. As more reading was required in middle school, Meaghan continued to struggle with slow and inconsistent reading.

A psychoeducational evaluation was conducted by Denise Nagim, M.C.D., at Jefferson Speech and Language in 2003. Significant variability was noted in Meaghan's academic skills with relative weakness noted in her reading skills, including sound blending, word attack, and phonological awareness. These dyslexic deficiencies also impacted Meaghan's written language, especially her spelling and story composition, where her score fell in the borderline or slow learner range. This weakness was even more remarkable given Meaghan's very superior intelligence. Some dysgraphia was also reported and Meaghan tended to omit words when writing sentences and she had difficulty copying and maintaining appropriate spacing between letters and words. Meaghan participated in the recommended multisensory reading program to build phonological awareness, phonology, as well as reading and writing fluency. It was also suggested that Meaghan become proficient in computer keyboarding to address her dysgraphia.

Meaghan transferred to St. Francis Xavier Catholic School where she received accommodations to address her dyslexia and dysgraphia. Occasionally, Meaghan did poorly on tests due to her reading issues, even though she had mastered the information at exceptional level. Her scores on standardized tests also were not consistent with her cognitive potential and academic achievement as Meaghan progressed through elementary school.

Meaghan was reassessed as a sixth grader at Mercy Family Center. Her overall intelligence again fell in the very superior range but her working memory was average and specific difficulties were noted with her auditory processing. The educational re-evaluation indicated a significant improvement in Meaghan's phonemic awareness as a result of the tutoring. However, the psychoeducational testing indicated mild dyslexia

characterized by difficulties with accurate/fluent word recognition, poor spelling, and decoding. Meaghan's attention was also a concern and she also suffered with headaches.

Accommodations recommended to address Meaghan's dyslexia included extended time on tests, previewing instructional content, and not being penalized for misspelled words in content subjects. To address Meaghan's issues with written expression and dysgraphia, it was recommended that she receive copies of lecture notes so that she can check her notes for accuracy. Interventions included the LindaMoodBell and software programs designed to improve Meaghan's writing skills as well as the use of a laptop computer when completing written assignments and tests. In eighth grade, Meaghan transitioned to Dominican High School where she started to experience more attentional issues. She then attended Ben Franklin High School.

Many of Meaghan's issues in high school were the result of her testing into ninth grade honors classes when she was in eighth grade. Because of her dysgraphia and dyslexia, this significant increase in academic expectations resulted in her struggling to address them independently. To better meet these demands, Meaghan began taking medication. She was evaluated by Dr. James Barbee, M.D. and diagnosed with Attention Deficit/Hyperactivity Disorder. Medication, including Adderall was prescribed when she began high school. Meaghan is currently taking Adderall XR 30mg twice a day prescribed by Dr. Barbee. A short acting stimulant (dextroamphetamine 10 mg) was also prescribed for late afternoon to aid studying in the evenings. An Anxiety Disorder was diagnosed in 2014 and fluoxetine was prescribed to address Meaghan's mild anxiety.

After graduating from high school, Meaghan attended the University of Wisconsin, where she majored in biology and minored in environmental studies and global health. Meaghan stated that she managed her attentional issues by carefully selecting her classes and reducing her course load to keep things manageable. Meaghan also earned 21 credits by taking Advanced Placement classes in high school. She stated that, although she did exceptionally well in school, she reported the most difficulty in classes where the exams included writing essays in a blue book in a very traditional fashion. Meaghan struggled to complete these exams satisfactorily and she tended to earn lower grades in these classes.

Meaghan has always been highly motivated and accustomed to being one of the best students in her class. During the interview, she reported that her self-esteem has been closely entwined with her academic success. As she matured, Meaghan became more comfortable with the diagnosis of Attention Deficit/Hyperactivity Disorder and dyslexia. She has addressed the challenges she experienced in proactive ways rather than trying to deny them.

Meaghan's challenges with test performance have been exacerbated since she began medical school. Because of the increased complexity and amount of information she's expected to learn and recite on tests, her grades have not reflected her learning. She is requesting accommodations that will result in more fair and unbiased measures of her learning and therefore she requested this evaluation to substantiate her learning needs.

## BEHAVIORAL OBSERVATIONS:

Meaghan was an attractive, young woman with her dark blonde hair pulled back in a ponytail. She was dressed neatly and casually for the testing sessions. Throughout the evaluation, Meaghan was concerned about her performance and she often made comments about her strengths and weaknesses. Meaghan demonstrated a very strong work ethic and she often worked beyond the specified time limits in order to do tasks to the best of her ability. Meaghan generally responded in a careful and confident way but, when she needed to carefully analyze more complex material, she took her time to do her best. Meaghan demonstrated exceptional verbal and nonverbal problem solving, although occasionally she benefitted from prompts from the examiner to elaborate on her answers.

Timed measures tended to underestimate Meaghan's skills. The most dramatic example of this was when she was asked to solve basic oral Arithmetic word problems in her head. When extended time was provided, Meaghan's score improved on this and other timed measures of her skills as well. On tasks requiring motor skill, Meaghan sometimes commented about her shaking hands. She noted that this occurs very often, especially when she needs to write or complete other motor tasks.

Many of Meaghan's errors on measures of her visual problem solving were due to issues with spatial relationships and directionality. This is often seen in individuals with a history of dyslexia. Despite this, Meaghan was a very impressive young woman who performed very well on the tasks presented. During the academic testing, her scores were very strong but measures related to her symbol management skills in reading continue to reflect impact of these issues on her performance. On one task, Meaghan's reading skills were particularly slow as she tried to sound out individual words and nonsense words.

Despite the inconsistencies in her skills, Meaghan was a young woman with an exceptional work ethic and she was very responsive to the positive structure presented by the examiner. The results of this testing are therefore seen as a vali. and reliable measure of her current functioning.

## EVALUATION FINDINGS

**Cognitive/Intellectual Functioning:** The Wechsler Adult Intelligence Scale – Fourth Edition (WAIS – IV) was administered to Meaghan as an overall measure of her cognitive functioning. Ten individual subtests were presented that included a variety of skills and competencies considered important in understanding an individual's intellectual development. This test has five main scores, including: Verbal Comprehension Index (VCI), Perceptual Reasoning Index (PRI), Working Memory Index (WMI), Processing Speed Index (PSI), and Full Scale IQ Score. The results are presented using the standardized test administration as well as when providing extended time on some measures.

Meaghan's Full Scale IQ Score, the measure of her overall cognitive functioning, fell in the superior range at the 96th percentile, following the standard administration of the test. When accommodations were provided (e.g., extended time on one measure), her overall Full Scale IQ Score fell at the 97th percentile in the superior range. Significant variability was noted in Meaghan's cognitive profile due to her slow processing during timed tests.

Meaghan's Verbal Comprehension Index (VCI), the overall measure of her verbal reasoning abilities, fell in the very superior range at the 99+th percentile. This was a significant relative strength when compared with her Index Scores on the other three Scales. Meaghan's scores on the Verbal Scale fell in the superior-to-very superior range. On the Similarities subtest, a measure of Meaghan's categorization and reasoning skills, she was asked to tell how two items or concepts were alike. Her score on this measure fell in the very superior range at the 99+th percentile. On the Vocabulary subtest, a measure of her word knowledge, Meaghan's score fell in the very superior range at the 99+th percentile based on her ability to provide oral definitions. Her score on the remaining subtest on this Scale, Information, fell in the superior range at the 95th percentile. This was a measure of her general factual knowledge.

Meaghan's Perceptual Reasoning Index (PRI), the overall measure of her nonverbal problems solving, fell in the superior range at the 95th percentile. The Block Design subtest was a timed measure of Meaghan's abstract reasoning where she was asked to construct complex patterns from pictures. She was able to construct all of the designs presented very quickly and efficiently, and her score on this measure fell in the very superior range at the 98th percentile. On the Visual Puzzles subtest, Meaghan was shown a pattern and she was asked to select three components from the six pictured options that could be combined to complete the desired pattern. Her score on this timed measure of her deconstruction skills fell in the very superior range at the 98th percentile. Meaghan's weakest score on this Scale (falling in the mid-average range at the 50th percentile) was noted on the Matrix Reasoning subtest. This was an untimed measure of her nonverbal problem solving where she was asked to solve visual analogies. An error analysis indicated that many of Meaghan's mistakes were due to visual-spatial errors or errors of directionality that are often seen in individuals who have a history of dyslexia.

On the Working Memory Scale, two measures were presented to assess Meaghan's auditory short-term memory and attention. Her Working Memory Index (WMI) fell on the strong side of the average range at the 70th percentile, and it was a significant relative weakness when compared with her Index Scores on the Verbal Comprehension and Perceptual Reasoning Scales. It was a significant relative strength when compared with her Processing Speed Index. Significant variability was also noted on this Scale. On the Digit Span subtest, Meaghan was asked to repeat, reverse, or sequence progressively longer number series to assess her auditory short-term memory and attention. Her overall score on this measure fell in the average range at the 37th percentile. This was a significant relative weakness when compared with her other scores on the intelligence test. Meaghan struggled when asked to repeat or reverse the number series but she did exceptionally well sequencing them in numerical order. On the oral Arithmetic subtest, Meaghan was asked to solve word problems without the use of paper and pencil. Her

score on this measure under the standardized time conditions fell in the superior range at the 91st percentile. When given extended time to solve the word problems, Meaghan's score improved and fell in the very superior range at the 98th percentile. This suggests that timed measures underestimate Meaghan's skills, even on tasks where she is successful.

Meaghan's Processing Speed Index (PSI) fell in the average range at the 34th percentile and it was a significant relative weakness when compared with her Index Scores on the other three Scales. Meaghan's PSI was based on two timed paper-and-pencil tasks designed to measure her graphomotor copying, visual discrimination with abstract symbols, and speed of information processing. On the Coding subtest, Meaghan was asked to copy symbols from a coded key as quickly and accurately as possible. Her score on this measure fell in the mid-average range at the 50th percentile. Meaghan made no errors on this task so her score reflects her processing speed. On the Symbol Search subtest, Meaghan was asked to mark a visual match for one of the two initial designs presented at the beginning of each row. If no match was available, she was asked to mark the box labeled no. Meghan's score on this measure fell at the low end of the average range at the 25th percentile, which was her weakest performance during the cognitive testing. Although her accuracy was perfect, Meaghan worked slowly in order to do her best on this visually complex task. Issues with symbol management were seen to be related her dyslexia and written language.

In summary, Meaghan's overall intelligence fell in the superior range with significant variability noted in her cognitive profile. Measures of her Verbal Comprehension fell in the very superior range, while her overall nonverbal problem solving fell in the superior range. One average score in this area was noted based on Meaghan's ability to solve her visual analogies due to her challenges with visual-spatial, positioning, and directionality negatively impacted her performance. On measures of her working memory, Meaghan struggled when asked to repeat or reverse progressively longer number series. However, she did well solving Arithmetic word problems without the use of paper and pencil, especially when she was given extended time. Meaghan's score improved significantly and fell in the very superior range using this accommodation. Meaghan's overall weakest score was noted in the Processing Speed Scale, on a visually complex task where she was asked to discriminating symbols. Although her accuracy was perfect on this task, Meaghan slowed her work speed in order do her best. Timed measures significantly underestimate Meaghan's skills even in areas where she was successful.

On the Bender Gestalt Visual-Memory test, Meaghan was asked to copy a series of abstract designs and organize them on a piece of paper. This was an untimed measure of her paper and pencil skills designed to complement the Timed Processing Speed subtest during the individual intelligence test. Meaghan's overall written product fell within normal limits, although attempted the designs several times in order to so her best.

**Memory, Processing and Attention:**  To further assess the role of memory, processing and attention in Meaghan's learning, subtests from the Wide Range Assessment of Memory and Learning–Second Edition (WRAML2) were presented.

On the Verbal Learning subtest, Meaghan was asked to learn a list of unrelated words over four repeated trials. She was able to add additional words to her report each time the word list was repeated. However, some intrusion errors (i.e., reporting words not on the list) were noted on the second learning trial, indicating some inaccuracies in her processing. Meaghan was able to self-correct these mistakes on the third and final trials. Meaghan's Verbal Learning Recall Score, based on the number words she reported correctly throughout this learning process, fell in the high average range at the 84th percentile. Later in the testing session when Meaghan was again asked to remember words from the list, she was able to report almost all of the words she stated earlier. Her Verbal Learning Delayed Recall Score therefore fell in the high average range at the 84th percentile. On the Verbal Learning Recognition subtest, a list of 40 words was read to Meaghan, and she was asked to tell whether each word was on/off the list she learned. Her score on this measure was perfect and fell in the high average range at the 84th percentile. Meaghan also felt the use of the structured format made it a little easier for her to recall the words when compared with the free recall measure.

