Appeal No. 19-30661

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

MEAGHAN DOHERTY,

Plaintiff-Appellee,

v.

NATIONAL BOARD OF MEDICAL EXAMINERS

Defendant-Appellant.

---

PLAINTIFF'S OPPOSITION TO EMERGENCY MOTION TO STAY
INJUNCTION PENDING APPEAL

---

William M. McGoey
Attorney At Law
1828 Rose Street
Arabi, Louisiana 70032
Telephone: 504-250-3293

Frances M. Olivier
Law Office of Frances M. Olivier
2341 Metairie Road
Metairie, LA 70001
Telephone: 504-483-6334
Fax: 504-483-6344


Attorneys for
Plaintiff-Appellee
MEAGHAN DOHERTY

# CERTIFICATE OF INTERESTED PERSONS

## NO. 19-30661

### MEAGHAN DOHERTY,
Plaintiff-Appellee,

v.

### NATIONAL BOARD OF MEDICAL EXAMINERS
Defendant-Appellant.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiff-Appellee:**
    Meaghan Doherty

**Counsel for Plaintiff-Appellee:**
    William M. McGoey
    Frances M. Olivier

**Defendant-Appellant:**
    National Board of Medical Examiners

**Counsel for Defendant-Appellant:**
    Eric B. Wolff
    Robert A. Burgoyne
    Alison R. Caditz

                        /s/ William M. McGoey
                        William M. McGoey

                        Counsel of Record for Plaintiff-Appellee

i

# TABLE OF CONTENTS

Page

Certificate of Interested Parties……….….….……………………………i

Table of Contents……………………………………………..……ii

Table of Authorities…………………………………………………iii

Response to Defendant's Introduction and Nature of the Emergency….1

Argument………………………………………………………6

       Defendant is not entitled to a stay……………………………7

       Defendant has not made a strong showing it is likely
       to succeed on the merits……………………………………8

       A stay will substantially harm Plaintiff……………………16

       Defendant has not shown that it, or others
       will be irreparably harmed……………………………………22

       The public interest is served by denying the stay…………………23

Conclusion……………………………………………………24

Certificate of Compliance………………………………………26

Certificate of Service……………………………………………27

# TABLE OF AUTHORITIES

PAGE

## CASES

*Agranoff v. Law Sch. Admission Counsel, Inc.*,
  97 F. Supp. 2d 86 (D. Mass. 1999)………………………………………20

*Bach v. Law Sch. Admission Council*
  2014 U.S. Dist. LEXIS 124632
  (M.D.N.C. Feb. 4, 2014)……………………………………………………21

*Berger v. National Board of Medical Examiners*,
  2019 WL 4040576 (S.D. Ohio, Western Division)…………………..12

*Bonnette v. District of Columbia Court of Appeal*,
  *796 F. Supp. 2d 164* (D.D.C. 2011)……………………………………..20

*Doe v. N.Y. Univ.*,
  666 F2d 1981(2nd Cir. 1981)……………………………………………21

*Elder v. Nat'l Conference of Bar Examiners*,
  2011 WL 672662 (N. D. Cal. Feb. 16, 2011)………………………...20

*Jones v. Nat'l Conference of Bar Examiners*,
  801 F. Supp. 2d 270 (D. Vt. 2011)……………………………………..20

*Rothberg v. Law Sch. Admission Council*,
  102 Fed. Appx 122 (2004)………………………………………………21

*Rush v. National Board of Medical Examiners*,
  268 F. Supp. 673 (N.D. Tex.2003)……………………………..……..23

*Texas v. United States*,
  787 F.3d 733 (5th Cir. 2015)………………………………………………7

# TABLE OF AUTHORITIES
(continued)

PAGE

**STATUTES**

42 U.S.C. § 12101, et seq. ……………………………………….…………………4

42 U.S.C. § 12102(2)……………………………………………………………8,9


**RULES & REGULATIONS**

28 C.F.R. 36.105(a)(1)……………………………………………………………8

28 C.F.R. 36.105(b)(2)……………………………………………………………8

28 C.F.R. 36105(c)(1)(i)…………………………………………………………9

28 C.F.R. 36.309(b)(1)(v)……………………………………………..…15

## Response to Defendant's
## Introduction and Nature of the Emergency

Defendant National Board of Medical Examiners (NBME)'s "Introduction and Nature of the Emergency" misconstrues the facts and paints a false picture of this case.  The NBME created the "emergency" for which it now seeks a stay in the following ways:

1. Plaintiff must submit her Residency Program application between September 5 and September 15, 2019. To ensure she could both take the Step 2CK test and get her score in a timely manner, plaintiff applied to take the test and requested ADA accommodations on May 2, 2019.  She attached supporting professional evaluations going back to 2003.

