# UNITED STATES DISTRICT COURT

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

## EASTERN DISTRICT OF LOUISIANA

2019 JUL 22 P 4: 25

| | | |
|---|---|---|
| **MEAGHAN DOHERTY** | * | **CIVIL ACTION NO. 19-11790** |
| | * | |
| **VERSUS** | * | **JUDGE:** |
| | * | |
| **NATIONAL BOARD OF** | * | **MAGISTRATE:** SECT. T MAG 5 |
| **MEDICAL EXAMINERS** | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### UNDER SEAL

## PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH EQUITABLE RELIEF AND ORDER TO SHOW CAUSE WHY A PRELIMNARY INJUNCTION SHOULD NOT ISSUE

**NOW INTO COURT,** comes Plaintiff, Meaghan Doherty, through undersigned counsel, who, pursuant to Rule 65 of the Federal Rules of Civil Procedure, hereby applies for a temporary restraining order ("TRO") with other equitable relief against the NATIONAL BOARD OF MEDICAL EXAMINERS ("NBME"). In support of her application, Plaintiff respectfully presents the following, to wit:

### JURISDICTION AND VENUE

1. Plaintiff brings this action for a temporary restraining order and injunctive relief for violations of the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. §12101, et seq.; specifically, violations of Title III of the ADA, 42 U.S.C. §§12181-12189.

2. Plaintiff's cause of action for disability discrimination under the ADA is authorized by 42 U.S.C. § 12188(a)(1) and 42 U.S.C. 2000a-3(a).

Fee You
Process
X Dktd
CtRmDep
Doc. No.

1

3. This Honorable Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1331 and §1343(a)(4).

4. Injunctive relief is authorized by 28 U.S.C. §§ 2201 & 2202 and Fed. R. Civ. Proc. 65.

5. Venue is proper to the Eastern District of Louisiana as a substantial part of the events or omissions giving rise to the present claim occurred in this District, and Plaintiff is a natural person domiciled and residing in this judicial circuit. 28 U.S.C. §1391(b) and (c).

## PLAINTIFF

6. Plaintiff, Meaghan Doherty, is a person of the full age of majority, a native of, and domiciled in, the Parish of Orleans, State of Louisiana. She is 25 years old, enrolled in the Tulane University School of Medicine[1], and is starting her senior year of medical school.

7. Plaintiff, Meaghan Doherty, is disabled in reading: rate; ADHD Combined Type and Generalized Anxiety Disorder. (Exhibit#2 at 32-33)

8. Plaintiff is required to take and pass the NBME Step 2-CK (Clinical Knowledge) Test as a condition of graduation from an accredited U.S. Medical School, here, the Tulane University School of Medicine. Plaintiff applied for the test and requested test-taking accommodations of additional time (Exhibit #2 at 3) under the Americans with Disabilities Act of 1990 and the ADA Amendments Act of 2008, based on her diagnosis

---

[1] Plaintiff specifically provides this disclaimer-- that the opinions, statements of law and legal conclusions contained in this Civil Action should not be ascribed to Tulane University, and are solely the opinions/position of plaintiff and not of Tulane University or of any healthcare institution (i.e. hospital, clinic or healthcare system) in which she works. She makes this disclaimer in accordance with Tulane University School of Medicine Handbook - Policy on Social Media and Out – of – Work Conduct, Section C, page 35.

of Learning Disability with Impairment in Reading: rate; ADHD Combined Type, and Generalized Anxiety Disorder. (Exhibit #2 at 32-33)

9. NBME Step 2- CK (Clinical Knowledge) Test is a nine-hour 316 multiple choice question test divided into eight 60-minute blocks with a total of 45-minutes of break time for authorized breaks, inclusive of lunch, and for computer transitions between blocks. If a block is completed early the unused time will be added to the break time, not the test taking time. Once the time for each section has expired there is no returning to the section to complete the section. Each question is a written passage which must be read with options to select written multiple-choice answers. Any unanswered question will be counted as a wrong answer. (Exhibit #17 at 11, and Exhibit #21)

10. NBME Step 1 is a similar testing format (*Id.*) and as will be explained, plaintiff applied and was not granted accommodations and performed well below her predicted abilities.

**DEFENDANT**

11. Defendant NBME is a private, non-profit organization, incorporated in the District of Columbia. Its offices and principal place of business are located in Philadelphia, Pennsylvania.

12. With the Federation of State Medical Boards, Defendant NBME sponsors the United States Medical Licensing Examination (USMLE), a standardized examination used to evaluate applicants' competence for the purposes of medical licensure in the United States. State medical boards rely upon successful completion of the three USMLE component exams, or "Steps," as an integral element in the process of licensing physicians. These exams are referred to as Step 1, Step 2-CK and Step 2- CS (Measuring

3

Clinical Skills is not a timed multiple-choice test) and Step 3 which is taken post-graduation from medical school and upon completion of the first year of residency program (or "intern year".) (Exhibit #12 at 1, ¶¶ 1-3)

13. Pursuant to Title III of the ADA, as a private entity that administers examinations related to professional licensing, the NBME must offer examinations in a place and manner accessible to persons with disabilities. 42 U.S.C. §12189, and its related implementing regulations, 28 C.F.R. §36.309, as well as all other requirements specified within Title III of the ADA, 42 U.S.C. §§12181-12189. (See also Exhibit 12 at 1, ¶5)

## FACTS PRECIPITATING TRO REQUEST

14. On Monday, July 15, 2019, Defendant emailed notification to Plaintiff that her Step 2 registration was complete, however Plaintiff could not schedule a test date until she received her "scheduling permit"; that her scheduling permit was on "hold because you indicated in your application that you are requesting test accommodations. Your permit will be issued as soon as Disability Services processes your request for test accommodations." (Exhibit #13 at 3, ¶¶ 1-2)

15. On Tuesday, July 16, 2019, Defendant emailed notification to Plaintiff (in an attached PDF letter dated July 15, 2019) that it had **denied** her request for accommodations on the Step 2 Test. (Exhibit #1 at 2) & (Exhibit #13 at 4)

16. On Thursday, July 18, 2019 at 1:04 a.m., Defendant emailed notification to Plaintiff that "[y]our USMLE Step 2 CK scheduling permit is now available." (Exhibit #13 at 5, ¶ 1) The scheduling permit is attached. (Exhibit #13 at 6).

4

17. Plaintiff opened the above referenced email at 6:00 a.m. the same day and began the process of scheduling her Step 2 Test, despite the denial of accommodations. The first available test date was August 6, 2019 within 300 miles of New Orleans.

18. On July 18, 2019 at 6:32 a.m., Defendant's third-party exam proctor, Prometric.com, emailed notification to Plaintiff that she was officially scheduled to take the computer-based Step 2 CK Test at 8:00 a.m. on Tuesday, August 6, 2019 at the NBME test center at 2424 Edenborn Ave., Metairie, LA 70001. (Exhibit #13 at 7).

19. Plaintiff must pass the USMLE Step 2- CK Exam in order to graduate from medical school. She will not be allowed to complete medical school or to graduate with a medical degree without passing Step 2-CK. (Exhibit #18 at 12)

20. Plaintiff must take Step 2-CK on August 6, 2019 if she is to remain in good standing and in hopes of competing –based on her achievement and knowledge – for a residency placement in September 2019. Residency placement in the field of desired study is the holy grail for all US Medical school seniors.  Participation and success in the Main Residency Match program (NRMP), also called "The Match," is the requisite next step in the US Medical licensing requirements. (Exhibit #19)

21. Main Residency Match occurs in September of each year.  Applications are sent to programs through the Electronic Residency Application Services (ERAS), a service of the Association of American Medical Colleges.  After applicants apply to programs, the applications are reviewed on a rolling basis, underscoring that time is of essence in obtaining positions in residency programs.  Candidates are then selected for interviews held between October and February.  After the interview period is over, programs and

5

applicants each compile "rank order lists" in which applicants are ranked in order from most to least preferred as to whom they wish to train. (Exhibits #20 and #21)

22. September 15, 2019 opens the 2020 Match registration period. November 30, 2019 ends the application deadline which requires that both Step 2- CK and Step 2- CS be completed and scores made available. Scores are typically returned four weeks later. (Exhibit #19)

23. Obtaining a residency position is highly competitive. In 2018, 37,103 active applicants vied for the 30,232 first year and 2,935 second year residency position. (Exhibit #22, page 2)

24. The USMLE Step 2-CK is a critical component of the ranking of applicants. Scores on USMLE Step2-CK are used by residency programs to decide admissions with the assumption that the test score is an indicator of the applicant's abilities. (Exhibit #22, at iii)

25. Further, Plaintiff must take and pass the USMLE Step 2-CK Exam by September 15, 2019 which is the ERAS (Electronic Residency Application System) deadline for application processing for Residency Programs for post-graduation placement. If Plaintiff has not passed Step 2-CK by that deadline:

   a. She will not be able to timely apply for a post-graduate residency placement, and

   b. Any application submitted after that date will be date stamped and reviewed after the timely applications are submitted.

   c. She may be put in a position to have to wait until the following year for an opportunity for a residency placement.

6

26. If she receives a failing score on Step 2-CK plaintiff would then be competing with a new cohort of medical school seniors, it being readily apparent that she had to sit out a year due to failing Step 2-CK, where her only two options would be to attempt to explain a poor performance as an inaccurate reflection on her aptitude or achievement level because of her disability, which HIPAA otherwise protects, thus incurring the stigma of disability which the ADA was enacted to overcome and placing a permanent brand on her professional record. Her other choice is to remain silent and the evaluators will process and rank her application for residency against other non-disabled candidates, thereby allowing them to consider her low performance on Step as an accurate reflection of her aptitude or achievement level, or lack thereof, when in actuality the scores on a non - accommodated test would reflect her disability rather than accurately reflect her abilities. Either way, Plaintiff finds herself trapped between the Scylla and Charybdis of the NBME and the National Residency Matching Program which views Step scores as indicators of abilities and achievement.

27. Plaintiff applied to NBME for accommodations in advance of Step 1 which is the first of the series of tests taken after the second year of medical school and her request was similarly denied. She consequently took the Step 1 exam without accommodations. Plaintiff passed by only a few points, scoring a 200 with a minimum passing score of 194. (Exhibit # 5)[2] The score, though not technically failing, was so low that plaintiff is not in any of the percentiles of individuals who received matches with any residency programs in their selected field based on data generated in 2018. (Exhibit #22 at 9) Ironically, if she had failed she would have been allowed to take the test again before the

[2] In 2018, "Overall, U.S> allopathic seniors who matched to their preferred specialty have mean USMLE step 1 scores of 232.8 (s.d. =17.5) well above the 2018 minimum passing score of 194." Exhibit 22, at 9.

Plaintiff's Exhibit 5, Page7

current Match period, but the very low pass score prevented that.  Plaintiff is in the dilemma of having to overcome the passing, but abysmally low, Step 1 score in order to be considered for *any* residency program, much less her chosen field of OB/GYN and/or her chosen geographic location of New Orleans[3].  She has already suffered the consequence of not being provided accommodations for the Step 1 with no means of addressing the harm other than to do well on the Step 2 CK and demonstrate her true abilities.

28. If she were to receive the score she received on Step 1 she would fail as a passing score would be in the 209 range. (Exhibit #23, at 1)

29. If she is not able to take the test on August 6, 2019, with the accommodations she has requested, she will suffer irreparable injury as outlined above.

30. It is essential that she be allowed to take the Step 2 CK test with accommodations so that her true abilities are measured rather than her disabilities in accordance with law.

## APPLICABLE ADA DEFINITIONS, PROVISIONS & REGULATIONS

31. Congress stated its intent in the ADA is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities, and to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities. 42 U.S.C. §12101(b).

32. Under the ADA, the term "disability" for an individual means a physical or mental impairment that substantially limits one or more major life activities of such individual, a

---

[3] Meaghan Doherty is a native New Orleanian who is married to first year Tulane Medical Student, Steven Fielkow. It is their intention to raise their family in New Orleans and serve the New Orleans community to which they are dedicated after they become licensed medical doctors.

Plaintiff's Exhibit 5, Page8

record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. §12102(1).

33. Under the definition of "disability," the statute specifies that a "major life activity" (among other things) the activities of "learning, *reading, concentrating, thinking, communicating*, and working." 42 U.S.C. §12102(2)(A). [Emphasis added]

34. Congress stated the definition of disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. §12101(4)(A).

35. Congress further stated the ADA's term "substantially limits" in the definition of disability "shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." 42 U.S.C. §12102(4)(B).

36. The ADA provides that an impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability. 42 U.S.C. §12102(4)(C).

37. Based on the foregoing, Plaintiff is an individual with a "disability" as that concept is defined by the American with Disabilities Act of 1990, as amended. 42 U.S.C. §12101.

38. Pursuant to Title III of the ADA, private entities that administer examinations related to professional licensing must offer the examinations in a place and manner accessible to individuals with disabilities or must offer alternative accessible arrangements for such individuals. 42 U.S.C. §12189 and 28 C.F.R. §36.309(A).

39. Pursuant to 28 C.F.R. §36.309, private entities that administer such examinations are required to provide reasonable modifications to the examination and appropriate auxiliary aids and services (i.e., testing accommodations) for individuals with disabilities. Private

Plaintiff's Exhibit 5, Page9

entities must ensure that such examinations are selected and administered "so as to best

ensure that, *when the examination is administered to an individual with a disability* that

impairs sensory, manual, or speaking skills, *the examination results accurately reflect the*

*individual's aptitude or achievement level* or whatever other factor the examination

purports to measure, *rather than reflecting the individual's impaired sensory, manual, or*

*speaking sills* (except where those skills are the factors that the examination purports to

measure.)." 28 C.F.R. §36.309(b)(1)(i). [Emphasis added]

40. Moreover, when considering requests for modifications and accommodations, a private

entity administering such examinations must ensure that it "*gives considerable weight* to

*documentation of past modifications, accommodations, or auxiliary aids or services*

received in similar testing situations. 28 C.F.R. §36.309(b)(1)(v). [Emphasis added]

41. Finally, the ADA's implementing regulations specifically provide that required

modifications and accommodations "may include *changes in the length of time permitted*

*for completion of the examination*" as well as adaptation of the manner in which the

examination is given. 28 C.F.R. §36.309(b)(2). [Emphasis added]

## PLAINTIFF'S DOCUMENTED DIAGNOSIS & DISABILITY

42. In 2003, when she was ten years old, Plaintiff was diagnosed with dyslexia. Her overall

cognitive ability was calculated to be 91%, but her achievement skills were at 57%.

Noting this "substantial difference," Denise Nagim, the education evaluator, sought an

explanation in Plaintiff's "Phon /Graph Knowledge" or the ability to use sounds along

with graphemes/letters" yielded her lowest score of 31%. The evaluator noted "symptoms

of dysgraphia are identified in writing and affect written expression. Meaghan is unable

10

to reach potential as evidenced by her Spontaneous Writing score of 10 percent according to the TOWL-3." (Exhibit #12 at 3)

43. In November 2004, Plaintiff was again evaluated due to problems in school, particularly spelling, writing, test taking, and overall paying attention. Dr. Sarah Ducey, a licensed Louisiana Psychologist, found Plaintiff's Full-Scale IQ fell in the Very Superior range at the 98th percentile. However, her "Working Memory (WMI)" was in the 42nd percentile. The evaluator found that "[o]verall. Meaghan's subtest scores ranged from Low Average to Very Superior." (Exhibit #11 at 7)

44. Dr. Ducey diagnosed Plaintiff with mild dyslexia "characterized by difficulties with accurate learning and/or fluent word recognition and poor spelling and decoding abilities." She added "[s]econdary consequences may include problems in reading comprehension and reduced reading experience." (Exhibit #11 at 7)

45. Plaintiff continued through her elementary and high school years struggling in classes with writing essays, yet doing well enough in other areas that she was always at the top of her class. In her own words: "as a child, the discrepancy between my high intellectual ability and my low reading and spelling ability was a source of serious consternation for my parents. I assumed they were being overly dramatic or hyper-critical because my grades were always excellent, and I didn't think that my way of learning or writing was different from that of my friends." She had been tested in kindergarten as gifted and was also in a French Immersion program. "I attributed my inadequacy" to that. Her parents changed schools in 3rd grade to get her in a smaller class size, but "the discrepancies in my performance on standardized tests, particularly, spelling, did not improve, and my parents decided to have me evaluated." After the evaluations found dyslexia and ADHD,

11

"I was afraid I would be put in a separate program and treated differently." She even

"refused all the accommodations the school offered me. I didn't think they would help."

