Appeal No. 19-30661

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

*MEAGHAN DOHERTY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Louisiana, Case No. 19-11790

**BRIEF OF DEFENDANT-APPELLANT
NATIONAL BOARD OF MEDICAL EXAMINERS**

Robert A. Burgoyne
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Eric B. Wolff
Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# CERTIFICATE OF INTERESTED PERSONS

NO. 19-30661

## *DOHERTY v.*
## *NATIONAL BOARD OF MEDICAL EXAMINERS*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

**Defendant-Appellant:**
National Board of Medical Examiners

**Counsel for Defendant-Appellant:**
Eric B. Wolff (Perkins Coie LLP)
Robert A. Burgoyne (Perkins Coie LLP)
Alison R. Caditz (Perkins Coie LLP)

**Plaintiff-Appellee:**
Meaghan Doherty

**Counsel for Plaintiff-Appellee:**
Frances M. Olivier (Law Office of Frances M. Olivier)
William Martin McGoey
Richard C. Stanley
    (Stanley, Reuter, Ross Thornton & Alford, LLC)
Kathryn Weatherly Munson
    (Stanley, Reuter, Ross Thornton & Alford, LLC)

/s/ Eric B. Wolff
Eric B. Wolff
*Counsel of Record for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

As a strictly legal matter, oral argument is unnecessary for this appeal. Upon review of the modest record and well-established legal standard, Plaintiff Meaghan Doherty is not disabled, and the district court abused its discretion in granting the preliminary injunction now on appeal. That said, the district court proceedings were very strange, and oral argument may help ensure an accurate understanding of the proceedings below. Further, Defendant National Board of Medical Examiners ("NBME") believes the underlying issues—reflecting an effort to inappropriately use the Americans with Disabilities Act ("ADA") to obtain extra testing time and thereby boost scores on high-stakes tests—are matters of significant public interest, which weighs in favor of oral argument.

# TABLE OF CONTENTS

Certificate of Interested Persons .............................................. i

Statement Regarding Oral Argument .................................... ii

Table Of Contents .................................................................. iii

Table of Authorities ................................................................ v

Statement of Jurisdiction ........................................................ 1

Introduction ........................................................................... 2

Issue Presented for Review ..................................................... 4

Statement Of The Case ........................................................... 4

    A.   National Board of Medical Examiners and the United States Medical Licensing Examination ........................................................... 4

    B.   Meaghan Doherty ................................................. 6

    C.   Procedural History ............................................. 15

Summary Of Argument ......................................................... 22

Standard Of Review .............................................................. 24

Argument .............................................................................. 25

    I.   The district court erred in concluding on the merits that Plaintiff is "disabled." ..................... 26

        A.   The ADA .................................................... 26

        B.   The district court misunderstood the legal standard for a "disability." .............. 30

C.    The district court's factual findings
        were clearly erroneous...............................33

D.    Plaintiff's arguments to the contrary
        are unpersuasive........................................41

II.    Plaintiff failed to show that she is likely to
        suffer  irreparable harm. ...................................45

III.    The harm to NBME and other test-takers
        outweighs any alleged harm to Plaintiff............51

IV.    Injunctive relief would disserve the public........53

Conclusion................................................................55

Certificate Of Compliance....................................56

Certificate Of Service ..........................................57

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Bach v. Law Sch. Admission Council,*
   2014 U.S. Dist. LEXIS 124632
   (M.D.N.C. Feb. 4, 2014) ................................................51, 53

*Baer v. Nat'l Bd. of Med. Exam'rs,*
   392 F. Supp. 2d 42 (D. Mass. 2005) ..................................47

*Bartlett v. N.Y. State Bd. of Law Exam'rs,*
   2001 WL 930792 (S.D.N.Y. Aug. 15, 2001) ...........42, 43, 44

*Bartlett v. N.Y. State Bd. of Law Exam'rs,*
   226 F.3d 69 (2d Cir. 2000) .................................................37

*Bercovitch v. Baldwin Sch., Inc.,*
   133 F.3d 141 (1st Cir. 1998) .............................................28

*Berger v. Nat'l Bd. of Med. Exam'rs,*
   2019 WL 4040576 (S.D. Ohio Aug. 27, 2019) .............44, 48

*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.,*
   2016 WL 1404157 (E.D. Pa. Apr. 11, 2016) ..........37, 40, 42

*Black v. Nat'l Bd. of Med. Exam'rs,*
   281 F. Supp. 3d 1247 (M.D. Fla. 2017) .............................34

*Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.,*
   577 F.3d 250 (5th Cir. 2009) .............................................25

*Bonnette v. Dist. of Columbia Ct. of Appeals,*
   796 F. Supp. 2d 164 (D.D.C. 2011) ...................................48

*Bridges v. City of Bossier,*
   92 F.3d 329 (5th Cir. 1996) ...............................................24

**Page(s)**

*Byrum v. Landreth*,
  566 F.3d 442 (5th Cir. 2009).............................................24

*Campbell v. Lamar Inst. of Tech.*,
  842 F.3d 375 (5th Cir. 2016).............................................53

*Cannon v. Jacobs Field Servs. N. Am., Inc.*,
  813 F.3d 586 (5th Cir. 2016).......................................28, 42

*Choice Inc. of Tex. v. Greenstein*,
  691 F.3d 710 (5th Cir. 2012).............................................45

*Doe v. Merritt Hosp., LLC*,
  353 F. Supp. 3d 472 (E.D. La. 2018) ...............................17

*Doe v. N.Y. Univ.*,
  666 F.2d 761 (2d Cir. 1981) .......................................47, 48

*Doe v. Ohio State Univ.*,
  2016 WL 692547 (S.D. Ohio Feb. 22, 2016).....................49

*EEOC v. Chevron Phillips Chem. Co., LP*,
  570 F.3d 606 (5th Cir. 2009).............................................32

*Foreman v. Babcock & Wilcox Co.*,
  117 F.3d 800 (5th Cir. 1997).............................................26

*Glueck v. Nat'l Conference of Bar Exam'rs*,
  2018 WL 3977891 (W.D. Tex. Aug. 20, 2018*)*.................37

*Gonzales v. Nat'l Bd. of Med. Exam'rs*,
  225 F.3d 620 (6th Cir. 2000).............................................41

*Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.*,
  870 F. Supp. 2d 607 (S.D. Ind. 2012) ....................30, 32, 34

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011).............................................25

**Page(s)**

*Kelly v. W. Va. Bd. Of Law Exam'rs*, 2008 U.S.
Dist. LEXIS 56840 (S.D. W. Va. July 24, 2008) ..............47

*Koller v. Riley Riper Hollin & Colagreco*,
850 F. Supp. 2d 502 (E.D. Pa. 2012) .................................29

*La Union Del Pueblo Entero v. FEMA*,
608 F.3d 217 (5th Cir. 2010)..............................................45

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.*,
328 F.3d 192 (5th Cir. 2003)........................................25, 40

*Love v. Law Sch. Admission Council, Inc.*,
513 F. Supp. 2d 206 (E.D. Pa. 2007) .................................10

*Mancini v. City of Providence*,
909 F.3d 32 (1st Cir. 2018) ................................................27

*Mann v. La. High Sch. Athletic Ass'n*,
535 F. App'x 405 (5th Cir. 2013) ...........................24, 40, 45

*Martin v. Helstad*,
699 F.2d 387 (7th Cir. 1983)..............................................47

*Martinez v. Mathews*,
544 F.2d 1233 (5th Cir. 1976)............................................25

*McClure v. Ashcroft*,
335 F.3d 404 (5th Cir. 2003)..............................................24

*Munaf v. Geren*,
553 U.S. 674 (2008)............................................................25

*Neely v. Benchmark Family Servs.*,
640 Fed. App'x 429 (6th Cir. 2016) ...................................28

**Page(s)**

*Neely v. PSEG Tex., Ltd. P'ship,*
    735 F.3d 242 (5th Cir. 2013)..............................................28

*New York v. FERC,*
    535 U.S. 1 (2002)..............................................................33

*Pazer v. N.Y. State Bd. of Law Exam'rs,*
    849 F. Supp. 284 (S.D.N.Y. 1994) ....................................44

*Powell v. Nat'l Bd. of Med. Exam'rs,*
    364 F.3d 79 (2d Cir. 2004) .........................................passim

*Price v. Nat'l Bd. of Med. Exam'rs,*
    966 F. Supp. 419 (S.D. W. Va. 1997)...........................33, 52

*Rawdin v. Am. Bd. of Pediatrics,*
    985 F. Supp. 2d 636 (E.D. Pa. 2013) .................................42