On the Story Memory subtest, two short stories were read aloud and Meaghan was asked to recall as many story details as possible. The context for the stories provided an overall organization for the information but more details were presented on this task. Meaghan sometimes used the sequence of events to organize her report. Her Story Memory Recall Score, based on the number of details reported immediately after the stories were read, fell on the strong side of the average range at the 63rd percentile. Later in the testing session when Meaghan's delayed recall for story details was assessed, she was able to report all of the facts she stated earlier. Her Verbal Learning Delayed Recall Score therefore fell in the high average range at the 75th percentile. This suggests that additional processing or think time aided Meaghan's ability to recall the facts. When a multiple-choice questionnaire was used to assess the accuracy of Meaghan's story memory recall, her Story Recognition Score fell in the high average range at the 75th percentile.

In summary, Meaghan was more successful learning material and retaining information when it was simple and repeated several times. Although she learned information satisfactorily when it was presented within a meaningful context, Meaghan's delayed recall improved when she was given additional processing time to aid her memory. The use of structured formats under both conditions allowed Meaghan to produce accurate and reliable measures of her learning.

**Attention:** The Conners' Continuous Performance Test-II (CPT II V.5) was administered to Meaghan to assess her attention regulation, impulsivity, and vigilance on a computer task. Half of the 12 overall response measures fell in the mildly-to-markedly atypical range. The other measures fell within the average range or indicated a good performance. Five of the eight measures of Inattention indicated concerns, while two of the three Impulsivity measures also indicated problems. Both Vigilance measures were within normal limits. On the simple, rote computer measure, Meaghan's overall performance was a better match for the clinical (AD/HD) than the nonclinical profile

with a confidence interval of 62.57. This indicated that there are 63 chances out of 100 that a significant attention problem exists. It should be noted that Meaghan was on her medication when taking this measure. This testing should be reviewed by her physician to determine whether Meaghan's medical management should be adjusted.

The Brown ADD Scales (Adult Form) were completed by Meaghan, her fiancée, and her father, to assess the impact of AD/HD on her learning and performance in academic and everyday situations. The Brown ADD Scales provided a measure of the cognitive and executive functions as well as other symptoms associated with Attention Deficit/Hyperactivity Disorder. Cluster One focuses on the problems of organizing, prioritizing and initiating work and academic activities. Cluster Two is comprised of problems sustaining attention for tasks that are not self-selected. Cluster Three includes difficulties maintaining adequate alertness and sufficient sustained effort and problems with executive slowness when processing information. Cluster Four assesses the problems with emotional regulation (such as, low frustration tolerance and/or excessive sensitivity) and related aspects of social interaction that are often problematic for persons AD/HD impairment. Cluster Five is comprised of items related to short-term memory, such as, forgetfulness during daily routines or retrieval of learned information.

Meaghan's father, Judge Mark Doherty, completed this form and reported clinically significant concerns on three of the five Cluster Scales. He reported the most concerns related to Meaghan's working memory as well as clinically significant issues related to his daughter's ability to initiate and organize tasks (Cluster #1 – Activation) and sustain her attention long enough to complete them (Cluster #2 – Attention). Judge Doherty reported minimal concerns about Meaghan's effort but he noted some problematic issues related to her emotional regulation (Cluster #4 – Affect). Judge Doherty's ratings of Meaghan's behavior on the individual Cluster Scales and Total Score as well as the resulting ranges are presented in the table below:

| Brown ADD Cluster | T-Score | Range |
|---|---|---|
| 1. Activation | 60 | Clinically Significant |
| 2. Attention | 62 | Clinically Significant |
| 3. Effort | 50 | ADD Probable but not Certain |
| 4. Affect | 55 | ADD Probable but not Certain |
| 5. Memory | 79 | Clinically Significant |
| ADD Total Score | 62 | Clinically Significant |

Meaghan's fiancée also completed these ratings. He reported clinically significant concerns on the Cluster Scales related to Meaghan's attention regulation (Cluster #2) and working memory (Cluster #5). Concerns were noted on the other Scales but not to a significant degree. Meaghan's fiancée's ratings on the individual Cluster Scales, as well as the Total Score and the resulting ranges are presented in the table below:

| Brown ADD Cluster | T-Score | Range |
|---|---|---|
| 1. Activation | 53 | ADD Probable but not Certain |
| 2. Attention | 66 | Clinically Significant |
| 3. Effort | 53 | ADD Probable but not Certain |
| 4. Affect | 52 | ADD Probable but not Certain |
| 5. Memory | 62 | Clinically Significant |
| **ADD Total Score** | **59** | **Problematic** |

Meaghan also completing these ratings with the examiner during the psychological testing. She reported clinically significant concerns in all areas with the most difficulty related to her ability to initiate and organize tasks (Cluster #1 – Activation). Meaghan also reported major concerns related to her ability to sustain effort on complex academic tasks (Cluster #2) and her working memory (Cluster #5). Meaghan's self-ratings on the individual Cluster Scales, as well as the Total Score and resulting ranges are presented in the table below:

| Brown ADD Cluster | T-Score | Range |
|---|---|---|
| 1. Activation | 89 | Clinically Significant |
| 2. Attention | 71 | Clinically Significant |
| 3. Effort | 81 | Clinically Significant |
| 4. Affect | 67 | Clinically Significant |
| 5. Memory | 82 | Clinically Significant |
| **ADD Total Score** | **84** | **Clinically Significant** |

**Executive Functioning:** Meaghan and her fiancé were also asked to complete the Behavior Rating of Executive Function–Adult version (BRIEF-A) to provide a standardized measure of her executive functions or self-regulation in her everyday life. Meaghan completed the Self-Report form while her fiancée completed the Informant measures.

This assessment tool is designed to be completed by adults 18 to 90 years of age with a wide variety of developmental, systemic, neurological, and attention problems, including learning disabilities and AD/HD. Seventy-five items were completed that are designed to measure behavioral regulation and metacognitive skills. These skills include inhibiting, self-monitoring, planning and organizing activities, shifting attention, initiating tasks, self-monitoring, emotional controls, working memory and organization of materials.

The Inhibit Scale measures the ability to inhibit, resist, or not act on impulse and the ability to stop one's one behavior at the appropriate time. The Shift Scale assesses whether an individual can move freely from one situation, activity, or aspect of a problem to another as the circumstances demand. Key aspects of Shifting include the ability to make transitions, problem solve flexibly, switch or alternate attention and change focus from one mindset or topic to another.

The Emotional Control Scale measures an adult's ability to modulate emotional responses and can be expressed as lability or explosiveness, such as, overreacting to seemingly minor events.

The Self-Monitor Scale measures the extent to which the adult keeps track of his/her own behavior and the effect of his/her behavior on others. Problems in this area are usually associated with failing to appreciate or have an awareness of one's own social behavior and the effect this might have on others.

The Initiate Scale relates to the ability to begin a task or activity and includes skills, such as, generating ideas, responses, or problem solving strategies. Although an individual may want to succeed on a task, they may have trouble getting started and need extensive prompts or cues to begin a task or activity.

Items on the Working Memory Scale assess the individual's ability to actively hold information in mind for the purpose of completing a task or generating a response. Everyday cognitive tasks include carrying out multi-step directions, implementing a sequence of actions, or following complex directions.

The Plan/Organize Scale measures the adult's ability to manage current and future oriented tasks within the situational context. Planning refers to the ability to anticipate future events, implement instructions or goals, and develop appropriate steps ahead of time to carry out a task or activity. This generally involves setting a goal and then selecting the most effective way of achieving it. This includes an individual's ability to start tasks on a timely basis as well as obtain, in advance, the correct tools or materials necessary to complete the activity. The Organize component assess the ability to bring order to the information, actions, or materials to achieve an objective. Individuals who struggle in this area often approach tasks in a haphazard fashion or become easily overwhelmed by large amounts of information or actions.

The Task Monitor Scale measures the extent to which the adult keeps track of his/her own success or failure, such as, the ability to catch mistakes. The Organization of Materials Scale measures the orderliness of the individual's everyday environment.

Meaghan's and her fiancé's ratings varied and the ranges of the assessment are presented below.

| BRIEF-A Cluster | T-Score Self Report/Informant | Range |
|---|---|---|
| Behavior Regulation Index | 60/54 | Typical/Typical |
| Inhibit | 46/60 | Typical/Clinically Significant* |
| Shift | 51/46 | Typical/Typical |
| Emotional Control | 58/54 | Typical/Typical |
| Self-Monitor | 54/54 | Typical/Typical |

(* with margin of error)

| Metacognitive Index | 76/56 | Clinically Significant/Typical |
| Initiate | 76/48 | Clinically Significant/Typical |
| Working Memory | 76/58 | Clinically Significant/Typical |
| Plan/Organize | 70/49 | Clinically Significant/Typical |
| Task Monitor | 72/57 | Clinically Significant/Typical |
| Organization of Materials | 69/65 | Clinically Significant on Both |

**Global Executive Composite 71/55**          **Clinically Significant/Typical**

In general, Meaghan reported Clinically Significant issues on the Scale assessing her ability to initiate and organize tasks and her environment. She also reported clinically significant concerns related to working memory and self-monitoring. Her fiancés ratings indicated some concerns in these areas but not to the same degree. Clinically significant problems with organization of materials and their living environment rating were reported by Meaghan and her fiancé.

**Educational Achievement:** Because of concerns related to Meaghan's AD/HD, anxiety, and dyslexia and their impact on her learning and her ability to complete tests/exams, the Nelson Denny Reading Test and the Wechsler Individual Achievement Test – Third Edition (WIAT-III) were administered.

The Nelson Denny Reading Test provided a measure of Meaghan's Vocabulary, Reading Comprehension, Reading Rate as well as an Overall Reading Score. This test used a Scantron multiple-choice format similar to most group-administered tests. The tests were administered under standardized and extended time conditions to provide an accurate and fair measure of Meaghan's skills.

In the Vocabulary section, Meaghan was able to complete 72 of the 80 items within the standardized time. Her accuracy was 90.3% correct. Lola's Vocabulary Score under this condition fell in the average range at the 41st percentile, at the 15.9 grade level. This was not as strong as her very superior Vocabulary subtest score on the WAIS-IV. When given extended time, Meaghan was able to complete the remaining 8 items. Her accuracy remained high even on these more difficult words (90% correct). Meaghan's Vocabulary subtest score under the extended time conditions improved and fell at the 46th percentile, at the 16.3 grade level.

The most remarkable score on this measure was noted on Meaghan's Reading Rate based on the amount of text she read in one minute. Meaghan's Reading Rate fell in the borderline or slow learner range at the 6th percentile. This confirmed her Specific Learning Disorder with Impairment in Reading: reading *This indicated a functional impairment that would affect her ability to do reading tasks in day-to-day situations as well as complex learning situations. Despite her slow Reading Rate, Meaghan's Comprehension score fell in the mid-average range at the 54th percentile, at the 17.1 grade level. Her accuracy was 89% correct.

Meaghan's Total Reading score on the Nelson Denny, based on the standardized test conditions, fell in the mid-average range at the 46th percentile, at the 16.6 grade level. The three additional minutes on the Vocabulary subtest did not improve her Total Reading score.

To complement the testing on the Nelson Denny Reading Test, the Wechsler Individual Achievement Test–Third Edition (WIAT-III) was also administered to obtain a comprehensive measure of her academic skills.

In the Oral Language area, Meaghan's listening comprehension and oral expression were assessed. On the Listening Comprehension subtest, her receptive vocabulary and oral discourse comprehension were measured. On the Receptive Vocabulary component, Meaghan was asked to point to the picture from an array of four pictures that best portrayed the word presented. Her score on this measure fell in the superior range at the 91st percentile, consistent with her very superior vocabulary score on the intelligence test. On the Oral Discourse Comprehension component, Meaghan listened to a variety of passages and she was then questioned about what she heard. Her score on this measure of her auditory attention and comprehension fell in the high average range at the 82nd percentile. Based on the above two tasks, Meaghan's Listening Comprehension subtest score fell in the high average range at the 88th percentile.