2. Defendant took seventy-five days to notify Plaintiff that it denied her accommodations request on July 16.

3. Plaintiff immediately applied to take the Step 2 CK test without accommodations, but based on Defendant's rules requiring a "permit" prior to scheduling a date, Plaintiff was not able to register for a test until July 18.

4. Defendant's website states that the scores for Step 2 CK Tests taken between July 1 and August 8 would be delayed due to a

transition in Defendant's system. Due to Defendant's circumstances, Plaintiff had to register for the earliest test date that was still available in order to receive her scores in time to apply for the Residency Programs (first week of September).

5. With a test date of August 6 (the only date available within 300 miles) she filed suit to obtain her ADA accommodations for the test.  (See P. Ex. 5)

6. Defendant's dilatory tactics in ruling on her accommodations request put Plaintiff in the miserable position of having to litigate Defendant's denial of ADA accommodations in the narrow window from July 18 till the August 6 test date.

7. On July 22 Plaintiff filed suit and a Motion to Seal the Record. Defendant claims the District Court sealed the entire case "before Defendant had a chance to oppose the requested sealing." (Page 1) This is false. Plaintiff filed the Motion to Seal at the time of the filing of the TRO request and defendant had it the next day. Defendant chose not to contact the court or plaintiff.  Defendant took no action to oppose the motion to seal, despite actual contemporaneous notice.

8. Defendant's received all pleadings by FedEx delivery July 23. On July 24 NBME provided the name of its counsel.

9. On July 24, Plaintiff's counsel called Defense counsel who indicated he was not authorized to accept service.

10.    On July 26, the Court denied Plaintiff's request for a TRO, but set a preliminary injunction hearing for August 1.

11.    Defendant did not contact the District Court until July 29 when served with a copy of the order setting the August 1 hearing.

12.    Defendant did not acknowledge whether it would appear at the hearing until the day before the hearing.

13.    Defendant filed nothing prior to the hearing, presented no evidence, despite having a copy of Plaintiff's pleadings for nine days prior to the hearing.

14.    On August 1, the District Court conducted a three-hour hearing on the preliminary injunction.

15.    The Court accepted post-hearing memoranda on August 2.

16.    The Court granted the preliminary injunction on August 5.

17.    Defendant filed no request for an emergency stay and

3

Plaintiff took the test with accommodations on August 6 & 7.

18.    Defendant filed a Notice of Appeal on August 9.

19.    Defendant waited until August 22 to file its Motion to Clarify and for a stay of the Court's order of August 5.

20.    The Court denied that Motion on August 27, noting that it was a disingenuous attempt to circumvent the Court's order.

21.    Defendant filed this motion on August 29 seeking once again to void the Court' s grant of a preliminary injunction.

Thus, the rush to court was because Defendant left Plaintiff no other opportunity to obtain the ADA accommodations to which her diagnoses entitle her under the Americans with Disabilities Act (ADA, 42 U.S.C. Section 12101, et seq.)

Defendant also asserts that the District Court reached its findings without giving Defendant "a meaningful chance to respond." This is false. Nothing barred Defendant from calling witnesses or introducing evidence. The Court accepted post-hearing memoranda. Defendant has asserted other inaccuracies.[1]

---

[1] Defendant notes "Plaintiff…who was represented by her mother (a fact witness) and another lawyer." (p11). Defendant implies that her mother functioned as both attorney and was offered as a fact witness. This is false.

4

Defendant incorrectly asserts that Plaintiff obtained psychiatric evaluations from Dr. Brockman and others after she realized that her medical school exam scores were not at the top of the class. This is false. Plaintiff was first evaluated and diagnosed with a learning disability in 2003 (5th Grade), confirmed in 2004 (6th Grade); reaffirmed in 2014; confirmed again in 2017, and a comprehensive (25-page psychological educational evaluation done in March 2017). Based on the licensed psychiatric and psychological evaluations, Tulane University School of Medicine granted her test taking accommodations of time and a half on her written examinations. Tulane granted that accommodation (the same one requested in this lawsuit) in January 2017. She has taken every test since then with accommodations in medical school. Her test scores immediately went up and have remained high.

The purpose of the ADA is to provide the disabled student a level playing field, so the test results reflect the student's actual base of knowledge and not the underlying disability. Plaintiff had applied for testing accommodation of 50% for Defendant's Step 1 Exam in February 2018. Defendant denied the request. Plaintiff took the exam without accommodations and scored a 200; passing was 194; her score was 28

5

points below the mean test result. In April 2019, Plaintiff sat for another evaluation. Dr. Brockman issued an Addendum to her 2017 evaluation confirming the original findings.