(Exhibit #7 at 1)

46. In August 2006, Plaintiff tested into the 8th Grade honors programs at Dominican High

School. "The leap in academic expectations was the first time I struggled in school and

was unable to keep up on my own." She then was prescribed Adderall for the ADHD. "I

quickly realized it was a big help." (Exhibit 7 at 2)

47. In August 2007, Plaintiff began 9th grade at Benjamin Franklin Senior High School.

There, for the first time, she became comfortable admitting her diagnosis and medication

when she realized other students were suffering from ADHD and were on Adderall.

However, she still resisted applying for testing accommodations as "a badge of honor: I

was smart enough to well even without the recommended accommodations." For

Plaintiff, "accommodations and the stigma they carry, was an admission that there was

something wrong with me; that I was inadequate compared to my classmates." (Exhibit

#7 at 2)

48. She continued taking Adderall through her college years at the University of Wisconsin,

Madison, and she excelled, but worked very, very hard.

49. When she got to Tulane University School of Medicine, her performance on the first

semester exams made her realize this was a different academic environment from what

she had succeeded in before. She read and studied constantly, but her test grades were

borderline with some failures. She realized "it was not a lack of preparation, knowledge,

or understanding, but a lack of time" that was the source of her poor performance. It was

time to ask for accommodations.

12

50. In her NBME Personal Statement, Plaintiff stated "[t]he basis for my belief" was the "correlation between my performance on a medical school exam and the type of questions on the exam. On exams where the majority of questions were "NBME" style (usually a paragraph long) my average score was around a 67 – which is failing. However, for exams that were mostly short questions (a sentence or two), my average score was 85 – which is the class average exam result. When I noticed this disparity in my performance, I realized extra-time may be an accommodation that would help my performance, and more importantly, one that would more accurately reflect my knowledge and ability." (Exhibit #7 at 2)

51. In January 2017, the start of her second semester of medical school, she applied for test time accommodations based on her diagnosis and medication. Tulane University granted her accommodations on written tests of time and a half. (Exhibit #7 at 1) Since then she had done well on her exams and is performing at the same average as her classmates, and sometimes better.

52. In 2018, Plaintiff requested test-time accommodations in her application to the NBME for the Step 1 Exam. She submitted the evaluations from her elementary and high school years, as well as an evaluation by James Barbee,[4] M.D., a licensed Louisiana psychiatrist, and that of M. Patricia Brockman,[5] Ph.D., a licensed Louisiana psychologist, which completed a comprehensive psychological evaluation and psychometric testing results. See (Exhibit #s 9, 10, 11, & 12)

---

[4] In 1982, Dr. Barbee joined the faculty of the Department of Psychiatry at LSU School of Medicine and held positions as Residency Director, Vice Chairman of the Department and Director of the Department Outpatient Clinics. He was The George C. Dunne Professor of Psychiatry and a Professor in the LSU School of Medicine until he entered private practice in 2009. He continues teaching residents in the department, where he is currently a Clinical Professor of Psychiatry.
[5] Dr. Brockman specializes in Child, Adolescent, School, and Family Services and has been in private practice for over thirty years.

13

53. Plaintiff requested accommodations based on diagnosed disabilities, the first being: Specific Learning Disorder with impairment in Reading: rate (DSM-V 315.00 ICD-10 F81.0). Accommodation Requested: Extended (150%) time for testing.

54. Dr. Barbee, who remains Plaintiff's treating psychiatrist, confirmed her ADHD diagnosis in June 2014, and continued her on Adderall. (Exhibit #9 at 1)

55. Dr. Brockman found "timed measures consistently underestimated Meaghan's skill's, even in areas where she was successful." (Exhibit #10 at 17) "The most remarkable observation was Meaghan's slow reading and decoding speed" *Ibid*. "On the timed Nelson-Denny subtest Meaghan's Reading Speed fell in the borderline or slow learner range." *Id.* Dr. Brockman found this creates a Functional Impairment for which the "accommodation of extended time is needed to produce fair and unbiased measures of Meaghan's skills on academic and daily tasks where reading is required."

56. The second disability was "Attention Deficit/Hyperactivity Disorder-Combined Type (DSM-V 314.01 ICD-10 F*). Accommodation requested: Testing room conditions that are free from distractions.

57. Dr. Brockman found "behavioral ratings by Meaghan and other informants (her father and fiancé) on several measure indicated clinically significant symptoms of Attention Deficit/Hyperactivity Disorder." (Exhibit #10 at 17)

58. The third disability was "Generalized Anxiety Disorder (DSM-V 300.02 ICD-10 F41.1). Accommodation requested: Additional breaks during testing.

59. Dr. Barbee recommended a testing environment with minimal distractions for this disorder. (Exhibit #9 at 2)

Plaintiff's Exhibit 5, Page14

60. Dr. Brockman recommended a testing room free of distractions to help Plaintiff focus, as well as regular breaks during standardized testing. (Exhibit #10 at 18)

## DEFENDANT'S VIOLATIONS OF THE ADA of 1990 & ADA AMENDMENTS ACT OF 2008

61. As a direct and proximate result of Defendant's disregard for Plaintiff's ADA protections and Defendant's own ADA obligations to provide reasonable accommodations, Defendant has violated the ADA by discriminating directly and personally against Plaintiff in several ways, including, without limitation, to the following:

    a. Defendant has violated 28 C.F.R. § 36.309(b)(1)(v) by not giving "considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received" by Plaintiff "in similar testing situations."

        i. Plaintiff presented written documentation from Tulane University School of Medicine to Defendant that Tulane has been providing Plaintiff with testing accommodations on all written exams ("similar testing situations") consisting of "extended time (x1.5)" due to "Specific Learning Disorder, Impairment in Reading" since January 2017. (Exhibit #7)

        ii. Remarkably, the Defendant's Denial of Accommodations letter of July 15, 2019, makes no reference to, or acknowledgement of, the "past accommodations" which (1) Tulane University determined Plaintiff was entitled; (2) that Tulane provided extended time (x1.5) accommodations (the same accommodation Defendant denied her); (3) that the accommodations Tulane provided were for "similar testing situations," namely, written examinations; or (4) that Tulane has granted to Plaintiff

15

these accommodation for the past two years. The NBME Denial letter to

Plaintiff was silent on this point on which Defendant has a statutory

obligation to give "considerable weight."

b.  Defendant has violated its duty under 28 C.F.R. § 36.309(b)(1) that it "must

assure that the Step 2 CK test shall be:

"administered so as to best ensure that, *when the examination is administered to an induvial with a disability* that impairs sensory, manual, or speaking skills, *the examination results accurately reflect the individual's aptitude or achievement level* or whatever other factor the examination purports to measure, *rather than reflecting the individual's impaired sensory, manual, or speaking skills.*" 28 C.F.R. § 36.309(b)(1)(i) [Emphasis added]

   i.  Plaintiff presented Defendant with written documentation from one

   licensed Louisiana psychiatrist and two licensed Louisiana psychologists,

   who, as qualified professionals have personally observed Plaintiff in a

   clinical setting, in accordance with generally-accepted diagnostic criteria

   (DSM-V), as supported by reasonable documentation, have determined –

   in their clinical judgment – that Plaintiff is substantially limited in one or

   more major life activities within the meaning of the ADA, and is therefore

   in need of the requested test accommodation of extended time in order to

   demonstrate her ability and achievement level on the Step 2 test.

c.  Defendant has violated its duty to Plaintiff under 42 U.S.C. § 12189 to offer its

Step 2 CK licensing examination "in a place and manner accessible to persons

with disabilities or offer alternative accessible arrangement for such individuals"

in that:

   i.  Defendant has denied Plaintiff's request for testing accommodations under

   28 C.F.R. §36.309(b)(2), to wit: "changes in the length of time permitted

16

for completion of the examination and adaptation of the manner in which the examination is given," and

ii. Defendant has denied, despite the written documentation available to it presented by Plaintiff, that Plaintiff is not "currently substantially limited" in the major life activities of learning, reading, concentrating or thinking – all major life activities specified in the text of the ADA and implementing regulations.

62. For the reasons set out above in Paragraphs 19-30, Plaintiff will suffer irreparable injury by Defendant's denial of her request for ADA accommodations on the Step 2 test, with which she is without adequate remedy at law.

## GROUNDS FOR TRO WITH EQUITABLE RELIEF
## AND REQUEST FOR PRELIMINARY INJUNCTION

63. As Plaintiff now has a scheduled test date for the Step 2 Test and Defendant has rejected her request for testing accommodations, Defendant NBME is in violation of the ADA of 1990 and the ADA Amendments Act of 2008 for discrimination against persons with disabilities in a professional licensing examination by refusing to provide plaintiff with reasonable and statutorily available testing accommodations.

64. Pursuant to Fed. R. Civ. P. 65(b), Plaintiff has provided actual notice to Defendants as of the time of the making of this application and has provided copies of all pleadings and papers filed in this action to date, by email. A certificate of counsel accompanies this motion.

65. Pursuant to 42 U.S.C. § 12188 and 42 U.S.C. §2000A-3(a), Plaintiff has provided notice of this civil action, including a copy of all pleadings and papers filed to date via email, to

Plaintiff's Exhibit 5, Page17

the U.S. Department of Justice, Civil Rights Division, Disability Rights Section, and

requests that this Honorable Court permit the Attorney General of the United States to

intervene if he certifies that "the case is of general public importance."

66. A memorandum in support of TRO and proposed TRO Order are filed concurrently.


**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's

application for temporary restraining order with equitable relief and order to show cause with a

preliminary injunction should not issue, by entering the proposed TRO Order attached hereto,

and enter judgment against Defendant, National Board of Medical Examiners, providing the

following relief:

1) Entrance of an injunction directing Defendant National Board of Medical Examiners and
   its officers, employees, and agents to cease discriminating against Plaintiff in violation of
   the ADA and grant Plaintiff's application for reasonable testing accommodations of time
   and a half (50% additional time) when she takes the Step 2 CK Examination on Tuesday,
   August 6, 2019 at 2424 Edenborn Avenue, Metairie, LA 70001, beginning at 8:00 a.m.
   and continuing through the end of the testing session on that date.

2) Entrance of an injunction directing Defendant NBME, and its officers, employees,
   agents, contractors, and any third part test-proctor who administers the actual Step 2 CK
   Exam on NBME's behalf, voluntarily or contractually, to provide Plaintiff with
   reasonable testing accommodations of time and a half (50% additional time) to Plaintiff
   on her Step 2 Examination on Tuesday, August 6, 2019 at 2424 Edenborn Avenue,
   Metairie, LA 70001, beginning at 8:00 a.m. and continuing through the end of the testing
   session on that date.

3) Temporarily restraining and enjoining Defendant NBME and its officers, employees, agents, contractors, and any third part test-proctor who administers the actual Step 2CK Exam on NBME's behalf, voluntarily or contractually, from withholding test-taking time accommodations of time and a half (50% additional time) to Plaintiff on her Step 2 Examination on Tuesday, August 6, 2019 at 2424 Edenborn Avenue, Metairie, LA 70001, beginning at 8:00 a.m. and continuing through the end of the testing session on that date.

4) Entrance of an injunction directing Defendant NBME, and its officers, employees, agents, contractors, and any third part test-proctor who administers the actual Step 2 CK Exam on NBME's behalf, voluntarily or contractually, directing same to expedite the grading of Plaintiff's Step 2 CK Exam and to provide Plaintiff , MEAGHAN DOHERTY, with the results of same by email not later than 4:00 p.m. on Friday, August 30, 2019.

5) Award Plaintiff the costs of this action, and reasonable attorneys' fees pursuant to 42 U.S.C. §12188 and 42 U.S.C. §2000a-3(b).

6) Pursuant to 42 U.S.C. § 12188 and 42 U.S.C. §2000A-3(a), permit the Attorney General of the United States, through the Civil Rights Division, Disability Rights Section, to intervene in this civil action if he certifies that "the case is of general public importance."

7) Provide such other relief as the Court deems to be just and equitable.

Respectfully submitted,

WILLIAM MARTIN MCGOEY, Esq., LSBA #14205
1828 Rose Street
Arabi, Louisiana 70032
Telephone: 504-250-3293
bmcgolaw@yahoo.com

19

FRANCES M. OLIVIER, ESQ. LSBA No. 17895
2341 Metairie Road
Metairie, Louisiana 70001
Telephone: 504-483-6334; Fax: 504-483-6344
folivier@olivierlawfim.com

Attorneys for Plaintiff Meaghan Doherty

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above has been forwarded to all parties of record via

the Electronic E-mail, U.S. Mail, and or/the Court's ECF system when not under protective

seal, on July 22, 2019.

_____
WILLIAM M. MCGOEY

20

Plaintiff's Exhibit 5, Page20

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MEAGHAN DOHERTY** | \* | CIVIL ACTION NO. **19 - 11790** |
| | \* | |
| **VERSUS** | \* | **JUDGE:** |
| | \* | |
| **NATIONAL BOARD OF** | \* | **MAGISTRATE:** **SECT. T MAG 5** |
| **MEDICAL EXAMINERS** | \* | |
| | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## UNDER SEAL

### MEMORANDUM IN SUPPORT OF
### PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH
### EQUITABLE RELIEF AND ORDER TO SHOW CAUSE WHY PRELIMINARY
### INJUNCTION SHOULD NOT ISSUE

**MAY IT PLEASE THE COURT:**

Plaintiff, Meaghan Doherty, respectfully presents this Memorandum in Support of her

Application for Temporary Restraining Order with equitable relief and Order to Show Cause

Why a Preliminary Injunction Should Not Issue against Defendant, National Board of Medical

Examiners, for reasons more fully explained below.

I.    FACTS

Plaintiff is a twenty-five-year-old senior at Tulane University School of Medicine who

requested testing-accommodations from Defendant NBME of extended time (x1.5) under the

ADA for the Step 2 CK Exam she must take in order to be eligible for Residency Placement and

for graduation with a medical degree. Defendant denied her request for accommodations.

Plaintiff filed the underlying Application for Temporary Restraining Order with equitable relief

and Order for Rule to Show Cause why a Preliminary Injunction should not Issue.

1

II.    LAW AND ARGUMENT

## A. The ADA Amendments Act of 2008

The U.S. Department of Justice succinctly explained the background and purpose of the ADA Amendments Act of 2008 in the introduction to its notice of rule making authority under the act, to wit: "The ADA Amendments Act retains the ADA's basic definition of "disability" as: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. 12102(1)(A)-(C). However, it provides rules of construction necessary to ensure that the definition is construed broadly and without extensive analysis. Id. at 12102(4).

"Congress enacted the ADA Amendments Act in response to a series of Supreme Court decisions in which the Court interpreted the definition of "disability" narrowly, thus eliminating protection for many individuals that Congress intended to protect when it first enacted the ADA. Public Law 110-325, sec. 2. For example, in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), the Court ruled that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures. Id. at 482. In Sutton, the Court also adopted a restrictive reading of the meaning of being "regarded as" disabled under the ADA's definition of disability, holding that the plaintiff could not prevail under this prong of the definition of disability without first demonstrating that the employer believed the plaintiff's impairment to be substantially limiting. Id. at 490. Subsequently, in Toyota Motor Manufacturing, Kentucky, Inc., v. Williams, 534 U.S. 184 (2002), the Court held that the terms "substantially" and "major" in the definition of disability "need to be interpreted strictly to create a demanding standard for qualifying as disabled" under the ADA, and that to be substantially limited in performing a major life activity under the ADA, "an individual must have

2

an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Id. at 197–98.