*Ridgely v. FEMA,*
    512 F.3d 727 (5th Cir. 2008)..............................................24

*Rothberg v. Law Sch. Admission Council,*
    102 F. App'x 122 (10th Cir. 2004) ..................46, 48, 49, 52

*Rumbin v. Ass'n of Am. Med. Colls.,*
    803 F. Supp. 2d 83 (D. Conn. 2011) ..................................42

*Scheidler v. Nat'l Org. for Women, Inc.,*
    537 U.S. 393 (2003)...........................................................33

*SEC v. Van Waeyenberghe,*
    990 F.2d 845 (5th Cir. 1993)..............................................17

*Singh v. George Wash. Univ. Sch. of Med. & Health Scis.,*
    508 F.3d 1097 (D.C. Cir. 2007).........................................42

**Page(s)**

*Singh v. George Wash. Univ. Sch. Of Med. & Health Scis.*,
    597 F. Supp. 2d 89 (D.D.C. 2009) ...................................... 40

*Sutton v. United Air Lines*,
    527 U.S. 471 (1999) ............................................................ 30

*Tate v. Am. Tugs, Inc.*,
    634 F.2d 869 (5th Cir. 1981) .............................................. 25

*Toyota Motor Mfg., Ky., Inc. v. Williams*,
    534 U.S. 184 (2002) ............................................................ 30

*Weaving v. City of Hillsboro*,
    763 F.3d 1106 (9th Cir. 2014) ............................................ 29

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................... 25, 45, 50

**STATUTES**

42 U.S.C. § 12101, *et seq.* .............................................. passim

42 U.S.C. § 12102 ...................................................................... 30

42 U.S.C. § 12189 ...................................................................... 26

Pub. L. No. 110-325, 122 Stat. 3553 ...................................... 30

**RULES & REGULATIONS**

28 C.F.R. § 36.105 ................................................ 27, 31, 32, 42

28 C.F.R. § 36.309 ................................................................... 33

Fed. R. Civ. P. 3 ...................................................................... 15

Fed. R. Civ. P. 65 ................................................................... 18

**Page(s)**

OTHER AUTHORITIES

*ACT Scores: Fast Facts*, National Center for
  Education Statistics,
  https://nces.ed.gov/fastfacts/display.asp?id=897 ..............10

Jennifer Medina et al., *Actresses, Business
  Leaders and Other Wealthy Parents Charged
  in U.S. College Entry Fraud*, N.Y. Times
  (March 12, 2019),
  https://www.nytimes.com/2019/03/12/us/college
  -admissions-cheating-scandal.htm ....................................6

M. Patrick Yingling*, Learning Disabilities and
  the ADA: Licensing Exam Accommodations in
  the Wake of the ADA Amendments Act of 2008*,
  59 Clev. St. L. Rev. 291 (2011) .........................................41

*SAT Percentile Ranks: 2011 College-Bound
  Seniors—Critical Reading, Mathematics and
  Writing Percentile Ranks*, College Board,
  https://secure-
  media.collegeboard.org/digitalServices/pdf/SAT
  -Percentile_Ranks_2011.pdf..............................................10

Statement of Managers to Accompany S. 3406,
  ADAAA of 2008, 154 Cong. Rec. S8840-41,
  2008 WL 4223414 (Sept. 16, 2008) ...................................29

## STATEMENT OF JURISDICTION

The district court had federal question jurisdiction un-der 28 U.S.C. § 1331 because this action arises under the ADA, 42 U.S.C. § 12101, *et seq*. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal from the grant of a preliminary injunction. ROA.798-807. NBME timely filed its notice of appeal on August 9, 2019, four days after the district court entered its preliminary injunction or-der. ROA.808-09.

**INTRODUCTION**

Shortly before a scheduled medical licensing exam, medical student Meaghan Doherty—who among many other accomplishments scored, without accommodations, in the top one percent of all examinees on the ACT college admissions test and the top 12 percent on the Medical College Admission Test—went to court claiming to have a reading disability under the ADA that entitled her to extra testing time. She sought a mandatory preliminary injunction (without first filing a complaint) and requested that the case be sealed. The district court sealed the case (causing considerable procedural obstacles), ordered the extra testing time following a hearing held two days after NBME was served, then denied a stay and ordered that her score be released. The bizarre proceedings below have produced an indefensible result.

There was *no* evidence that Ms. Doherty has a reading disability compared to *the general population*, which is the required standard under the ADA. Either the district court misunderstood that standard, or it misunderstood—with Ms. Doherty's help—the evidence presented. The diagnostic assessment evidence on which the district court relied compared Ms. Doherty to her academic peers, not the general

population. In fact, Ms. Doherty's stellar academic record and history of top scores on prior standardized tests emphatically show that she is not disabled compared to most people, as do the results of her diagnostic assessments.

Receiving unwarranted extra time on a standardized test is an unfair advantage. It also compromises the validity of the resulting scores—a particular concern where, as here, jurisdictions rely on the exam to make professional licensure decisions. If the injunction is not reversed, Plaintiff will submit her unfairly obtained score as part of her application to medical residency programs. Those programs will in turn rely on her score to the potential detriment of other candidates and the residency programs themselves. That disserves all other examinees, including those the ADA is meant to protect, and is contrary to the public interest.

NBME respectfully requests a reversal of the district court's mandatory preliminary injunction because Plaintiff has not shown a likelihood of success on the merits or a risk of irreparable harm. It is other students and the fairness of the testing standards that will be irreparably injured if the current injunction is not reversed.

## ISSUE PRESENTED FOR REVIEW

Whether the district court abused its discretion by granting a mandatory preliminary injunction based on the erroneous conclusions that Plaintiff (1) has a strong likelihood of successfully showing that she is substantially impaired in reading compared to most people, and thus "disabled" under the ADA, (2) has demonstrated that she will likely be irreparably harmed absent injunctive relief, (3) that the balance of harms favors injunctive relief, and (4) that the public interest favors injunctive relief.

## STATEMENT OF THE CASE

### A.    National Board of Medical Examiners and the United States Medical Licensing Examination

NBME is a nonprofit organization that, together with the Federation of State Medical Boards, sponsors the United States Medical Licensing Examination ("USMLE"). ROA.887. The USMLE is a standardized test comprised of three "steps," one of which has two components—Step 1, Step 2 (consisting of Step 2 Clinical Knowledge ("CK") and Step 2 Clinic Skills ("CS")), and Step 3. *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 82 (2d Cir. 2004); ROA.435. The exams consist primarily of multiple-choice tests taken on

computers in testing centers operated by a third-party vendor. ROA.902. This case concerns the Step 2 CK, a nine-hour multiple choice test with approximately 315 questions split into eight 60-minute sections. ROA.128-29.

The USMLE, including the Step 2 CK, is "designed to assess an examinee's understanding of and ability to apply concepts and principles that . . . constitute the basis of safe and effective patient care." ROA.253. Medical licensing authorities across the country rely on the USMLE as part of their licensure process. *Powell*, 364 F.3d at 82; ROA.887. Medical residency programs also rely on USMLE scores in evaluating applications as part of the yearly "Match" cycle that places graduates with residency programs. ROA.38, ROA.132, ROA.903.

All examinees take the tests under the same conditions except individuals who are disabled within the meaning of the ADA. ROA.686. NBME provides reasonable testing accommodations to disabled examinees and conscientiously evaluates each request for accommodations. ROA.686. NBME's "procedures are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that

those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage." *Powell*, 364 F.3d at 88.

In the wake of recent college admissions scandals—which illustrate the ease with which non-disabled students can obtain diagnoses that enable them to secure accommodations on high-stakes tests, and highlight the lengths to which people will go to receive extra testing time—NBME's "duty to ensure that its examination is fairly administered to all those taking it" has never been clearer.[1] *See id.* at 89.

## B. Meaghan Doherty

Meaghan Doherty is a 26-year-old medical student in her fourth and final year at Tulane University School of Medicine. ROA.181, ROA.684. She claims to be disabled under the ADA and entitled to 50 percent extra testing time on the Step 2 CK. ROA.127, ROA.182.

**Early diagnostic tests.** Plaintiff has excelled academically since a young age. From elementary through high

---

[1] *See, e.g.*, Jennifer Medina et al., *Actresses, Business Leaders and Other Wealthy Parents Charged in U.S. College Entry Fraud*, N.Y. Times (March 12, 2019), https://www.nytimes.com/2019/03/12/us/college-admissions-cheating-scandal.html.

school, Plaintiff was "accustomed to . . . being a top per-
former" and was "one of the best students in her class."
ROA.192, ROA.197. Her "grades were always excellent," and
she was told by teachers that she was "a great student."
ROA.186.