In the Oral Expression area, three components were presented. Meaghan was first asked to name the concept presented in a picture accompanied by an oral definition of the word. Her score on this measure fell in the superior range at the 96th percentile. Meaghan's Oral Word Fluency was measured by having her name everyday items in a category within a one-minute period. Her score on this measure fell in the very superior range at the 99th + percentile. Meaghan was then asked to repeat sentences of increasing length. Her Sentence Repetition Score fell in the superior range at the 91st percentile. Meaghan's Oral Expression subtest score, based on the above three components, fell in the very superior range at the 99+th percentile, consistent with her Verbal Comprehension Index on the WAIS-IV.

Meaghan's Oral Language Composite, based on the above two subtests, fell in the superior range at the 99th percentile and it was generally consistent with her Verbal Comprehension Index on the WAIS-IV. It was a significant relative strength when compared with her academic Composites in all other areas (Basic Reading, Reading Comprehension and Fluency, Total Reading, Written Expression, Mathematics and Math Fluency).

In the Reading area, Meaghan's sight vocabulary, decoding skills, oral reading fluency, and comprehension were assessed on timed and untimed measures. On the Word Reading subtest, a measure of Meaghan's sight vocabulary, she was asked to read a list of increasingly difficult words. Her score on this measure, reflecting her accuracy, fell in the high average range at the 77th percentile. The most remarkable score on this task was Meaghan's Reading Rate, which was slower than 99% of students her age. On the Pseudoword Decoding subtest, she was asked to sound out increasingly difficult nonsense

words to assess her reading mechanics (phonics). The accuracy of Meaghan's decoding fell at the low end of the average range at the 27th percentile. This was her weakest score during the educational testing and reflected her early and ongoing reading problems. Her decoding speed on this task was slower than 75% of students her age.

Meaghan's Basic Reading Composite, based on these two subtests assessing the accuracy of her reading mechanics, fell in the mid-average range at the 50th percentile. This was a significant relative weakness when compared with her overall intelligence as well as her academic Composites in all other areas (Oral Language, Total Reading, Reading Comprehension and Fluency, Written Expression, Mathematics, and Math Fluency). The most remarkable observation was Meaghan's slow reading and decoding speeds which indicated a Specific Learning Disorder with Impairment in Reading: reading rate/fluency (DSM-V 315.00 ICD-10 F81.0). This is consistent with her very slow reading rate on the Nelson Denny, which fell in borderline or slow learner range.

On the Reading Comprehension subtest, Meaghan was asked to read passages aloud or silently under untimed conditions and then questioned about each one. Unlike the Nelson Denny Reading Test where multiple-choice options were presented under timed conditions, Meaghan responded at her own pace by answering comprehension questions posed by the examiner. Meaghan's Reading Comprehension subtest score under these conditions fell in the high average range at the 87th percentile. This was a significant relative strength when compared with the timed measures of her reading comprehension. On the Oral Reading Fluency subtest, Meaghan was asked to read passages aloud to assess her accuracy and speed. Her Oral Reading Accuracy fell at the low end of the average range at the 34th percentile. Meaghan's errors typically involved word endings or misreading a visually similar word. However, she corrected many of her mistakes. Her Oral Reading Rate on this task fell in the average range at the 61st percentile. Based on these two measures, Meaghan's Oral Reading Fluency subtest score fell in the average range at the 61st percentile. This was a significant relative weakness when compared with her overall intelligence.

Meaghan's Reading Comprehension and Fluency Composite, based on the above timed and untimed subtests, fell in the high average range at the 82nd percentile. Her reading comprehension obtained under untimed conditions was much stronger than that on the timed Nelson Denny Reading subtest. Meaghan's Reading Comprehension and Fluency Composite on the WIAT-III was a significant relative strength when compared with her academic Composites in Total Reading and Basic Reading. It was a significant relative weakness when compared with her academic Composites in Oral Language and Mathematics.

Meaghan's Total Reading Composite, based on the above timed and untimed measures of her reading mechanics, comprehension and fluency on timed and untimed measures, fell in the average range at the 66th percentile. This was a significant relative weakness when compared with her overall intelligence as well as her academic Composites in Oral Language, Basic Reading, Mathematics, and Math Fluency. It was also weaker than her Written Expression Composite but the difference was not statistically significant.

Significant variability was noted in Meaghan's reading skills with a significant relative weakness noted in her reading/decoding speeds, which fell well below average. This is consistent with her slow reading rate obtained on the timed Nelson Denny subtest, which fell in the borderline or slow learner range. This confirmed Meaghan's Specific Learning Disorder in Reading: rate (DSM-V 315.00 ICD-10 F81.0). Because of her slow reading rate, Meaghan's reading comprehension was much stronger under untimed conditions and fell at the 87th percentile. On the Nelson Denny timed reading test, her comprehension score fell in the mid-average range.

In the Written Language area, several subtests were administered to assess Meaghan's skills. On the Sentence Composition subtest, she was asked to combine information from two or three sentences into a single sentence that meant the same thing (Sentence Combining). She was then asked to write sentences using the specific words (Sentence Building). Her Sentence Combining score fell in the average range at the 42nd percentile while her Sentence Building score fell on the strong side of the average range at the 63rd percentile. Meaghan tended to make more errors of writing mechanics when she had to integrate the information from several sentences. When writing sentences with words of her own choosing, she tended to keep them very simple and the words easy to spell. Meaghan's Sentence Composition subtest score, based on these two components, fell in the mid-average range at the 53rd percentile. On the Spelling subtest, Meaghan was asked to write individual words from dictation. Again, with fewer elements to manage, her Spelling fell in the high average range at the 82nd percentile

To assess her essay composition skills, Meaghan was asked to write about a topic and give three reasons to justify her selection. Meaghan was able to complete her essay within the 10-minute time limit. Her Word Count, a measure of her production and effort on this task, fell in the superior range at the 92nd percentile. Her Essay Composition Grammar and Mechanics score fell in the high average-to-superior range at the 90th percentile. In general, Meaghan sometimes did not fully develop her ideas. Her Theme Development and Text Organization Score fell on the strong side of the average range at the 66th percentile. Meaghan's Essay Composition subtest score, based predominantly on her Word Count and writing mechanics, fell at the high average range at the 84th percentile.

Meaghan's Written Expression Composite, based on her scores on the above subtests, fell in the high average range at the 79th percentile. This was a significant relative weakness when compared with her very superior Oral Language Composite and superior Mathematics Composite. It was a significant relative strength when compared with her Basic Reading Composite.

In the Mathematics area, Meaghan's written calculation and understanding/application of math concepts were assessed on two untimed measures. On the Math Problem Solving subtest, her spatial reasoning, ability to solve word problems, and application of mathematical concepts were assessed. Meaghan's score on this measure fell in the high average range at the 84th percentile. When given the accommodation of a calculator, her score improved and fell in the superior range at the 91st percentile. Her responses were

more accurate when solving more complex problems or those containing multiple steps. On the Numerical Operations worksheet, Meaghan was asked to complete a variety of problems to assess her written calculation skills. Her score on this measure fell in the very superior range at the 98th percentile. When allowed to use a calculator to perform some of the multi-step problems, her score improved and fell in the very superior range at the 99+th percentile.

Meaghan's Mathematics Composite, based on the above two subtests, fell in the superior range at the 95th percentile. When she was given the accommodation of a calculator, her score improved and fell in the very superior range at the 98th percentile. Under the standard conditions, Meaghan's Mathematics Composite was a significant relative strength when compared with her academic Composites in Total Reading, Basic Reading, Reading Comprehension and Fluency, and Math Fluency. It was a significant relative weakness when compared with her Oral Language Composite. When given the use of a calculator, however, Meaghan's Mathematics Composite was consistent with her Oral Language Composite.

Three separate worksheets with basic addition, subtraction, and multiplication problems were presented to Meaghan to complete within a 60-second period to assess her math fluency in each area. Her Math Fluency–Addition subtest score fell in the high average range at the 86th percentile. Meaghan was able to self-correct any errors and complete the problems just under the time limit. Her Math Fluency–Subtraction subtest score fell in the high average range at 87th percentile. Meaghan made one fact error but otherwise she worked very quickly and accurately. Meaghan's Math Fluency–Multiplication subtest score fell in the high average range at the 86th percentile. She completed almost all of the problems, correcting her errors when she noted them.

Meaghan's Math Fluency Composite, based on the above three timed subtests, fell in the high average range at the 88th percentile. This was a significant relative weakness when compared with her academic Composites in Oral Language and Mathematics. It was a significant relative strength when compared with her academic Composites in Total Reading and Basic Reading.

Meaghan's Total Achievement Composite, based on the above battery of academic tests, fell in the superior range at the 92nd percentile, which was generally consistent with her overall intelligence. When given the use of a calculator, Meaghan's Total Achievement Composite improved and fell in the 94th percentile. Significant variability was noted in her educational skills. Relative strengths were noted in her very superior Oral Language and superior Mathematics Composites. Even in areas where she was successful, Meaghan benefitted from the accommodation of a calculator on the untimed math tasks. Her Written Expression and Reading Comprehension and Fluency fell solidly in the high average range and was stronger than the timed measures of her Reading Comprehension on the Nelson Denny. Significant variability was noted in Meaghan's reading skills. The accuracy of her sight vocabulary fell in the high average range but her ability to decode words fell at the low end of the average range. The most remarkable observation regarding Meaghan's Reading was her slow reading and decoding rate. On the measure

of Meaghan's sight vocabulary, her reading speed was slower than 90% of students her age and her decoding speed was slower than 75% of students her age. On the timed Nelson Denny subtest, her Reading Speed fell in the borderline or slow learner range at the 6th percentile. This indicated a Specific Learning Disorder with Impairment in Reading: rate (DSM-V 315.00 ICD-10 F81.0). This indicates a Functional Impairment for which the accommodation of extended time is needed to produce fair and unbiased measures of Meaghan's skills on academic and daily tasks where reading is required. Meaghan's writing skills fell in the high average range, although she had more issues when asked to integrate information from several sentences than when asked to compose sentences on her own. Her spelling of individual words was strong

**Social-Emotional Functioning:** Both direct and indirect measures were used to assess Meaghan's social-emotional functioning.

As a part of the evaluation, Meaghan completed the Achenbach Adult Self-Report (ASR) to obtain further information related to her perceptions of her competencies and challenges. Meaghan reported that she is most concerned about getting through medical school. She reported that she generally did well in elementary and middle school with accommodations and interventions including tutoring to address her learning disability in Reading. When she made the transition to high school with the increasing demand of a challenging curriculum, she benefitted from medical management of her AD/HD symptoms. In college, Meaghan was also diagnosed with an Anxiety Disorder and additional medication was prescribed to help her manage these symptoms.

Meaghan's self-ratings on the Adult Self-Report indicated clinically significant problems on the Attention Deficit/Hyperactivity Scale. These were noted on both AD/HD Subscales measuring Inattentive and Hyperactive/Impulsive symptoms. Meaghan reported clinically significant concerns on the Anxiety Problems Scale as well. Some depressive symptoms, related to her fatigue and need for sleep, were also noted on the Depressive Problems Scale.

On the Revised Manifest Anxiety Scale, Meaghan responded to 49 questions designed to assess the level and nature of her anxiety. She reported the most concerns related to the physical symptoms she experiences, including those related to her sleeping issues (waking up scared sometimes, having a hard time getting to sleep at night, bad dreams, often feeling fatigue), as well as her sweaty hands, psychomotor restlessness, and having a hard time keeping her mind on her schoolwork. Meaghan also reported a significant number of concerns on the Worry Scale. These include the fact that she is often nervous, gets nervous around people, worries a lot of the time, worries about what others (including her parents) think about her or will say to her, worries about making a mistake in front of people, and worries about what is going to happen in general. Meaghan's responses indicated a Generalized Anxiety Disorder (DSM-V 300.02 ICD-10 F41.1) Moderate Severity with most of her difficulties related to the physical symptoms of anxiety.

## SUMMARY OF FINDINGS AND IMPRESSIONS:

In summary, Meaghan's overall intelligence fell in the superior range with significant variability noted in her cognitive profile. Measures of her Verbal Comprehension fell in the very superior range, while her overall nonverbal problem solving fell in the superior range. On measures of her working memory, Meaghan struggled when asked to repeat or reverse progressively longer number series. However, she did well solving Arithmetic word problems without the use of paper and pencil, especially when she was given extended time. Meaghan's score improved significantly and fell in the very superior range using this accommodation. Meaghan's overall weakest score was noted in the Processing Speed Scale, on a visually complex task where she was asked to discriminating symbols. Although her accuracy was perfect, Meaghan slowed her work speed in order do her best. Timed measures consistently underestimated Meaghan's skills, even in areas where she was successful.