Plaintiff produced to the District Court licensed professional evaluations in support of her request for accommodations, which professional conclusions Defendant chose not to contest, either by challenging the expertise of the psychologist and psychiatrist, requesting their own evaluation, challenging the substance of the reports. Defendant offered no evidence whatsoever in support of its conclusions about Plaintiff. The entire record consists of uncontroverted evidence in support of Plaintiff's disabilities. Plaintiff submits that Defendant, by its inaction and delay, has created its own emergency.

## ARGUMENT

Defendant's request to stay reporting Plaintiff's Step 2 CK score, is an attempt to negate the District Court's ruling of August 5 that defendant provide accommodations to Plaintiff on the August 6th test, and the Order's implicit requirement that Defendant submit plaintiff's score at the same time it submits the scores to other students. See Judge Guidry's Order dated August 27, 2019, Defendant's Exhibit A. A

6

stay will create the harm plaintiff sought to avoid by preventing her from timely applying for a Residency placement. Defendant seeks to overturn the District Court' order by holding Plaintiff's test scores hostage pending appeal, leaving Plaintiff unable to take another exam or know the score of the exam she took. A stay will allow Defendant to continue discriminating against Plaintiff in violation of the ADA and to perpetrate the irreparable harm the preliminary injunction was intended to prevent.

## Defendant is not entitled to a Stay

### Standard for Determining Stay of Preliminary Injunction

Defendant cannot meet the U.S. 5th Circuit's standard for staying a preliminary injunction. In Texas v. U.S. 787 F.3d 733, (5th Cir. 2015), the Fifth Circuit set forth the analysis to be used in deciding whether to grant a stay of a preliminary injunction order.  The Court noted:

> We consider four factors in deciding whether to grant a
> stay pending appeal: '(1) whether the stay applicant has
> made a strong showing that he is likely to succeed on
> the merits; (2) whether the applicant will be irreparably
> injured absent a stay; (3) whether issuance of the stay
> will substantially injure the other parties interested in
> the proceeding; and (4) where the public interest lies.

The Court noted an appellant seeking the stay must show the district court abused its discretion by entering a preliminary injunction. The Court further explained that a decision "grounded in erroneous legal principles is reviewed de novo," and findings of fact are reviewed for clear error. Ultimately, a "stay 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.' Defendant cannot meet any of these factors.

### (1)     Defendant has not made a strong showing it is likely to succeed on the merits.

Defendant cannot meet its burden of a strong likelihood of success on the merits  based on the provisions of the ADA and ADA Amendments Act of 2008 and the evidence presented to the District Court.  The ADA definition of disability (42 U.S.C. 12102(2) requires a showing that the individual has a "physical or mental impairment that substantially limits one or more of the major life activities of the individual." 28 C.F.R. 36.105(a)(1).   A "physical or mental impairment" includes a "specific learning disability" and "Attention Deficit Hyperactivity Disorder." 28 C.F.R. 36.105(b)(2).   A "major life activity"

includes "learning, reading, concentrating, thinking, writing." 42 U.S.C. 12102(2) & 28 C.F.R. 36105(c)(1)(i).

Dr. Patricia Brockman diagnosed Plaintiff with a Learning Disorder with impairment in Reading: rate (DSM-V 315.00 ICD-10 F81.0) (Defendant's Exhibits E & F); Dr. James Barbee diagnosed her with Attention Deficit/Hyperactivity Disorder-Combined Type (DSM-V F-90.1) (Plaintiff's Exhibit #1) and Generalized Anxiety Disorder (DSM-V 300.02 ICD-10 F41.1) (Defendant's Exhibits E & F). Defendants completely disregard the fact that Plaintiff was diagnosed with similar disabilities in Fifth and Sixth Grade. See Reports of Sr. Sarah Ducy, PH.D. and Denise Nagin, M.C.D, CCC/SLP (Plaintiff's Exhibits #2 & #3).

Defendant argues that the trial court erred in finding that Plaintiff is an individual with a disability because she is substantially limited in the major life activities of reading when compared to most people in the general population. Defendant argues that the Court erred because the Nelson Denny Reading Test ("NDRT") indicates that her reading speed was slower than 75% of students her age, not lower than 75% of the general population. But defendant ignores the fact that

9

the trial court's decision was not based on that one test result. Judge

Guidry wrote:

> The totality of the evidence and testimony presented in this case establishes that Plaintiff is an individual with a disability under the ADA because she is substantially limited in the major life activities of reading **when compared to most people in the general population.** Plaintiff produced evidence showing that she has a history of impairment in reading based on current professional examinations in accordance with the accepted standard of clinical review of the SDM-V. See Judge Guidry's 8/5/19 decision, Exhibit B to Defendant's Motion for Emergency Order.