"As a result of these Supreme Court decisions, lower courts ruled in numerous cases that individuals with a range of substantially limiting impairments were not individuals with disabilities and thus not protected by the ADA. See 154 CONG REC. S8841 (daily ed. Sept. 16, 2008) (Statement of the Managers) ("After the Court's decisions in Sutton that impairments must be considered in their mitigated state and in Toyota that there must be a demanding standard for qualifying as disabled, lower courts more often found that an individual's impairment did not constitute a disability. As a result, in too many cases, courts would never reach the question whether discrimination had occurred.").

"While the vast majority of these court decisions arose in the area of employment, the narrowing of the definition of disability had an adverse impact on individuals seeking the protection of the ADA in circumstances involving entities covered by titles II and III, particularly individuals seeking reasonable modifications for learning disabilities in education programs at colleges and universities and in licensing and testing situations. See, e.g., Gonzales v. National Board of Medical Examiners, 60 F. Supp. 2d 703 (E.D. Mich. 1999); and Wong v. Regents of University of California, 410 F.3d 1052 (9th Cir. 2005).

"Congress concluded that Sutton, Toyota, and their progeny interpreted the definition of disability more narrowly than what Congress had originally intended. Congress determined that these decisions, coupled with the EEOC's 1991 ADA regulation, which had defined the term "substantially limits" as meaning "significantly restricted," unduly precluded many individuals from being covered under the ADA. See Public Law 110-325, sec. 2; see also 154 Cong. Rec. S8840–41 (daily ed. Sept. 16, 2008) (Statement of the Managers) ("Thus, some 18 years later we

3

are faced with a situation in which physical or mental impairments that would previously have been found to constitute disabilities are not considered disabilities under the Supreme Court's narrower standard" and "[t]he resulting court decisions contribute to a legal environment in which individuals must demonstrate an inappropriately high degree of functional limitation in order to be protected from discrimination under the ADA."). [Emphasis added] For that reason, Congress passed the ADA Amendments Act of 2008 [to clarify the following points:]

•That the term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA;

•That an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population;

•That the primary issue in a case brought under the ADA should be whether the covered entity has complied with its obligations and whether discrimination has occurred, not the extent to which the individual's impairment substantially limits a major life activity;

•That in making the individualized assessment required by the ADA, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADA Amendments Act;

•That the comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence;

•That mitigating measures other than "ordinary eyeglasses or contact lenses" shall not be considered in assessing whether an individual has a "disability";

•That an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active; and

•That an impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.[1]

### ADA STATUTORY DEFINITIONS

The ADA definition of "disability" with respect to an individual" is three pronged:

---

[1] Office of the Attorney General, 28 CFR Parts 35 and 36, CRT Docket No. 24; AG Order No. RIN 1190-A59; Amendment of Americans with Disabilities Act Title II and Title III Regulations to Implement ADA Amendments Act of 2008. https://www.ada.gov/nprm_adaaa/nprm_adaaa.htm

Plaintiff's Exhibit 5, Page24

(i) A <u>physical or mental impairment</u> that substantially limits one or more of the major life activities of such individual;

(ii) <u>A record of such an impairment</u>; or

(iii) Being regarded as having such an impairment as described in paragraph (f) of this section. 28 C.F.R. 36.105(a)(1) [Emphasis added]

In its "Rules of Construction," Congress bluntly stated how this definition is to be applied, at

28 C.F.R. 36.105(a)(2):

(i) The definition of "disability" <u>shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.</u> [Emphasis added]

(ii) An individual may establish coverage <u>under any one</u> or more of the three prongs of the definition of "disability" in paragraph (a)(1) of this section, <u>the "actual disability" prong</u> in paragraph (a)(1)(i) of this section, <u>the "record of" prong</u> in paragraph (a)(1)(ii) of this section, <u>or the "regarded as" prong</u> in paragraph (a)(1)(iii) of this section. [Emphasis added]

Plaintiff is proceeding under Prongs (i) and (ii) of the ADA definition of disability.

## DISABILITY DEFINITION PRONG (i)

The ADA states "**physical or mental impairment**" means:

(ii) Any mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and <u>specific learning disability</u>. 28 C.F.R. 36.105(b)(1)(ii): [Emphasis added]

(2) Physical or <u>mental impairment includes,</u> but is not limited to, contagious and noncontagious diseases and conditions such as the following: Orthopedic, visual, speech and hearing impairments, and cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, intellectual disability, <u>emotional illness, dyslexia and other specific learning disabilities, Attention Deficit Hyperactivity Disorder,</u> Human Immunodeficiency Virus infection (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism. 28 C.F.R. 36.105(b)(2) [Emphasis added]

Plaintiff produced written documentation from licensed Louisiana professionals who

clinically observed her that she has three mental impairments: (Exhibit #8, #9, & #10)

(1) A specific Learning Disability: Impairment of reading: rate;
(2) Attention Deficit Hyperactivity Disorder; and
(3) General Anxiety Disorder

5

Plaintiff submitted to the NBME documentation of her impairments. The issue becomes whether her "mental impairments" fall under the definition of a "major life activity," which definition is found in 28 C.F.R. 36.105(c)(1)(i) and includes the activities listed:

(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, <u>learning, reading, concentrating, thinking, writing, communicating</u>, interacting with others, and working; [Emphasis added]

Again, it its "Rules of construction" under this definition, Congress was clear as to how it is to be construed, as found at 28 C.F.R. 36.105(c)(1)(2):

(i) In determining whether an impairment substantially limits a major life activity, <u>the term major shall not be interpreted strictly to create a demanding standard</u>. [Emphasis added]

(ii) Whether an activity is a major life activity is not determined by reference to whether it is of central importance to daily life.

Plaintiff submits that her "mental impairments" as outlined above, fall under the statutory categories of "learning, reading, concentrating, thinking, writing, communicating" and qualify as "major life activities."

The inquiry now focuses on what the ADA means by "substantially limits" in regard to a "major life activity." Here to, Congress has been specific, as found at 28 C.F.R. 36.105(d):

(1) The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity.

(i) The term "substantially limits" shall be <u>construed broadly</u> in favor of <u>expansive coverage</u>, to the <u>maximum extent permitted</u> by the terms of the ADA. "Substantially limits" is <u>not meant to be a demanding standard</u>. [Emphasis added]

(ii) <u>The primary object of attention</u> in cases brought under title III of the ADA <u>should be whether public accommodations have complied with their obligations and whether discrimination has occurred</u>, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, <u>the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis</u>. [Emphasis added]

(iii) An impairment that substantially limits one major life activity does not need to limit other major life activities in order to be considered a substantially limiting impairment.

6

(iv) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(v) An impairment is a disability within the meaning of this part if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(vi) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for substantially limits applied prior to the ADA Amendments Act. [Emphasis added]

(vii) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence. Nothing in this paragraph (d)(1) is intended, however, to prohibit or limit the presentation of scientific, medical, or statistical evidence in making such a comparison where appropriate. [Emphasis added]

(viii) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity. Ordinary eyeglasses or contact lenses are lenses that are intended to fully correct visual acuity or to eliminate refractive error.

Plaintiff submits her written documentation of clinical findings meets the statutory standard. The inquiry now turns to the issue of how to measure Plaintiff's performance of the "major life activities" of "learning, reading, thinking" in comparison to "most people in the general population." Significantly, on this point, the ADA provides that this inquiry will "usually will not require scientific, medical, or statistical evidence." 28 C.F.R. 36.105(d)(1)(vii).

"Most People In the General Population": With Whom is Plaintiff Compared?

Bearing in mind always, that the ADA requires "expansive coverage, to the maximum extent permitted by the terms of the ADA," (28 C.F.R. §1630.2(i), Patrick Yingling in his article, Disabilities and the ADA: Licensing Exam Accommodations in the Wake of the ADA

7

Amendments of 2008, 59 Cleveland State L. Rev. 291, 309 (2011), extensively explores this issue and concludes that an analysis that requires comparisons with the general population as opposed to Plaintiff's peers, can only be based on the authority of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) and Sutton v. United Airlines, Inc., 527 U.S. 471 (1999) – which are the exact cases that Congress intended to overturn with the ADA Amendment Act of 2008. See Singh v. George Washington University School of Medicine and Health Sciences, 508 F. 3d 1097, 1100-1101 (D.C.Cir. 2007);[2] Accord Wong v. Regents of the University of California, 410 F.3d 1052, 1065 (9th Cir. 2005).

Jenkins v. National Bd. of Medical Examiners, 2008 WL 410237 (W.D.Ky. 2008), was reversed exactly on this point. 2009 WL 331638 (6th Cir. 2009). See Yingling, *supra*. In Singh, the Court of Appeal agreed that the plain text of the ADA "never speaks of making a comparison." 506 F. 3d 1097. The District Court had said,

"these regulations do not require a comparison to the general population in all cases. As for the EEOC regulations, quite clearly, when an ADA plaintiff claims a limitation in the major life activity of working, her limitation is assessed in comparison to others of comparable training, skills, and abilities. It is not surprising that the EEOC, concerned with employment practices and empowered by Congress to issue some ADA interpretive regulations in the employment context, see 42 U.S.C. §12116, would offer a more particular and detailed definition of "substantially limits" with respect to working while devising a more generalized definition for other activities. For many of the other listed activities, a person's training, skills, and abilities are far less relevant to assessing whether that person is substantially limited in that activity. See Duncan v. WMATA, 240 F.3d 1110, 1121-22 (D.C. Cir. 2001) (en banc) (Edwards, C.J., dissenting). But see Wong v. Regents of the U. of Cal., 379 F.3d 1097, 1108 (9th Cir. 2004) (importing, without convincing analysis, the "entire population" comparison requirement from the physical disability context to deny relief to a learning-impaired medical student dismissed after receiving poor grades, discovering his impairment, and requesting accommodations). For example, whether a blind or deaf or paraplegic person has a college degree is of no moment to assessing whether she is substantially limited as to seeing, hearing, or walking. In this respect, learning, is more like working that other major life activities. When learning, a person always finds herself amongst people with similar academic background. In pre-school, children, have almost no prior educational training. At graduate school, at medical school, every student has a degree from a

---

[2] A number of courts continue to cite Singh and Wong despite this. Rawdin v. American Bd. of Pediatrics, 985 F. Supp. 2d 636 (E.D.Pa. 2013); Rumbin v. Ass'n of Am. Med. Colls., 803 F. Supp. 2d 83, 85 (D.Conn. 2011); Biber v. National Bd. of Osteopathic Medical Examiners, Inc., 2016 WL 1404157 (E.D. Pa. 2016).

four-year college. Students generally compared to their peers on examinations, and that is how their substantial success or limitation in learning is measured. Cf. Bartlett, 970 F. Supp. At 1126 (comparing plaintiff seeking bar exam accommodations to fellow law students when concluding she is substantially impaired in activity of working as a lawyer). Defendants would compare plaintiff, a graduate medical student, to a high school graduate or perhaps even a pre-school student to determine whether she is substantially limited in her ability to learn. They would apply the general definition of "substantially limited" when the more specific definition, that for working which accounts for a person's training, is more applicable. Using a more specific definition makes sense. The EEOC regulations, therefore, do not require a plaintiff to show that she is substantially limited in learning compared to the rest of the world, but as compared to people of similar age and educational background. The Department of Justice regulation is not at all inconsistent, advising that a comparison be made to "most people." Most people is by no means all people, and the language's ambiguity would permit the agency or other entity to shape the appropriate comparison given the circumstance."

In Bartlett v. N.Y. State Bd. of Law Examiners, 2001 WL 930792 (S.D.N.Y. 2001),

Justice Sotomayor, then a Circuit judge sitting by designation, noted that the comparison to the

average person in the general population could not be based on a test score alone[3] or on

plaintiff's ability "to self-accommodate." She concluded (at slip 3):

When considering both the positive and negative effects of plaintiff's self-accommodations, plaintiff is substantially limited in the major life activity of reading when compared to the average reader by her slow reading rate and by the fatigue caused by her inability to read with automaticity."

She noted further, at 22:

Plaintiff's experts have convinced me…that learning disabilities cannot be captured by psychometric measures alone and that clinical observations are essential to a diagnosis of learning disabilities.

And she concluded that plaintiff's reading disability "substantially limit[ed] her major life

activity of reading." Id. at 29[4] citing, inter alia, Root v. Ga. State Bd. of Veterinary Med. 114 F.

Supp. 1324 (N.D. Ga. 2000), reversed in part, vacated in part on other grounds, 252 F. 3d 443

---

[3] "All of the experts, including defendant's experts, agree that no psychometric tests directly measure automaticity." "Nor do such tests properly diagnose "reading rate problems." Id. at 22. Such tests are also "extremely limited in their application to adults." Id.

[4] Note that she is relying on the restrictive ADA readings of Sutton, et al, decided prior to the ADAAA of 2008.

Plaintiff's Exhibit 5, Page29

(11th Cir. 2001)[5] (distinguishing between measures that improved abilities to overcome

disabilities and other disabilities). In doing so, *Id*. at 35, the Court noted the requirements of

distinguishing "between the mitigating measures plaintiff uses that affect her ability to read and

those that merely assist her in functioning in her daily life."

Justice Sotomayor concluded:

In order to find that plaintiff had a reading disability, I must find that she is substantially limited
in reading in comparison to "most people." 28 C.F.R. Pt. 35, App. A §35.104. Dr. Ferguson
contends that "most people" should be defined in reference to a bell curve on standardized tests.
Specifically, she testified that individuals can only be substantially limited when compared to
"most people" if their scores fall outside the average range of the 16th or 84th percentiles.
(Flanagan Aff. 9(a)(i); Tr. at 616). While I have already rejected the proposition that plaintiff's
disability can be diagnosed solely on her scores outcome on tests without reference to the
manner in which she achieved those outcomes, see supra, Conclusions of Law, Section 1.B, I
also disagree with Dr. Flanagan that, to the extent that such tests scores are relevant, I should
equate "most people" with the average range on the bell curve. While the DOJ has not
specifically defined the term "most people," I find the EEOC's discussion of this term to be
instructive: "[a]n impairment is substantially limiting if it significantly restricts the duration,
manner or condition under which an individual can perform a particular major life activity as
compared to the average person in the general population's ability to perform that same major
life activity…It should be noted that the term "average person" is not intended to imply a precise
mathematical 'average.' 29 C.F.R. Pt. 1630, App. A §1630.2(j).

In <u>Yingling</u>, *supra*, the author (at 306) noted the views of the House Committee on

Education and Labor regarding the ADAAA.

It is critical to reject the assumption that an individual who performs well academically or
otherwise cannot be substantially limited in activities such as learning, reading, thinking, or
speaking.

Moreover, the Committee endorsed Bartlett's holding "that a determination of whether a

plaintiff is substantially limited should not take into consideration the plaintiff's ability to self-

accommodate." He further noted (at 307):

The courts can bring case law in step with the intentions of Congress and can also clarify
standards for examination boards by addressing future claims in a slightly different manner than
in the past. This article makes three primary recommendations for future decisions regarding
licensing exam accommodations for learning disabilities: (1) the courts should no longer

---

[5] See <u>Bartlett</u> at fn. 41.

10

foreclose the finding of a substantially limiting impairment in regard to the major life activity of reading due to an individual's academic success; (2) "working" should be recognized as an appropriate major life activity under which to evaluate claims for accommodations on the bar exam (and possible other licensing exams), with such evaluations involving a comparison to people having comparable training, skills, and ability; and (3) reading disabilities should be recognized not only by psychometric test that show a substantial limitation in comparison to most people, but also by test scores that indicate a significant discrepancy between an individual's intellectual capacity and actual reading ability. By following these recommendation, the courts will be able to evaluate with standards that reflect Congress' intention to provide a broad scope of protection under the ADA.