Nevertheless, her parents perceived "discrepancies in
[her] performance on standardized tests," a "source of seri-
ous consternation for [them]." ROA.186; ROA.300 ("[T]hey
fe[lt] 'something' [was] lacking in her ability to read flu-
ently."). Plaintiff's mother (a co-counsel in this lawsuit) and
father had her evaluated when she was ten, and again when
she was eleven. *See* ROA.229-43. Plaintiff has said that she
"could not understand why they felt something was wrong
with [her] . . . even though [she] always made honor roll[.]"
ROA.186. Plaintiff's "self-worth [became] entwined with
[her] academic performance," and, even now, Plaintiff re-
ports "worr[ying] about what others (including her parents)
think about her[.]" ROA.187, ROA.210; *see* ROA.192 ("I
feared I just wasn't smart enough to do well no matter how
hard I tried[.]").

Despite her parents' concerns, the healthcare providers Plaintiff saw in elementary school all reported average or above-average scores in reading. *See* ROA.689-90. For example, the 2004 Ducey evaluation, prepared after Plaintiff "was referred for a psychoeducational evaluation by her parents due to a possible reading problem" at the age of 11, found that her overall "reading skills fell in the Superior range (93rd percentile)," and her "reading fluency . . . in the Very Superior range," with her other reading subscores in the "High Average" and "Average" ranges. ROA.233-34. And although Plaintiff's "mother rated her as having significant problems in scales measuring restlessness and impulsivity," the evaluator noted that Plaintiff "did not perform like a child with attention problems" and her "teacher [saw] no attention or behavioral problems" either. ROA.234-35.

Prior diagnostic tests also showed Plaintiff as performing well in reading and comprehension. The 2003 Nagim evaluation rated Plaintiff's performance on the Verbal Ability component of the Woodcock-Johnson-III Tests—which "predicts how a student will function in reading"—as "almost superior ability (90 percent) [(90th percentile/top 10

percent)]." ROA.239. And on the "GORT-4, a high volume, timed reading assessment of passage reading and comprehension in a multiple-choice format," Plaintiff performed at the 75th percentile (top 25 percent) "in both Reading Rate and Reading Comprehension." ROA.241-42.

### Performance without Accommodations

Plaintiff says that she previously refused accommodations because of how others might react if they knew she had an impairment. *See, e.g.*, ROA.14, ROA.17. But in all events, she performed exceptionally without extra testing time or any other academic accommodations.

**Elementary, middle, and high school.** Plaintiff purportedly "refused all the accommodations [her elementary] school offered[.]" ROA.186. Nor did she request or receive any accommodations, formal or informal, during high school. ROA.184. Plaintiff excelled regardless. *See* ROA.187 (testimony from Plaintiff that she "was smart enough to do well even without the recommended accommodations"). In elementary school, Plaintiff "maintain[ed] an A average." ROA.300. She tested into ninth grade honors classes when she was in eighth grade and had a 3.75 grade point average

at a "highly competitive" high school with a "superior academic rating." ROA.17, ROA.63, ROA.186; *see* ROA.87 (statement by Plaintiff's counsel that she is "brilliant . . . obviously, she went to Ben Franklin [High School.]").

**University of Wisconsin.** Plaintiff also "excelled" without accommodations at the University of Wisconsin, where she majored in biology and minored in environmental studies and global health with a GPA of 3.73. ROA.63, ROA.138, ROA.221.

**ACT, SAT, and AP exams.** Plaintiff likewise received stellar scores on standardized tests that require reading under time pressure, with no accommodations. She scored in the *top one percent* of the nearly 1.6 million examinees nationwide who took the ACT college admissions test in 2010.[2] ROA.228; *see also* ROA.66. On the SAT, Plaintiff scored in the top 16 percent of all examinees on the "Critical Reading" subtest.[3] ROA.227; *see Love v. Law Sch. Admission Council,*

---

[2] *ACT Scores: Fast Facts*, National Center for Education Statistics, https://nces.ed.gov/fastfacts/display.asp?id=897.

[3] *SAT Percentile Ranks: 2011 College-Bound Seniors—Critical Reading, Mathematics and Writing Percentile Ranks*, College Board, https://secure-media.collegeboard.org/digitalServices/pdf/SAT-Percentile_Ranks_2011.pdf. Although

*Inc.*, 513 F. Supp. 2d 206, 227 (E.D. Pa. 2007) (noting that the ACT and SAT "are strictly timed and . . . involve reading and processing information"). And Plaintiff earned 21 college credits based on strong scores on her high school Advanced Placement ("AP") exams. ROA.197.

**The Medical College Admission Test ("MCAT").** Perhaps most telling for present purposes, Plaintiff performed exceptionally well on the MCAT without accommodations, scoring, on her first try, in the top 12 percent of all test-takers—a select, high-performing sample of individuals—between January 2012 and September 2014. ROA.226; *see also* ROA.67. She received her highest subscore on the most reading-intensive section of the MCAT, scoring in the *top five percent* in Verbal Reasoning. ROA.226; *see also* ROA.615-30 (sample Verbal Reasoning questions).

Like the Step 2 CK, the MCAT is a challenging multiple-choice exam administered over several hours on a computer, with questions that require extensive reading and

---

Plaintiff's overall SAT score was "very good" and sufficient "[t]o get into a competitive college" it was not, in her view, high enough to get "into an Ivy League," so she relied on her ACT score instead when applying to colleges. ROA.67.

concentration under fixed time limits. ROA.69-70, ROA.97; *see also* ROA.587-660.

Plaintiff testified that she did not ask for accommodations on the MCAT "[b]ecause it was a test that could be taken more than once, and [I] figured that . . . I should take it to see if I could at least do it, as well as because I knew I could retake it." ROA.19. She argued in her motion papers that NBME improperly relied on her MCAT score because "an individual may have an impairment that is episodic or in remission," ROA.158, but she conceded at the hearing that the impairment at issue here—an alleged learning disability—is lifelong, ROA.64.

**Seeking accommodations at Tulane medical school.** After Plaintiff started medical school and apparently was not at the top of her class, she went to see Dr. Brockman for an evaluation to "request accommodations" in her courses. ROA.195; *see* ROA.222 (statement by Dr. Brockman that Plaintiff's "challenges with test performance have been exacerbated since she began medical school" given "the increased complexity and amount of information she's expected to learn and recite on tests").

Dr. Brockman's report starts by noting—incorrectly—that Plaintiff "received accommodations throughout her elementary and high school years." ROA.195. Despite testifying in this case that she never received accommodations before medical school, ROA.64-65, Plaintiff apparently "reported [to Dr. Brockman] that she generally did well in elementary and middle school with accommodations," and that she had "received accommodations to address her dyslexia and dysgraphia," ROA.210, ROA.221. *See also* ROA.184. The report explains that Dr. Brockman conducted a "diagnostic interview with Ms. Doherty and her father, Judge Mark Doherty," as well as a battery of tests. ROA.195.

All but one of the many test results reflected average to superior abilities in reading. ROA.213-18. The outlier was Plaintiff's sixth-percentile score on a **one-minute** subtest of the Nelson Denny Reading Test.[4] ROA.218; *see* ROA.76. Dr. Brockman relied primarily on that result in diagnosing

---

[4] Plaintiff's Total Reading score on the Nelson Denny subtest "fell in the mid-average range at the 46th percentile[.]" ROA.206. Her Composite Scores for Total Reading, Basic Reading, and Reading Comprehension and Fluency were all Average. ROA.217.

Plaintiff with a learning disability in reading that, in her view, warranted extra test time. ROA.211.

In an Addendum to the report, Dr. Brockman acknowledged that percentile scores on the Nelson Denny Reading Test "are not based on the general population" but rather "the educational level that most closely resembles the individual being tested." ROA.220. Dr. Brockman explained that Plaintiff's "superior intelligence places her overall scores above that of the general population." ROA.223.

Apparently relying on Dr. Brockman's evaluation, Plaintiff requested and was granted an accommodation of time and a half on her written tests at Tulane's medical school. ROA.184, ROA.188, ROA.190; *see also* ROA.89 (arguing that the increase in Plaintiff's test scores at Tulane, with 50 percent more time than other students, is "exact proof" that she is entitled to accommodations).