On the concurrent measures of her working memory, Meaghan was more successful learning and retaining new verbal content when it was simple and repeated several times. She learned information satisfactorily when it was presented within a meaningful context, and Meaghan's delayed recall was stronger than her initial learning when she was given additional processing time to aid her memory. The use of structured formats under both conditions allowed Meaghan to produce accurate and reliable measures of her learning.

Meaghan's overall achievement fell in the superior range and it was generally consistent with her overall intelligence. When given the use of a calculator, her overall achievement was even stronger. Significant variability was noted in Meaghan's educational skills, with relative strengths noted in her very superior Oral Language and superior Mathematics Composites. Her Written Expression and Reading Comprehension fell in the high average range and was stronger than the timed measures of her Reading Comprehension on the Nelson Denny. Significant variability was noted in Meaghan's reading skills. The accuracy of her sight vocabulary fell in the high average range but her ability to decode words fell at the low end of the average range. The most remarkable observation was Meaghan's slow reading and decoding speed. On the measure of her sight vocabulary, Meaghan's reading speed was slower than 90% of students her age and her decoding speed was slower than 75% of students her age. On the timed Nelson Denny subtest, Meaghan's Reading Speed fell in the borderline or slow learner range at the 6th percentile. This indicated a Specific Learning Disorder with Impairment in Reading: rate (DSM-V 315.00 ICD-10 F81.0). This creates a Functional Impairment for which the accommodation of extended time is needed to produce fair and unbiased measures of Meaghan's skills on academic and daily tasks where reading is required.

Behavioral ratings by Meaghan and other informants (her father and fiancé) on several measures indicated clinically significant symptoms of Attention Deficit/Hyperactivity Disorder – Combined Type (DSM-V 314.01 ICD-10 F *).

The concurrent social-emotional testing indicated a Generalized Anxiety Disorder (DSM-V 300.02 ICD-10 F41.1) Moderate Severity with most of her difficulties related to the

physical symptoms of anxiety. The results of this testing should be reviewed by Meaghan's psychiatrist to determine whether the dosage of her medical management is within a therapeutic range.

It is recommended that the current psychological and educational evaluation be reviewed so that continued accommodations are provided to address Meaghan's Specific Learning Disorder with impairment in Reading rate, AD/HD- Combined Type, and Generalized Anxiety Disorder. These accommodations should include the following:

1. Assistive technologies, such as, a computer as a learning tool, calculator, tape recorder and other recording devices, as well as digital recordings of books in content subjects should be employed as needed to help Meaghan compensate for her slow reading speed.
2. Meaghan should be able to take tests in a room free from distractions as needed to help her focus better, especially during exams and other high stakes testing.
3. Preferential seating should be used to ensure Meaghan's ability to attend and focus on the classroom instruction.
4. Extended (150%) time should be provided to compensate for Meaghan's Specific Learning Disorder with impairment in Reading: rate (DSM-V 315.00) as well as issues related to her Attention Deficit/Hyperactivity Disorder and Anxiety Disorder
5. Regular breaks should be provided during exams and standardized tests as well as other academic tasks performed for sustained periods of time. This will ensure fair and unbiased measures of Meaghan's skills.
6. Accommodations should also be applied to standardized and high stakes testing.

Test scores and supporting materials accompany this report. These problems create a functional impairment not only to her academic performance but also Meaghan's ability to complete every day tasks, especially those requiring reading. It is strongly recommended that she be given every consideration in her application for these accommodations.

Further information related to this evaluation will be provided to the relevant professionals at Ms. Doherty's request.

M. Patricia Brockman

M. Patricia Brockman, Ph.D.
Licensed Psychologist #574

# WAIS-IV Integrated Tables and Graphs Report - (United States)

| | |
|---|---|
| EXAMINEE: | Meaghan Doherty |
| AGE: | 23 years |
| DATE OF BIRTH: | 08/17/1993 |
| SCHOOL | Tulane School of Medicine |
| GENDER | Female |

REPORT DATE: 03/29/2017

EXAMINER: M. Patricia Brockman, Ph. D.

**Test Administered:** WAIS-IV Core/Supplemental (03/29/2017)

Age at Testing: (23 years)

### Composite Scores Summary

| Scale | Sum of Scaled Scores | Composite Score | Percentile Rank | 90% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|
| Verbal Comprehension (VCI) | 52 | 145 | 99.6 | 138-148 | Very Superior |
| Perceptual Reasoning (PRI) | 43 | 125 | 95 | 119-129 | Superior |
| Working Memory (WMI) | 23 (26)* | 108 (117)* | 70 (87)* | 102-113 (110-122)* | Average (High Average)* |
| Processing Speed (PSI) | 18 | 94 | 34 | 96 | Average |
| Full Scale (FSIQ) | 136 (114)* | 128 (128)* | 96 (97)* | 122-129 (124-131)* | Superior (Superior)* |

### Verbal Comprehension Subtest Score Summary (Total Raw Score to Scaled Score Conversions)

| Subtest | Raw Score | Scaled Score | Percentile Rank |
|---|---|---|---|
| Similarities | 35 | 18 | 99 |
| Vocabulary | 54 | 19 | 99 |
| Information | 21 | 15 | 95 |

### Perceptual Reasoning Subtest Score Summary (Total Raw Score to Scaled Score Conversions)

| Subtests | Raw Score | Scaled Score | Percentile Rank |
|---|---|---|---|
| Block Design | 64 | 17 | 98 |
| Matrix Reasoning | 19 | 10 | 50 |
| Visual Puzzles | 24 | 16 | 98 |

### Working Memory Subtest Score Summary (Total Raw Score to Scaled Score Conversions)

| Subtests | Raw Score | Scaled Score | Percentile Rank |
|---|---|---|---|
| Digit Span | 27 | 9 | 37 |
| Arithmetic | 19(21)* | 14(17)* | 91(98)* |

### Processing Speed Subtest Scores Summary (Total Raw Score to Scaled Score Conversions)

| Subtests | Raw Score | Scaled Score | Percentile Rank |
|---|---|---|---|
| Coding (CD) | 73 | 10 | 50 |
| Symbol Search (SS) | 29 | 8 | 25 |

** Extended Time



| Student Name: | Meaghan Doherty | Date of Report: | 4/3/2017 |
|---|---|---|---|
| School: | Tulane Univerity | Program: | School Of Medicine |
| Date of Birth: | 8/17/1993 | Home Language: | English |
| Gender: | Female | Handedness: | Right |
| Race/Ethnicity: | White | Examiner Name: | M. Patricia Brockman, Ph.D. |

Test Administered:     WIAT-III (3/31/2017)    Age at Testing: 23 years 7 months    Retest?   No

WIAT-III Comments:    Standard Administration

## WIAT-III

Age Based Scores

### Subtest Score Summary

| Subtest | Raw Score | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Grade Equiv. | Age Equiv. | Growth Score |
|---|---|---|---|---|---|---|---|---|---|
| Listening Comprehension | — | 118 | 111–125 | 88 | 75 | 7 | N/A | N/A | N/A |
| Reading Comprehension | 46* | 117 | 107–127 | 87 | 74 | 7 | N/A | N/A | N/A |
| Math Problem Solving | 64 | 115 | 109–121 | 84 | 71 | 7 | N/A | N/A | N/A |
| Sentence Composition | — | 101 | 91–111 | 53 | 51 | 5 | N/A | N/A | N/A |
| Word Reading | 71 | 111 | 105–117 | 77 | 65 | 7 | N/A | N/A | N/A |
| Essay Composition | — | 115 | 106–124 | 84 | 71 | 7 | N/A | N/A | N/A |
| Pseudoword Decoding | 35 | 91 | 87–95 | 27 | 37 | 4 | N/A | N/A | N/A |
| Numerical Operations | 57 | 131 | 127–135 | 98 | 94 | 9 | N/A | N/A | N/A |
| Oral Expression | — | 140 | 132–148 | 99.6 | >99 | 9 | N/A | N/A | N/A |
| Oral Reading Fluency | 156* | 104 | 98–110 | 61 | 56 | 6 | N/A | N/A | N/A |
| Spelling | 56 | 114 | 109–119 | 82 | 70 | 7 | N/A | N/A | N/A |
| Math Fluency—Addition | 48 | 116 | 106–126 | 86 | 72 | 7 | N/A | N/A | N/A |
| Math Fluency—Subtraction | 47 | 117 | 110–124 | 87 | 74 | 7 | N/A | N/A | N/A |
| Math Fluency—Multiplication | 39 | 116 | 108–124 | 86 | 72 | 7 | N/A | N/A | N/A |

— Indicates a subtest with multiple raw scores (shown in the Subtest Component Score Summary).
* Indicates a raw score that is converted to a weighted raw score (not shown).
† Indicates that a raw score is based on a below grade level item set.

### Supplemental Subtest Score Summary

| Score Name | Raw Score | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Grade Equiv. | Age Equiv. | Growth Score |
|---|---|---|---|---|---|---|---|---|---|
| Essay Composition: Grammar and Mechanics | 183 | 119 | 109–129 | 90 | 77 | 8 | N/A | N/A | N/A |
| Oral Reading Accuracy | 372* | 94 | 81–107 | 34 | 42 | 4 | N/A | N/A | N/A |
| Oral Reading Rate | 143* | 104 | 97–111 | 61 | 56 | 6 | N/A | N/A | N/A |

* Indicates a raw score that is converted to a weighted raw score (not shown).

Copyright © 2009 NCS Pearson, Inc. All rights reserved.
Produced in the United States of America.



## Cumulative Percentages

| | |
|---|---|
| Word Reading Speed | The score is the same as or higher than the scores obtained by 10% of students in the normative sample; 90% of students in the normative sample scored higher than this score. |
| Pseudoword Decoding Speed | The score is the same as or higher than the scores obtained by 25% of students in the normative sample; 75% of students in the normative sample scored higher than this score. |

## Subtest Component Score Summary

| Subtest Component | Raw Score | Standard Score | Percentile Rank | Normal Curve Equivalent | Stanine | Qualitative Description |
|---|---|---|---|---|---|---|
| **Listening Comprehension** | | | | | | |
| Receptive Vocabulary | 18 | 120 | 91 | 78 | 8 | Above Average |
| Oral Discourse Comprehension | 23 | 114 | 82 | 70 | 7 | Average |
| **Sentence Composition** | | | | | | |
| Sentence Combining | 17 | 97 | 42 | 46 | 5 | Average |
| Sentence Building | 26 | 105 | 63 | 57 | 6 | Average |
| **Essay Composition** | | | | | | |
| Word Count | 196 | 121 | 92 | 79 | 8 | Above Average |
| Theme Development and Text Organization | 11 | 106 | 66 | 58 | 6 | Average |
| **Oral Expression** | | | | | | |
| Expressive Vocabulary | 17 | 126 | 96 | 87 | 9 | Above Average |
| Oral Word Fluency | 58 | 144 | 99.8 | >99 | 9 | Superior |
| Sentence Repetition | 27 | 120 | 91 | 78 | 8 | Above Average |

## Composite Score Summary

| Composite | Sum of Subtest Standard Scores | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Qualitative Description |
|---|---|---|---|---|---|---|---|
| Oral Language | 258 | 134 | 128–140 | 99 | 98 | 9 | Superior |
| Total Reading | 423 | 106 | 103–109 | 66 | 58 | 6 | Average |
| Basic Reading | 202 | 100 | 97–103 | 50 | 50 | 5 | Average |
| Reading Comprehension and Fluency | 221 | 114 | 107–121 | 82 | 70 | 7 | Average |
| Written Expression | 330 | 112 | 106–118 | 79 | 67 | 7 | Average |
| Mathematics | 246 | 125 | 122–128 | 95 | 85 | 8 | Above Average |
| Math Fluency | 349 | 118 | 112–124 | 88 | 75 | 7 | Above Average |
| Total Achievement | 1143 | 121 | 118–124 | 92 | 79 | 8 | Above Average |

Copyright © 2009 NCS Pearson, Inc. All rights reserved.
Produced in the United States of America.