The Court noted that plaintiff "was first diagnosed with dyslexia

and dysgraphia when she was ten years old" and was prescribed

Adderall. *Id.* The court further noted that she struggled with her

disability from elementary school through college and worked hard to

overcome her disabilities without requesting accommodations to avoid

the stigma associated with her disabilities. *Id.*

The Court correctly cited the most pertinent portion of Dr.

Brockman's evaluation:

> [Plaintiff's] overall achievement fell in the superior range and it was generally consistent with her overall intelligence. When given the use of a calculator, her overall achievement was even stronger. Significant variability was noted in [Plaintiff's ] educational skills, with relative strengths noted in her very superior Oral

10

Language and superior Mathematics Composites. Her Written Expression and Reading Comprehension fell in the high average range and was stronger than the timed measures of her Reading Comprehension on the nelson Denny. Significant variability was noted in [Plaintiff's] reading skills. The accuracy of her sight vocabulary fell in the high average range but her ability to decode words fell at the low end of the average range. The most remarkable observation was [Plaintiff's] slow reading and decoding speed. On the measure of her sight vocabulary, [Plaintiff's] reading speed was slower than 90% of students her age and her decoding speed was slower than 75% of students her age. On the timed Nelson Denny subtest, [Plaintiff's] **Reading Speed fell in the borderline or slow learner range** at 6th percentile. This indicated a Specific Learning Disorder with Impairment in Reading-V 315.00 ICD 10F81.0) This creates a Functional Impairment for which accommodation of extended time is needed to produce fair and unbiased measures of [Plaintiff's] skills on academic and daily tasks when reading is required.

The Court noted these findings were consistent with plaintiff's testimony that she was able to score well in standardized tests like the MCAT, but on tests like the Step 2 exam, at issue here, consisting of lengthy reading vignettes with a short time period allowed per question, her scores were significantly lower. See Judge Guidry's Opinion, Exhibit B-7 to Defendant's Emergency Motion. The trial court properly noted that Plaintiff's medical school exam scores (on tests like the NBME Step 1 and 2 tests, from which Tulane's test questions are

11

taken) increased by twenty percent once Tulane Medical School gave her the accommodation of 50% extra time. This demonstrates that her substantial limitation of the major life activity of reading must be and can actually be, reasonably accommodated.

Defendant also argues that because Plaintiff has achieved academic success, she is not substantially limited in a major life activity and is not entitled to accommodations, in <u>Berger v. NBME</u>, S.D. Ohio, Western Division, 2019 WL 4040576, at *18, the Judge wrote:

"The Court is not persuaded that the evidence and legal authority presented by the NBME compel a contrary finding on whether Mr. Berger has shown a substantial likelihood of success on the merits of his ADA claim. The Court recognizes that some courts, as cited in NBME's brief, have concluded that average to above-average performance on past examinations does not support a finding that a person is substantially limited when compared to the general population. Nevertheless, the Court also recognizes that "[a] definition of disability based on outcomes alone, particularly in the context of learning disabilities, would prevent a court from finding a disability in the case of any individual…[sic] who is extremely bright and hardworking, and who uses alternative routes to achieve academic success," a result that would be inconsistent with the goals of the ADA. Bartlett v. New York State Bd. of Law Examiners, No. 93 CIV, 4986, 2001 WL 930792, at *37 (S.D.N.Y. Aug. 15, 2001) (Sotomayor, J.). See also <u>Peters</u>, 2012 WL 3878601. At *6 (Defendant's rational—that anyone who has had some modicum of academic success cannot be found to have a disability that affects learning—flies in the face of Congress' directives and the relevant implementing regulations."

The <u>Berger</u> Court also noted:

In addition, under the ADA regulations, the Court must consider the
condition and manner under which the individual performs the major
life activity, as well as the duration of time it takes to perform such
activity, in determining whether a person has a disability under the
ADA: The focus is on how a major life activity it substantially limited,
and not on what outcomes an individual can achieve. For example,
someone with a learning disability may achieve a high level of academic
success, but may nevertheless be substantially limited in the major life
activity of learning because of the additional time or effort he or she
must spend to read, write, or learn compared to most people in the
general population." *Ibid*.