## DEFENDANT'S DENIAL OF ACCOMODATIONS

Defendant NBME based its decision to deny Plaintiff's accommodations request on the grounds that her performance on the 2014 MCAT and the 2018 Step 1 Exam, when compared to "most people in the general population," does not "demonstrate impaired functioning relative to most people or that standard test conditions are a barrier to your access to the USMLE." (Exhibit #1 at 2, ¶2). Plaintiff reiterates the argument above regarding the "most people in the general population" standard.

Plaintiff scored a 32 on the MCAT in June 2014. (Exhibit #2 at 47). That test was five years ago. Defendant's reliance on this test score to deny accommodations in 2019 is misplaced. In contrast, Plaintiff's professional evaluations are current and based on clinical observation in accordance with the accepted standard of clinical review of the DSM-V. It further assumes that Plaintiff could not have done better than a score of 32, given testing accommodations; that the question-answer format allowed her to show her aptitude and academic achievement level, as opposed to testing her disability. In fact, other than that there were no accommodations, Defendant has no information about the testing circumstances of her MCAT or how she interacted with the test format.

11

Further, Defendant overlooks that the statute provides that an individual may have an impairment that is episodic or in remission, and that it too is protected under the first prong of the disability definition. 28 C.F.R. §§ 35.108(d)(1)(iv); 36.105(d)(1)(iv). In <u>Manzzeo v. Color Resolution Int'l, L.L.C.</u>, 746 F.3d 1264 (11th Cir. 2014), the Court stated, "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active," citing 42 U.S.C. § 12102(4)(D).

In effect, Defendant's position on Plaintiff's MCAT score is that "Plaintiff has no disability requiring accommodations because she did well on that test." Plaintiff's good score on the MCAT is not a legitimate justification for denying her accommodations five years later on Step 2. Defendant also ignores the fact that plaintiff's medical school grades have significantly increased since Tulane granted her the same test-taking accommodations which she is requesting here. Defendant's argument is contradictory on its face and disregards the positive impact accommodations in medical school have had on Plaintiff's test results.

Plaintiff scored a 200 on the Step 1 test (for which Defendant had denied her first accommodations request). The minimum passing score on that test was 194. The mean was 228. Thus, Plaintiff scored just above passing and twenty-eight points <u>below</u> the mean. This was an underachievement by a student who has excelled academically throughout her career. It is also a remarkably poor performance for an individual with a Full-Scale IQ in the 96th percentile (Exhibit #9 at 5), who on all scales has scored consistently in the intellectually superior range. Plaintiff's low Step 1 score emphasizes that her impairment/learning disability shows a discrepancy between her age, measured intelligence, education, and her actual –versus– her expected achievement.

12

Contrary to Defendant's portrayal of Plaintiff's Step 1 score as being satisfactory compared to most people, it is the strongest evidence yet that her diagnosed disabilities are affecting her performance on a standardized test, specifically the Step Test format. Further, her low performance on Step 1 is evidence that Defendant's USMLE is doing exactly what the ADA statutorily is trying to avoid: testing Plaintiff's disability. This contravenes the ADA's plain language mandate that "the examination results accurately reflect the individual's aptitude or achievement level" and not her disability. 28 C.F.R. § 36.309(b)(1)(i). Bluntly put, just as her elementary school evaluations showed that Plaintiff's reading skills and test-taking skills were substantially below the level of performance one could reasonably expect from her overall intelligence level, her Step 1 score drives home the point that, without accommodations for her reading learning disability and ADHD, Plaintiff will perform at a very low level. Defendant uses Plaintiff's poor Step 1 results to justify denying accommodations on Step 2: since she didn't fail Step 1, Plaintiff has not demonstrated a need for accommodations on Step 2. This argument ignores the fact that her "barely passing score" virtually eliminated the possibility of Plaintiff securing any residency match – a requisite to Plaintiff being able to ultimately practice as a licensed doctor. It also puts her in the catch-22 of having barely passed Step 1, she was barred from retaking the test. The NBME only permits a retake if the student fails outright.

Third, Defendant has denied Plaintiff's request for accommodations (based on these two test results) without giving any weight to the psychiatric and psychological evaluations submitted clinically assessing her. Defendant's letter of denial makes an oblique, passing reference to these professional evaluations and their recommendations: "A diagnostic label, in and of itself, does not establish coverage under the ADA." (Exhibit #1 at 2, ¶1). Defendant cites no basis in the

13

record of Plaintiff's submissions as to why it discounted the findings of the professional evaluations. Nor did Defendant request additional information.

Fourth, Defendant has denied Plaintiff's accommodations request with out giving any weight to the extended time accommodations granted to her by Tulane for the past two years. Defendant merely states "nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings or circumstances." (Exhibit #1 at 2, ¶1). Astoundingly, Defendant makes this bald assertion without citing anything in the record in Plaintiff's psychiatric, psychological or academic submissions to show that Tulane's grant of accommodations was wrong, misplaced, or somehow irrelevant to Plaintiff's present request for accommodations.

Defendant's basis for denial of accommodations is even more startling when read in contrast to the ADA provisions stating that a disability or impairment "does not need to prevent, or significantly or severely restrict, an individual from performing a major life activity *in order to be substantially limiting.*" [Emphasis added] 28 C.F.R. 36.105(d)(1)(ii) This underscores the corrective nature of the ADA Amendments Act and its explicit rejection of the strict standards imposed under Toyota and its progeny. See Public Law 110-325, sec. 2(b)(4).

Defendant's denial of accommodations also contradicts the plain language of the statute that disability determinations "should not demand extensive analysis." See Public Law 110-325, sec. 2(b)(4)-(5). It defies reason that Defendant could reject Plaintiff's accommodation request when the statute itself contemplates that a disability need not "prevent" or "severely restrict" an individual from performing a major life activity; it need only substantially limit it to received protection under the ADA.

14

Plaintiff's Exhibit 5, Page34

Plaintiff submits that the professional psychiatric and psychological evaluations she has submitted establish that she is covered by the ADA and that has satisfied the definition of "disability." The professionals who evaluated her have documented her need for particular testing accommodations as the best means to mitigate the effects of her disabilities. As such, she is entitled to testing accommodations under the ADA.

## DISABILITY DEFINITION PRONG (2)

The second part of the definition of "disability" is the "record of impairment" prong. An individual with a "record of an impairment" that substantially limits or limited a major life activity is an individual with a disability under the ADA. 42 U.S.C. § 12102. A "record" in this context is defined in 28 C.F.R. § 36.105 (e):

(1) An individual has a record of such an impairment if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities. [Emphasis added]

(2)Broad construction. Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will be considered to fall within this prong of the definition of "disability" if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment. In determining whether an impairment substantially limited a major life activity, the principles articulated in paragraph (d)(1) of this section apply.

(3)Reasonable modification. An individual with a record of a substantially limiting impairment may be entitled to a reasonable modification if needed and related to the past disability.

Plaintiff's record of disability dates back to 2003 documenting her learning disability and ADHD. (Exhibits #7, 8, 9, 10, & 11). Again, the Attorney General explained the context of this prong under the ADA Amendments Act, noting: "there are many types of records that could potentially contain this information, including but not limited to, education, medical, or

15

employment records. The Department notes that past history of an impairment need not be reflected in a specific document. Any evidence that an individual has a past history of an impairment that substantially limited a major life activity is all that is necessary to establish coverage under the second prong."[6]

Thus, plaintiff submits that by her sixteen-year documented record of a learning disability in regard to reading and her diagnosis as suffering ADHD, she has established she is covered under the ADA pursuant to the "record of impairment" prong of the disability definition. As such, she is entitled to testing accommodations on the Step 2 Exam.


ADA IS A REMEDIAL ACT TO RELIEVE THE STIGMA OF DISABILITY

The ADA "has been described as a 'milestone on the path to a more decent, tolerant, progressive society.'" P.G.A. Tour, Inc., v. Martin, 532 U.S. 671, 675 (2001). It is the essence of remedial legislation. As such, it is entitled to great weight, if not controlling weight. United States v. Board of Trustees for the University of Alabama, 908 F. 2d 740 (11th Cir. 1990).

The late Judge Alvin Rubin explained "where the nature of an act is remedial, as here, it should be construed liberally in an attempt to provide the remedy, not avoid it. See Thomas v. Myers-Dickson Furniture Co., 479 F.2d 740 (5th Cir. 1973). Compare Raetano v. Kelly Inc., 2009 WL 651808 (M.D. Fla. 2009) slip at 2, with Henrietta D. v. Bloomberg, 331 F. 3d 261, 279 (2d Cir. 2003), where the Court stated "[t]he Eleventh Circuit, quoting the Fifth Circuit, has explained that remedial statutes (and thus their supporting regulations) are to be construed liberally to effectuate their purpose." CFTC v. Hefferman, 245 F. Supp. 2d 1276, 1301 (S.D. Ga.

---

[6]  Office of the Attorney General, 28 CFR Parts 35 and 36, CRT Docket No. 24; AG Order No. RIN 1190-A59; Amendment of Americans with Disabilities Act Title II and Title III Regulations to Implement ADA Amendments Act of 2008. https://www.ada.gov/nprm_adaaa/nprm_adaaa.htm

Plaintiff's Exhibit 5, Page36

2003); accord <u>National Engineering & Contracting Co. v. OSHA</u>, 928 F.2d 762, 767 (6th Cir.

1991), citing <u>Whirlpool Corp. v. Marshall</u>, 445 U.S. 1, 13 (1980).

## ADHD IS A DISABILITY UNDER THE ADA AMENDMENTS ACT OF 2008

As noted above, ADHD is a disability under the ADA Amendments. 28 C.F.R.

36.105(b)(1) The cases that hold otherwise were decided before the ADAAA became effective

date of the Act on January 1, 2009. See Weaving v. City of Hillsboro, 763 F.3d 1106 (9th Cir.

2014) (covering 2006-2009).

In <u>McCarthy v. Marple Tp. Ambulance Corps.</u>, 869 F. Supp.2d 638, 648 (E.D.Pa. 2012),

the Court stated:

ADHA is an impairment within the meaning of the ADA, but it only qualifies as a disability under the ADA it is "substantially limits one or more [of McCarthy's] major life activities." 42 U.S.C. §12102(1); see <u>Love v. Law Sch. Admission Council, Inc.</u> 513 F. Supp. 2d 206, 224 (E.D.Pa. 2007) (citing <u>Rothberg v. LSAC</u>, 300 F. Supp. 2d 1093 (D.Colo. 2004); <u>Bartlett v. N.Y. State Bd. of Law Exam'rs</u>, 2001 WL 930792 (S.D. N.Y. Aug. 15, 2001); <u>Prince v. Nat'l Bd. of Med. Exam'rs</u>, 966 F. Supp. 419 (S.D. W.Va. 1997). McCarthy asserts that the major life activities affected by his ADHD are concentrating, thinking, and interacting with others. The Third Circuit has already held that concentrating and thinking are major life activities. See <u>Gagliardo v. Connaught Labs, Inc.</u> 31 F.3d 565, 569 (3rd Cir. 2002) (concentrating); <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 307 (thinking). [7]

According to her verified complaint, Plaintiff suffers from disabilities which substantially

affect her performance on standardized tests. She is substantially limited in the major life

activities of concentrating, reading, learning, and test-taking. See <u>Doe</u>, *supra* at 966, citing

<u>Bartlett v. N.Y. State Board of Law Examiners</u>, 970 F. Supp. 1094, 1117 (S.D.N.Y. 1997) affd.

in part and vacated in part on other grounds 527 U.S. 1031 (1999)[8]

---

[7] Rothberg was reversed on appeal of the preliminary relief. 102 Fed. Appx. 122 (10th Cir. 2004).
[8] <u>Bartlett</u> is cited a number of times in this brief. Plaintiff is referring however, to 2001 WL 930792 (S.D.N.Y. 2001).

Plaintiff's Exhibit 5, Page37

It appears that the NBME refuses to accept that a reading learning disability or ADHD is a disability under the ADA; and refuses to accept either <u>Bartlett</u> or the EEOC regulations interpreting "substantially limits one or more major life activities compared to most people in the general population."[9] One might have thought that having entered into a settlement with the Department of Justice, (although concededly, it is now expired) that Defendant would have changed its practices.

PLAINTIFF IS ENTITLED TO A TRO

The standards for a temporary restraining order are the same as for a preliminary injunction. See <u>City of Eufaula v. Alabama DOT</u>, 2014 WL 7369783 (M.D. Ala. 2014); <u>O'Boyle v. Town of Gulf Stream</u>, 2013 WL 3147639 (S.D. Fla. 2013); <u>Florence v. Donald</u>, 207 WL 1033523 (S.D. Ga. 2007) citing <u>Bieros v. Nicola</u>, 857 F. Supp. 445, 446 (E.D. Pa. 1994); <u>Johnson v. Patterson</u>, 2012 WL 353238 (S.D. Ala. 2012) fn.1.

The appropriate standards are set out in Texas v. Seatrain International, 518 F2d 175, 179-180 (5th Cir. 1975):

As we said in <u>Canal Authority of State of Florida v. Callaway</u>, 489 F.2d 567 (5th Cir. 1974), it is an extraordinary and drastic remedy which should not be granted unless the movant has clearly carried the burden of persuasion concerning the existence and application of what we have recognized as the four prerequisites to such relief. These are: (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the party or parties opposed; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. <u>Canal Authority</u>, *supra*, 489 F.2d at 572; <u>DiGiorgio v. Causey</u>, 488 F.2d 527 (5th Cir. 1973); <u>Blackshear Residents Organization v. Romney</u>, 572 F2d 1197 (5th Cir. 1973); <u>Allison v. Froehle</u>, 470 F2d 1123 (5th Cir. 1972).

No matter how severe and irreparable an injury one seeking a preliminary injunction may suffer in its absence, the injunction should never issue if there is no chance that the movant will

---

[9] This is almost word for word what the NBME was doing to Mr. Rothberg and Ms. Whyte, see Paragraph 8 of the DOJ-NBME Agreement.

18

eventually prevail on the merits. Nor is there need to weigh the relative hardships which a preliminary injunction or the lack of one might cause the parties unless the movant can show some likelihood of ultimate success. Obviously, it is inequitable to temporarily enjoin a party from undertaking activity which he has a clear tight to pursue. However, one appealing to the conscience of the chancellor to maintain the status quo pending final decision, although he carries a burden, is not required to prove to a moral certainty that his is the only correct position. The prerequisite, as an absolute, is more negative than positive: one cannot obtain a preliminary injunction if he clearly will not prevail on the merits; however, that he is unable, in an abbreviated proceeding, to prove with certainty eventual success does not foreclose the possibility that temporary restraint may be appropriate. In its negative sense, the factor is critical; but viewed positively, the importance an nature of the requirement can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of the interlocutory relief and the relative balance of the threatened hardship faced by each of the parties. <u>Canal Authority</u>, *supra*. This is so because, as we have noted, none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus, <u>Siff v. State Democratic Executive Committee</u>, 500 F. 2d 107 (5th Cir. 1974).

Plaintiff is Entitled to a TRO

It is true that there are a number of cases prior to the ADA Amendments of 2008 that

denied a TRO, but as noted above, the 2008 Amendments have completely changed the legal

landscape.[10]

Nevertheless, there was, and is a substantial body of case law granting such relief. See

<u>Rush v. National Bd. of Medical Examiners</u>, 268 F. Supp. 2d 673 (N.D. Tex. 2003) (granting

preliminary injunction); <u>Agranoff v. Law School Admissions Council, Inc.</u>, 97 F. Supp. 2d 86

(D. Mass, 1999); <u>Badgley v. Law School Admissions Council, Inc.</u>, WL 33224318 (N.D. Tex.

2000). See also <u>Bonnette v. District of Columbia Court of Appeal</u>, 796 F. Supp. 2d 164 (D.D.C.

2011), <u>Jones v. National Conference of Bar Examiners</u>, 801 F. Supp. 2d 270 (D. Vt. 2011).