**Seeking accommodations for the USMLE.** Plaintiff later requested accommodations for Step 1 of the USMLE, ROA.191-94, which, like the Step 2 CK, is a challenging multiple-choice exam administered on a computer over the course of a full day, ROA.693. NBME denied the request,

and Plaintiff passed under standard testing conditions. ROA.251-53. In her view, she only "barely" passed, it was "not a successful score to get anywhere with," and her low score justified her seeking accommodations for the Step CK. ROA.51. Yet the score report shows that Plaintiff's passing Step 1 score, albeit lower-than-desired, reflected her relatively poor performance on three subjects, not a shortage of time. ROA.254.

Plaintiff later requested accommodations for the Step 2 CK. ROA.180-89. When her request was denied, she sued NBME.

### C.    Procedural History

This lawsuit had a strange beginning and only got stranger from there. To start, Plaintiff did not file a complaint. Instead, she initiated this lawsuit by filing an Application for Temporary Restraining Order with Equitable Relief and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Application") on July 22, 2019. ROA.127-46; *see* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court.").

The Application alleges that Plaintiff is entitled to an accommodation because she has been diagnosed with a Learning Disability with Impairment in Reading, Attention Deficit Disorder ("ADHD"), and Generalized Anxiety Disorder. ROA.140. Her request to NBME for accommodations pointed to the Learning Disability diagnosis as the basis for requesting extra testing time, and the ADHD diagnosis as the basis for requesting a testing room free from distractions, ROA.193, though she testified that she does not need a separate room because the USMLE exams are taken in a "kind of cubicle," ROA.41.

In her Application, Plaintiff sought a mandatory preliminary injunction requiring NBME to (1) administer the test with 50 percent extra time on August 6, 2019, and (2) expedite grading her exam and provide the results by 4:00 p.m. on August 30, 2019 (apparently in advance of other test-takers). ROA.144-45; *see* ROA.913 (arguing Plaintiff should receive her score early because she "believes that NBME has the ability to produce the test scores to Plaintiff by August 30").

Plaintiff also moved, in effect, to have all documents in the case filed under seal, asking the court to seal her Application and supporting documents, all medical records, and any pleading that "references plaintiff's disabilities or medical history or diagnoses." ROA.490-95 (July 22, 2019).

Three days later, without awaiting any response from NBME (which had not yet been properly served), the district court issued a one-page *ex parte* sealing order, which was a signed version of Plaintiff's proposed order with no analysis. ROA.511 (July 25, 2019). The court sealed the *entire* case and barred not only the public's but the *parties'* access to the online docket, such that NBME had to "file" by emailing a Courtroom Clerk. To obtain a copy of the docket report, NBME's counsel periodically had to request a PDF version from the case manager, as it was not accessible on Pacer.[5]

---

[5] Given the lack of explanation, the sealing order was a clear abuse of discretion. *See SEC v. Van Waeyenberghe*, 990 F.2d 845, 848-50 (5th Cir. 1993) (holding that the district court abused its discretion by failing to weigh competing interests before sealing an order). The sealing order was also an abuse of discretion on the substance because there is no basis for total sealing of an ADA case. *See Doe v. Merritt Hosp., LLC*, 353 F. Supp. 3d 472, 481-82 (E.D. La. 2018) (denying plaintiff's motion to proceed anonymously in an ADA case, stressing "the public's interest in an open judicial forum").

The next day, the district court denied Plaintiff's request for a temporary restraining order, finding that she had failed to satisfy Federal Rule of Civil Procedure 65, but set a hearing on her preliminary injunction request for August 1. ROA.514 (July 26, 2019). NBME was not served with a Summons and a copy of Plaintiff's Application until July 30 (a copy of the Application had been sent to NBME the prior week by Federal Express). ROA.683-84.

Because NBME had insufficient time to obtain local counsel, put on evidence, file a brief, or even attend the hearing in person, its out-of-town counsel requested and was granted permission to appear *pro hac vice* and participate in the hearing by telephone. *See* ROA.11. Plaintiff put on a single witness—the Plaintiff—who was represented by her mother (who would be a fact witness if the case proceeds) and another lawyer. ROA.8, ROA.11. NBME requested permission to file a post-hearing brief (having not yet had the chance to respond to the Application), and, although Plaintiff opposed the request because of Plaintiff's "anxiety issues," the parties were given until 12:30 p.m. the next day to file their briefs. ROA.109, ROA.111, ROA.799.

The district court ruled on Plaintiff's Application on August 5, 2019, granting her request for a mandatory preliminary injunction and ordering NBME to administer the Step 2 CK to Plaintiff the next day, on August 6, with 50 percent extra time. ROA.798-807. NBME complied with the district court's order, changing Plaintiff's test registration from a one- to two-day test administration and requesting that the third-party entity that administers the test keep its testing center open after normal hours if necessary to permit Plaintiff to test. ROA.891.

NBME filed its Notice of Appeal on August 9. ROA.808. The district court, however, did not submit the Notice to this Court until August 15, after undersigned counsel inquired and the Fifth Circuit Clerk's Office confirmed the district court had not submitted the Notice. Def's Mot. to Stay, at 12 (No. 19-30661). NBME was then required to request leave to have a transcript prepared as part of its appeal based on the sealing order. *Id.*; *see* ROA.816. This appeal was automatically sealed because of the district court's sealing order.

Although the case was not over and NBME had already noticed its appeal, Plaintiff moved for an award of attorneys' fees and costs. ROA.817-68.

On August 22, NBME requested that the district court clarify the scope of the preliminary injunction, and, if necessary, enter a stay pending appeal. ROA.883-904. The court denied the motion on August 27. ROA.988-990. The court did "not believe clarification of its order [was] necessary" and treated it as obvious that NBME must release Plaintiff's score in the ordinary course on or before September 4 notwithstanding NBME's pending appeal. ROA.989-90.

NBME had moved to clarify because, although Plaintiff had specifically requested an injunction requiring NBME to release her score, ROA.144-45, the court's order did not mention such relief, ROA.807. NBME thus assumed that the omission was intentional but requested clarification to avoid any suggestion it had failed to comply in good faith with the court's order. Proving it was unclear, Plaintiff also filed a motion to clarify because the order "did not include a reference to a test score reporting requirement by NBME." ROA.948. Even though Plaintiff moved for the same

clarification, the court stated that the "premise" of NBME's motion was "rather disingenuous." ROA.989.

NBME asked this Court for an emergency stay of the injunction and requested a ruling by September 4—the day on which NBME would release Plaintiff's score in the ordinary course. Plaintiff opposed the motion.

This Court granted NBME's motion on September 3, staying the preliminary injunction and ordering that the case proceed under an expedited briefing schedule. ROA.991.

Because of the sealing order, NBME was required to request an order from this Court directing the district court to provide it the record on appeal. Several days later, Plaintiff asked the district court to unseal the case below, conceding that sealing the case had been "in contravention of the public's common law right to inspect and copy judicial records." Dist. Ct. Dkt. No. 42 (Sept. 20, 2019). The district court granted Plaintiff's motion. Dist. Ct. Dkt. No. 43.

On September 24, this Court directed the district court to provide NBME the record on appeal. NBME nevertheless remained barred from accessing the electronic record—even though the district court case had been unsealed—

apparently because this appeal was still sealed. NBME thus requested that this appeal be unsealed. The Court granted that request and NBME was able to access the record on appeal on September 25.

## SUMMARY OF ARGUMENT

Plaintiff is not "disabled" within the meaning of the ADA, and the Step 2 CK score she received with extra testing time should not be released. It is perhaps an unfortunate consequence of a preoccupation with achieving academic advantage that Plaintiff, her parents, or anyone else is willing to go to federal court to insist on a finding that she is substantially limited. Her receiving extra time was unfair to other test-takers (including individuals entitled to ADA accommodations) and harms those examinees as well as the medical licensing authorities and residency programs that rely on scores. NBME seeks a reversal of the district court's mandatory preliminary injunction.

On the merits, the district court referenced the correct legal standard in its order but abused its discretion in holding that Plaintiff is substantially limited compared to most people and thus disabled under the ADA. The lower court

improperly conflated a diagnosis with a disability and failed to compare her properly to the general population. It also anchored its disability determination in clearly erroneous factual findings. Plaintiff cannot establish a likelihood of success on the merits, and the mandatory preliminary injunction should be reversed on that ground alone.