Ex. E - 21



# WIAT-III

## Clinician Report

| Student Name: | Meaghan Doherty | Date of Report: | 4/3/2017 |
|---|---|---|---|
| School: | Tulane University | Program: | School of Medicine |
| Date of Birth: | 8/17/1993 | Home Language: | English |
| Gender: | Female | Handedness: | Right |
| Race/Ethnicity: | White | Examiner Name: | M. Patricia Brockman, Ph.D. |

Test Administered: WIAT-III (3/31/2017)  Age at Testing: 23 years 7 months   Retest? No

WIAT–III Comments: Accommodations – Calculator on Mathematics tasks

## WIAT–III

Age Based Scores

### Subtest Score Summary

| Subtest | Raw Score | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Grade Equiv. | Age Equiv. | Growth Score |
|---|---|---|---|---|---|---|---|---|---|
| Listening Comprehension | — | 118 | 111–125 | 88 | 75 | 7 | N/A | N/A | N/A |
| Reading Comprehension | 46* | 117 | 107–127 | 87 | 74 | 7 | N/A | N/A | N/A |
| Math Problem Solving | 66 | 120 | 114–126 | 91 | 78 | 8 | N/A | N/A | N/A |
| Sentence Composition | — | 101 | 91–111 | 53 | 51 | 5 | N/A | N/A | N/A |
| Word Reading | 71 | 111 | 105–117 | 77 | 65 | 7 | N/A | N/A | N/A |
| Essay Composition | — | 115 | 106–124 | 84 | 71 | 7 | N/A | N/A | N/A |
| Pseudoword Decoding | 35 | 91 | 87–95 | 27 | 37 | 4 | N/A | N/A | N/A |
| Numerical Operations | 59 | 137 | 133–141 | 99 | >99 | 9 | N/A | N/A | N/A |
| Oral Expression | — | 140 | 132–148 | 99.6 | >99 | 9 | N/A | N/A | N/A |
| Oral Reading Fluency | 156* | 104 | 98–110 | 61 | 56 | 6 | N/A | N/A | N/A |
| Spelling | 56 | 114 | 109–119 | 82 | 70 | 7 | N/A | N/A | N/A |
| Math Fluency—Addition | 48 | 116 | 106–126 | 86 | 72 | 7 | N/A | N/A | N/A |
| Math Fluency—Subtraction | 47 | 117 | 110–124 | 87 | 74 | 7 | N/A | N/A | N/A |
| Math Fluency—Multiplication | 39 | 116 | 108–124 | 86 | 72 | 7 | N/A | N/A | N/A |

— Indicates a subtest with multiple raw scores (shown in the Subtest Component Score Summary).
\* Indicates a raw score that is converted to a weighted raw score (not shown).
† Indicates that a raw score is based on a below grade level item set.

### Supplemental Subtest Score Summary

| Score Name | Raw Score | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Grade Equiv. | Age Equiv. | Growth Score |
|---|---|---|---|---|---|---|---|---|---|
| Essay Composition: Grammar and Mechanics | 183 | 119 | 109–129 | 90 | 77 | 8 | N/A | N/A | N/A |
| Oral Reading Accuracy | 372* | 94 | 81–107 | 34 | 42 | 4 | N/A | N/A | N/A |
| Oral Reading Rate | 143* | 104 | 97–111 | 61 | 56 | 6 | N/A | N/A | N/A |

\* Indicates a raw score that is converted to a weighted raw score (not shown).

Copyright © 2009 NCS Pearson, Inc. All rights reserved.
Produced in the United States of America.



## Cumulative Percentages

| | |
|---|---|
| Word Reading Speed | The score is the same as or higher than the scores obtained by 10% of students in the normative sample; 90% of students in the normative sample scored higher than this score. |
| Pseudoword Decoding Speed | The score is the same as or higher than the scores obtained by 25% of students in the normative sample; 75% of students in the normative sample scored higher than this score. |

## Subtest Component Score Summary

| Subtest Component | Raw Score | Standard Score | Percentile Rank | Normal Curve Equivalent | Stanine | Qualitative Description |
|---|---|---|---|---|---|---|
| **Listening Comprehension** | | | | | | |
| Receptive Vocabulary | 18 | 120 | 91 | 78 | 8 | Above Average |
| Oral Discourse Comprehension | 23 | 114 | 82 | 70 | 7 | Average |
| **Sentence Composition** | | | | | | |
| Sentence Combining | 17 | 97 | 42 | 46 | 5 | Average |
| Sentence Building | 26 | 105 | 63 | 57 | 6 | Average |
| **Essay Composition** | | | | | | |
| Word Count | 196 | 121 | 92 | 79 | 8 | Above Average |
| Theme Development and Text Organization | 11 | 106 | 66 | 58 | 6 | Average |
| **Oral Expression** | | | | | | |
| Expressive Vocabulary | 17 | 126 | 96 | 87 | 9 | Above Average |
| Oral Word Fluency | 58 | 144 | 99.8 | >99 | 9 | Superior |
| Sentence Repetition | 27 | 120 | 91 | 78 | 8 | Above Average |

## Composite Score Summary

| Composite | Sum of Subtest Standard Scores | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Qualitative Description |
|---|---|---|---|---|---|---|---|
| Oral Language | 258 | 134 | 128–140 | 99 | 98 | 9 | Superior |
| Total Reading | 423 | 106 | 103–109 | 66 | 58 | 6 | Average |
| Basic Reading | 202 | 100 | 97–103 | 50 | 50 | 5 | Average |
| Reading Comprehension and Fluency | 221 | 114 | 107–121 | 82 | 70 | 7 | Average |
| Written Expression | 330 | 112 | 106–118 | 79 | 67 | 7 | Average |
| Mathematics | 257 | 131 | 128–134 | 98 | 94 | 9 | Superior |
| Math Fluency | 349 | 118 | 112–124 | 88 | 75 | 7 | Above Average |
| Total Achievement | 1154 | 123 | 120–126 | 94 | 82 | 8 | Above Average |

Copyright © 2009 NCS Pearson, Inc. All rights reserved.
Produced in the United States of America.

Ex. E - 23

## Wide Range Assessment of Memory and Learning-Second Edition (WRAML2)

|  | Standard Score | Percentile | Range |
|---|---|---|---|
| Verbal Learning | 13 | 84 | High Average |
| Delayed Recall | 13 | 84 | High Average |
| Verbal Learning Recognition | 13 | 84 | High Average |
| Story Memory | 11 | 63 | Average |
| Delayed Recall | 12 | 75 | High Average |
| Story Memory Recognition | 12 | 75 | High Average |

## Nelson Denny Reading Test

|  | Standard Score | Percentile | Grade Equiv. |
|---|---|---|---|
| Vocabulary | 233 | 41 | 15.9 |
| (with 150% time) | 235 | 46 | 16.3 |
| Comprehension | 235. | 54 | 17.1 |
| Total | 236 | 46 | 16.6 |
| (with 150% time) | 233 | 41 | 16.1 |
| Reading Rate | 181 | 6 | Borderline/Slow Learner |

# EXHIBIT F

Addendum:
April 19, 2019

Meaghan Doherty
Psychological /Educational Evaluation of March 31, 2017

I have reviewed the letter of February 14, 2018 in which the NBME rejected Meaghan Doherty's request for accommodations for the USMLE Step 1 test (USMLE ID#:5-397-670-0). There are several important issues that that report overlooked or failed to consider.

Meaghan's Nelson Denny Reading Test (NDRT) Reading Rate score fell at the 6th percentile, placing her in the borderline or slow learner. The NBME letter then stated that the NDRT Reading Rate "is not considered by experts to be a reliable measure of reading efficiency because, as your evaluator acknowledges, it is determined on the basis of a single, one-minute sample of words-per-minute." The letter went on to state that the NDRT Technical Report for Forms G & H (1993) reports that Reading Rate reliability to be quite low, with a coefficient of only 0.68." These concerns about the NDRT are misplaced since the 0.68 coefficient refers to test-retest reliability. The claim that "experts" do not consider the NDRT "to be a reliable measure of reading efficiency" because it is based on a one-minute reading sample is false. The NDRT is one of the most widely administered reading tests in the nation and is used by many medical schools to gauge reading ability.

The validity of the NDRT in relationship to medical school performance has a long history. In their 1985 study, Jackson and Brooks found that the NDRT "was a "better single predictor than the MCAT reading score" on basic science and clinical science GPA and total scores on various parts of the NBME exam. See Jackson JR, Brooks CM. *Relationship among the MCAT reading subtest, Nelson-Denny Reading test, and medical school achievement.* J Med Educ. 1985; 60:478–80, in particular at p. 479. Lastly, a review of the findings by Jackson EW, Dawson-Saunders R, Jackson JE. *The predictive validity of the Nelson-Denny Reading Test for scores on the reading subtest of the MCAT.* Advisor. 1984; 5:7–11, make clear that the NBME's view of the NDRT is unfounded.

The appropriateness of NDRT results in determining Meaghan's disability are supported by the literature. NDRT has been validated in a study of the correlation in the performance of health science students on the Pharmacy College Admissions Test (PCAT), which concluded a 'close correlation of the PCAT and NDRT scores, which were administered almost four years apart, implies that the PCAT does a good job of possibly predicting the reading skills of students." See *Pharmacy Students' Reading Ability and the Readability of Required Reading Materials*, Stephen Fuller, PharmD, et al., Am J Pharm Educ. 2007 Dec 15; 71(6): 111.

Another study examined students (N = 730) who took the Nelson-Denny Reading Test (current forms G or H) during orientation to medical school. Stepwise regression analyses showed the Nelson-Denny Reading Vocabulary, Comprehension, and Rate were significant predictors of MCAT (taken prior to admission to medical school) verbal reasoning. Reading Vocabulary was a significant predictor of USMLE Step 1 score (taken at the end of the second year of medical school). Pearson correlation analyses demonstrated significant positive relationships among the various subtests of the three instruments. The significant positive relationships between reading test performance and the MCAT and USMLE for medical students have been shown across

regions of the country and two decades of time. See Haught PA, Walls RT. Relationships of reading, MCAT, and USMLE Step 1 test results for medical students. Reading Psychol. 2004; 25:83–92.

The Nelson Denny Reading test is a valid reading measure that has some unique features that are useful diagnostically. In Meaghan's case, comparison of the three scores on this test (Vocabulary, Comprehension, and Reading Rate) yielded important information. There was a significant difference between her mid-average Vocabulary and Reading Comprehension scores, which fell at the 41st percentile (46th percentile with extended time) and 54th percentiles, respectively. Her Reading Rate fell at the 6th percentile in the borderline or slow learner range. This difference is significant.

The NDRT is also unique in that the percentile scores are not based on the normal population but the educational level that most closely resembles the individual being tested. Other tests generally use age norms so you are compared with others close to your age group, usually included balanced samples of males/females, regions of the country, racial/ethnic groups.

The NDRT is administered using standardized time limits but there are separate norms based on scores obtained when extended (150%) time is provided. This is often useful to determine whether the extra time will yield significant differences in an individual's performance and how well these measures compare with other measures of intelligence and academic performance.
Since Meaghan was able to complete almost all of the items in the Vocabulary section and all of the Comprehension section within the standardized time, giving her extended time did not yield big difference. It should be noted that her accuracy was very strong (90% correct), but Meaghan's percentile fell in the mid-average range because she was compared with other college graduates NOT the "normal" population like measure of her intelligence and other measures of her achievement, which are age based.

The NBME letter notes that, despite Meaghan's diagnosis of Specific Learning Disorder and ADHD, her record "does not demonstrate a developmental history of significant problems with reading or learning that impaired her academic functioning or that currently limits a major life activity." This is inaccurate. Although Meaghan she was a highly motivated and bright student with exceptional communication skills, she started to experience some difficulties with her early reading skills in elementary school. A psychoeducational evaluation was conducted by Denise Nagim, M.C.D., at Jefferson Speech and Language in 2003 indicated significant variability in Meaghan's academic skills with relative weakness noted in her reading skills, including sound blending, word attack, and phonological awareness. These dyslexic deficiencies also impacted Meaghan's written language, especially her spelling and story composition, where her score fell in the borderline or slow learner range. This weakness was even more remarkable given Meaghan's very superior intelligence. Some dysgraphia was also reported and Meaghan tended to omit words when writing sentences and she had difficulty copying and maintaining appropriate spacing between letters and words.

Addendum:
April 19, 2019

Meaghan Doherty
Psychological /Educational Evaluation of March 31, 2017

Meaghan received interventions to address her learning disabilities, including a multisensory reading program to build phonological awareness, phonology, as well as reading and writing fluency. It was also suggested that Meaghan become proficient in computer keyboarding to address her dysgraphia.