     The <u>Berger</u> Court further noted:

Consistent with DOJ guidance that an individual evaluation is
"particularly important in the learning disabilities context, where
proper diagnosis requires face-to-face evaluation," and that "[r]eports
from experts who have personal familiarity with the candidate should
take precedence over those from, for example, reviewers for testing
agencies, who have never personally met the candidate," Bibber, 2016
WL 1404157, at *6, the Court finds the strong weight of the evidence
supports the findings and conclusions of Dr. Beach, who personally
clinically observed his performance and efforts on these assessments."
*Id*. at 20.

     Interestingly, the NBME in <u>Berger</u> argued that a medical student

was not entitled to a reasonable accommodation of additional test

taking time on the Step 2 CK Exam and cited the student's previous

academic success as the basis for denying accommodations. The trial

court in Berger, just as Judge Guidry here, made short shrift of their

attempt at negating of the ADA.

13

Plaintiff's psychiatric evaluation was performed by her treating physician (since 2014, under who's treatment she remains); the psychological evaluation was performed by Dr. Brockman over a period of days in 2017 and then again, a day of interview and evaluation in April 2019. Both clinicians personally performed the evaluations and assessments of Plaintiff based on their face-to-face observance of her during the tests, and in the case of the psychiatrist, Dr. Barbee, also from his years of treating Plaintiff.

Defendant argued the Nelson Denny Test is "only" a one-minute reading test. Dr. Brockman refuted Defendant's view in her "Addendum of April 19, 2019" stating:

"the claim that 'experts' do not consider the NDRT [Nelson Denny Reading Test] 'to be a reliable measure of reading efficiency' because it is based on a one-minute reading sample is false. The NDRT is one of the most widely administered reading test in the nation and is used by many medical schools to gauge reading ability." See Defendant Exhibit F-1

Defendant assertion that Plaintiff is not disabled under the ADA standards is simply wrong and unsupported by the statute, case law, or the evidence produced at the hearing. The ADA regulations plainly state "When considering requests for modifications, accommodations, or auxiliary aids or services" the entity (Defendant) must "give

14

considable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations." (Emphasis added) 28 C.F.R. 36.309(b)(1)(v). Plaintiff has documented the past and present accommodations granted to her by Tulane University for the exact same accommodation under the same testing situations. As noted above, Plaintiff's test scores have gone up 20% across the board on written tests using NBME-style questions/vignettes. It is significant to note that her test scores went up *only* on tests in which the questions were NBME-style; her scores were already, and remained average to high, on tests that did *not* use the NBME-style vignettes.

In his Reasons for Judgment, Judge Guidry noted there is an objective standard embodied in the ADA for determination of accommodations. Despite Defendant's assertion in closing arguments, not "anyone" can ask for accommodations. An individual must medically prove that a diagnosed disability, by a licensed professional psychiatrist or psychologist, pursuant to the criteria of the DSM-V, for which there is a statutory accommodation provided by the ADA. Plaintiff has met that objective standard with uncontroverted professional psychiatric

15

and psychological diagnosed impairments which she submitted to the
NBME. The professionals who evaluated her have documented her need
for test-taking accommodations as the best means to mitigate the
effects of her disabilities. As such, she has met the objective criteria for
a disability and a statutorily authorized accommodation. Defendant
focuses its ire on the NDRT test, but Plaintiff submits this is only one
small part of the panoply of consideration under the ADA (and Plaintiff
disagrees with Defendant's interpretation of the NDRT test). Under a
"totality of the circumstances" test, the District Court concluded there
was ample evidence to support its findings. Defendant cannot show that
it has a likelihood of success on appeal, much less a "strong" likelihood.

## (2) **A stay will substantially harm Plaintiff**.

If this Court grants an emergency stay, the plaintiff will suffer
substantial harm. And it is the same harm that formed the basis for
the District Court finding that Plaintiff would suffer irreparable injury
absent immediate intervention. The District Court correctly noted:

[I]f plaintiff were to take the examination any later than August 6,
2019, or worse, take the test without accommodations and fail or score
poorly: (1) she would be at an irreparable disadvantage in securing

residency interviews and obtaining a match;[2] (2) she would suffer financially having to pay for an additional year of tuition, as well as the delay in earning an income as a resident for an entire year; (3) she would incur a permanent blemish on her academic record, which could not be removed; and (4) she would be placed in a very real danger of not being able to complete medical school. It is rather disingenuous of Defendant to minimize the possible and real consequences faced by Plaintiff should she not be allowed to take the Step 2 CK Examination on August 6, 2019, with the requested accommodations. (Defendant's Exhibit B-8)

Of course, the Court's comments assumed that once it granted the injunction, the NMBE would transmit the test scores, as this was implicit in its order. See Judge Guidry's August 27th Order, Defendant's Exhibit A. The Court's comments apply equally to the sending of the scores. If this Court grants a stay and Plaintiff's score is not transmitted than she will suffer the irreparable/substantial harm found by the trial court.