Plaintiff Will Suffer Irreparable Injury which Outweighs the Possible Harm to Defendant

---

[10] See <u>Rothberg v. Law School Admissions Council</u>, 102 Fed. Appx. 122 (10th Cir. 2004) reversing 300 F. Supp.2d 1093 (D. Colo. 2004). Unlike <u>Rothberg</u>, Plaintiff can show harm. If she is not allowed to take the upcoming USMLE and pass, she will not be able to continue her medical education.

19

In <u>Alejandro v. Palm Beach State College</u>, 843 F. Supp. 2d 1263 (S.D. Fla. 2012), the

Court granted a temporary injunction requiring defendant to allow plaintiff to bring her

"psychiatric service dog to mitigate the symptoms of her mental disabilities." The court noted:

"Since attending class is an important aspect of obtaining a degree, this Court believes that
plaintiff will suffer irreparable harm if the requested injunctive relief is not granted."

Here, if plaintiff does not pass Step 2 of the USMLE, she will no longer be enrolled and

will not obtain a degree. The question, then, is whether plaintiff should be allowed her right to

try to pass that test on a level playing field.

In <u>Rush</u>, the Court stated:

The USMLE Step 1 examination involves and requires extensive reading, and scoring well
and/or passage of the exam requires extensive subject-matter knowledge. Plaintiff has shown a
sufficient causal connection between his reading impairment and his failures to score well, or as
well as he might, on time-limited examinations requiring extensive reading. Plaintiff has shown
that if he is accommodated, he will be effectively tested not on his disability but rather on his
subject-matter knowledge. Plaintiff has shown that his reading impairment seriously decreases
the rate at which he reads with comprehension. Plaintiff will suffer irreparable injury if the
required injunction is denied.

With the requested reasonable accommodation of double time to take the Step 1 exam, Plaintiff
will have time to either display his mastery of the subject matter, or show that he has not
sufficiently mastered the tested materials. In either event, granting the injunction will allow
Plaintiff to be tested on his medical and science knowledge and not his disability.
The threatened injury to Plaintiff outweighs any damage that granting the preliminary injunction
might cause at this time to the Defendant or to the public.
The injunction will not disserve the public interest but will further the public interest in
prohibiting discrimination by public entities, such as the National Board of Medical Examiners,
on the basis of disability by fulfilling the ADA's requirement that entities offering licensing
examinations provide reasonable accommodations to disabled individuals.

### PLAINTIFF HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS

Plaintiff has shown, as described above, that she has a disability as defined by the ADA

and that she is entitled to a reasonable accommodation. She has met her burden of showing

likelihood of success.

20

Plaintiff's Exhibit 5, Page40

PLAINTIFF HAS DEMONSTRATED IRREPARABLE INJURY

Plaintiff has also shown, as described above, irreparable injury in that the result of her taking the test without accommodations will result in her not graduating from medical school, and/or not being able to practice as a medical doctor, or unnecessarily delaying her ability to do the same.

In Bonnette, *supra*, at 186-187, the Court explained the irreparable injury that necessarily results from denying accommodations to an individual with a disability who is taking a professional license test, as follows:

Bonnette contends that she will suffer irreparable injury in the absence of an injunction because she will either be forced to take the July 2011 MBE [Multistate Bar Exam] under discriminatory conditions or have to wait until at least the February 2012 administration while her claim is litigated. Because Bonnette can not practice law until she successfully passes the D.C. Bar Examination, any delay in taking the MBE deprives her of time to practice her chosen profession. The lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation. See Enyart, 630 F.3d at 1166 (Affirming finding of irreparable harm based on plaintiff's inability to practice law without successfully passing the bar examination).

THE THREATENED INJURY TO PLAINTIFF OUTWEIGHS ANY POTENTIANL HARM
TO DEFENDANT AS NBME WILL NOT SUFFER DAMAGE IF A TRO IS GRANTED

If the Court grants Plaintiff's application for a TRO, Defendant will not suffer damages. NBME will suffer no financial harm, or at most the hourly wage for one day of the proctor hired to administer the Step 2 Test to Plaintiff. Defendant will suffer no public stigma — in fact, the public will never even know that Plaintiff took the test with accommodations (whether she passes it or not). The TRO will not impact the fundamental structure or nature of the Step 2 test or what it purports to test; it will not jeopardize test security for this Step 2 Exam or any other given in future; it will not change the testing format, nor the time-based system as applied to student without a documented disability. If there are consequences to Defendant for a TRO, they are theoretical, at best. To the contrary, the threatened injury to Plaintiff is grave and irreparable.

21

Plaintiff's Exhibit 5, Page41

## THE GRANT OF A TRO WOULD NOT BE ADVERSE TO THE PUBLIC INTERST

The grant of a TRO here is actuality required to advance the public interest embodied in the ADA. For Plaintiff, the TRO affording testing accommodations will give life to the legislative goal of the ADA Amendments Act: to provide Plaintiff a level playing field to show what her mastery of the material, instead of showing the effects of her disability. It is not an "automatic" pass for Plaintiff. The promise of the ADA is a level playing field for all Americans.

It is important to keep in perspective the reality of time accommodations actually means. The NBME website gives the example of a section that lasts for an hour and has 40 questions on it. That amounts to a student has 90 seconds to answer each question. NBME offers three additional time categories: 25% time; 50% time; and 100% time. Plaintiff has requested the middle accommodation. She's asking for 50% time. That means she would be afforded an extra 45 seconds to answer each question. That's all this litigation is about: approximately 45 seconds. Here is a Step 2 sample question taken directly from the NBME website on July 18, 2019. (https://www.usmle.org/pdfs/step-2-ck/Step2CK_SampleItems.pdf at p. 10

7.   A 9-year-old boy is brought to the physician because of progressive weakness and a purple-red discoloration over his cheeks and upper eyelids over the past 8 weeks. His symptoms began shortly after a camping trip, and he now is unable to climb stairs, walk long distances, comb his hair, or dress himself. His mother says that she was careful to apply his sunscreen on the trip and can recall no tick bites or exposure to poisonous plants. His only medication is a topical corticosteroid for several dry, scaly patches of the skin. He appears weak and lethargic. He is at the 75th percentile for height and 25th percentile for weight; he has had no change in his weight since his last examination 9 months ago. His temperature is 37.7°C (99.8°F), blood pressure is 110/68 mm Hg, pulse is 105/min, and respirations are 28/min. Examination of the skin shows a purple-red discoloration over the cheeks and eyelids, periorbital edema, erythematous plaques and scales over the elbows and knees, and flat-topped red papules over all knuckles. There is generalized weakness and atrophy of the proximal muscles. Which of the following is the most likely diagnosis?

   (A) Dermatomyositis
   (B) Duchenne's muscular dystrophy
   (C) Eczema
   (D) Lyme disease
   (E) Psoriasis
   (F) Rocky Mountain spotted fever
   (G) Seborrhea
   (H) Systemic lupus erythematosus

10

Plaintiff's Exhibit 5, Page42

That factual part of the question contains approximately 196 words (some are Arabic numerals or numeric expressions). There are eight choices to evaluate. The average student has 90 seconds to spend on each question in a one-hour block test. Test are given in one-hour blocks. Plaintiff's disability is the process of the written word. Simply put, she reads slowly and processes the meaning slowly. The accommodations requested is that she have an extra 45 seconds to account for her ADHD and dyslexia and reduced comprehension time.

It is also important to consider that the U.S. Department of Justice investigated Defendant in 2011. (Exhibit #12) A Yale medical student, Frederick Romberg, with diagnosed disabilities, applied for extra time accommodation on Step 1. The NBME twice refused his request, basing the denial on the grounds that he "did not demonstrate that he is currently substantially limited in a major life activity as compared to most people, so as to be disabled within the meaning of the ADA, as amended." (Exhibit #12 at 2, ¶8). This the exact basis for which NBME has denied Plaintiff's request for time accommodations due to a reading problem (along with ADHD). (Exhibit #1 at 2)

The DOJ investigation concluded Romberg had submitted sufficient documentation to demonstrate his disability under the ADA and was entitled to accommodations. The NBME disputed the findings, but entered the settlement anyway. It is noteworthy that Romberg, like Plaintiff here, had received accommodations in medical school for his disability. (Exhibit #7, Tulane University Accommodations Grant)

## CONCLUSION

Defendant NBME can truthfully state that its Settlement Agreement with the DOJ has expired and is no longer binding. However, the ADA itself requires most if, not all, the provisions of the Agreement. NBME has violated the ADA:

23

Plaintiff's Exhibit 5, Page43

1. Defendant has failed to carefully consider the recommendations of the qualified professionals who have evaluated Plaintiff, diagnosed her under the accepted standards of the DSM-V, and recommended that she receive the accommodations she requested. continue to give considerable weight to documentation of past accommodations, as Plaintiff here has presented that Tulane affords her test-time accommodations on all written exams.

2. Defendant has failed to give weight to the documented record of impairment of her disability, nor the test-time accommodation granted to her by Tulane University for written exams (time 1.5) since January 2, 2017.

3. Defendant has failed to apply the ADA Amendments Act as written and in the context of the Congressional instruction to give it a liberal interpretation to broadly afford coverage under the Act. Had Defendant followed the Congressional findings and applied the "Rules of construction" as contained in the Code of Federal Regulations, Plaintiff would not be standing before this Honorable Court today.

For the reasons outlined above, Plaintiff respectfully requests that a TRO be issued.

Respectfully submitted,

WILLIAM MARTIN MCGOEY, Esq., LSBA #14205
1828 Rose Street
Arabi, Louisiana 70032
Telephone: 504-250-3293
bmcgolaw@yahoo.com

FRANCES M. OLIVIER, ESQ. LSBA No. 17895
2341 Metairie Road
Metairie, Louisiana 70001
Telephone: 504-483-6334; Fax: 504-483-6344
folivier@olivierlawfim.com

**Attorneys for Plaintiff Meaghan Doherty**

24

Plaintiff's Exhibit 5, Page44

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above has been forwarded to all parties of record via the Electronic E-mail, U.S. Mail, and or/or the Court's ECF system when not under protective seal, on July 22, 2019.

WILLIAM M. MCGOEY

Plaintiff's Exhibit 5, Page45

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MEAGHAN DOHERTY** | * | CIVIL ACTION NO. **19 - 1 1790** |
| | * | |
| **VERSUS** | * | **JUDGE:** |
| | * | |
| **NATIONAL BOARD OF** | * | **MAGISTRATE:** **SECT. T MAG 5** |
| **MEDICAL EXAMINERS** | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## UNDER SEAL

## <u>CERTIFICATE OF COUNSEL</u>

NOW INTO COURT, comes Frances M. Olivier, counsel for Plaintiff, Meaghan

Doherty, in the above captioned matter, who certifies as follows:

1.

I contacted the National Board of Medical Examiners NBME at its headquarters in

Philadelphia, PA at 215-590-9500 on July 22, 2019. The person who answered the phone refused

to take my name, number, or any information about the above captioned civil action. Further,

this person, who refused to give her name, would not connect me to the Legal Department, give

me a fax number, or an email address for either the Legal Department or for the NBME

generally, for the purpose of emailing or faxing the civil action and attachments filed this date to

the NBME to afford them actual notice of the filing of same.

1

2.

As a result, I forwarded a copy of the following to the NBME, to wit: the Application for Temporary Restraining Order with equitable relief and Order To Show Cause Why a Preliminary Injunction Should Not Issue, and Memorandum in Support of Application for Temporary Restraining Order, and every document filed in the District Court on July 22, 2019, by FedEx on July 22, 2019. A copy of the FedEx delivery receipt will be filed into the record as confirmation of delivery to Defendant.

3.

It is not my intent to request a TRO without notice to the opposing party and as soon as a hearing set, I will endeavor to provide notice to Defendant. As of this moment, I do not know who their counsel will be.

4.

Pursuant to 42 U.S.C. § 12188 and 42 U.S.C. §2000A-3(a), I have provided notice of this civil action, including a copy of all pleadings and papers filed on July 22, 2019, by fax, FedEx Delivery, and/or U.S. Mail, to Rebecca Bond, Chief, Disability Rights Section, Civil Rights Division, of the U.S. Department of Justice, with the request that the Attorney General of the United States intervene herein and certify to the District Court that "the case is of general public importance."

Respectfully submitted,

_Frances M. Olivier_
FRANCES M. OLIVIER, ESQ. LSBA No. 17895

2

2341 Metairie Road
Metairie, Louisiana 70001
Telephone: 504-483-6334; Fax: 504-483-6344
folivier@olivierlawfim.com

WILLIAM MARTIN MCGOEY, Esq., LSBA #14205
1828 Rose Street
Arabi, Louisiana 70032
Telephone: 504-250-3293
bmcgolaw@yahoo.com

**Attorneys for Plaintiff Meaghan Doherty**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above has been forwarded to all parties of record via

the Electronic E-mail, U.S. Mail, and or/or the Court's ECF system when not under protective

seal, on July 22, 2019.

*Frances M. Olivier*

FRANCES M. OLIVIER

3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MEAGHAN DOHERTY | * | CIVIL ACTION NO. **19 - 1 1790** |
| | * | |
| VERSUS | * | JUDGE: |
| | * | |
| NATIONAL BOARD OF | * | MAGISTRATE: **SECT. T MAG 5** |
| MEDICAL EXAMINERS | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

UNDER SEAL

### TEMPORARY RESTRAINING ORDER
### WITH EQUITABLE RELIEF AND ORDER TO SHOW CAUSE
### WHY A PRELIMNARY INJUNCTION SHOULD NOT ISSUE

Considering the foregoing Application for Temporary Restraining Order with equitable

relief and Order to Show Cause why a Preliminary Injunction Should Not Issue

IT IS HEREBY ORDERED that the application is GRANTED.

1. A Temporary Restraining Order is entered against the NATIONAL BOARD OF

   MEDICAL EXAMINERS, and its officers, employees, and agents requiring same to

   desist from discriminating against Plaintiff, MEAGHAN DOHERTY, in violation of the

   ADA, and requiring same to grant her application for reasonable testing

   accommodations of time and a half (50% additional time) when she takes the Step 2 CK

   Examination on Tuesday, August 6, 2019 at 2424 Edenborn Avenue, Metairie, LA

   70001, beginning at 8:00 a.m. and continuing through the end of the testing session on

   that date.

2. A Temporary Restraining Order is entered against the NATIONAL BOARD OF

   MEDICAL EXAMINERS and its officers, employees, agents, contractors, and any third

1

part test-proctor who administers the actual Step 2 CK Exam on NBME's behalf, voluntarily or contractually, to provide Plaintiff, MEAGHAN DOHERTY, with reasonable testing accommodations of time and a half (50% additional time) to on the Step 2 CK Examination which she will take on Tuesday, August 6, 2019 at 2424 Edenborn Avenue, Metairie, LA 70001, beginning at 8:00 a.m. and continuing through the end of the testing session on that date.

3. A Temporary Restraining Order is entered against the NATIONAL BOARD OF MEDICAL EXAMINERS, and its officers, employees, agents, contractors, and any third part test-proctor who administers the actual Step 2 CK Exam on NBME's behalf, voluntarily or contractually, enjoining same from withholding test-taking time accommodations of time and a half (50% additional time) to Plaintiff, MEAGHAN DOHERTY, on the Step 2 CK Examination which she will take on Tuesday, August 6, 2019 at 2424 Edenborn Avenue, Metairie, LA 70001, beginning at 8:00 a.m. and continuing through the end of the testing session on that date.

4. A Temporary Restraining Order is entered against the NATIONAL BOARD OF MEDICAL EXAMINERS, and its officers, employees, agents, contractors, and any third part test-proctor who administers the actual Step 2 CK Exam on NBME's behalf, voluntarily or contractually, requiring same to grade Plaintiff's Step 2 CK Examination and provide Plaintiff, MEAGHAN DOHERTY, with the results of same by email not later than 4:00 p.m. on Friday, August 30, 2019.

5. Plaintiff is awarded the costs of this action, and reasonable attorneys' fees pursuant to 42 U.S.C. §12188 and 42 U.S.C. §2000a-3(b).