The district court also failed to adequately scrutinize Plaintiff's claims of irreparable harm and abused its discretion in finding that irreparable harm is likely absent an injunction. Plaintiff was not in a do-or-die situation regarding the test. She did not need a Step 2 CK score to submit her residency applications, she can retake the exam now without accommodations (and she will almost certainly pass) if she wants to include a Step 2 CK score with her application sooner than required, or she can apply for a residency position next year. But if NBME must release her Step 2 CK score earned with an unwarranted accommodation, it will undermine the integrity of the USMLE and residency selection process. Any alleged injury to Plaintiff is thus outweighed by the significant harm to NBME, other test-takers,

and the public should her score be released. All four factors support reversing the preliminary injunction.

## STANDARD OF REVIEW

The grant of a preliminary injunction is reviewed for abuse of discretion, but questions of law—including mixed questions of law and fact—are reviewed *de novo. Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

Whether an individual is disabled under the ADA is a mixed question of law and fact reviewed *de novo. Mann v. La. High Sch. Athletic Ass'n*, 535 F. App'x 405, 410, 412 (5th Cir. 2013) (per curiam) (unpublished) (reversing grant of preliminary injunction); *see Bridges v. City of Bossier*, 92 F.3d 329, 333 (5th Cir. 1996). This Court reviews the district court's factual findings for clear error. *Ridgely v. FEMA*, 512 F.3d 727, 734 (5th Cir. 2008).

A court thus abuses its discretion when it "(1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *McClure v. Ashcroft*, 335 F.3d 404, 408 (5th Cir. 2003) (citation omitted).

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must establish: (1) a strong likelihood of success on the merits; (2) a likelihood of irreparable injury absent an injunction; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the public interest will not be disserved. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *see also Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This Court has "cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009) (citation omitted); *see also Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).

The burden is even greater for a mandatory preliminary injunction, which "goes beyond the status quo[,] is even more disfavored[,] and 'should not be issued unless the facts and law clearly favor the moving party.'" *See Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)); *see Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870

(5th Cir. 1981) ("Only in rare instances is [issuing] a mandatory preliminary injunction proper." (citation omitted)).

Because Plaintiff has not met her heavy burden on any of the four factors, the district court's mandatory preliminary injunction should be reversed.

## I.    The district court erred in concluding on the merits that Plaintiff is "disabled."

Plaintiff is not significantly impaired in reading compared to most people in the general population. She is therefore not "disabled" within the meaning of the ADA.

### A.    The ADA

Title III of the ADA requires NBME to offer the USMLE "in a place and manner accessible to persons with disabilities[.]" 42 U.S.C. § 12189. The issue on appeal is whether, as a threshold matter, Plaintiff is "disabled" under the ADA. *See Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 805 (5th Cir. 1997) ("If [the plaintiff] is not disabled, he would not be entitled to a reasonable accommodation[.]").

"Disability" is a legal term of art tied to significant impairment relative to most people, not elite peer groups at college or medical school or elite professional settings. A "disability" requires "a physical or mental impairment that

substantially limits one or more major life activities," or "a record of such an impairment." 42 U.S.C. § 12102(1)(A)-(B).

Under implementing Department of Justice regulations, a "major life activity" includes "learning, reading, concentrating, [and] thinking," and a "physical or mental impairment" includes specific learning disorders. 28 C.F.R. § 36.105(b)(2), (c)(1). Although there is a significant question whether Plaintiff even suffers from a "mental impairment," this Court need not decide that question for purposes of this appeal (nor could it on the limited record). Critically, an impairment is only a disability "if it substantially limits the ability of an individual to perform a major life activity as *compared to most people in the general population.*" 28 C.F.R. § 36.105(d)(1)(v) (emphasis added); *see also* § 36.105(e)(2).

Relative to "most people" means to a greater degree than the majority of people. *See Mancini v. City of Providence*, 909 F.3d 32, 42 (1st Cir. 2018) ("[A] determination as to whether this 'substantially limits' requirement has been satisfied calls for a comparison between the plaintiff's limitations and those of the majority of people in the general

population." (citation omitted)); *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 156 (1st Cir. 1998) ("Impairment is to be measured in relation to normalcy, or, in any event, to what the average person does." (citation omitted)). Even assuming Plaintiff has an impairment, it does not substantially limit her compared to most people.

And while the ADA, as amended by the ADA Amendments Act ("ADAAA"), should be construed to provide "broad coverage," this Court has stressed that Congress "in no way eliminated the term ['disability'] from the ADA or the need to prove a disability." *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 & n.4 (5th Cir. 2013); *see also Neely v. Benchmark Family Servs.*, 640 Fed. App'x 429, 434-35 (6th Cir. 2016) (unpublished) ("Though the [ADAAA] undoubtedly eased the burden required for plaintiffs to establish disability, we note that Congress expressly chose to retain the 'substantially limits' modifier for 'one or more major life activities'" (citation omitted)).

Nor did the ADAAA disturb the requirement that courts determine a substantial limitation by comparison to most people. *See, e.g., Cannon v. Jacobs Field Servs. N. Am.,*

*Inc.*, 813 F.3d 586, 591 (5th Cir. 2016) ("The inquiry in this post-amendment case is thus whether Cannon's impairment substantially limits his ability 'to perform a major life activity as compared to most people in the general population.'" (citation omitted)); *Weaving v. City of Hillsboro*, 763 F.3d 1106, 1112 (9th Cir. 2014) (plaintiff must be "limited . . . compared to 'most people in the general population.'" (citation omitted)).

The ADAAA's legislative history also "reaffirm[s] that not every individual with a physical or mental impairment is covered by the . . . definition of disability in the ADA." Statement of Managers to Accompany S. 3406, ADAAA of 2008, 154 Cong. Rec. S8840-41, 2008 WL 4223414 (Sept. 16, 2008). Thus, "[a] person who can walk for ten miles continuously is not substantially limited in walking merely because on the eleventh mile, he or she begins to experience pain because most people would not be able to walk eleven miles without experiencing some discomfort."[6] *Id.* (citation omitted).

---

[6] The ADAAA was enacted to "address certain impairments that were not receiving the protection that Congress intended," such as "cancer, HIV–AIDS, epilepsy, [and] diabetes[.]" *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012). The amendments also explicitly

The ADA is meant to accommodate people who are substantially impaired in a major life activity compared to most people. It is not designed to maximize performance on high-stakes tests or "allow individuals to advance to professional positions through a back door." *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.*, 870 F. Supp. 2d 607, 616 (S.D. Ind. 2012) (citation omitted).

**B.    The district court misunderstood the legal standard for a "disability."**

The district court's statements during the preliminary injunction hearing indicate a fundamental misunderstanding of the legal standard for proving a disability under the ADA. The court seemed to think that Plaintiff should be compared against some nebulous sense of her own potential, not against the general population:

---

rejected two Supreme Court decisions involving the employment provisions of the ADA: *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002). Pub. L. No. 110-325, § 2(b)(2)-(5), 122 Stat. 3553. The ADAAA thereby clarified that courts are to identify a substantial limitation "without regard to the ameliorative effects of mitigating measures," and expanded the definition of "major life activities" beyond those "of central importance to most people's daily lives." *See id.*; 42 U.S.C. § 12102(2)(A)-(B), (4)(E)(i).

> But isn't the answer you look at how the impairment
> affects [Plaintiff]? For example, a person could oper-
> ate between zero and ten. Some people might oper-
> ate at a nine with a disability, some may operate at a
> seven with a disability, but they both have disabili-
> ties. . . . The person who's operating at a six with an
> accommodation may then rise to an eight. A person
> who's operating at an eight with the impairment
> may raise to a ten. *So you're not comparing them against
> each other*; you're comparing how their disability af-
> fects them and their ability to function.

ROA.100 (emphasis added). The district court would thus

consider each person's impairment in a vacuum and—with-

out regard to the level of functional limitation compared to

most people—provide accommodations if doing so would en-

hance a person's already top performance in a given context,

even slightly. In short, the court would accommodate the

walker who tires at the eleventh mile. *See* ROA.102 ("[W]e're

looking at how she's performing at this point in her life in

this situation that she's in in medical school as opposed to

how she performed when she was in third grade[.]").

As an initial matter, the district court improperly con-

flated a diagnosis with a disability. But Plaintiff's diagno-

ses—even assuming they were proper—cannot alone estab-

lish she is disabled. *See* 28 C.F.R. § 36.105(d)(1)(v) ("[N]ot

every impairment will constitute a disability[.]"); *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 614 (5th Cir. 2009) ("Merely having an impairment . . . does not make one disabled for purposes of the ADA.").