Meaghan also received accommodations to address her dyslexia and dysgraphia. She sometimes did poorly on tests due to her reading issues, even though she had mastered the information at exceptional level. Meaghan's scores on standardized tests in elementary school also were not consistent with her cognitive potential and academic achievement as she progressed through elementary school.

Meaghan was reassessed as a sixth grader. Her overall intelligence again fell in the very superior range but her working memory was average and specific difficulties were noted with her auditory processing. The educational re-evaluation indicated a significant improvement in Meaghan's phonemic awareness as a result of the tutoring. However, the psychoeducational testing indicated mild dyslexia characterized by difficulties with accurate/fluent word recognition, poor spelling, and decoding. Meaghan's attention was also a concern and she also suffered with headaches.

Accommodations recommended to address Meaghan's dyslexia included extended time on tests, previewing instructional content, and not being penalized for misspelled words in content subjects. To address Meaghan's issues with written expression and dysgraphia, it was recommended that she receive copies of lecture notes so that she can check her notes for accuracy. Interventions included the LindaMoodBell and software programs designed to improve Meaghan's writing skills as well as the use of a laptop computer when completing written assignments and tests. In eighth grade, Meaghan transitioned to Dominican High School where she started to experience more attentional issues. She then attended Ben Franklin High School.

Many of Meaghan's issues in high school were the result of her testing into ninth grade honors classes when she was in eighth grade. Because of her dysgraphia and dyslexia, this significant increase in academic expectations resulted in her struggling to address them independently. To better meet these demands, Meaghan began taking medication. She was evaluated by Dr. James Barbee, M.D. and diagnosed with Attention Deficit/Hyperactivity Disorder. Medication, including Adderall was prescribed when she began high school. Meaghan is currently taking Adderall XR 30mg twice a day prescribed by Dr. Barbee. A short acting stimulant (dextroamphetamine 10 mg) was also prescribed for late afternoon to aid studying in the evenings. An Anxiety Disorder was diagnosed in 2014 and fluoxetine was prescribed to address Meaghan's mild anxiety.

After graduating from high school, Meaghan attended the University of Wisconsin, where she majored in biology and minored in environmental studies and global health. Meaghan stated that

Addendum:
April 19, 2019

Meaghan Doherty
Psychological /Educational Evaluation of March 31, 2017

she managed her attentional issues by carefully selecting her classes and reducing her course load to keep things manageable. Meaghan also earned 21 credits by taking Advanced Placement classes in high school. She stated that, although she did exceptionally well in school, she reported the most difficulty in classes where the exams included writing essays in a blue book in a very traditional fashion. Meaghan struggled to complete these exams satisfactorily and she tended to earn lower grades in these classes.

Meaghan has always been highly motivated and accustomed to being one of the best students in her class. During the interview, she reported that her self-esteem has been closely entwined with her academic success. As she matured, Meaghan became more comfortable with the diagnosis of Attention Deficit/Hyperactivity Disorder and dyslexia. She has addressed the challenges she experienced in proactive ways rather than trying to deny them.

Meaghan's challenges with test performance have been exacerbated since she began medical school. Because of the increased complexity and amount of information she's expected to learn and recite on tests, her grades have not reflected her learning. She is requesting accommodations so that testing will yield fair and unbiased measures of her learning.

In effect, the NBME is holding Meaghan's superior intelligence and hard work over the years to compensate for her attentional and learning disabilities against her. Meaghan has intuitively devised her own coping skills to succeed academically and in her daily life, is a testament to her superior intelligence and strong work ethic. Yet the NBME disregards that clear aspect of record to justify its determination that her own record militates against her receiving accommodations at this stage of her academic career, now that she faces high stakes testing of specialized knowledge, as the Step 2 Test.

The NBME concluded that Meaghan has no reading impairment by comparing her reading rate to the national average. The NBME based this conclusion on its view that the ADA determines disability in comparison to "most people in the general population." This is an outdated interpretation of the ADA. In fact, the ADA Amendments Act of 2008 made clear that Congress abandoned the "demanding standard" of strictly interpreting the ADA in favor of assessing an individual's disability in order to provide coverage under the act "to the maximum extent."

The correct comparison of Meaghan's reading rate is with the cohort on which the NDRT reading percentile scores are based, namely, other college educated students, not the general population. More specifically, she should be assessed in comparison to her fellow medical students sitting for the USMLE Step 2 Test. Again, the NBME is holding Meaghan's intelligence against her. The purpose of the ADA Amendments Act was to provide ADA coverage for disabilities, not block to accommodations for those with a diagnosed disability.

Meaghan's overall intelligence fell in the superior range, as would be expected by her MCAT score and pre-medical school academic record. However, in contrast to her superior intellectual

Addendum:
April 19, 2019

Meaghan Doherty
Psychological /Educational Evaluation of March 31, 2017

abilities is the significant variability in her cognitive profile. A prime example of this is seen in her overall weakest score was noted in Processing Speed Scale, on a visually complex task, where she was asked to discriminate between symbols. Although her accuracy was perfect, Meaghan slowed her work speed in order to do her best. Timed measures have consistently underestimated her skills, even in areas where she was successful.

Significant variability was also noted in Meaghan's reading skills on the Wechsler Individual Achievement Test – Third Edition. The accuracy of her sight vocabulary fell in the high average range but Meaghan's decoding skills fell at the low end of the average range. The most remarkable observation was her slow reading and decoding speeds on these basic reading tasks. On the measure of her sight vocabulary, Meaghan's reading speed was slower than 90% of the students her age and her decoding speed was slower than 75% of students her age. These scores in addition to the measure of her Reading Speed on the NDRT, which fell in the borderline or slow learner range, indicated a Specific Learning Disorder with Impairment in Reading Rate (DSM-V 315.00 ICD-10 F81.0). Meaghan's slow reading speed resulting from her dyslexia creates a Functional Impairment for which the accommodation of extended time is needed to produce fair and unbiased measures of her skills on academic and daily tasks where reading is required.

The essence of Meaghan's disability is the impact her slow reading rate has on her executive functions. On the Behavior Rating of Executive Function – Adult Version, her overall score fell at the 95th percentile indicating clinically significant problems. Most of these were noted on the Metacognitive Scale where Meaghan's rating ranged from the 97th to the 99th percentile in the clinically significant range. The testing time limits of the Step 2 test exacerbate the effect of her disability.

In conclusion, Meaghan's superior intelligence places her overall scores above that of the general population. But that fact, taken in isolation, gives a distorted picture of the disability. Specifically, were Meaghan on average intelligence, the impact of her disability on her scores would be stark – placing her in the low range in overall performance and in the poor range for reading comprehension. It is her superior intelligence that makes it appear her reading disability has little impact on her ability to perform.

Contrary to what one would expect, given her overall intelligence level, Meaghan did poorly on the Step 1 Test, scoring at just passing. But that is not surprising given the fact that the NBME denied her accommodations request. In fact, her poor performance confirms the original evaluation findings.

It is indeed a shame that the NBME would construe the ADA Amendments in such a manner as to minimize this young lady's disability and hence penalize her for her superior intelligence as well as her excellent work ethic.

# EXHIBIT G

# The ACT® Plus Writing
## Student Report



STUDENT'S NAME: MEAGHAN O DOHERTY
HIGH SCHOOL NAME: BENJAMIN FRANKLIN HIGH SCHOOL
HIGH SCHOOL CODE: 192-006

ACT ID: -21371282
SSN: XXX-XX-6289
TEST DATE & LOCATION: JUN 2010 NATIONAL

## Your ACT Scores

Rank: Approximate percent of ACT-tested students at or below your score



| | In Your State | In the U.S. |
|---|---|---|
| Composite Score 32 | 99% | 99% |
| ENGLISH | 34* | 99% |
| Usage/Mechanics | 17 | 97% |
| Rhetorical Skills | 16 | 97% |
| MATHEMATICS | 33* | 98% |
| Pre-Algebra/Elem. Algebra | 17 | 96% |
| Algebra/Coord. Geometry | 15 | 96% |
| Plane Geometry/Trig. | 18 | 99% |
| READING | 31* | 93% |
| Social Studies/Sciences | 16 | 93% |
| Arts/Literature | 17 | 97% |
| SCIENCE | 28* | 94% |
| COMBINED ENGLISH/WRITING | 31 | 97% |
| Writing (score range 2 to 12) | 08 | 81% |

The Combined English/Writing score ranges from 1 to 36 and is a combined measure of the Writing and English tests. The Writing score ranges from 2 to 12. Your ranks for these two scores are based on recent ACT-tested students who took the Writing test.

- ACT® test scores and the Composite score range from 1 to 36; subscores range from 1 to 18.
- Your Composite score is the average of your scores on the four subject area tests. Subscores do not necessarily add up to your score for a subject area test.
- Your ranks tell you the approximate percentages of recent high school graduates in the U.S. and your state who took the ACT and received scores that are the same as or lower than yours. A rank of 70, for example, means that 70% of students received scores that are the same as or lower than your score.
- Your test scores are only estimates, not precise measures, of your educational development. You will find more information about interpreting your scores in the booklet you received with this report and at www.actstudent.org.

COMMENTS ON YOUR ESSAY: YOUR ESSAY ACKNOWLEDGED COUNTERARGUMENTS ON THE ISSUE BUT DID NOT DISCUSS THEM. YOUR ESSAY ADEQUATELY SUPPORTED GENERAL STATEMENTS WITH SPECIFIC REASONS, EXAMPLES, AND DETAILS.



Looking for more information about your individual strengths and test preparation? Go to www.actstudent.org.

*Your College Readiness: If your scores are at or above the following ACT benchmark scores, you will likely be ready for first-year college courses—English 18, Mathematics 22, Reading 21, Science 24.

## Your College Reports

At your direction, your scores from this test date are being reported to the colleges shown below. College planning information is provided for the first four choices you listed when you registered or tested. (Fifth and sixth choices, if any, appear just above your first choice.) Your GPA was calculated from the grades you reported. To view additional college planning information or to send additional reports, visit www.actstudent.org.

YOU DID NOT PROVIDE CODES FOR ANY COLLEGES TO WHICH TO REPORT SCORES.

| Your Class Rank | Your Composite Score | Your Calculated GPA | Your Selected Major |
|---|---|---|---|
| -- | 32 | 3.63 | MEDICINE (PRE-MEDICINE) |

## Your Information

Check with colleges for recent changes in information. A dash (—) indicates information was not provided or could be calculated. *Comprehensive fee including room and board. © 2008 by ACT, Inc. All rights reserved

# EXHIBIT H

# CollegeBoard SAT

## Student Answer Service for the SAT®

It's easy to re-register online at www.collegeboard.com.

| TEST DATE | FORM CODE | Critical Reading | 620 |
|---|---|---|---|
| 08-10 | AETW | Math | 660 |
| | | Writing | 660 Multiple Choice 67 |
| | | | Essay 68 |

SEQ# S465080910
MEAGHAN O DOHERTY
5603 HAWTHORNE PL
NEW ORLEANS LA 70124-1811

### KEYS TO THE SECTIONS BELOW

**Your Answer**
+ Your answer was correct.
- Your answer was incorrect.
0 You omitted the question.

**Difficulty Level**
1-5 Difficulty of question, with 1 being the easiest level and 5 the hardest.

**TYPE OF QUESTION**

Critical Reading
C Sentence Completion
R Passage-based Reading

Writing
S Improving Sentences
E Identifying Sentence Errors
P Improving Paragraphs

**TYPE OF CONTENT**

Math
N Numbers & Operations
A Algebra & Functions
G Geometry & Measurement
D Data Analysis, Statistics, Probability

---

### SECTION 1 - ESSAY

Visit www.collegeboard.com to view your essay. If you do not have Web access, see reverse for details about requesting a copy of your essay.