Additionally, Plaintiff will also suffer irreparable harm for the following reasons:

1.     The NBME keeps a permanent transcript of every test activity.  (Plaintiff's Exhibit #4) "Your USMLE transcript includes the

---

[2] Judge Guidry's conclusion that Plaintiff would be irreparably harmed in obtaining a Residency match was supported by Plaintiff's testimony and Plaintiff's Exhibit 4, a graph that shows the median Step 1 and Step 2 scores for successful candidates for Residency Programs. Plaintiff's Step 1 score and a commensurate Step 2 score achieved without accommodations render it almost impossible for her to be accepted into a Residency Program.

following….your complete examination history of all Steps and Step Components that you took;"  Since plaintiff has already taken the test with accommodations, her transcript will reflect that a test was taken on August 6 and 7, 2019.  The NBME annotation choices for non-reported scores will be "valid and reported" or "invalid and canceled." If canceled, then an annotation of "score not available" will appear on the transcript next to the date of the exam. These annotations will unfairly mark plaintiff as having engaged in test taking anomalies, and raise questions for any potential Residency employers about the reason for the notation. She took the test with an unchallenged Court directive. The transcript is a permanent record that follows plaintiff throughout her career.

2.    Plaintiff is not permitted to retake the test unless she receives a failing score.  Likewise, she is not permitted to take the test if there is no score or score pending. Throughout the appeals process, plaintiff will be held in a suspended state unable to move forward. She has no idea if she passed or failed.  She has nothing to report to the potential Residency program and must report that she has a disability, took an accommodated test, which scores are now being withheld. She

18

has no score whatsoever to report to Tulane Medical School in order to graduate. The appeals process can take an indeterminate amount of time. The senior year of medical training is on a very tight schedule of residency submissions, residency interviews, residency matches, and in a mere nine months potential graduation. The score of a lawfully taken test should not be held until the completion of appeals process. The District Court recognized this in both his orders.

3.    Plaintiff has already studied and worked hard to prepare for the August 6 test. She was permitted by the NBME to take the accommodated test. Plaintiff was not made aware when she was granted permission to take the test by NBME that they would then label her score invalid. She validly took the test. Simply because the NBME did not agree with the ruling of the District Court who provided very detailed findings of the need for accommodations and need for injunctive relief, the plaintiff was unaware that she risked having her results hijacked. In fact, the NBME has been warned by the District Court that it would consider a failure to timely release the scores an act of contempt.

The courts have held that the lost time and effort in preparing for a professional exam is itself irreparable harm. See <u>Berger</u>, *supra*, at *27, citing <u>Agranoff v. Law Sch. Admission Counsel, Inc.</u>, 97 F. Supp. 2d, 86,88 (D. Mass. 1999); <u>Elder v. Nat'l Conference of Bar Examiners</u>, No. C-11-00199, 2011 WL 672662, at *10 (N. D. Cal. Feb. 16, 2011); <u>Jones v. Nat'l Conference of Bar Examiners</u>, 801 F. Supp. 2d 270, 288 (D. Vt. 2011).

4.    If the stay is granted, there is absolutely nothing plaintiff can do to obtain a STEP 2-CK score in any timeframe that would be meaningful. She would not be eligible to graduate or apply for Residency interviews.

Defendant NBME argues that Plaintiff would still be eligible for residency placement in the "Scramble" in March, a scrum in which senior medical students who got no residency placements "scramble" with one another to find some placement anywhere. That is not a plan or an alternative for Plaintiff. Further, Defendant's assertion that Plaintiff can "just wait" is contradicted by the case law. Specifically, in <u>Bonnette v. District of Columbia Court of Appeal</u>, 796 F. Supp. 2d 164 (D.D.C. 2011), the Court  explained the irreparable injury that

necessarily results from denying accommodations to an individual with

a disability who is taking a professional license test, as follows:

Bonnette contends that she will suffer irreparable injury in the absence
of an injunction because she will either be forced to take the July 2011
MBE [Multistate Bar Exam] under discriminatory conditions or have to
wait until at least the February 2012 administration while her claim is
litigated. Because Bonnette cannot practice law until she successfully
passes the D.C. Bar Examination, any delay in taking the MBE
deprives her of time to practice her chosen profession. The lost
opportunity to engage in one's preferred occupation goes beyond
monetary deprivation. See Enyart, 630 F.3d at 1166 (Affirming finding
of irreparable harm based on plaintiff's inability to practice law without
successfully passing the bar examination). Bonnette 796 F. Supp. at
186-187).