2

FILED UNDER SEAL

## James G. Barbee, MD LLC

3439 Magazine Street
New Orleans, LA 70115



504-891-8808
504-891-8883 fax

EXHIBIT 8

January 19, 2017

Goldman Center for Student Accessibility
103 Science & Engineering Lab Complex, Building 14
6823 St. Charles Avenue
New Orleans, LA 70118

Re: Meaghan Doherty (DOB: 08/17/1993)

To whom it may concern:

I am the treating physician for Meaghan Doherty. I began seeing Ms. Doherty on June 24, 2014. After meeting with her for approximately 90 minutes, I diagnosed her with attention-deficit/hyperactivity disorder (ADHD), predominately hyperactive-impulsivity presentation (F90.1) based on the following symptoms consistent with the criteria stated in the Diagnostic and Statistical Manual of Mental Disorders, fifth edition (DSM-V):

- Often fidgets with or taps hands or feet
- Squirms in seat/ "constantly readjusting"
- Feelings of restlessness
- Impulsivity evident by interrupting others
- Blurts out things she later regrets
- Procrastinates tasks excessively
- Often loses items necessary for tasks
- Difficulty sustaining attention

Ms. Doherty was diagnosed with ADHD at the age of 10. She will provide copies of her psychological testing evaluation results from 2003 and her psychoeducational evaluation from 2004, as it documents emergence of symptoms, academic history, diagnostic instruments, and previously recommended accommodations.

Though I have prescribed her medication to ameliorate these symptoms, some limitations could be affecting Ms. Doherty's academic progress. She has been prescribed Adderall since the age of 13, and is currently taking Adderall XR 30mg twice per day. Ms. Doherty reports that medication has helped her significantly, though she still tends to procrastinate and fidget. She also reports having difficulty sustaining concentration when studying and during tests. In addition to medication, treatment interventions include discussing and implementing study skills.

0001

I am requesting that Ms. Doherty be granted any available accommodations, specifically extra time for tests and an environment minimal of distractions. Please contact me if you have any questions.

Sincerely,

James G. Barbee, MD
Psychiatrist
Louisiana license # 05855R

FILED UNDER SEAL



**M E R C Y**
**FAMILY CENTER**
A Number of
Sisters of Mercy Ministries

EXHIBIT 10

**CONFIDENTIAL**
The contents of this report may
not be divulged or released without
the permission of the parents or legal guardian.

## PSYCHOEDUCATIONAL EVALUATION

NAME:              Meaghan Doherty

TEST DATE(S):      11/11/04

BIRTH DATE:        08/17/93

GENDER:            Female

CURRENT AGE:       11 years 3 months          GRADE:    6

SCHOOL:            St. Francis Xavier School      PARISH:  Jefferson

PARENTS:           Fran and Mark Doherty

ADDRESS:           6415 West End Blvd.  New Orleans LA 70124

TELEPHONE:         (504) 482-2729

### REASON FOR REFERRAL

Meaghan Doherty is a 11 year old sixth grader who was referred by her parents for a psychoeducational evaluation due to difficulty oral reading and possible dyslexia and/or dysgraphia..

### PROCEDURES ADMINISTERED

Parent and Child Interviews
Wechsler Intelligence Scale for Children –Fourth Edition (WISC-IV)
Woodcock-Johnson Tests of Achievement – Third Edition (WJ-III)
Gray Oral Reading Test – 4th Edition (GORT-4)
Conner's Continuous Performance Test – Second Edition (CPT-II)
Achenbach Child Behavior Checklist (CBCL) – Parent and Teacher Report Forms
Conners' Parents and Teacher's Rating Scales

110 Veterans Boulevard, Suite 425 • Metairie, LA 70005     1445 W. Causeway Approach • Mandeville, LA 70471     www.mercyfamilycenter.com
TEL 504.838.8283 • FAX 504.830.9799     TEL 905.727.7993 • FAX 985.727.7016
Sponsored by the Sisters of Mercy Health System

0001

## RELEVANT HISTORY

Meaghan's full history is contained in her previous evaluation in August of 2003 with Denise Nagim. At that time she was reported to be displaying signs of dyslexic processing and possible dysgraphia.

Meaghan is currently in the sixth grade at St. Francis Xavier School. She was tested by the Jeferson Parish Pupil Appraisal team and qualified as gifted. Her mother, However, chose not to take this placement. Meaghan was in gifted classes when she was in earlier grades in a public school. There are no behavioral concerns.

## CLINICAL INTERVIEW and BEHAVIORAL OBSERVATIONS

Meaghan presented as an attractive young lady, with a friendly interpersonal style. Meaghan cooperated fully in the testing process. She worked hard on all tasks presented and was motivated to perform well. When presented with challenging tasks, Meaghan generally persisted. She was very agreeable and quick in responding. No problems were noted with her conversational proficiency. Overall, Meaghan approached testing in a very positive manner. Thus, the present test results appear to be a valid measure of her true level of functioning.

## TEST RESULTS

### Intellectual Functioning

In this section, Meaghan's overall capacity to understand and cope with the surrounding world was estimated through standardized intellectual assessment. Intelligence is considered an overall or global entity that is multidetermined and multifaceted and is measured by assessing a variety of mental abilities. The WISC-IV provides scores at several different levels. The Full Scale Composite, a global estimate of intellectual ability, is the most reliable and valid measure of cognitive functioning. It is derived from the child's performance on ten core subtests requiring various verbal and nonverbal reasoning skills.

The WISC-IV is further subdivided into four indexes which reflect more specific cognitive abilities: Verbal Comprehension; a measure of verbal reasoning and comprehension skills; Working Memory, a measure of the examinee's ability attend to, hold in memory, and process verbal information; Perceptual Reasoning, a measure of visual-spatial, nonverbal reasoning; and Processing Speed, or the efficiency of processing visual information. Index scores are derived from subtests which measure similar abilities. Interpretation of abilities measured by individual subtests can also be made, but is less reliable than Composite interpretation.

Composite scores (Full Scale, Verbal Comprehension, Working Memory, Perceptual Reasoning, and Processing Speed) have a mean of 100 and a standard deviation of 15. The individual subtests have a mean of 10 and standard deviation of 3. About 68% of children achieve

Composite scores between 85 and 115, and subtest scores between 8 and 12. Meaghan's composite and subtest scores are reported below:

## WISC-IV Composite Score Summary

| Scale | Composite Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| Verbal Comprehension (VCI) | 134 | 99 | Very Superior |
| Perceptual Reasoning (PRI) | 135 | 99 | Very Superior |
| Working Memory (WMI) | 97 | 42 | Average |
| Processing Speed (PSI) | 118 | 88 | High Average |
| Full Scale (FSIQ) | 130 | 98 | Very Superior |

Meaghan's Full Scale IQ score fell in the Very Superior range, at the 98th percentile. Her verbal skills are in the Very Superior range, as are her visual-motor-spatial skills. Her working memory score is in the Average range, while her Processing Speed Index is in the High Average Range. Overall, Meaghan's subtest scores ranged from Low Average to Very Superior. Her subtest scores are listed below.

### Verbal Comprehension Subtest Scores Summary

| Subtests | Scaled Score |
|---|---|
| Similarities | 17 |
| Vocabulary | 14 |
| Comprehension | 16 |

### Perceptual Reasoning Subtest Scores Summary

| Subtests | Scaled Score |
|---|---|
| Block Design | 18 |
| Picture Concepts | 13 |
| Matrix Reasoning | 16 |

### Working Memory Subtest Scores Summary

| Subtests | Scaled Score |
|---|---|
| Digit Span | 7 |
| Letter-Number Sequencing | 12 |

### Processing Speed Subtest Scores Summary

| Subtests | Scaled Score |
|---|---|
| Coding | 12 |
| Symbol Search | 14 |

## Description of WISC-IV Subtests:
**Verbal Comprehension Scale**
Similarities - Ability to categorize verbal information into abstract concepts.
Vocabulary - Word knowledge, verbal fluency, expressive language.
Comprehension - Common sense and social judgment, verbal reasoning and expression.

Perceptual Reasoning Scale
Block Design - Spatial reasoning, ability to reproduce abstract design from pattern, visual-motor coordination and speed.
Picture Concepts – Ability to categorize pictures of objects into abstract concepts.
Matrix Reasoning – Visual reasoning, classification, and serial reasoning.

Working Memory Scale
Digit Span – Auditory short-term memory for series of numbers, learning ability, working memory, concentration.
Letter/Number Sequencing – Short-term auditory memory, mental manipulation of verbal stimuli, attention.

Processing Speed
Coding – Speed and accuracy in copying symbols with paper and pencil, hand-eye coordination, cognitive flexibility, visual-motor speed.
Symbol Search – Visual processing speed, visual discrimination.

## Educational and Academic Achievement

Meaghan's mastery of academic subject areas was measured using the Woodcock-Johnson Tests of Achievement – Third Edition (WJ-III), the Gray Oral Reading Test – 4th Edition (GORT-4).

### Description of WJ-III Scores

A Standard Score is based on the statistical comparison of a student's score to same-aged peers in the standardization sample. A standard score of 100 is considered Average. Scores are also expressed as Percentile Ranks. This number describes the student's rank in comparison to children the same age in the standardization group (11 years, 3 months in this case). For example, a standard score of 100 is the same as a percentile rank of 50, meaning the student performed better than 50% of the students in the standardization sample. Meaghan's scores are described below. (Mean = 100; Standard Deviation = 15).

### WJ-III Test Scores

| Cluster/Test | Standard Score | Percentile | Classification | Grade Equivalence |
|---|---|---|---|---|
| **BROAD READING** | 122 | 93 | Superior | 10.3 |
| Letter-Word Identification | 105 | 62 | Average | 6.3 |
| Passage Comprehension | 113 | 80 | High Average | 10.1 |
| Reading Fluency | 132 | 98 | Very Superior | 12.2 |
| **BROAD MATH** | 128 | 97 | Superior | 11.6 |
| Calculation | 120 | 91 | Superior | 9.7 |
| Applied Problems | 121 | 92 | Superior | 12.9 |
| Math Fluency | 132 | 98 | Very Superior | 13.0 |

| BROAD WRITTEN LANGUAGE | | | | |
|---|---|---|---|---|
| Spelling | 107 | 67 | Average | 7.1 |
| Writing Samples | 95 | 36 | Average | 4.3 |
| Writing Fluency | 119 | 90 | High Average | 9.2 |
| | | | | |
| ACADEMIC SKILLS | 113 | 80 | High Average | 7.4 |
| APPLICATION | 116 | 86 | High Average | 9.6 |
| ACADEMIC FLUENCY | 129 | 97 | Superior | 11.8 |

The Reading section of the WJ-III consists of three subtests: Letter Word Identification, Passage Comprehension, and Reading Fluency. The Letter-Word Identification subtest measures the student's ability to identify isolated letters and words. It should not be assumed that the student knows the meaning of the word if correctly identified. The Passage Comprehension subtest measures the student's ability to study a short passage with a key word missing and then determine a word appropriate to the content of the passage. For younger children, visual cues are available. This requires a variety of comprehension and vocabulary skills. The Reading Fluency test measures the rate at which the student reads. Overall, Meaghan's reading skills fell in the Superior range (93rd percentile). Her reading fluency is in the Very Superior range and is better developed than her mechanics of reading, in the average range or her comprehension, in the high average range.

The Math section consists of three subtests: Calculation, Applied Problems, and Math Fluency. Calculation is a test of math achievement and measures the ability to perform mathematical computations presented in printed form. Applied Problems is a measure of a child's understanding of applied math concepts and ability to analyze and solve word problems. Math Fluency requires a child to rapidly and accurately solve simple addition, subtraction, and multiplication problems within a time limit. Meaghan's math skills were in the Superior range overall (97th percentile). She demonstrated a significant strength on the fluency subtest, performing in the Very Superior range.

The Written Language section consists of three subtests: Spelling, Writing Samples and Writing Fluency. Spelling measures knowledge of spelling and writing skills. The task requires the production of letters and/or words in response to oral prompts. Writing Fluency measures the child's ability to write simple sentences in responses to visual cues rapidly and with ease. While Meaghan's spelling fell in the Average range, her writing fluency skills were in the near Superior range. Her original sentences, in Writing Samples, were very short and had little in the way of details.

Results of the WJ-III indicate that Meaghan's reading, math, and writing skills are in the High Average range overall, her ability to apply these skills is in the High Average range, and her fluency in using these skills is in the Superior range.

## Oral Reading

Meaghan was administered the GORT-4 in order to assess her oral reading. This test required her to read passages aloud and then answer questions to ascertain her comprehension of the

passages range. This test allows for the correction of any miscues. The following table presents Meaghan's scores. A score between 8-12 is considered average for the subtests and the Oral Reading Quotient is a Standard score as explained above.

| Subtest | Standard Score | Percentile Rank | Descriptive Level |
|---|---|---|---|
| Rate | 12 | 75 | Average |
| Accuracy | 12 | 75 | Average |
| Fluency (rate+accuracy) | 12 | 75 | Average |
| Comprehension | 13 | 84 | High Average |
| Oral Reading Quotient | 115 | 84 | High Average |

### Attentional Capacity

The Conners' Continuous Performance Task - II (CPT-II) was administered to provide information about Meaghan's ability to sustain her attention and withhold her responses when appropriate. This task requires a child to attend to a boring, repetitive task for 14 minutes; the child is required to press the space bar for every letter that appears on the screen, except the letter X. Meaghan's response style on the CPT-II produced a 57.5% confidence index of a nonclinical classification. That is, the chances are 57.5 out of 100 that no significant attention problem exists.

### Behavioral and Emotional Functioning

Meaghan's behavioral and emotional functioning was assessed through clinical interview and rating scales completed by her parents and her teacher.

Parent-report measures: On the Conners forms Meaghan's mother  rated her as having significant problems in scales measuring restlessness and impulsivity. No other scales were elevated to a significant level. Her father's ratings were significant in several areas, including restlessness and impulsivity, but also in Inattention, Oppositional behavior and the Conners Global Index.

Teacher-report measures: Meaghan's Language Arts teacher  reported very few problems at all and  none of them reached a significant level. As a matter of fact, her teacher reports that Meaghan is prepared, well-organized and participates fully in class.

### SUMMARY

Meaghan Doherty is an 11-year old sixth grader who was referred for a psychoeducational evaluation by her parents due to a possible reading problem, manifested by poor phonemic awareness. Meaghan's spelling skills are also questioned, as she misspells even simple words. She is a child with an eagerness to learn to and perform well in school.

Intellectual testing revealed Very Superior verbal comprehension, Very Superior perceptual reasoning skills, Average working memory, and High Average processing speed. Her overall IQ fell in the Very Superior range.

Results of achievement testing indicated that Meaghan's academic skills cluster in the High Average range overall, with a relative weakness in some areas of written language. This is a form of mild dyslexia. Dyslexia, as defined by the International Dyslexia Association, is a "specific learning disability that is neurological in origin. It is characterized by difficulties with accurate and/or fluent word recognition and poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction. Secondary consequences may include problems in reading comprehension and reduced reading experience that can impede the growth of vocabulary and background knowledge." Much of Meaghan's work typifies a remediated dyslexic pattern, that is, she has made much improvement in phonemic awareness which has helped the flow of her reading and writing.

Regarding attention, Meaghan did not perform like a child with an attention problem on the individually administered tests of attention. Her parents do not see this to be a significant problem, although her father sees this to be somewhat of a problem. Both parents see some restlessness and impulsive behavior. Meaghan's language arts teacher sees no attention or behavioral problems. In her opinion, Meaghan functions very well in the classroom.