The district court also erred by stating "you're not comparing them against each other." ROA.100. The legal standard *explicitly requires* such a comparison. 28 C.F.R. § 36.105(d)(1)(v); *Healy*, 870 F. Supp. 2d at 620 ("[A] person may exhibit statistically significant variation in test scores sufficient to support a clinical diagnosis, but . . . *[w]hen the test scores are compared to an external referent as the ADA requires*—that is, the general population—that person may nevertheless exhibit average abilities." (emphasis added)).

The question, therefore, is whether Plaintiff is substantially limited compared to most people, not whether she is performing up to her subjective potential in medical school. In concluding that Plaintiff is disabled because she is not maximizing her potential or might benefit from extra testing time, the district court put the cart before the horse: although there is a DOJ regulation under which "examination results [must] accurately reflect the individual's aptitude or

achievement level," that regulation applies only to individuals with disabilities. 28 C.F.R. § 36.309(b)(1)(i). "When a person is found to have a disability, § 36.309 is triggered," but "[f]or persons without disabilities under the ADA, § 36.309 does not apply." *Price v. Nat'l Bd. of Med. Exam'rs*, 966 F. Supp. 419, 426 (S.D. W. Va. 1997).

While the district court may not agree with the legal standard, "the sort of policy arguments [underlying the court's proposed standard] are properly addressed to the [Department of Justice] or to the Congress, not to this Court." *New York v. FERC*, 535 U.S. 1, 24 (2002) (citation omitted); *see Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003) ("[S]uch a significant expansion of the law's coverage must come from Congress, and not from the courts.").

## C.    The district court's factual findings were clearly erroneous.

Even if the district court applied the correct legal standard—which, as discussed above, is doubtful—it plainly erred by finding that "[t]he evidence and testimony clearly support that Plaintiff has an impairment that substantially limits her in the major life activities of reading **when**

**compared to most people in the general population**." ROA.804 (emphasis added).

No evidence supports the "compared to most people" part of that finding. Plaintiff has gerrymandered a "reading disability" by emphasizing her low performance on **a one-minute reading test** that did **not** compare her to the general population. But Plaintiff's own evaluations, academic history, and testimony show that her reading ability is, at worst, average and likely above average. And "average (or above-average) performance presumptively establishes the absence of a substantial limitation." *See Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d 1247, 1249 (M.D. Fla. 2017); *Healy*, 870 F. Supp. 2d at 620 (same).

Plaintiff herself did not claim or emphasize any below-average performance. She just wanted to maximize her score on the Step 2 CK. She said her passing Step 1 score, which "jeopardized the likelihood of [her] obtaining an internship and residency program" because it was not higher, was "the best evidence" supporting her request for accommodations on the Step 2 CK. ROA.188. But accommodations are not

intended as a means for improving the scores of non-disabled test-takers.

The district court emphasized the purported "record medical evidence documenting Plaintiff's disability, the description in evidence of how overcoming her disability inspired her activities, and more importantly her credible explanation for not seeking accommodations earlier." ROA.804. But none of that matters if Plaintiff's alleged impairments do not substantially limit her ability to read compared to most people. They do not. Plaintiff proffered *no evidence* that she reads below average compared to the general population. In concluding otherwise, the district court's preliminary injunction order miscited two of Dr. Brockman's findings.

**First,** the district court erroneously referred to a purported finding by Dr. Brockman that Plaintiff's "reading ability was . . . as low as just the 6th percentile **of the general population** on the Nelson Denny Reading Test ['NDRT']." ROA.804 (emphasis added). That finding is clearly erroneous for two reasons. The NDRT results compared her to college graduates, not the general population.

And she was not in the 6th percentile for the whole test, just the one-minute subtest (*see supra* at p.13, n.4).

Plaintiff's psychologist acknowledged that the NDRT "percentile scores are *not based on the normal population* but the educational level that most closely resembles the individual being tested." ROA.220 (emphasis added). Plaintiff "was compared with other college graduates NOT the 'normal' population." ROA.220. It was "a select group of about 500 college educated individuals." ROA.251. But the district court's mistake could have easily been prompted by how Plaintiff misstated her psychologist's evidence in both her briefing and at the preliminary injunction hearing.[7]

Courts have recognized the limited nature of the NDRT results regarding a disability finding. The Second Circuit, for example, has noted that the NDRT is not a test that

---

[7] Plaintiff argued, for example, that "the 6th percentile is way below **most of the population**. . . . She has to show that [her impairment] substantially limits her major life activity **in comparison with the general population or most of the population. We beat that with the 6th percent**." ROA.110 (emphasis added); *see also* ROA.549 ("On the timed Nelson Denny subtest, Meaghan's Reading Speed fell in the borderline or slow reader range at the 6th Percentile **of all readers**.") (emphasis added).

compares a person to "most people." *See Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 81-82 (2d Cir. 2000) ("[Plaintiff's NDRT] test results, which show a reading rate in the fourth percentile or below as compared to college freshmen, are of limited value, because the proper reference group is 'most people,' not college freshmen."). Other courts have noted the same.[8]

Dr. Brockman understood the limited nature of the NDRT result and implicitly conceded that it could not satisfy the disability standard by expressly arguing that a more lenient standard should apply. Dr. Brockman asserted that NBME's interpretation of the ADA was "outdated" and that—instead of most people—Plaintiff should be compared "with the cohort on which the NDRT reading percentile

---

[8] *See also Glueck v. Nat'l Conference of Bar Exam'rs*, No. SA-17-CV-451-XR, 2018 WL 3977891, at *5 & n.4 (W.D. Tex. Aug. 20, 2018*)* (holding that the plaintiff was not disabled as a matter of law, despite scoring in the fourth percentile on the NDRT, because "this comparison was made 'using end of college norms'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*, No. CV-15-4987, 2016 WL 1404157, at *8 (E.D. Pa. Apr. 11, 2016); ("[T]he Nelson-Denny compared Bibber to other four-year college graduates, which is assuredly not representative of the general population when over half of the people in the country lack a bachelor's degree.").

scores are based, namely, other college educated students, not the general population." ROA.222. Dr. Brockman asserted that Plaintiff "should be assessed in comparison to her fellow medical students sitting for the USMLE Step 2 Test." ROA.222. She emphasized that Plaintiff's "superior intelligence places her overall scores above that of the general population." ROA.223.

Similarly, Plaintiff seeks only to be compared to her medical school peers. She has argued she should be compared to those who "have been successfully admitted to medical school and have successfully completed the course work." ROA.50. She does not claim that her reading level falls below average compared to most people, or even compared to other college graduates, who, according to Plaintiff, are "a very different population" from those who take the USMLE even if planning to attend medical school. ROA.50. Plaintiff also attempted to discount her superior MCAT score by emphasizing that MCAT-takers is a broader population than USMLE-takers. Plaintiff asserted that "[a]nyone can take the MCAT" and "[t]here [are] no qualifications that have to be met." ROA.50. As an initial matter, those assertions are

not true, but as a legal argument they flaunt the reality that the only "impairment" Plaintiff is truly claiming is vis-à-vis the small, elite sample of enrolled medical school students taking the USMLE, not even the somewhat larger sample of MCAT-takers and *definitely not* the general population, which is the only sample that matters legally.

The district court clearly erred in its reliance upon—and characterization of—the 6th percentile score on the one-minute NDRT subtest as showing a disability related to the general population, which neither Plaintiff's psychologist nor Plaintiff herself is claiming.

**Second,** the district court (essentially quoting Plaintiff's post-hearing brief) erroneously cited Dr. Brockman as finding that Plaintiff's "reading 'decoding' speed [is] slower than 75% of students against the general population." ROA.800; *see* ROA.549. That finding is also clearly erroneous because her decoding score did not relate to the "general population." Plaintiff's "decoding speed . . . was slower than 75% of *students her age*."[9] ROA.207.

---

[9] In its motion to the district court for a stay pending appeal, NBME pointed to the two findings the court had miscited in

**Finally,** while Plaintiff's outstanding scores earned on the MCAT and other standardized tests without accommodations do not necessarily negate her claims, they certainly bolster the conclusion that she is not disabled by an alleged learning disability that limits her reading ability.[10]

Far from one of the rare instances in which a mandatory injunction is appropriate—where the "facts and law clearly favor the moving party," *Lake Charles*, 328 F.3d at 196—there was *no* basis for concluding that Plaintiff is disabled under the ADA. *See Mann*, 535 Fed. App'x at 411-12 (reversing grant of preliminary injunction for failing to satisfy "the legal test for a disability under the ADA," where the

---

its preliminary injunction order. ROA.893-95. In denying a stay, the court did not address these errors. *See* ROA.988-90.