---

### SECTION 2 - WRITING (Multiple Choice)

| Student Produced Responses | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | |
| Your Answer ► | + | + | + | + | - | + | + | + | | |
| Type of Question ► | D | H | Q | A | D | A | Q | A | | |
| Difficulty Level ► | 1 | 1 | 1 | 3 | 3 | 3 | 3 | 4 | | |

| | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
|---|---|---|---|---|---|---|---|---|---|---|
| | + | + | + | + | + | + | - | + | - | |
| | A | A | N | D | D | N | Q | N | A | A |
| | 2 | 3 | 1 | 2 | 3 | 4 | 4 | 4 | 5 | |

---

### SECTION 3 - CRITICAL READING

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | - | + | - | + | + | - | + | + | - | + | - | + | + | + | + | + | - | + | + | + | + | + | |
| Type of Question ► | C | C | C | C | C | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | | |
| Difficulty Level ► | 1 | 4 | 5 | 5 | 5 | 3 | 1 | 2 | 1 | 2 | 3 | 4 | 3 | 3 | 1 | 1 | 4 | 3 | 3 | 3 | 4 | | | |

---

### SECTION 4 - WRITING

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | + | - | + | - | + | + | + | + | + | + | - | + | + | + | - | + | + | + | + | + | + | + | - | + | + | | | | | | |
| Type of Question ► | S | S | S | S | S | S | S | S | S | E | E | E | E | E | E | E | E | E | E | E | E | E | P | P | P | P | P | P | P | | | | | | |
| Difficulty Level ► | 1 | 1 | 1 | 2 | 2 | 3 | 3 | 3 | 5 | 1 | 1 | 3 | 2 | 3 | 2 | 3 | 3 | 3 | 3 | 3 | 6 | 4 | 3 | 4 | 4 | 5 | 5 | 2 | 2 | 3 | 3 | 3 | | | |

---

### SECTION 5 - MATH

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | + | + | + | + | + | + | + | + | + | - | + | + | - | - | | |
| Type of Question ► | A | O | D | N | A | O | D | A | N | O | N | N | G | A | O | A | O | A | | |
| Difficulty Level ► | 1 | 1 | 1 | 1 | 2 | 2 | 1 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 5 | 5 | 5 | | |

---

### SECTION 6 - CRITICAL READING

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | - | + | + | + | + | + | + | + | - | + | + | - | + | + | + | + | + | + | + | |
| Type of Question ► | C | C | C | C | C | C | C | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | | |
| Difficulty Level ► | 1 | 2 | 2 | 3 | 4 | 4 | 5 | 1 | 3 | 4 | 3 | 2 | 3 | 2 | 2 | 3 | 2 | 3 | 3 | 3 | 3 | 3 | | |

---

### SECTION 7 - MATH

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | + | + | + | + | + | + | + | + | + | + | + | + |
| Type of Question ► | A | N | A | D | H | G | A | A | O | D | N | A | O | A | O | N |
| Difficulty Level ► | 1 | 1 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 |

---

### SECTION 8 - CRITICAL READING

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | - | + | + | + | + | + | + | - | + | + | + | + | + | + | |
| Type of Question ► | C | C | C | C | C | C | R | R | R | R | R | R | R | R | R | R | R | | |
| Difficulty Level ► | 1 | 2 | 3 | 4 | 5 | 6 | 1 | 2 | 3 | 3 | 1 | 3 | 4 | 3 | 3 | 4 | 3 | | |

---

### SECTION 9 - MATH

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | + | + | + | + | + | + | + | + | - | |
| Type of Question ► | S | S | S | S | S | S | S | S | S | S | S | S | S | |
| Difficulty Level ► | 1 | 1 | 1 | 2 | 2 | 3 | 3 | 3 | 4 | 4 | 5 | 5 | | |

S465080910

---

Visit www.collegeboard.com for detailed information about your scores and to view your essay.

Ex. H - 1

# EXHIBIT I

# MCAT Score Report

**Name** MEAGHAN DOHERTY

**Verification Code** FCB8-VDKE-ECVX-FTBY

**AAMC ID** 13744061

**Date of Birth** 08/17/1993

**URL** * https://apps.aamc.org/score-reporting-web/#/report/verify

*\* This report will no longer be able to be verified after 04/02/2018*

In order to verify these scores, you will be directed to create a user name and password. When visiting this page, select "Register for an AAMC Account" to begin this process.

## MCAT Scores

For exams taken after January 31, 2015

No Scores Available

## MCAT Scores

For exams taken before January 31, 2015

| | MCAT Total | | Physical Sciences | | Verbal Reasoning | | Writing Sample | | Biological Sciences | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exam Date | Total Score | Confidence Band [1] | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [3] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [3] |
| 06/13/2014 | 32 | 30 to 34 | 88% | 11 | 89% | 11 | 95% | | | 10 | 76% |

### Notes

[1] Test scores, like other measurements, are not perfectly precise. The confidence bands that are shown for the Total Scores above mark the ranges in which the test taker's true scores probably lie. To obtain the confidence band for each section score, subtract one point from and add one point to the score (or, in the case of the Writing Sample, subtract and add one letter).

[2] The percentile ranks of scores are the percentages of test takers who received the same scores or lower scores. The percentile ranks are based on tests administered from January 2012 through September 2014.

Copyright Â©1995-2015 | Association of American Medical Colleges

Ex. I - 1

# EXHIBIT J

# FILED UNDER SEAL



## UNITED STATES MEDICAL LICENSING EXAMINATION ®

### STEP 1 SCORE REPORT

This score report is provided for the use of the examinee.
Third party users of USMLE information are advised to rely solely on official USMLE transcripts.

**Doherty, Meaghan Olivier**

**USMLE ID:  5-397-670-0**                    **Test Date:  April 24, 2018**

The USMLE is a single examination program consisting of three Steps designed to assess an examinee's understanding of and ability to apply concepts and principles that are important in health and disease and that constitute the basis of safe and effective patient care. Step 1 is designed to assess whether an examinee understands and can apply important concepts of the sciences basic to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy. The inclusion of Step 1 in the USMLE sequence is intended to ensure mastery of not only the sciences underlying the safe and competent practice of medicine in the present, but also the scientific principles required for maintenance of competence through lifelong learning. Results of the examination are reported to medical licensing authorities in the United States and its territories for use in granting an initial license to practice medicine. This score§ represents your result for the administration of Step 1 on the test date shown above.



> **PASS**
>
> This result is based on the minimum passing score recommended by USMLE for Step 1. Individual licensing authorities may accept the USMLE-recommended pass/fail result or may establish a different passing score for their own jurisdictions.

> **200§**
>
> This score is determined by your overall performance on Step 1. For administrations between Jan 1, 2016 and Dec 31, 2016, the mean and standard deviation for first-time examinees from U.S. and Canadian medical schools were approximately 228 and 21, respectively, with most scores falling between 140 and 260. A score of 194 is set by USMLE to pass Step 1. The standard error of measurement (SEM)‡ for this scale is six points.

§Effective April 1, 2013, test results are reported on a three-digit scale only. Test results reported as passing represent an exam score of 75 or higher on a two-digit scoring scale.

‡Your score is influenced both by your general understanding of the basic biomedical sciences and the specific set of items selected for this Step 1 examination. The Standard Error of Measurement (SEM) provides an index of the variation in scores that would be expected to occur if an examinee were tested repeatedly using different sets of items covering similar content.

INFORMATION PROVIDED FOR EXAMINEE USE ONLY

The Performance Profile below is provided solely for the benefit of the examinee.
These profiles are developed as self-assessment tools for examinees only and will not be reported or verified to any third party.

## USMLE STEP 1 PERFORMANCE PROFILE

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **PHYSICIAN TASK** | | | |
| MK: Applying Foundational Science Concepts | | xxxxxxxxxx | |
| PC: Diagnosis | | xxxxxxxxxxxxxx | |
| PC: Management | *xxxxxxxxxxxxxxx | | |
| PBLI: Evidence-Based Medicine | | xxxxxxxxxxxxxxxxxxxx | |
| **DISCIPLINE** | | | |
| Behavioral Sciences | | xxxxxxxxxxxxxxxxxx | |
| Biochemistry & Nutrition | xxxxxxxxxxxxxxx | | |
| Genetics | | xxxxxxxxxxxxxxxxxxx | |
| Gross Anatomy & Embryology | | xxxxxxxxxxxxxxxx | |
| Histology & Cell Biology | *xxxxxxxxx | | |
| Microbiology & Immunology | | | xxxxxxxxxxxxxx |
| Pathology | | xxxxxxxxxx | |
| Pharmacology | xxxxxxxxxxxxx | | |
| Physiology | | xxxxxxxxxxxx | |
| **SYSTEM** | | | |
| General Principles | | xxxxxxxxxxxxxx | |
| Blood & Lymphoreticular and Immuno Systems | | xxxxxxxxxxxxxxxxxxxx | |
| Behavioral Health & Nervous Systems/Special Senses | | xxxxxxxxxxxxxxxx | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | *xxxxxxxxxxxxx | | |
| Cardiovascular System | | xxxxxxxxxxxxxxxx | |
| Respiratory and Renal/Urinary Systems | xxxxxxxxxxxxxxx | | |
| Gastrointestinal System | | xxxxxxxxxxxxxxxxxxxx | |
| Reproductive & Endocrine Systems | | xxxxxxxxxxxxxx | |
| Multisystem Processes & Disorders | | | xxxxxxxxxxxxxxxxxxxx |
| Biostatistics & Epidemiology/Population Health | | xxxxxxxxxxxxxxxxxxxx | |

The above Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. The band width for a given content area is the same for all examinees. An asterisk indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because Step 1 is designed to be integrative, many items contribute to more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

This profile should not be compared to those from other Step 1 administrations.

Additional information concerning the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials*.

MK—Medical Knowledge; PC—Patient Care; PBLI—Practice-based Learning and Improvement

# EXHIBIT K

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3

4

5  MEAGHAN DOHERTY                    *
                                      *    Docket No.: 19-CV-11790
6  versus                            *    Section "T"
                                      *    New Orleans, Louisiana
7  NATIONAL BOARD OF MEDICAL         *    August 1, 2019
   EXAMINERS                         *
8  * * * * * * * * * * * * * * * *

9                       SEALED
         TRANSCRIPT OF PROCEEDINGS BEFORE
10       THE HONORABLE GREG GERARD GUIDRY
          UNITED STATES DISTRICT JUDGE
11

12 APPEARANCES:

13
   For the Plaintiff:        St. Bernard Parish District
14                             Attorney's Office
                             BY:  WILLIAM M. MCGOEY, ESQ.
15                           1101 W. St. Bernard Highway
                             Chalmete, Louisiana 70043
16

17
                             Law Offices of Frances Mae
18                             Olivier, LLC
                             BY:  FRANCES M. OLIVIER, ESQ.
19                           2341 Metairie Road
                             Metairie, Louisiana 70001
20

21
   For Defendant:            Perkins coie, LLP
22                           BY:  ROBERT A. BURGOYNE, ESQ.
                             700 13th Street N.W.
23                           Suite 600
                             Washington, DC 20006
24

25

                      OFFICIAL TRANSCRIPT

1   APPEARANCES:

2

3   Official Court Reporter:      Jodi Simcox, RMR, FCRR
                                   500 Poydras Street
4                                  Room HB-275
                                   New Orleans, Louisiana 70130
5                                  (504) 589-7780

6

7   Proceedings recorded by mechanical stenography, transcript

8   produced by computer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

Ex. K - 2

1  **Q.**   Where did you go to high school?

2  **A.**   I went to Ben Franklin here in New Orleans.

3  **Q.**   And that's the Ben Franklin with a superior academic

4  rating, that high school?

5  **A.**   Yes.

6  **Q.**   What was your grade point average at Franklin?

7  **A.**   It was approximately a 3.75.

8  **Q.**   Okay.  Did you ask for accommodations at Franklin?

9  **A.**   No, I did not.

10  **Q.**   Why not?

11  **A.**   Because, once again, I didn't want my peers to know of my

12  diagnoses, and it would have required me to take my test in a

13  different room.

14  **Q.**   What did you do to deal with your diagnoses and your

15  impairments while you were in high school at Ben Franklin?

16  **A.**   I took two study halls.  We had a block schedule, so it

17  equated to having a study hall every day.  When a lot of other

18  students took more electives, I made sure I had two study halls

19  so that I had extra time to study and do homework every day at

20  school, as well as after school.

21  **Q.**   Yeah.  And what did -- after school, what did you do as

22  far as to deal with your situation?

23  **A.**   It was the same, about -- it just took a lot longer to

24  study.

25  **Q.**   Where did you go to college?