Here Plaintiff cannot practice medicine without passing Step 2

and ultimately Step 3. Defendant cites three cases, Doe v. N.Y Univ.

666 F2d 1981(2nd Cir. 1981), decided before the 2008 amendments],

Rothberg, 102 F. Appx at 125 and Bach, 2014 U.S. Dist. LEXIS 124632

at *6, for the proposition that forcing plaintiff to wait another year

before she takes the test and/or has her scores released is not

substantial harm.  However, these cases are distinguishable as they are

all graduate school admission tests and law school admission tests.  The

students in those cases did not already start their professional school.

And more importantly they would not have to attempt to get a

residency match having to explain why their medical school education

was interrupted for a year and having to disclose the stigma of an ADA protected disability.

### (3)  **Defendant has not shown that it, or others, will be irreparably harmed**.

If Defendant's request for a Stay is denied, Defendant will suffer no irreparable harm whatsoever. Defendant will suffer no public stigma — in fact, the public will never even know that Plaintiff took the test with accommodations (whether she passes it or not), both based on the anonymity of the test and the fact that proceeding is the District Court is Sealed.  There is no injury to other parties interested in the proceeding.   To argue that a non-disabled student is injured by the grant of a reasonable accommodation  to a student with a disability is absurd.  That is required by the ADA.

Further, to assert that Defendant "has no remedy once it reports" Plaintiff's scores under <u>Bach</u>, is disingenuous.  <u>Bach</u> was a district court decision denying an accommodation where the district court found that plaintiff did not meet the burden of showing that it was entitled to a preliminary injunction.  Here, the district court found that plaintiff met its burden.

(4) **The Public Interest is served by denying the stay.**

The denial of the stay will substantially advance the public

interest as it is codified in the ADA of 1990 and the ADA Amendments

Act of 2008. For Plaintiff, testing accommodations will give life to the

ADA's legislative goal: to provide Plaintiff a level playing field to show

what her mastery of the material, instead of showing the effects of her

disability.

In <u>Rush v. National Board of Medical Examiners</u>, 268 F. Supp.

673 (N.D. Tex. 2003), the Court stated:

> The USMLE Step 1 examination involves and requires extensive
> reading, and scoring well and/or passage of the exam requires extensive
> subject-matter knowledge. Plaintiff has shown a sufficient causal
> connection between his reading impairment and his failures to score
> well, or as well as he might, on time-limited examinations requiring
> extensive reading. Plaintiff has shown that if he is accommodated, he
> will be effectively tested not on his disability but rather on his subject-
> matter knowledge. Plaintiff has shown that his reading impairment
> seriously decreases the rate at which he reads with comprehension.
> Plaintiff will suffer irreparable injury if the required injunction is
> denied.
>   With the requested reasonable accommodation of double time to
> take the Step 1 exam, Plaintiff will have time to either display his
> mastery of the subject matter, or show that he has not sufficiently
> mastered the tested materials. In either event, granting the injunction

will allow Plaintiff to be tested on his medical and science knowledge and not his disability.

The threatened injury to Plaintiff outweighs any damage that granting the preliminary injunction might cause at this time to the Defendant or to the public.

The injunction will not disserve the public interest but will further the public interest in prohibiting discrimination by public entities, such as the National Board of Medical Examiners, on the basis of disability by fulfilling the ADA's requirement that entities offering licensing examinations provide reasonable accommodations to disabled individuals.

## CONCLUSION

Accordingly, defendant NBME is not entitled to a stay as the District Court did not abuse its discretion. Quite to the contrary, a stay would frustrate the purposes of the ADA and injunctive relief. Judge Guidry stated that he granted the preliminary injunction on the basis of the "applicable law, the facts established at the hearing of August 1, 2019" and his "finding that Plaintiff was a credible witness in every aspect of her testimony." (Defendant's Ex. B-9)

DATED: August 30, 2019

<u>/s/ William M. McGoey</u>

William M. McGoey                    Frances M. Olivier
Attorney At Law                      Law Office of Frances M. Olivier
1828 Rose Street                     2341 Metairie Road
Arabi, Louisiana 70032               Metairie, LA 70001
Telephone: 504-250-3293              Telephone: 504-483-6334
                                     Fax: 504-483-6344

                                     *Counsel of Record for Plaintiff-
                                     Appellee*

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,113 words, excluding the parts by Rule 27(a)(2)(B); and (2) the type-face and type style requirements of Rule 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook font.