## RECOMMENDATIONS

Based on the findings described above, the following recommendations are indicated:

1. Given her diagnosis of mild dyslexia, Meaghan may qualify for 504 accommodations through the school. A copy of this evaluation should be provided to the school for consideration of developing a 504 Plan for Meaghan. Accommodations that would be appropriate to support Meaghan's mild learning disability include extended time on tests and previewing what is to be taught, a technique that helps all students. Meahgan's misspellings in the content area should be corrected, but not part of the grade. Meghan will need to check her notes with another child's note that are correct and legible, or the teacher's master copy.
2. To improve Meaghan's writing ability she may benefit from a computer software program like "Write Out Loud," or "Inspiration." There is also a Lindamood-Bell program called "Seeing Stars." She would have to work with a trained tutor on this program.
3. Meaghan's attention should continue to be monitored.
4. Meaghan may eventually need a laptop in class for long tests and writing assignments.

It has been a pleasure to work with Meaghan and her family. If there are any questions regarding those results or interpretation, please call (504) 838-8283.

Sr. Sarah Ducey, Ph.D.
Licensed Psychologist # 715

Plaintiff's Exh. 2, Page 8

CONFIDENTIAL
for professional use only



Jefferson Speech
& Language Center

Since 1972
Specializing in
Speaking • Reading • Writing

617 N. Causeway Blvd.
Suite A
Metairie, LA 70001
(504) 835-5550
Fax (504) 835-5510

**NAME:** Meaghan Doherty

**ADDRESS:** 6415 West End Blvd.
New Orleans, LA 70124

**PARENTS:** Fran and Mark

**TELEPHONE:** (504) 482-2720
568-7381

**SCHOOL:** St Francis Xavier School

**EXAMINER:** Denise Nagim, M.C.D., CCC/SLP

**REFERRAL SOURCE:** Sharon Henry, BCSW

**DATE OF EVALUATION:** 08/18/2003

**DATE OF BIRTH:** 08/17/93

**CHRONOLOGICAL AGE:**
10 years

**GRADE:** 5.0

EXHIBIT 11

### SUMMARY OF EVALUATION RESULTS

SIGNIFICANT HISTORY:

Meaghan Doherty, a ten-year-old female was seen at the Center for a Complete Language-Based Psycho/Educational Evaluation on August 8 and 18, 2003. The purpose of the evaluation is to ascertain Meaghan's learning style related to difficulty linking sounds together quickly in reading. Meaghan is diagnosed as gifted and she attended the French immersion program at Audubon Elementary School in New ~~Haynes~~ Orleans from kindergarten to third grade. Mrs. Doherty noticed that Meaghan experienced difficulty developing phonology to enhance reading fluency during kindergarten through third grade. She presents as a highly motivated, bright student who demonstrates excellent communication skills.

Psycho/Educational testing indicates a profile of a superior student who presents a grand discrepancy in sound blending, word attack, spelling of sounds and phonological awareness. Cognitive Cluster scores are in the superior to average range; however, Auditory Processing, her weakest cluster score on the W/J-III Test of Cognitive Abilities, yields 44 percent. Although this is an average score, it is significantly below Meaghan's ability level (GIA, 91%). Further discrepancy is noted when comparing Academic Fluency (90%) with Basic Reading Skills (41%) and Phono/Grapheme Knowledge (31%). The Comprehensive Test of Phonological Processing (CTOPP) concurs with the W/J-III indicating that Meaghan has difficulty in Phonological Awareness (35%), the ability to hear sounds as a single unit. In depth

Denise Nagim, M.C.D., C.C.C.
Director

Kathleen Fake, M.C.D., C.C.C.
Natalie Gandy, M.C.D /CF
Anne T. Pret, S.L.P./Asst.

Speech-Language Pathologist
Learning Specialist

1

reading testing using the Gray Oral Reading Test-4 (GORT-4) additionally concurs with test findings indicating a discrepancy in Reading Accuracy (37%); when compared to Reading Rate (75%) and Comprehension (75%). Therefore, Meaghan is a gifted student who presents a grand discrepancy in reading due to a Phonological Awareness weakness and Auditory Processing difficulty. Research (Torgesen, Wagner and Roshotte, 1997; Torgesen et al., in press) indicates that Phonological Awareness, is a necessary component in developing fluency in reading.

Prenatal and birth history indicates complications. Meaghan was born full term with a normal birth weight of 9 pounds, 4 ounces. She was born post-term at nine and half months with Aspirated Meconium and was placed in the Neonatal unit for one week. Developmental milestones were achieved within chronological age norms, as well as, speech and language development.

Medical history is not reported to be significant. Behavioral, social and emotional development indicates that Meaghan is a well-adjusted youngster, who enjoys school, her friends and her family. She demonstrated excellent work ethics and conformity in life, at school and during the evaluation.

Education history indicates that Meaghan is a bright young lady who maintains an A average in the academic arena. Both Mr. and Mrs. Doherty are concerned about Meaghan's prevailing difficulty in blending sounds together quickly for fluent reading. They describe Meaghan's reading as slow and choppy. Meaghan began school in a French immersion program where she was taught both French and English to develop reading, writing and speaking skills. Meaghan's parents feel that the basic phonic and reading skills were not drilled and rehearsed; therefore, Meaghan did not develop phonic skills easily for fluent reading. As the volume of reading has increased in learning, they feel "something" is lacking in her ability to read fluently. She is diagnosed as a gifted student; however, Mr. and Mrs. Doherty recently had her tested by Sylvan Learning Center who determined that oral reading skills are below grade-level expectations. Sylvan Learning Center recommended several hours of tutoring to assist Meaghan in developing reading skills. Mr. and Mrs. Doherty's observations of Meaghan's reading skills are astute. Psycho/Educational test results depict a profile of a student who is deficient in Phonological Awareness affecting Meaghan's ability to develop phonological skills, the ability to place sounds with graphemes (letters) for fluent reading and spelling. Observations made over time related to Meaghan's reading discrepancy are: omits words in writing sentences, has difficulty copying at near and far point, has difficulty maintaining the spacing between words in spontaneous writing, and spells phonetically; lacking visual recall for non-phonetic words. Meaghan occasionally does poorly on reading related tests even though information has been mastered. She suffers with headaches and performs worse on standardized tests as she progresses in school.

EVALUATION:

In order to assess cognition and language processing abilities related to information processing, long-term retrieval, processing speed, short-term memory, visual processing, spatial thinking, auditory processing, vocabulary/comprehension, and fluid reasoning, the Woodcock-Johnson-III Tests of Cognitive Ability (W/J-III) were administered. To assess the areas of reading, writing and math in depth the Woodcock-Johnson-III Tests of Achievement (W/JTA-III), the Test of Written Language- 3 (TOWL-3) and the Gray Oral Reading Test (GORT-4) were utilized.

In order to coordinate cognitive/achievement testing, cognitive cluster scores will be discussed as how cognitive clusters relate to academic areas of reading, writing, math and fluency speed. Test norms indicate that standard scores between 85 and 115 are in the average range while a score of 70 is

2

Plaintiff's Exh. 3, Page 2

indicative of a learning disability. Variability of 22 points within test scores indicates that a 1.5 standard deviation is present and will affect learning in some specific way.

Overall Psycho/Educational testing yields a profile of a superior student with difficulty in Phonological Awareness affecting skills in reading orally. Cognitive difficulties underlying problems in reproduction are identified in Sound Blending and Auditory Processing (W/J III) which are significantly below Meaghan's GIA of 120. Cognitive Performance Clusters yield; Verbal Ability (90%) Thinking Ability (86%), and Cognitive Efficiency (80%). A grand discrepancy in the average range occurs in Auditory Processing when scores are closely analyzed (44%). Oral Language skills are excellent. Meaghan achieves above average ability (91%). Overall Academic Skills indicate a decrease in functioning, (57%). Meaghan's psycho/educational profile demonstrates that she has excellent executive processing skills, which allow her to view her behaviors, assess its appropriateness and make changes if required. She is a verbal learner, but utilizes visual cues to enhance fluency in cognition. Auditory processing difficulties and phonological awareness problems affect rapid linking of sounds for fluent reading, spelling and writing. Errors in reading and in spelling are dyslexic-like in nature, and may affect note taking in school and foreign language reading and writing.

VERBAL ABILITY:

Verbal Ability is a measurement of language development that includes the comprehension of individual words, the comprehension of relationships among words (antonyms and synonyms), aspects of lexical knowledge and the ability to reason using lexical (language) knowledge. It indicates almost superior ability (90%). Verbal Ability predicts how a student will function in reading and reading yields efficient skills. The Oral Language Cluster of the Achievement Battery yields commensurate skills. Oral Language involves tests that identify the receptive and expressive language skills of an individual. In Story Recall, a test measuring language development, listening and meaningful memory, Meaghan achieves almost superior ability (90%). On the test Understanding Directions, which measures listening ability as an aspect of comprehension/knowledge, memory and attention, she receives above average ability (80%). Meaghan's strong verbal comprehension and language processing skills allow her to trigger information from listening and reading. It should be noted that Meaghan hears, reads or gathers information through listening.

THINKING ABILITY:

Thinking Ability represents a sampling of the different thinking processes that may be invoked when information in the short-term memory cannot be processed automatically. It represents an aggregate of abilities that allow an individual to process information placed in short-term memory but cannot be processed quickly and fluently. This Performance Cluster includes one test from each of the four thinking abilities: long-term retrieval, visual-spatial thinking, auditory processing and fluid reasoning. These abilities are probably the core of what many professionals mean by "intelligence"; Meaghan scores in the above average range (86%).

Long-Term Retrieval: Long-Term Retrieval indicates skills ranging in the above average to superior range. Skills measuring long-term retrieval for automatic learning and storing yield above average ability (86%). Meaghan presents efficiency in her ability to store and recall learned information when information is taught using both a visual and verbal cue simultaneously. The ability to access language information stored in the brain yields superior ability (93%). The ability to put together information seen with information heard is similar to the process of learning to read, write and remember math operations efficiently over time (storing information and retrieval while additional

3

learning occurs). However, Academic Skills present a discrepancy (57%) when compared to Long-Term Retrieval (92%).

Visual-Spatial Thinking: Visual-Spatial Thinking, the ability to store and recall visual representations, to analyze, synthesize and to think with visual patterns, indicates above average performance (76%). Meaghan presents superior ability in retrieving math operations and procedures learned over time. She integrates and remembers visual representations. Visual patterns and operations of numbers necessary to perform math operations indicate fluent ability in math (Calculation, 87% and Math Fluency, 91%). In contrast, patterns related to sounds, indicate a substantial difference as noted in Spelling of Sounds, (32%) and in single word Spelling, (35%).

Phonemic Awareness/Auditory Processing: The ability to detect the finer differences in sounds to understand speech and to develop phonology in reading indicates average but weaker ability when compared to IQ patterns of a gifted intelligence student (44%). Sound Blending, the ability to hear single sounds and identify the word that these sounds form, yields a further decrease, (32%). In Basic Reading Skills from the WJ-III Achievement Test, Meghan's scores are commensurate with her grand academic discrepancy in hearing sounds as a single unit. She scores 32 percent in Word Attack, the academic assessment of a student's ability to link sounds together fluently. Concurrent results are identified in Reading Accuracy on the (GORT-4). In Auditory Attention, Meaghan achieves average skills (62%). Auditory Attention allows a student to listen for understanding of sounds and the ability to listen to verbal information in noise. However, ability decreases in Phonological Awareness (35%) according to the CTOPP; and in Spelling of Sounds (32%) according to the WJ-III.

Fluid Reasoning: Fluid Reasoning involves the broad ability to reason, form concepts, and solve problems using unfamiliar or novel procedures. In Concept Formation, a measure of categorical reasoning based upon logic and an aspect of Executive Processes, one is required to shift mental tasks frequently; this process requires flexibility in thinking. On this test, Meghan's score indicates superior ability (94%). It should be noted that this particular measure of executive functioning involves non-verbal language sequencing and categorization.

COGNITIVE EFFICIENCY:

Cognitive Efficiency, which represents the capacity of the cognitive system to process information automatically, indicates skills to be in the above average range. Cognitive Efficiency involves a sampling of two different factors of automatic cognitive processing: processing speed and short-term memory. Meaghan achieves above average ability (80%).

Processing Speed: Processing speed is the ability to perform cognitive tasks particularly when under pressure to maintain focused attention. Visual Matching, a perceptual speed task measuring attention, concentration and efficiency of problem solving, yields superior ability (95%). Decision Speed, another measurement of mental processing speed that assesses the association of simple concepts and the ability to make quick rapid decisions, Meaghan achieves commensurate ability, (98%). Pair Cancellation, a test measuring sustained attention and the ability to perform a simple cognitive task under time constraints, indicates above average skills (78%). Thus, reinforcing that Meaghan is able to shift mental tasks easily.

Short-Term Memory: Short-Term Memory, the ability to hold information in immediate awareness, is efficient for learning; results indicate average ability (63%). This ability allows Meaghan to "hold and perform" mental operations, as well as, waiting to the last minute to study. Information not utilized in short-term memory is pushed to working memory to perform mental operations of information immediately received. Auditory Working Memory yields superior skills (93%); further allowing

4

Meaghan to listen and understand information quickly. Information is then stored in long-term memory. Memory is vital to learning, since learning involves a student's ability to use old information while learning new information.

## EXECUTIVE PROCESSES:

Tests involved in Executive Processes measure a student's ability to plan, control interference, and use mental flexibility. These processes have been discussed throughout cognitive interpretation of Meaghan's test results. Scores in executive processing yield superior ability and Meaghan demonstrates ease and speed when attempting to access her knowledge. Meaghan presents excellent ability in monitoring her performance, blocking-out interference and in using mental flexibility to solve executive problems.

## BROAD ATTENTION:

The Broad Attention Cluster is multi-faceted and includes four areas of testing attention: focused or selective attention, vigilant or sustained attention, divided attention and attentional capacity or working attention. In Numbers Reversed, measuring attention capacity, Meaghan scores 63 percent, which indicates efficient immediate recall of information in the academic arena. In the ability to divide attention between information that has been placed in short-term memory into distinct sequences necessary for comprehension she receives 93 percent in Auditory Working Memory, which is very efficient for learning. In Auditory Attention, measuring Meaghan's ability to attend selectively to discriminate speech sounds amid the effects of noise, indicates average ability (62%). Pair Cancellation, also part of both executive functioning and processing speed, has been previously discussed indicating that as Meaghan is required to block-out interference while focusing on one task, she is efficient.

## ACADEMIC ASSESSMENT:

Academic assessment was measured using the following tools: the Woodcock-Johnson III Tests of Achievement (W-JTA-III), the Gray Oral Reading Test (GORT-4), and the Test of Written Language-3 (TOWL-3).

Reading: To assess reading related to basic phonology skills, sight-word reading, reading fluency and passage comprehension in a cloze sentence reading format the (W/J-III) was utilized. In low volume untimed reading, Meaghan's score indicates average ability (51%) in single word reading (Letter-Word Identification) and her scores decrease to (32%) in the ability to blend nonsense words. Spelling of Sounds also measuring Meaghan's ability to link sounds together rapidly and reproduce information on paper yields concurrent ability (32%). Further evidence of Meaghan reading problem related to hearing sounds and linking sounds together for fluent reading is identified Phonological Awareness, (35%), and in Reading Accuracy of the GORT-4 (37%). Although skills related to Oral reading particularly associating sounds with graphemes are in the average range a grand discrepancy is present when comparing oral reading skills related to sounds with other academic skills and with cognition. Reading Fluency related to the ability to read simple sentences and answer yes/no questions correctly in a timed format indicates 88 percent. Comprehension, reading sentences or short paragraphs using a cloze sentence format, yields average ability (61%) in Passage Comprehension, a low volume measure of reading comprehension using the W/J-III. On the GORT-4, a high volume, timed reading assessment of passage reading and comprehension in a multiple-choice format, indicates (75%) in both Reading Rate

5

and Reading Comprehension. Meaghan is diagnosed with an oral reading problem, which has intermittent characteristics of dyslexia.

Math: Math skill assessment, utilizing the Calculation and Applied Problem Tests indicates skills fluctuating in the above average to superior ability. She achieves 87 percent in Calculation. On the Applied Problems Test, Meaghan's skills are superior (96%). In Math Fluency, measuring the ability to recall basic math facts within time constraints yields above average skills (91%).