[10] *See, e.g.*, *Bibber*, 2016 WL 1404157, at *8 ("[Plaintiff's] confidence in taking those exams without even attempting to receive accommodations speaks volumes about whether her dyslexia is substantially limiting when compared to high achieving groups of people, let alone the general population."); *Singh v. George Wash. Univ. Sch. Of Med. & Health Scis.*, 597 F. Supp. 2d 89, 95 (D.D.C. 2009) (rejecting the possibility that Plaintiff's "enormous success in other reading and comprehension tasks—undoubtedly some of them timed—is consistent with a reading disorder which primarily manifests itself in limiting her reading speed"), *aff'd*, 667 F.3d 1 (D.C. Cir. 2011).

plaintiff had only proffered evidence of a diagnosis and "some deficiencies in his academic functioning"). To the contrary, the record compels the opposite conclusion: Plaintiff is a bright, talented individual whose reading abilities are, at worst, average but likely well above average. *See Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 627 & n.13, 630 (6th Cir. 2000) (affirming denial of preliminary injunction where the plaintiff was not "disabled" under the ADA, emphasizing that his scores earned on timed tests without accommodations were "squarely in the average to superior range," including an average SAT score and "high enough" MCAT score).

### D.   Plaintiff's arguments to the contrary are unpersuasive.

Plaintiff asserted below that the "most people" standard should not apply to her and that testing accommodations should be more freely granted to further the spirit of the ADA, relying primarily on a 2011 law review article written by a law firm associate—M. Patrick Yingling, *Learning Disabilities and the ADA: Licensing Exam Accommodations in the Wake of the ADA Amendments Act of 2008*, 59 Clev. St. L. Rev. 291 (2011). ROA.153-56; *see also* ROA.326-50. Even

though such an article isn't legal authority at all, Plaintiff's counsel referred to it during the preliminary injunction hearing as "the Sixth Circuit *Yingling* case." ROA.94.

The arguments in Mr. Yingling's article are barred by both the unambiguous text of the regulation and case law interpreting it in the specific context at hand. 28 C.F.R. § 36.105(d)(1)(v); *see, e.g.*, *Cannon*, 813 F.3d at 591 (reasoning that the relevant comparison is "to most people in the general population") (citation omitted); *Singh v. George Wash. Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097, 1100 (D.C. Cir. 2007) (noting that the proper comparison is to "the general population," not "persons of elite ability or unusual experience.").[11]

Plaintiff also relies on *Bartlett v. N.Y. State Bd. of Law Exam'rs*, No. 93-CV-4986-SS, 2001 WL 930792 (S.D.N.Y. Aug. 15, 2001), in which then-Judge Sotomayor held that a law student was disabled under the ADA. *See* ROA.155-56.

---

[11] These cases also reject comparing the plaintiff with fellow test-takers as opposed to the general population. *See Bibber*, 2016 WL 1404157, at \*6; *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 651 (E.D. Pa. 2013), *aff'd*, 582 F. App'x 114 (3d Cir. 2014); *Rumbin v. Ass'n of Am. Med. Colls.*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011).

The disability finding, made after a 21-day bench trial and four-day remand trial, was based on significant evidence establishing the plaintiff's below-average reading abilities. *Bartlett*, 2001 WL 930792, at *1, 3.

*Bartlett* did not question the "most people" standard, but rather based the disability finding on both psychometric tests and clinical observations. *Id.* at *22. Although Marilyn Bartlett was "highly educated" and "intelligent," she read "slower than 78 percent of fourteen year-olds." *Id.* at *28. She also (1) used an index card with a hole to help her read; (2) read emails by printing and enlarging them; (3) avoided reading for pleasure; (4) scored so low on the SAT that she was not admitted to a single college until she met with the president of one; and (5) failed the Bar exam four times (despite receiving accommodations on her last attempt). *Id.* at *4-5, 20, 40. Four experts testified that Bartlett's ability to read was limited compared to most people. *Id.* at *4-13.

Although both Bartlett and Plaintiff are bright and highly educated, the similarities end there. Here, there is no evidence—either from psychometric assessments *or* clinical observations—that Plaintiff struggles to read compared to

the average person. Not even her psychologist claims she is impaired compared to most people (and implicitly concedes she is not). ROA.222-23. While Plaintiff offered reports indicating some disparity in her test scores, these, even if valid, "do not, standing alone, identify a learning disabled person[.]" *Bartlett*, 2001 WL 930792, at *25 (citation omitted). "[T]o hold otherwise would compel the conclusion that any underachiever would by definition be learning disabled as a matter of law[.]". *Pazer v. N.Y. State Bd. of Law Exam'rs*, 849 F. Supp. 284, 287 (S.D.N.Y. 1994).

Neither is *Berger v. Nat'l Bd. of Med. Exam'rs*, No. 1:19-CV-99, 2019 WL 4040576 (S.D. Ohio Aug. 27, 2019) helpful to Plaintiff. There, in holding that the plaintiff was disabled, the court emphasized his "extensive history" of accommodations starting in grade school and continuing through medical school, as well as his below-average assessment results. *Id.* at *21-26. The court indicated that on a different record—where the plaintiff had offered no reports reflecting below-average abilities and received no accommodations before graduate school—it would have reached the opposite conclusion. *Id.* at *23.

Plaintiff cannot establish a likelihood of success on the merits and the preliminary injunction should be reversed on that ground alone.[12]

## II. Plaintiff failed to show that she is likely to suffer irreparable harm.

The district court also abused its discretion in concluding that Plaintiff will likely be irreparably harmed if she cannot apply for residency positions this fall with a Step 2 CK score in hand. ROA.805-06. "A plaintiff seeking a preliminary injunction must establish that . . [she] is likely to suffer irreparable harm in the absence of preliminary relief[.]" *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 717 (5th Cir. 2012) (quoting *Winter*, 555 U.S. at 20). Rather than meaningfully apply this standard, the district court uncritically accepted Plaintiff's claims of harm and did not examine the record as required to award extraordinary relief.

---

[12] *See La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217, 225 (5th Cir. 2010) ("Because we have determined that Plaintiffs cannot show a substantial likelihood of success on the merits, we need not address [the] additional arguments regarding the other necessary elements for preliminary injunctive relief."); *Mann*, 535 Fed. App'x at 412 n.2 (declining to reach the other factors where the plaintiff was unlikely to prove a disability under the ADA). In any event, Plaintiff cannot satisfy the other three factors, as set forth below.

Plaintiff's Application claimed that she must take the Step 2 CK by September 15 "to timely apply for a post-graduate residency," and that "November 30, 2019 ends the application deadline which requires that . . . Step 2-CK . . . be complete and scores made available." ROA.132. Neither of those assertions are true. Plaintiff did not need to pass the Step 2 CK by September 15, nor does she need a score by November 30 to participate in the 2020 "Match" cycle.

Rather, Plaintiff has until February 26, 2020 to verify her credentials for the 2020 Match, including a passing Step 2 CK score, ROA.465, and until April 2020 to pass under Tulane's rules (or later if she requests a leave of absence), ROA.461. In fact, Tulane "recommend[s]" that students take the Step 2 CK "before December 31 of their senior year to participate in the Match." ROA.461. It is difficult to imagine a medical school would recommend taking the exam by December 31, 2019 if, as Plaintiff asserts, doing so would irreparably harm her prospects in the application process.

Plaintiff can also retake the Step 2 CK without accommodations and include that score in her residency application. *See Rothberg v. Law Sch. Admission Council*, 102 F.

App'x 122, 126 (10th Cir. 2004) (unpublished) ("Rothberg is not now prevented from applying to these other law schools using her unaccommodated score and competing for entry."). Plaintiff's strong past standardized test results and passing Step 1 score suggest that she would almost certainly pass. *See* ROA.226-28, ROA.253; *Kelly v. W. Va. Bd. of Law Exam'rs*, No. 2:08-CV-00933, 2008 U.S. Dist. LEXIS 56840, at *6-7 (S.D. W. Va. July 24, 2008) (insufficient showing of harm where the plaintiff had done well on tests without accommodations); *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) ("[I]t is not certain that she will suffer the predicted harm; she may pass the test.").

Regardless, Plaintiff cannot show a likelihood of irreparable harm even if she must wait a year to apply for a residency position. Any alleged harm associated with the potential delay is unduly speculative and, in all events, not irreparable. *See Doe v. N.Y. Univ.*, 666 F.2d 761, 773 (2d Cir. 1981) (reasoning that "a one-year delay in obtaining admission to a graduate school . . . as distinguished from interruption or termination of attendance already in progress, is [generally] insufficient to warrant an injunction"); *Martin v. Helstad*,

699 F.2d 387, 391-92 (7th Cir. 1983) (same); *Rothberg*, 102 F. App'x at 125 (reasoning that a preliminary injunction "mandating that LSAC report [the plaintiff's] accommodated score to various law schools" was not needed, as "[n]othing requires [her] to apply to law schools now").