1 standardized across the nation.  So those percentiles are
2 actually nationwide and not just for Tulane students.
3          **MR. McGOEY:**  Your Honor, I would offer and introduce
4 into evidence Exhibit 3, which is Record Document 1-5.
5          **MR. BURGOYNE:**  That's her personal statement.  No
6 objection, Your Honor.
7          **THE COURT:**  It's admitted.
8 **BY MR. McGOEY:**
9 **Q.**   Ms. Doherty, can you tell us what the Step 1 and Step 2
10 exams are used for?
11 **A.**   They were designed originally to be used just as part of
12 the licensing process, but, in reality, they're the most
13 important factor for residency application.
14 **Q.**   Okay.  And residency application, why is that important?
15 What is that?
16 **A.**   Residency application is the training that you receive
17 after medical school, and the first year of residency is your
18 internship, which is required to become a licensed physician.
19 **Q.**   So if you don't get a residency program, you can't become
20 a doctor?
21 **A.**   Exactly.  A licensed doctor.  You're still a -- you still
22 have an MD, but you cannot practice.
23 **Q.**   Given your class schedule and the topics that you're
24 learning in med school, when was the best time or the strategic
25 point in time for you to take the Step 1 test, the one that

1  various types of residency programs, aren't there some programs
2  that are more sought after by students than others, residency
3  programs?
4  **A.**   Yes.
5  **Q.**   And the ones that are more sought after require higher
6  scores to get into; is that correct?
7  **A.**   Yes.
8  **Q.**   And so if we were to break down, you know, the various --
9  the 22 residency programs, just roughly, in like the top
10  25 percent, hardest to get into, you know, then there would be
11  the second 25 percent, the third, and the fourth 25th percent,
12  where does OBGYN fit in?
13  **A.**   Kind of straddling that third and fourth percentile.
14  **Q.**   So in the lower 50 percent?
15  **A.**   Yes.
16  **Q.**   And closer to the 25 percent range?
17  **A.**   Yes.
18  **Q.**   So you're looking at roughly a program that is in the
19  lower one-fourth of hardness to get into?
20  **A.**   Yes.
21          **MR. McGOEY:**   I can't recall, Your Honor, if I
22  haven't, I'm offering and introducing into evidence Exhibit 22.
23          **THE COURT:**   I think it's already been admitted,
24  hasn't it?
25          **THE DEPUTY CLERK:**   Yes.

46

1   their reasoning?

2   **A.**   Yes.

3   **Q.**   If we look at page 2, the third to last paragraph, there's

4   a reference to the fact that they rejected your accommodation

5   because you didn't need an accommodation for MCAT, and you

6   scored better than 88 percent of a highly select sample of

7   medical school applicants. Why do you disagree with that as a

8   rationale for denying your accommodation?

9   **A.**   Anyone can take the MCAT. There is no qualifications that

10   have to be met. You can take the MCAT many times. This is a

11   very -- there are a lot of people who take the MCAT and never

12   go to medical school. So to say it's a highly select group is

13   inaccurate. As well as comparing it to the USMLE Step 1 or

14   Step 2 is also inaccurate because those people have been

15   successfully admitted to medical school and have successfully

16   completed the course work required to take those exams. It's a

17   very different population of people.

18   **Q.**   What about the testing format? And we've covered it, so I

19   don't want you to go -- but the testing format, why do you

20   disagree with this saying that MCAT is a barometer and that you

21   don't need an accommodation for the Step tests?

22   **A.**   On the MCAT, the questions were much shorter, as well as

23   there were occasional times where there were a passage of sorts

24   that were about two paragraphs long. You would then answer six

25   to seven questions for that two paragraphs. So it's like three

1   questions per -- I mean, three sentences per question as
2   opposed to approximately ten sentences per question on the Step
3   1 and Step 2.  And for that one, it's the same or more amount
4   of time on the MCAT.
5   **Q.**   Part of the MCAT test, is there a math section?
6   **A.**   Yes.  Math makes up -- or it used to make up about
7   approximately 25 percent of the MCAT.
8   **Q.**   And is your reading impairment implicated by the math
9   questions that are on MCAT?
10  **A.**   No, it is not.
11  **Q.**   There's also in that same paragraph as a rationale for
12  denying you an accommodation for Step 2, there's a statement:
13  "Our records show that you successfully completed the USMLE
14  Step 1 under standard test conditions without accommodations."
15  **A.**   Uh-huh.
16  **Q.**   Do you disagree with that?
17  **A.**   Yes.  I don't think there are many people in the medical
18  profession that would say that I successfully completed that
19  exam.  That was not a successful score.  I may have passed, but
20  that was barely, and that is not a successful score to get
21  anywhere with, as well as I was only six points above the
22  failure cutoff, and well below the range of the majority of
23  people that take this exam.
24  **Q.**   So for your score compared when we were looking at those
25  graphs indicate that you virtually have a very slim chance to

1  **A.**    No one that I know personally.  I cannot testify to if
2  anyone at Tulane University has ever failed Step 2 CK in their
3  senior year.
4  **Q.**    Yeah.  Well, I assume if they hadn't, they wouldn't need
5  to rule.  In all events, am I correct that residency programs
6  are very competitive, including the residency programs that you
7  want to apply to?
8  **A.**    Yes.  All residency programs are very competitive.
9  **Q.**    And you'd agree, I take it, that if you get a position in
10 a given residency program, that means someone else who might
11 want to get that position is not going to be chosen?
12 **A.**    Yes, because only one person can have a single position.
13 **Q.**    You said based on your Step 1 CK score that your chances
14 of getting a residency position, I think the words you used
15 were pretty dismal?
16 **A.**    Yes.  If I were to submit my application to residency
17 programs by the September 15th deadline without my Step 2 CK
18 score, it would be highly unlikely that I would get any
19 interviews, other than the one that I am guaranteed by Tulane's
20 OBGYN program who interviews everyone from Tulane that is
21 interested in staying at Tulane.
22       And that is not a common feature in all departments
23 at Tulane, that just happens to be the policy of OBGYN's for
24 the approximately eight students per class that are going into
25 the field, and they want them to at least be able to interview

1    there if they want to stay.

2    Q.   So you'll be able to interview there?

3    A.   That would be the only place I would likely be able to

4    interview if I submitted my application on September 15th

5    without my Step 2 CK score.

6    Q.   I can't recall if -- was that one of the residency

7    programs?  I saw a footnote somewhere to the effect that you

8    want to stay in New Orleans.  So is that one of the residency

9    programs you're interested in applying to?

10   A.   It is a residency program that I will apply to.

11   Q.   Bear with me here.  I'm still here.  I'm just looking

12   through my notes to see what else I needed to cover with you.

13         If you were to participate in next year's match

14   without -- rather than this year's match and simply delayed

15   taking the Step 2 CK exam, what information would residency

16   programs see beyond the fact that you didn't take the exam in

17   your fourth year of medical school?

18   A.   I would need to justify my leave of absence from school in

19   all of my residency applications; and in interviews, I will be

20   specifically asked about it, as I will already be asked about

21   my Step 1 score.

22   Q.   Are you aware whether students who take their Step 2 CK

23   exam after their fourth year of medical school get positions in

24   residency programs through the match?

25   A.   I have no idea.  I have not seen any data on that point.

1      **THE COURT:** I understand.

2      **MR. McGOEY:** Your Honor, thanks for your time.

3      **THE COURT:** All right. Thank you very much.

4            Court will be adjourned.

5      (WHEREUPON, the proceedings were concluded.)

6                          *****

7                        <u>CERTIFICATE</u>

8            I, Jodi Simcox, RMR, FCRR, Official Court Reporter

9   for the United States District Court, Eastern District of

10  Louisiana, do hereby certify that the foregoing is a true and

11  correct transcript, to the best of my ability and

12  understanding, from the record of the proceedings in the

13  above-entitled and numbered matter.

14

15

16                          <u>s/*Jodi Simcox, RMR, FCRR*</u>
                            Jodi Simcox, RMR, FCRR
17                          Official Court Reporter

18

19

20

21

22

23

24

25

                        OFFICIAL TRANSCRIPT

                        **Ex. K - 10**

# EXHIBIT L



## 2020 Main Residency Match® Calendar

**The Match is managed in the Registration, Ranking, and Results (R3) system.**

### 2019

**SEP 15**
<u>12:00 p.m. ET</u>: Registration opens

**OCT 1**
<u>8:00 a.m. ET</u>: Medical schools begin uploading rising seniors

**NOV 30**
<u>11:59 p.m. ET</u>: Applicant Standard Registration Deadline (*$50 additional fee for late registration*)

### 2020

**JAN 14**
<u>11:59 p.m. ET</u>: Program deadline to create joint advanced/preliminary program tracks

**JAN 15**
<u>12:00 p.m. ET</u>: Ranking opens

Programs can set SOAP participation status and medical schools begin verifying student/graduate graduation credentials

**JAN 31**
<u>11:59 p.m. ET</u>: Programs: quota change, withdrawal, and SOAP participation status deadlines

**FEB 26**
<u>9:00 p.m. ET</u>: Rank Order List Certification Deadline

- Applicant late registration and Match withdrawal deadline
- Medical school student/graduate graduation credentials verification deadline
- Institutional official change approvals deadline
- Program reversion deadline

**MAR 9**
<u>8:00 a.m. ET</u>: Medical schools begin verifying SOAP eligibility of students/graduates

2121 K Street NW, Suite 1000, Washington, DC 20037
www.nrmp.org Email: support@nrmp.org
Toll Free: (866) 653-NRMP Phone: (202) 400-2233

**MAR 11**  
**5:00 p.m. ET**: Deadline for medical schools to verify SOAP eligibility of students/graduates

---

**MAR 16**  
Match Week

**10:30 a.m. ET**: Medical school *Unmatched Applicants* report available (*embargoed until 11:00 a.m.*)

**11:00 a.m. ET**: Applicant match status and program fill status available (*by email and R3 system*)

*Regional Match Statistics* report available

Supplemental Offer and Acceptance Program (SOAP) begins

---

**MAR 19**  
**8:00 a.m. ET**: Confidential *Advance Data Tables* report available to medical schools, programs, and institutions

Medical school confidential Match results reports and Match notification letters available

**11:00 a.m. ET**: SOAP ends

**2:00 p.m. ET**: Program *Confidential Roster of Matched Applicants* report available (*by email and R3 system*)

---

**MAR 20**  
Match Day

**12:00 p.m. ET**: Medical school Match Day ceremonies

**1:00 p.m. ET**: Applicant Match results available (*by email and R3 system*)

*Advance Data Tables* available at www.nrmp.org

**1:00 p.m. ET**: Program *Match Results by Ranked Applicant* and *SOAP Programs Preferred Applicants* reports available

---

**JUN 30**  
**11:59 p.m. ET**: Match closes and reports no longer available in R3 system

2121 K Street NW, Suite 1000, Washington, DC 20037
www.nrmp.org Email: support@nrmp.org
Toll Free: (866) 653-NRMP Phone: (202) 400-2233

Ex. L - 2

# EXHIBIT M



Tulane University

## SCHOOL OF MEDICINE

# Medical Student Handbook

Published by the Office of Admissions and Student Affairs
Revised June 2019

## USMLE Requirements: Step 1 and Step 2

1.  A passing score for USMLE step 1 must be recorded by NBME by the end of the October block in the third year. Students not passing Step 1 are required to take a leave of absence until a passing score on Step 1 is achieved. Students must allow 30 days after NBME records a passing score before they should expect to return to clerkships: this allows clerkship departments adequate time to place and credential students.

    Please note the following scheduling considerations:
    *   The end dates of the October block change each year. Please consult the clinical block calendar in eMedley's eCurriculum for relevant October block dates.
    *   USMLE step 1 results generally take 4 weeks to be recorded, and results are released only on Wednesdays. Therefore, the last possible date a student should plan on taking Step 1 to avoid being placed on a leave of absence is 4 Wednesdays BEFORE the end of Tulane's October block.
    *   Students who are not passing step 1 practice tests should consult with Dr. Kahn for advising and strategies before scheduling/sitting for step 1. The top priority should be achieving a passing score on the first attempt.

2.  All students are required to pass USMLE Step 2CK and Step 2CS prior to graduating medical school.

3.  Students not passing both Step 2CK and CS by April of their fourth year of medical school will be required to take a leave of absence until passing scores on both Step 2CK and CS are achieved.

4.  These three USMLE exams must be passed to graduate from Tulane University School of Medicine. Failure to pass USMLE Step 1, Step 2 CK, and Step 2 CS will result in a student's being withdrawn from the academic rolls as a medical student.

5.  *All senior students are recommended to sit for USMLE Step 2 CS and Step 2 CK before December 31 of their senior year to participate in the Match.*

6.  A student may accumulate a maximum of 24 months of leave for the purpose of meeting the USMLE requirement. After 24 months, if USMLE Step 1, Step 2 CK and Step 2 CS are not passed, students will be dismissed.

7.  The Student Professionalism and Promotion Committee and the senior associate dean for admissions and student affairs may recommend a delay in a student sitting for Step 1 until a study program is satisfactorily completed.