/s/ William M. McGoey
William M. McGoey

*Counsel of Record for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

On August 30, 2019, this brief was served via CMF/ECF on all registered counsel and submitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ William M. McGoey
William M. McGoey

*Counsel of Record for Plaintiff-Appellee*

27

## DECLARATION OF WILLIAM M. McGOEY

I, William M. McGoey, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct:

A. I am an attorney at law and counsel of record for Plaintiff Meaghan Doherty in the above-captioned proceeding.

B. I submit this declaration in support of Plaintiff-Appellee's Opposition to Defendant's Emergency Motion to Stay Injunction Pending Appeal. I have personal knowledge of the facts stated below and am competent to testify regarding same.

C. Plaintiff's Ex. 1 – Dr. James Barbee Eval. (2017) is a true and correct copy of Dr. Barbee's Evaluation that was introduced as Exhibit 8 at the preliminary injunction hearing.

D. Plaintiff's Ex. 2 – Dr. Sarah Ducey Eval. (2004) is a true and correct copy of Dr. Ducey's Evaluation that was introduced as Exhibit 10 at the preliminary injunction hearing.

E. Plaintiff's Ex. 3 – Denise Nagim, MCD Eval (2003) is a true and correct copy of Denise Nagim's Evaluation that was introduced as Exhibit 11 at the preliminary injunction hearing.

F. Plaintiff's Ex. 4 – NBME Website Scores, Transcripts, & Bulletin (*en globo*) is a true and correct copy of the information and bulletins regarding NBME test scores and transcripts that was downloaded off of the NBME Website by accessing a hyperlink on the Website to usmle.org. The pages constituting Plaintiff's Ex. 4 can currently be accessed by selecting the hyperlink on the NBME's website.

G. Plaintiff's Ex. 5 – Plaintiff's Application for Temporary Restraining Order with Equitable Relief and Order to Show Cause why a Preliminary Injunction Should Not Issue & Plaintiff's Memorandum in Support is a true and correct copy of the said pleadings filed in the District Court.

H. The following is true and correct based on the documents that were introduced at the preliminary injunction hearing

and based on plaintiff counsels' communications with

Defendant, NBME:

1. To ensure Plaintiff could both take the Step 2CK test and
   get her score in a timely manner, plaintiff applied to take the
   test and requested ADA accommodations on May 2, 2019.
   She attached supporting professional evaluations going back
   to 2003.

2. Defendant took seventy-five days to notify Plaintiff that it
   denied her accommodations request on July 16.

3. Plaintiff immediately applied to take the Step 2 CK test
   without accommodations, but based on Defendant's rules
   requiring a "permit" prior to scheduling a date, Plaintiff was
   not able to register for a test until July 18.

4. Defendant's website states that the scores for Step 2 CK
   Tests taken between July 1 and August 8 would be delayed
   due to a transition in Defendant's system. Due to
   Defendant's circumstances, Plaintiff had to register for the
   earliest test date that was still available in order to receive

her scores in time to apply for the Residency Programs (first week of September).

5. Armed with a test date of August 6 (the only date available within 300 miles) plaintiff filed suit on July 22 to obtain her ADA accommodations for the test.

6. Defendant's long delay in ruling on her accommodations request put Plaintiff in the position of having to litigate Defendant's denial of ADA accommodations in the narrow window from July 18 till the August 6 test date.

7. On July 22 Plaintiff filed suit and a Motion to Seal the Record.

8. Defendant's received all pleadings by FedEx delivery July 23. On July 24 NBME provided the name of its counsel.

9. On July 24, Plaintiff's counsel called Defense counsel who indicated he was not authorized to accept service.

10.     On July 26, the Court denied Plaintiff's request for a TRO, but set a preliminary injunction hearing for August 1.

11.     Defendant did not contact the District Court until July

29 when served with a copy of the order setting the August 1

hearing.

12.     Defendant did not acknowledge whether it would

appear atthe hearing until the day before the hearing.

13.     Defendant filed nothing prior to the hearing and

presented no evidence.

14.     On August 1, the District Court conducted a three-hour

hearing on the preliminary injunction.

15.     The Court accepted post-hearing memoranda on

August 2.

16.     The Court granted the preliminary injunction on

August 5.

17.     Defendant filed no immediate request for an

emergency stay and Plaintiff took the test with

accommodations on August 6 & 7.

18.     Defendant filed a Notice of Appeal on August 9.

19.     Defendant waited until August 22 to file its Motion to

Clarify and for a Stay of the Court's order of August 5.

20.    The Court denied that Motion on August 27.

21.    Defendant filed this motion on August 29 seeking

once again to void the Court' s grant of a preliminary

injunction.


Dated August 30, 2019          s/ William M. McGoey
                               William M. McGoey