Written Language: Written language was measured using the TOWL-3. Spontaneous writing measuring the ability to integrate spelling patterns, apply rules governing grammar and use a variety of sentences and parts of speech, indicates efficient ability in integration of language sequencing and usage of grammatical forms. However, spontaneous spelling when asked to transfer language information from brain to paper to create an interactive story about a given picture confirms difficulty in linking sounds together rapidly (16%). Sentence structure yields the ability to use simple/compound sentences, difficulty in the mechanics of writing related to letter formation, spacing, and unfinished letters, as well as, misuse of the lines and margins which affects organization on paper and indicates some effort in using writing as a communication tool. Single word spelling indicates average skills (35%) and Writing Fluency, the ability to formulate ideas when words are given, as well as, thinking quickly yields above average ability, (85%). Characteristics of dysgraphia are identified in handwriting as mentioned above.

SUMMARY:

Based upon Meaghan's evaluation results, review of classroom performance, review of report card grades, review of case history information and standardized test scores, she presents a cognitive/achievement profile of an above average student with a grand discrepancy, although average, in auditory processing related to phonological awareness, or the ability to hear single units of sounds and manipulate sounds quickly in blending and in writing. She has difficulty translating handwriting skills for output to paper. Characteristics of dyslexia are identified in reading and in handwriting related to spelling. Overall cognitive ability yields 91 percent, and achievement skills yield 57 percent. This is a substantial difference; however, math skills are in the above average to superior range but oral reading and spelling skills are inefficient and are considered the contributing factors to the discrepancy between cognitive versus achievement performance. Phon/Graph Knowledge, or the ability to use sounds along with graphemes/letters yields Meaghan lowest score (31%). Symptoms of dysgraphia are identified in writing and affect written expression. Meaghan is unable to reach potential as evidenced by her Spontaneous Writing score of 10 percent according to the TOWL-3.

6

## RECOMMENDATIONS

The following recommendations are prescribed for Meaghan:

1. Enroll Meaghan in a multi-sensory program to build phonological awareness, phonology, reading and writing fluency.

2. As Menghan becomes proficient in computer keyboarding, she should use computer programming to assist written expression.

7

## SUMMARY OF TEST SCORES
### The Woodcock-Johnson-III Tests of Cognitive Ability-Revised

|  | Standard Score | Percentile Rank | Rating Equivalent |
|---|---|---|---|
| GIA. | 120 | 91 | Above Average |
| VERBAL ABILITY | 119 | 90 | Above Average |
| Verbal Comprehension | 119 | 90 | Above Average |
|  |  |  |  |
| THINKING ABILITY | 116 | 86 | Above Average |
| Visual-Auditory Learning | 116 | 86 | Above Average |
| Spatial Relations | 111 | 76 | Above Average |
| Sound Blending | 93 | 32 | Average |
| Concept Formation | 123 | 94 | Superior |
| Retrieval Fluency | 122 | 93 | Superior |
|  |  |  |  |
| COGNITIVE EFFICIENCY | 113 | 80 | Above Average |
| Visual Matching | 117 | 87 | Above Average |
| Numbers Reversed | 105 | 63 | Average |
| Decision Speed | 129 | 98 | Superior |
|  |  |  |  |
| LONG-TERM RETRIEVAL | 121 | 92 | Superior |
| Visual-Auditory Learning | 116 | 86 | Above Average |
| Retrieval Fluency | 122 | 93 | Superior |
|  |  |  |  |
| AUDITORY PROCESSING | 98 | 44 | Average |
| Sound Blending | 93 | 32 | Average |
| Auditory Attention | 104 | 62 | Average |
|  |  |  |  |
| PROCESSING SPEED | 125 | 95 | Superior |
| Visual Matching | 117 | 87 | Above Average |
| Decision Speed | 129 | 98 | Superior |
|  |  |  |  |
| PHON/GRAPH KNOWLEDGE | 92 | 31 | Average |
|  |  |  |  |
| SHORT-TERM MEMORY |  |  |  |
| Numbers Reversed | 105 | 63 | Average |
|  |  |  |  |
| WORKING MEMORY | 115 | 84 | Above Average |
| Auditory Working Memory | 122 | 93 | Superior |
| Numbers Reversed | 105 | 63 | Average |
|  |  |  |  |
| BROAD ATTENTION | 117 | 87 | Above Average |
| Numbers Reversed | 105 | 63 | Average |
| Auditory Attention | 104 | 62 | Average |
| Auditory Working Memory | 122 | 93 | Superior |
| Pair Cancellation | 112 | 78 | Above Average |
|  |  |  |  |
| EXECUTIVE PROCESSES | 124 | 94 | Superior |
| Concept Formation | 123 | 94 | Superior |
| Pair Cancellation | 112 | 78 | Above Average |
| Planning | 122 | 93 | Superior |

8

| | ACHIEVEMENT Standard Score/ Scaled Score | Percentile Rank | Grade & Rating Equivalent |
|---|---|---|---|
| (W/J III) | | | |
| ACADEMIC SKILLS | 103 | 57 | 5.3 Average |
| ACADEMIC FLUENCY | 120 | 90 | 8.0 Above Average |
| | | | |
| ORAL LANGUAGE: | 120 | 91 | 12.4 Above Average |
| Story Recall | 119 | 90 | >18.0 Above Average |
| Understanding Directions | 113 | 81 | 10.4 Above Average |
| | | | |
| READING: | | | |
| (W/J III) | | | |
| Letter-Word Identification | 101 | 51 | 5.1 Average |
| Reading Fluency | 117 | 88 | 8.4 Above Average |
| Passage Comprehension | 104 | 61 | 5.8 Average |
| Word Attack | 93 | 32 | 3.1 Average |
| Spelling of Sounds | 93 | 32 | 3.3 Average |
| Sound Awareness | 106 | 65 | 7.3 Average |
| BROAD READING ABILITY | 111 | 77 | 6.8 Above Average |
| | | | |
| (GORT-4) | | | |
| Rate | 12 | 75 | 6.0 Average |
| Accuracy | 9 | 37 | 4.7 Average |
| Passage Reading | 11 | 63 | 5.7 Average |
| Comprehension | 12 | 75 | 7.2 Average |
| ORAL READING QUOTIENT | 109 | 73 | Average |
| | | | |
| MATHEMATICS: | | | |
| (W/J-III) | | | |
| Calculation | 117 | 87 | 7.3 Above Average |
| Applied Problems | 126 | 96 | 11.4 Superior |
| Math Fluency | 120 | 91 | 7.9 Above Average |
| BROAD MATH ABILITY | 128 | 97 | 8.7 Superior |
| | | | |
| WRITTEN LANGUAGE: | | | |
| (W/J-III) | | | |
| Spelling | 94 | 35 | 4.1 Average |
| Writing Fluency | 115 | 85 | 7.1 Above Average |
| | | | |
| (TOWL-3) | | | |
| Contextual Conventions | 7 | 16 | Below Average |
| Contextual Language | 7 | 16 | Below Average |
| Story Construction | 7 | 16 | Below Average |
| SPONTANEOUS WRITING QUOTIENT | 81 | 10 | Below Average |

9

## COMPREHENSIVE TEST OF PHONOLOGICAL PROCESSING
### (CTOPP)

|  | Standard Score | Percentile Rank | Rating Equivalent |
|---|---|---|---|
| PHONOLOGICAL AWARENESS | 94 | 35 | Average |
| Elision | 9 | 37 | Average |
| Blending Words | 9 | 37 | Average |
|  |  |  |  |
| PHONOLOGICAL MEMORY | 94 | 35 | Average |
| Memory for Digits | 12 | 75 | Average |
| Nonword Repetition | 8 | 25 | Average |
|  |  |  |  |
| RAPID NAMING | 112 | 79 | Above Average |
| Rapid Digit Naming | 12 | 75 | Average |
| Rapid Letter Naming | 12 | 75 | Average |

Denise Nagim, M.C.D., CCC/SLP
Language Learning Specialist
LaBIDA Board Member
LA Lic. No. 603

10

# Scores & Transcripts

## Understanding Your USMLE Score Report

Please note: The interactive score report below is a sample Step 3 report, but can be used to understand Step 1, Step 2 Clinical Knowledge (CK), and Step 3 score reports. Samples of the content areas that appear in Step 1 and Step 2 CK score reports are also provided.



Content Areas page – Step 1 Score Report

Content Areas page - Step 2 CK Score Report

## Scores

With the exception of Step 2 CS (which is reported as Pass/Fail), USMLE results are reported on a 3-digit scale.

The current minimum passing scores are as follows:

**Step 1:** 194
**Step 2 CK:** 209
**Step 3:** 196

Examination data (including performance information and recorded patient encounters) from USMLE examinations may be used by the USMLE program or made available to third parties for research and other purposes that are disclosed to or authorized by you, as appropriate, at the time any data is collected. In such instances, the data will be confidential, and individual examinees will not be identifiable in any publication. If you do not wish your examination data to be made available for such purposes, you must advise the USMLE Secretariat in writing no later than 30 days before your administration.

For more information about scores, view Scores Frequently Asked Questions (FAQs)

## What's Included on Your Transcript?

Your USMLE transcript includes the following:

- your name and other personal identification information, including your date of birth;

- your complete examination history of all Steps and Step Components that you took;

- your history of any examinations for which no results were reported;

- annotation(s) and information documenting classification of any scores as indeterminate (see Score Validity and Irregular Behavior);

- annotation(s) and information documenting any irregular behavior (see Score Validity and Irregular Behavior); and

- annotation(s) of any actions taken against you by medical licensing authorities or other credentialing entities that have been reported to the FSMB Board Action Databank.

**Note:** Graphical performance profiles, which are included on your original score reports, are not included in your USMLE transcript.

To obtain your USMLE transcript or have it sent to a third party, you must contact the ECFMG, FSMB, or NBME depending on which examinations you have taken and where you want your transcript sent.

Contact the FSMB if you want your transcript sent to a medical licensing authority at any time. If you have not registered for or taken Step 3 and want your transcript sent to anyone other than a medical licensing authority, submit the request to the last entity that registered you.

# Requesting a Transcript of USMLE Scores

To obtain your USMLE transcript or have it sent to a third party, you must contact the ECFMG, FSMB, or NBME and pay the associated fee. Which entity you contact depends on which Steps you have taken and where you want your transcript sent. Use the table below to determine which entity you should contact based on your specific details and needs.

| Step(s)/Component(s) Taken | Recipient of Transcript | Contact |
|---|---|---|
| One or more USMLE Steps | Medical licensing authority | FSMB |
| All three USMLE Steps; or Step 1 and Step 2 CK and CS (if required), only when registered for or after taking Step 3 | Any recipient | FSMB |
| Step 1 and/or Step 2 CK and/or CS only, registered by ECFMG | Any recipient other than a medical licensing authority | ECFMG |
| Step 1 and/or Step 2 CK and/or CS only, registered by NBME | Any recipient other than a medical licensing authority | NLES |

Bulletin: Official Transcripts

Plaintiff's Exh. 4, Page 2

# Bulletin

## Scoring and Score Reporting

| Exam Results & Scoring | Score Reporting | Score Rechecks | Score Validity | Anomalous Performance |

## Score Validity

The performance of examinees is monitored and may be analyzed to detect aberrancies that raise questions about the validity of scores. The USMLE program reserves the right to cancel scores that are at or above the passing level if the USMLE program has a good faith basis for questioning whether they represent a valid measure of knowledge or competence as sampled by the examination. Questions about score validity may result from irregular behavior (please refer to the **Irregular Behavior** section of this *Bulletin*) or other factors. If there are questions related to the validity of your score, your score report may be delayed or withheld pending completion of further review and/or investigation. You will have an opportunity to provide information that you consider relevant.

After review and analysis of all available information, scores will be classified as either valid and reported or invalid and canceled. If your score is canceled, an annotation of "score not available" will appear on your record next to the date of your examination. If your score is canceled, you will be notified and advised of the options for retaking the examination.

**Continue to: Anomalous Performance »**

Plaintiff's Exh. 4, Page 3

# Bulletin

# Scoring and Score Reporting

| Exam Results & Scoring | Score Reporting | Score Rechecks | Score Validity | Anomalous Performance |

## Examination Results and Scoring

The USMLE program provides a recommended pass or fail outcome on all Step examinations. Recommended performance standards for the USMLE are based on a specified level of proficiency. As a result, no predetermined percentage of examinees will pass or fail the examination. The recommended minimum passing level is reviewed periodically and may be adjusted at any time. Notice of such review and any adjustments will be posted at the USMLE website. On the examinations containing multiple-choice items, the percentages of correctly answered items required to pass varies by Step and from form to form within each Step. However, examinees typically must answer approximately 60 percent of items correctly to achieve a passing score.

For Step 3, your performance on the case simulations will affect your Step 3 score and could affect whether you pass or fail. The proportional contribution of the score on the case simulations is no greater than the amount of time you are given to complete the case simulations.

For up-to-date information on minimum passing scores, examination performance data, and general scoring methodology, please visit the USMLE website.

⚠ You must pass all three subcomponents of Step 2 CS (ICE, CIS, SEP) in a single administration to obtain the overall designation of passing on Step 2 CS.

**Continue to: Score Reporting »**

---

# Scoring and Score Reporting

Exam Results & Scoring | Score Reporting | Score Rechecks | Score Validity | Anomalous Performance

## Score Reporting

**Score Availability**

Results for computer-based examinations (Step 1, Step 2 CK, and Step 3) are typically available three to four weeks after your test date. However, a number of factors may delay score reporting. When selecting your test date and inquiring about results, you should allow at least eight weeks to receive notification that your score report is available. For Step 2 CS results, you should refer to the Step 2 CS Score Reporting Schedule. For more specific information about potential scoring delays, please visit the Announcement section of the USMLE website.

When your score is available, you will receive an e-mail notification from the organization that registered you for your examination. Your score report will remain available on the website of the organization that registered you for your examination for approximately 365 days from the date of the e-mail notification. After the score report is removed from the website, your scores will be provided to you only in the form of an official transcript, for a fee, through the organization that registered you for your examination. Visit the USMLE website for more details, including how to request a transcript for you or for a third party.

**Reporting to Third Parties**

The NBME reports the results of the USMLE to LCME- and AOA-accredited medical school programs for their students and graduates. For Step 1, Step 2 CK, and Step 2 CS, if you do not want your results reported to your medical school, you must send a request from your e-mail account of record to webmail@nbme.org, at least 10 business days before your scheduled test date. A separate request must be submitted for each examination administration. For Step 3, you must specify your reporting preference on your application.

The ECFMG may provide the results of the USMLE to international medical schools for their students and graduates. For Step 1, Step 2 CK, and Step 2 CS, if you do not want your results reported to your medical school, you must submit a request for each examination administration, via the ECFMG's Interactive Web Applications (IWA), at least 10 business days before your scheduled test date.

Examination data (including performance information and recorded patient encounters) may be used by the USMLE program or made available to third parties for research and other purposes that are disclosed to or authorized by you, as appropriate. In all instances, the data will be confidential, and individual examinees will not be identifiable in any publication. If you do not wish your examination data to be made available for such purposes, you must advise the USMLE Secretariat via e-mail at webmail@nbme.org no later than 30 days before your administration.

**Incomplete Scores**

If you do not open every block of your Step 1, Step 2 CK, or Step 3 examination, your examination may not be scored and the attempt may be reported as an incomplete on your USMLE transcript.

For Step 2 CS, if you leave the test early, or otherwise fail to carry out one or more of the cases, your performance may be assessed on those cases you completed. If, based on the performance of the completed cases, a pass/fail outcome cannot be determined, the attempt may be recorded as an incomplete on your USMLE transcript.

*For privacy purposes, the USMLE program does not provide scores or outcomes by telephone, e-mail, or fax to anyone. Additionally, the scoring process is not expedited or accelerated for any individual or group.*

**Continue to: Score Rechecks »**

Plaintiff's Exh. 4, Page 6