Where courts have concluded that the plaintiff would suffer irreparable harm, they found that the alleged injury was both imminent and non-speculative.[13] Here, by contrast, Plaintiff's medical school attendance will not be interrupted or terminated. *See Doe*, 666 F.2d at 773. She will likely pass, will at worst be forced to wait a year to apply, and will not be dismissed from school. Moreover, no unwarranted harm will come of maintaining the status quo because Plaintiff is not disabled under the ADA. *See supra*, Part I. At best, then, "[she] can only allege a delay of her application [for residency positions]," the next part of her graduate medical education. *Rothberg*, 102 F. App'x at 126.

---

[13] *See, e.g.*, *Berger*, 2019 WL 4040576, at *28 (plaintiff likely to fail Step 2 CK, had failed twice, and faced dismissal from medical school if he failed again); *Bonnette v. Dist. of Columbia Ct. of Appeals*, 796 F. Supp. 2d 164, 187 (D.D.C. 2011) (emphasizing that the plaintiff had "been trying to become a licensed attorney for many years").

Plaintiff's testimony at the preliminary injunction hearing only underscores the speculative nature of her alleged harm. She testified she will not be invited to interview by her desired residency programs unless her application includes "the highest possible score that [she can get]" on the Step 2 CK. ROA.38-39; *see Rothberg*, 102 F. App'x at 125-26 (rejecting purported injury of "being 'deprived of the opportunity to compete for entry into any number of law schools that she could possibly get into with a better LSAT score'").

But Plaintiff also testified that she is guaranteed an interview with Tulane's residency program—one that interests her in "her chosen geographic location"—even without a Step 2 CK score. ROA.82-83, ROA.134; *cf. Doe v. Ohio State Univ.*, No. 2:15-CV-2830, 2016 WL 692547, at *11 (S.D. Ohio Feb. 22, 2016) ("If he does [obtain a residency], it would be, on this record, mere speculation as to whether [it] would be of lesser value to him than any residency he would get if he were able to represent to various residency programs that he was a student in good standing," and, "[e]ven if that were true, there is no evidence in this record about how the difference in the quality of a residency would play out over the

course of a career[.]"). Plaintiff further testified that she intends to apply to an obstetrics and gynecology program, which is easier to get into than about 75 percent of other types of residency programs. ROA.36-37.

The district court ignored those arguments entirely, simply noting that it was "rather disingenuous of Defendant to minimize the *possible* and real consequences faced by Plaintiff," ROA.805 (emphasis added), and that Plaintiff had demonstrated irreparable harm "through uncontroverted evidence and testimony," ROA.989. *See Winter*, 555 U.S. at 22 (rejecting a "possibility" standard and ruling that "irreparable injury [must be] likely in the absence of an injunction" (citation omitted)).

Far from uncontroverted, and as described above, Plaintiff's unsubstantiated allegations of harm are inconsistent with both the factual record (including key deadlines for residency applications) and the weight of case authority regarding what constitutes *irreparable* harm. The district court clearly erred in concluding that Plaintiff had carried her burden of demonstrating that *irreparable* harm is *likely* absent a preliminary injunction.

### III.   The harm to NBME and other test-takers outweighs any alleged harm to Plaintiff.

The balance of harm weighs in favor of NBME. NBME, and by extension, other test-takers, are irreparably harmed when "the award of potentially unfair accommodations on [an] exam before a merits determination will affect the comparable validity of the scores of the other examinees, and [it] has no remedy once it reports [Plaintiff's] scores." *Bach v. Law Sch. Admission Council*, 2014 U.S. Dist. LEXIS 124632, at *7 (M.D.N.C. Feb. 4, 2014).

Here, releasing a score Plaintiff received with an unwarranted accommodation will impact the relative ranking of other Step 2 CK examinees in the "highly competitive" residency application process—"the holy grail for all US Medical school seniors." ROA.131-32; *see* ROA.29 (testimony from Plaintiff that Step scores are "the most important factor for [an applicant's] residency application"). Once Plaintiff receives her Step 2 CK score, she will "immediately launch" her residency applications by requesting that NBME submit her USMLE scores to the Electronic Residency Application Service ("ERAS") as part of those applications. ROA.902-03, ROA.952. Plaintiff admitted that if she is accepted to a

residency program based on the Step 2 CK score she received with accommodations, her position will come at the expense of another applicant. ROA.82.

The mandatory injunction will thus undermine the integrity of her scores, the fairness of the residency selection process, and NBME's "duty to ensure that its examination is fairly administered to all those taking it." *Powell*, 364 F.3d at 89; *see Price*, 966 F. Supp. at 422 ("If a court were to grant testing accommodations to persons that do not have disabilities within the meaning of the ADA, it would allow persons to advance to professional positions through the proverbial back door," thereby "undermining the integrity of the USMLE[.]"); *Rothberg*, 102 F. App'x at 126 (overturning preliminary injunction that allowed plaintiff to take the LSAT with extra testing time and noting that LSAC would be irreparably harmed if the accommodated score were released). Other test-takers who will lose out because of Plaintiff's unfair score will also be irreparably harmed.

Disregarding these arguments, the district court concluded that the purported injury to Plaintiff "clearly outweighs any damage . . . to NBME or the public" because:

(1) "[t]he cost and effort to accommodate Plaintiff is minimal," and (2) "the requested accommodations will not change the testing format or the time-based system as applied to students without a documented disability[.]" ROA.806.

That reasoning misses the mark. First, the harm here is about fairness, not the cost of administering the test. And second, while the format and testing time obviously will not change for other test-takers, the extra time Plaintiff received will, as noted, affect relative scores. The balance of harms weighs strongly in favor of NBME and other test-takers.[14]

## IV.    Injunctive relief would disserve the public.

The public interest also weighs strongly in favor of reversing the mandatory preliminary injunction. Like NBME, the public "has an interest in the fair administration of standardized tests." *Bach*, 2014 U.S. Dist. LEXIS 124632, at *8; *see Campbell v. Lamar Inst. of Tech.*, 842 F.3d 375, 381 (5th Cir. 2016) (concern that the plaintiff "might obtain an

---

[14] Plaintiff also failed to address the real harms at stake by arguing that NBME will not be injured because it "will suffer no public stigma—in fact the public will never even know that Plaintiff took the test with accommodations . . . based on . . . the fact that proceeding [in] the District Court is Sealed." ROA.554.

unfair advantage over other students by having an extra two weeks to study" was a legitimate and "serious" reason for denying accommodations). This is particularly true when, as here, medical licensing authorities rely on the test to assess a potential doctor's ability to provide "safe and effective patient care." *See* ROA.253; *Powell*, 364 F.3d at 82.

Contrary to Plaintiff's assertion, this case is not just "about . . . approximately 45 seconds" of extra time for Plaintiff to answer each question. ROA.168. It's about ensuring effective patient care, and, again, about fairness. If residency programs rely on a score Plaintiff received with an unwarranted accommodation, it will "alter[] the substance of the product because the resulting scores [will] not be guaranteed to reflect each examinee's abilities accurately." *Powell*, 363 F.3d at 89. It would unfairly advantage Plaintiff to the detriment of other Step 2 CK examinees, residency applicants, and residency programs. Because this includes applicants with legitimate disabilities within the meaning of the ADA, the lower court's preliminary injunction harms the very population the ADA is designed to protect.

## CONCLUSION

The district court erred in concluding that Plaintiff is disabled under the ADA, that Plaintiff carried her burden of demonstrating irreparable harm absent an injunction, and that the balance of harms and public interest favor an injunction. The mandatory preliminary injunction requiring NBME to release Plaintiff's score should be reversed.


DATED: October 1, 2019

Robert A. Burgoyne
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

/s/ Eric B. Wolff
Eric B. Wolff
Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Attorneys for Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

*Counsel of Record for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,218 words, excluding the parts exempted by Rule 32(a)(7)(B)(iii); and (2) the typeface and type style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook and Palatino Linotype fonts.

/s/ Eric B. Wolff
Eric B. Wolff

*Counsel of Record for Defendant-Appellant*

## CERTIFICATE OF SERVICE

On October 1, 2019, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Eric B. Wolff
Eric B. Wolff