Appeal No. 19-30661

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

*MEAGHAN DOHERTY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Louisiana, Case No. 19-11790

## RECORD EXCERPTS

Robert A. Burgoyne
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Eric B. Wolff
Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# TABLE OF CONTENTS

| TAB | RECORD EXCERPTS | ROA |
|---|---|---|
| 1 | District Court Docket Sheet | ROA.1-4 |
| 2 | Notice of Appeal | ROA.808-09 |
| 3 | Order Granting Preliminary Injunction | ROA.798-807 |
| 4 | Order Denying NBME's Motion to Clarify and, If Necessary, for a Stay | ROA.988-90 |
| 5 | Preliminary Injunction Hearing Transcript (excerpts) | ROA.50-51; ROA.82-83; ROA.95-110 |
| 6 | ACT Score Report | ROA.228 |
| 7 | SAT Score Report | ROA.227 |
| 8 | MCAT Score Report | ROA.226 |
| 9 | Step 1 Score Report | ROA.253-54 |
| 10 | Brockman Evaluation: Test Results | ROA.213-18 |
| 11 | Brockman Addendum | ROA.219-23 |
| 12 | Plaintiff's Personal Statement, Application for Step 2 CK Accommodations | ROA.186-89 |

## CERTIFICATE OF SERVICE

On October 2, 2019, these record excerpts were served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Eric B. Wolff
Eric B. Wolff

# TAB 1

APPEAL,SEALED

Jump to Docket Table

# U.S. District Court
## Eastern District of Louisiana (New Orleans)
## CIVIL DOCKET FOR CASE #: 2:19-cv-11790-GGG-MBN *SEALED*

Doherty v. National Board of Medical Examiners
Assigned to: Judge Greg Gerard Guidry
Referred to: Magistrate Judge Michael North
Case in other court:  USCA 5th Circuit, 19-30661
Cause: 42:12101 Americans With Disabilities Act

Date Filed: 07/22/2019
Jury Demand: None
Nature of Suit: 446 Civil Rights: Americans with Disabilities - Other
Jurisdiction: Federal Question

**Plaintiff**

**Meaghan Doherty**                     represented by     **William Martin McGoey**
St. Bernard Parish District Attorney's Office
1101 W. St Bernard Hwy
Chalmette, LA 70043
504-271-1658
Email: wmcgoey@stbda.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frances Mae Olivier**
Law Office of Frances M. Olivier, LLC
2341 Metairie Road
Metairie, LA 70001
504-483-6334
Fax: 504-483-6344
Email: franntown@yahoo.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**National Board of Medical Examiners**     represented by     **Robert Anthony Burgoyne**
Perkins Coie LLP (Washington)
700 13th Street N.W.
Suite 600
Washington, DC 20006
202-654-1744
Email: rburgoyne@perkinscoie.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|

| 07/22/2019 | 1 | COMPLAINT against National Board of Medical Examiners (Filing fee $ 400) and APPLICATION for Temporary Restraining Order filed by Meaghan Doherty. (Attachments: # 1 Memorandum in Support, # 2 Certificate of Counsel, # 3 Proposed Order, # 4 Exhibits 1&2, # 5 Exhibits 3-10, # 6 Exhibits 11-14, # 7 Exhibits 15&16, # 8 Exhibits 17-23, # 9 Civil Cover Sheet, # 10 Summons)(mm) (Entered: 07/25/2019) |
|---|---|---|
| 07/22/2019 | 2 | EXPARTE/CONSENT MOTION for Leave to File Documents Under Seal by Meaghan Doherty. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order, # 3 Verification)(mm) (Entered: 07/25/2019) |
| 07/23/2019 | 3 | NOTICE by Meaghan Doherty re 1 Complaint. Certificate of Plaintiff's Counsel of Delivery to Defendant National Board of Medical Examiners and to the Disability Rights Section, U.S. Dept. Of Justice of Copy of All Pleadings & Attachments Filed July 27, 2019. (Attachments: # 1 Exhibit A)(mm) (Entered: 07/25/2019) |
| 07/25/2019 | 4 | ORDER granting 2 Motion for Leave to File Documents Under Seal. Signed by Judge Greg Gerard Guidry on 7/24/2019. (mm) (Entered: 07/25/2019) |
| 07/26/2019 | 5 | Summons Issued as to National Board of Medical Examiners. (mm) (Mailed U.S.P.S. to atty. William McGoey) (Entered: 07/26/2019) |
| 07/26/2019 | 6 | ORDERED that the plaintiff's request for a temporary restraining order is DENIED. FURTHER ORDERED that a hearing on the request for a preliminary injunction is SET for 8/1/2019, at 11:00 a.m. FURTHER ORDERED that plaintiff's counsel shall serve on counsel for the defendant National Board of Medical Examiners a copy of this order. Signed by Judge Greg Gerard Guidry on 7/26/2019. (copy: Plaintiff's counsel)(blg) (Entered: 07/26/2019) |
| 07/29/2019 | 7 | Summons Re-Issued as to National Board of Medical Examiners. (blg) (Entered: 07/29/2019) |
| 07/29/2019 | 8 | EXPARTE/CONSENT MOTION for Leave to File Supplemental Exhibits 24 and 25 by Meaghan Doherty. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order, # 3 Proposed Pleading Exhibits 24 and 25)(blg) (Entered: 07/29/2019) |
| 07/29/2019 | 9 | NOTICE by Meaghan Doherty re 1 Complaint. Supplemental Certificate of Plaintiff's Counsel of Delivery to Defendant National Board of Medical Examiners. (blg) (Entered: 07/29/2019) |
| 07/29/2019 | 10 | Letter to the Court from Plaintiff's counsel dated 7/25/2019. (blg) (Entered: 07/29/2019) |
| 07/31/2019 | 11 | AFFIDAVIT of Service of 6 Order, 1 Complaint served on National Board of Medical Examiners on 7/30/2019. (blg) (Entered: 08/01/2019) |
| 08/01/2019 | 12 | Minute Entry for proceedings held before Judge Greg Gerard Guidry. Evidentiary Hearing on Preliminary Injunction held on 8/1/2019. (Court Reporter Jodi Simcox.) (jrc) (Entered: 08/01/2019) |
| 08/01/2019 | 13 | Preliminary Injunction hearing exhibit list from hearing held 8/1/19. By Clerk. (jrc) (Entered: 08/01/2019) |
| 08/02/2019 | 14 | Post-Hearing Brief by Meaghan Doherty. (blg) (Entered: 08/02/2019) |
| 08/02/2019 | 15 | Post-Hearing Brief by National Board of Medical Examiners. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(blg) (Entered: 08/02/2019) |
| 08/02/2019 | 16 | EXPARTE/CONSENT MOTION to Appear Pro Hac Vice for Robert A. Burgoyne by |

| | | |
|---|---|---|
| | | National Board of Medical Examiners. (Attachments: # 1 Declaration and Certificate of Good Standing, # 2 Attorney Registration Form)(blg) (Entered: 08/02/2019) |
| 08/05/2019 | 17 | Corrected Post-Hearing Brief by National Board of Medical Examiners. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(blg) (Entered: 08/05/2019) |
| 08/05/2019 | 18 | ORDER granting 8 Motion for Leave to File Supplemental Exhibits 24 and 25. Signed by Judge Greg Gerard Guidry on 8/5/2019. (blg) (Entered: 08/05/2019) |
| 08/05/2019 | 19 | ORDER granting 16 Motion to Appear Pro Hac Vice, as to Robert A. Burgoyne. Signed by Judge Greg Gerard Guidry on 8/5/2019. (blg) (Entered: 08/05/2019) |
| 08/05/2019 | 20 | ORDER granting the Plaintiff's application for a preliminary injunction. Signed by Judge Greg Gerard Guidry on 8/5/2019.(blg) (Entered: 08/05/2019) |
| 08/08/2019 | | Filing fee paid from National Board of Medical Examiners for Robert A. Burgoyne re 16 Motion to Appear Pro Hac Vice (Filing fee $ 100); Receipt LAE057261. (sek) (Entered: 08/08/2019) |
| 08/09/2019 | 21 | NOTICE OF APPEAL by National Board of Medical Examiners as to 20 Order on Preliminary Injunction. (blg) (Entered: 08/09/2019) |
| 08/09/2019 | 22 | USCA Appeal Fee paid as to National Board of Medical Examiners (Filing fee $ 505) re 21 Notice of Appeal filed by National Board of Medical Examiners; Receipt No. LAE057283. (sek) (Entered: 08/09/2019) |
| 08/12/2019 | 23 | Exhibits from hearing held on 8/1/19 before Judge Greg Guidry. NOTE: This document will only be accessible to the attorneys in the case. The general public will NOT be able to view this document. (Attachments: # 1 Ex 2-23, # 2 Ex 24, # 3 Ex 26)(jrc) (Entered: 08/12/2019) |
| 08/15/2019 | 24 | EXPARTE/CONSENT MOTION for Permission to have the Appeal Transcript Prepared by National Board of Medical Examiners. (Attachments: # 1 Proposed Order)(blg) (Entered: 08/15/2019) |
| 08/15/2019 | 25 | ORDER granting 24 Motion for Permission to Have Appeal Transcript Prepared. Signed by Judge Greg Gerard Guidry on 8/15/2019. (Order emailed to Court Reporter) (mm) (Entered: 08/15/2019) |
| 08/15/2019 | 26 | BILL OF COSTS by Meaghan Doherty. Matter to be submitted on 8/30/2019 before Clerk of Court. Any opposition should be filed within 14 days of the filing of this document. (Attachments: # 1 Motion for Costs, # 2 Memorandum in Support, # 3 Exhibit A, # 4 Notice of Submission)(mm) (Entered: 08/16/2019) |
| 08/15/2019 | 27 | MOTION for Attorney Fees by Meaghan Doherty. Motion(s) will be submitted on 9/18/2019. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Notice of Submission, # 9 Proposed Order)(mm) (Entered: 08/16/2019) |
| 08/20/2019 | 28 | MOTION to Dismiss for Failure to State a Claim by National Board of Medical Examiners. Motion(s) will be submitted on 10/16/2019. (Attachments: # 1 Memorandum in Support, # 2 Notice of Submission)(blg) (Entered: 08/20/2019) |
| 08/22/2019 | 29 | APPEAL TRANSCRIPT REQUEST by National Board of Medical Examiners for proceedings held on 8/1/2019 re 21 Notice of Appeal. (Transcript(s) ordered) (Court Reporter Jodi Simcox noticed) (blg) (Entered: 08/22/2019) |

| 08/22/2019 | 30 | MOTION to Clarify and, If Necessary, for a Stay Pending Appeal by National Board of Medical Examiners. Motion(s) will be submitted on 9/18/2019. (Attachments: # 1 Memorandum in Support, # 2 Declarartion of Michael Barone, MD, # 3 Notice of Submission)(blg) (Entered: 08/22/2019) |
|---|---|---|
| 08/23/2019 | 31 | EXPARTE/CONSENT MOTION to Expedite 30 Motion to Clarify and, If Necessary, for a Stay Pending Appeal by National Board of Medical Examiners. (Attachments: # 1 Proposed Order)(blg) (Entered: 08/23/2019) |
| 08/23/2019 | 32 | RESPONSE/MEMORANDUM in Opposition filed by Meaghan Doherty re 30 MOTION to Clarify and, If Necessary, for a Stay Pending Appeal. (Attachments: # 1 Exhibit A)(mm) (Entered: 08/23/2019) |
| 08/23/2019 | 33 | MOTION to Clarify Order of August 5, 2019 by Meaghan Doherty. Motion(s) will be submitted on 9/18/2019. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Proposed Order, # 4 Notice of Submission)(mm) (Entered: 08/23/2019) |
| 08/23/2019 | 34 | SEALED APPEAL TRANSCRIPT of Evidentiary Hearing held on August 1, 2019 before Judge Greg Gerard Guidry. Court Reporter/Recorder Jodi Simcox, Telephone number 504-589-7780. (rsg) (Entered: 08/23/2019) |
| 08/23/2019 | 35 | EXPARTE/CONSENT MOTION to Expedite 33 MOTION to Clarify Order of August 5, 2019 by Meaghan Doherty. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order)(mm) (Entered: 08/23/2019) |
| 08/27/2019 | 36 | ORDER DENYING 30 Motion Motion to Clarify and, If Necessary, for a Stay Pending Appeal; DENYING as MOOT 31 Motion to Expedite; DENYING 33 Motion to Clarify the Order of August 5, 2019; DENYING as MOOT 35 Motion to Expedite. Signed by Judge Greg Gerard Guidry on 8/27/2019. (my) (Entered: 08/27/2019) |
| 08/28/2019 | 37 | USCA Case Number 19-30661 appealed to USCA 5th Circuit for 21 Notice of Appeal filed by National Board of Medical Examiners (mm) (Entered: 08/28/2019) |
| 09/10/2019 | 38 | ORDER of USCA as to 21 Notice of Appeal filed by National Board of Medical Examiners. USCA Judge Name: Dennis. Elrod, and Duncan. ORDERED that appellant's opposed motion to stay injunction pending appeal is GRANTED. This case will proceed under an expedited briefing schedule, and it will be set for oral argument on the court's October calendar or at the earliest available date. (blg) (Entered: 09/10/2019) |
| 09/10/2019 | 39 | RESPONSE/MEMORANDUM in Opposition filed by National Board of Medical Examiners re 27 MOTION for Attorney Fees, 26 Bill of Costs. (blg) (Entered: 09/10/2019) |

Doherty v. National Board of Medical Examiners (2:19-cv-11790-GGG-MBN *SEALED*)

**TAB 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MEAGHAN DOHERTY,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. 19-11790** |
| ) | |
| **v.** ) | **Judge: The Hon. Greg G. Guidry** |
| ) | |
| **NATIONAL BOARD OF MEDICAL** ) | **UNDER SEAL** |
| **EXAMINERS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### NOTICE OF APPEAL

Notice is hereby given that defendant National Board of Medical Examiners ("NBME")

appeals under 28 U.S.C. § 1292(a)(1) to the United States Court of Appeals for the Fifth Circuit

from the Order of this Court entered on August 5, 2019 (Doc. No. 20), granting plaintiff

Meaghan Doherty's application for a preliminary injunction (Doc. No. 1).

Dated: August 9, 2019                          Respectfully submitted,


                                               /s/ Robert A. Burgoyne
                                               _____

                                               Robert A. Burgoyne
                                               (admitted pro hac vice)
                                               Perkins Coie LLP
                                               700 Thirteenth Street, N.W. Suite 600
                                               Washington, D.C. 20005-3960
                                               Phone: 202-654-1744
                                               RBurgoyne@perkinscoie.com

                                               Counsel for Defendant NBME

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Notice of Appeal on all counsel of record by

placing a copy of same in the United States mail, postage prepaid, addressed to:

William Martin McGoey
1828 Rose Street
Arabi, Louisiana  70032

Frances M. Olivier
2341 Metairie Road
Metairie, Louisiana 70001

Counsel for Plaintiff

/s/ Robert A. Burgoyne

19-30661.809

**TAB 3**

**SEALED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MEAGHAN DOHERTY** | **CIVIL ACTION** |
| **VERSUS** | **NO: 19-11790** |
| **NATIONAL BOARD OF MEDICAL EXAMINERS** | **SECTION: T** |

## ORDER

Before the Court is an application for a preliminary injunction[1] filed by Meaghan Doherty ("Plaintiff") seeking an order directing the National Board of Medical Examiners ("NBME") to grant Plaintiff's request for reasonable testing accommodations of time and a half when she takes the Step 2 CK Examination on Tuesday, August 6, 2019. For the following reasons, the Plaintiff's application for a preliminary injunction is **GRANTED.**

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a medical student at Tulane University School of Medicine who has been diagnosed with Specific Learning Disorder with impairment in reading rate, Attention-Deficit/Hyperactivity Disorder ("ADHD") Combined Type, and Generalized Anxiety Disorder. Plaintiff is required to pass the Step 2 CK Examination as a condition of graduation and to participate in residency placement in September 2019. Plaintiff applied to take the exam and requested test-taking accommodations of additional time. The NBME denied Plaintiff's request for accommodations reasoning, in part, that the Plaintiff did not demonstrate a "substantial limitation in a major life activity as compared to most people."[2] Plaintiff is scheduled to take the examination without accommodations on August 6, 2019.

---

[1] R. Doc. 1.
[2] R. Doc. 1-5, p. 6.

1

19-30661.798

On July 22, 2019, Plaintiff filed under seal an Application for Temporary Restraining Order with Equitable Relief and Order to Show Cause Why a Preliminary Injunction Should Not Issue.[3] On July 26, 2019, the Court denied Plaintiff's request for a temporary restraining order and set the request for preliminary injunction for hearing,[4] which was conducted on August 1, 2019. The Court allowed the parties to file post-hearing briefs by 12:30 p.m. on August 2, 2019.

Plaintiff claims she is entitled to additional time in taking the Step 2 CK Examination because she is an individual with a disability as defined by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.* Plaintiff testified that she was first diagnosed with dyslexia and dysgraphia in 2003 when she was ten years old.[5] In 2006, Plaintiff was diagnosed with ADHD and prescribed Adderall.[6] Although she struggled with her disability from elementary school through college, Plaintiff worked hard to excel in school without requesting any testing accommodations because she was concerned with the stigma associated with her disabilities. Plaintiff testified that, rather than accept direct accommodations, she worked hard to overcome her dyslexia and ADHD issues, and that she continues to take Adderall to this day for her ADHD.

 In 2017, Plaintiff was evaluated by a licensed psychologist, Dr. Patricia Brockman, who diagnosed Plaintiff, pursuant to criteria in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V), with Learning Disorder with Impairment in Reading: rate (DSM-V 315.00 ICD-10 F81.0), Attention Deficit/Hyperactivity Disorder – Combined Type (DSM-V 314.01 ICD-10 F*), and Generalized Anxiety Disorder (DSM-V 300.02 ICD-10 F41.1).[7] Dr. Brockman determined that "timed measures consistently underestimate" Plaintiff's skills, and

---

[3] R. Doc. 1.
[4] R. Doc. 6.
[5] R. Doc. 1-6, p. 6.
[6] R. Doc. 1-5, p. 14.
[7] R. Doc. 1-5, pp. 31-32.

19-30661.799

that Plaintiff "needed accommodation of extended time to produce fair and unbiased measures" of her skills.[8] Dr. Brockman's testing established that Plaintiff's reading speed is slower than 90% of students her age and that her reading "decoding" speed was slower than 75% of students against the general population. On the timed portion of the Nelson Denny Reading Test, Plaintiff's reading speed fell in the borderline or slow learner range at the 6th percentile of all readers.[9] Although the NBME in its post-hearing brief has challenged the reliability of that specific test, Dr. Brockman had explained in an addendum to her original report, prepared in response to the NBME's rejection of Plaintiff's request for accommodations, that "the NDRT is one of the most widely administered reading tests in the nation and is used by many medical schools to gauge reading ability."[10]

Plaintiff's treating physician, Dr. James Barbee, explained in a 2017 letter submitted in evidence that he diagnosed Plaintiff in 2014 with ADHD, predominately hyperactivity-impulsivity presentation (DSM-V F-90.1) based on the criteria in the DSM-V. He opined that Plaintiff was diagnosed with ADHD in 2003, that she continues to have difficulty sustaining concentration when studying and during tests, and that she is currently prescribed Adderall XR, 30 mg twice per day.[11]

Plaintiff started at Tulane University School of Medicine in 2016, and first applied for testing accommodations on written tests at the start of her second semester in January 2017. Based on Dr. Brockman's evaluation and Dr. Barbee's diagnoses, as well as her 2003 and 2004 evaluations, Tulane University granted her request and provided her accommodations on written tests of time and a half. Plaintiff testified that her testing performance on written exams, like the NBME's Step 1 and 2 Examinations, dramatically improved by 20% once she received additional time for testing. In 2018, Plaintiff requested additional time for testing during the Step 1

---

[8] R. Doc. 1-4, pp.18-35.
[9] R. Doc. 1-5, p. 32.
[10] R. Doc. 1-5, p. 40.
[11] R. Doc. 1-4, p. 47.

19-30661.800

Examination, but the NBME denied her request. Plaintiff took the examination without accommodations and scored a 200. Plaintiff testified that a minimum passing score for the Step 1 Examination is a 194 and that the mean score was 228. She testified in detail that she did not believe her score on the Step 1 Examination without the requested accommodations reflected her knowledge of the material, but instead reflected her disability.[12] She further explained that her score, albeit a passing one, would negatively impact her ability to obtain a residency in obstetrics/gynecology, her preferred field, because it was far below the range of scores of students who ultimately obtained residencies in obstetrics/gynecology.[13]

The Step 2 CK Examination is a nine-hour multiple choice test divided into eight 60-minute blocks. Once the time for each section has expired, the examinee cannot return to complete the section. Each question is a written passage with multiple-choice options to select as the answer. Unanswered questions are counted as wrong answers. The results of the Step 2 CK Examination are a component of the criteria used in evaluating medical school candidates for interviews to participate in residency programs. Plaintiff testified that the applications are reviewed on a rolling basis between September 15, 2019, and November 30, 2019, and that obtaining a residency position is highly competitive. Plaintiff is scheduled to take the Step 2 CK Examination on August 6, 2019, without testing accommodations because the NBME denied her request for test-taking accommodations of additional time.

## **LAW AND ANALYSIS**

---

[12] The Step 1 Examination, like the Step 2 Examination, is a "mastery test." *See Rush v. National Bd. of Medical Examiners*, 268 F.Supp.2d 673, 675 (N.D. Texas 2003). "With a mastery test, the test taker either knows the material and passes the exam, or he does not know the tested-for material and fails the exam. Time constraints for most individuals who take this test are not of major consequence because the majority of medical students possess the reading and processing efficiency needed to work through the test and the set of possible answers within the time constraints that are allowed. *This is not true however, for individuals with reading disabilities.*" *Id.* (emphasis supplied).

[13] *See also* R. Doc. 1-8, p. 54.

19-30661.801

A preliminary injunction is an extraordinary equitable remedy that may be granted only if a plaintiff establishes the following four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause [the] defendant[ ]; and (4) that the injunction will not disserve the public interest."[14] Mandatory preliminary relief that goes beyond maintaining the status quo is particularly disfavored and should not be issued unless the facts and law clearly favor the moving party.[15]

42 U.S.C. § 12189 requires entities that offer licensing examinations to give examinations "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12102(1)(A)-(B) defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual" or a "record of such impairment." An impairment is considered a disability under the ADA if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."[16] Major life activities include, among other activities, "learning, reading, concentrating, thinking, writing, [and] communicating."[17]

Plaintiff has demonstrated to the satisfaction of this Court a substantial likelihood of success on the merits. The totality of the evidence and testimony presented in this case establishes that Plaintiff is an individual with a disability under the ADA because she is substantially limited in the major life activities of reading when compared to most people in the general population. Plaintiff produced evidence showing that she has a history of impairment in reading based on

---

[14] *S. Co. v. Dauben Inc.,* 324 F. App'x 309, 314 (5th Cir. 2009) (quoting *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir.1999)); Fed. R. Civ. P. 65.

[15] *Exhibitors Poster Exch., Inc. v. National Screen Serv. Corp*., 441 F.2d 560, 561–62 (5th Cir.1971)(per curiam); *Miami Beach Federal Savings & Loan Ass'n v. Callander,* 256 F.2d 410, 415 (5th Cir.1958).

[16] 28 C.F.R. § 36.105(d)(1)(v).

[17] 28 C.F.R. § 36.105(c)(1).

19-30661.802

current professional evaluations in accordance with the accepted standard of clinical review of the DSM-V. Plaintiff was diagnosed with dyslexia and dysgraphia as early as the age of 4. Dr. Barbee diagnosed Plaintiff in 2014 with ADHD-Combined Type and has prescribed Adderall, which Plaintiff has taken since she was a girl. Dr. Brockman's testing and evaluation revealed that Plaintiff suffers from ADHD, has a specific learning disability in reading, and that she suffers from generalized anxiety disorder. Dr. Brockman made the following conclusions:

> [Plaintiff's] overall achievement fell in the superior range and it was generally consistent with her overall intelligence. When given the use of a calculator, her overall achievement was even stronger. Significant variability was noted in [Plaintiff's] educational skills, with relative strengths noted in her very superior Oral Language and superior Mathematics Composites. Her Written Expression and Reading Comprehension fell in the high average range and was stronger than the timed measures of her Reading Comprehension on the Nelson Denny. Significant variability was noted in [Plaintiff's] reading skills. The accuracy of her sight vocabulary fell in the high average range but her ability to decode words fell at the low end of the average range. The most remarkable observation was [Plaintiff's] slow reading and decoding speed. On the measure of her sight vocabulary, [Plaintiff's] reading speed was slower than 90% of students her age and her decoding speed was slower than 75% of students her age. On the timed Nelson Denny subtest, [Plaintiff's] Reading Speed fell in the borderline or slow learner range at the 6th percentile. This indicated a Specific Learning Disorder with Impairment in Reading: rate (DSM-V 315.00 ICD 10 F81.0). This creates a Functional Impairment for which accommodation of extended time is needed to produce fair and unbiased measures of [Plaintiff's] skills on academic and daily tasks where reading is required.[18]

Dr. Brockman's professional conclusions are consistent with Plaintiff's testimony regarding her ability to score well on standardized testing, such as the Medical College Admissions Test (MCAT). Where the questions presented were composed of vignettes, even lengthier ones, with multiple questions, as on the MCAT, she performed well. However, where the vignette was followed by a single question, such as the NBME Step Examinations, she did not perform as well as would be expected for her overall intelligence and mastery of the material. She attributed this

---

[18] R. Doc. 1-5, p. 32.

19-30661.803

difference to the overall length of time allowed per question, with more time per question on the MCAT than on the Step Examination, and thus, to her, the testing results revealed her slow reading disability rather than demonstrating her knowledge of the material. Plaintiff testified that her performance on testing with a similar format to the Step Examination, when administered by Tulane with accommodations, was 20 percent better than her results without accommodations.

The evidence and testimony clearly support that Plaintiff has an impairment that substantially limits her in the major life activities of reading when compared to most people in the general population. Defendant, during the hearing and in its post-hearing brief, attempts to paint a portrait of the Plaintiff far different than the Court observed at the hearing of this matter. To the Defendant, Plaintiff is attempting to achieve an unfair advantage over other medical school students. As evidence of this, Defendant points out that Plaintiff has always performed well in school and yet never sought an accommodation until she became a medical student. However, Defendant ignores the record medical evidence documenting Plaintiff's disability, the description in evidence of how overcoming her disability inspired her activities, and more importantly her credible explanation for not seeking accommodations earlier in her academic career.

Plaintiff should not face discrimination, and the ADA does not countenance such discrimination, because she is intelligent and has previously performed well academically. The medical evidence in the record, which was not objected to by the Defendant, nor for that matter controverted, establishes that Plaintiff has a disability that substantially limits a major life activity, namely reading, and that her reading ability was in 2017 determined to be as low as just the 6th percentile of the general population on the Nelson Denny Reading Test. Someone who is disabled should not be penalized because they were able to compensate to some degree for their limitations or because they chose not to seek accommodations when they were first able to do so. It appears

19-30661.804

to the Court that Plaintiff would have been entitled to accommodations as early as elementary school, but she made a conscious decision that she would rather not be seen as different by the other students.

Next, Plaintiff has shown a substantial threat that she will suffer irreparable injury if the injunction is denied. Defendant has not undermined Plaintiff's showing of irreparable harm should she not be allowed to take the August 6, 2019 Step 2 Examination with accommodations. This includes the following facts established at the hearing, if Plaintiff were to take the examination any later than August 6, 2019, or worse, take the test without accommodations and fail or score poorly: (1) she would be at an irreparable disadvantage in securing residency interviews and obtaining a match; (2) she would suffer financially having to pay for an additional year of tuition, as well as the delay in earning an income as a resident for an entire year; (3) she would incur a permanent blemish on her academic record, which could not be removed; and (4) she would be placed in very real danger of not being able to complete medical school. It is rather disingenuous of Defendant to minimize the possible and real consequences faced by Plaintiff should she not be allowed to take the Step 2 CK Examination on August 6, 2019, with the requested accommodations. Although Plaintiff acknowledged on cross-examination that there are avenues to matching available to students who do poorly on the Step 2 Examination or fail it initially, she explained that the stigma of the delay or, worse, having to take a leave of absence to sit for the exam a second time, especially coupled with her underwhelming score on the Step 1 Examination without accommodations, would be nearly insurmountable in obtaining a match with a desired or preferred residency program. The lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation.[19] With the requested reasonable accommodation of time and a half

---

[19] *Bonnette v. District of Columbia Court of Appeal*, 796 F.Supp.2d 164, 186-87 (D.D.C. 2011).

19-30661.805

to take the Step 2 Examination, "Plaintiff will have time to either display [her] mastery of the subject matter, or show that [she] has not sufficiently mastered the tested materials. In either event, granting the injunction will allow Plaintiff to be tested on [her] medical and science knowledge and not [her] disability."[20]

Next, the Court finds the threatened injury to Plaintiff clearly outweighs any damage that granting the preliminary injunction might cause to the NBME or to the public. The cost and effort to accommodate Plaintiff is minimal. Furthermore, although Defendant suggests the integrity of the examination and licensing procedure will be compromised, the requested accommodations will not change the testing format or the time-based system as applied to students without a documented disability within the meaning of the ADA.

Finally, this Court finds the requested injunction will not disserve the public interest, but will instead further the public interest in prohibiting discrimination on the basis of disability and in fulfilling the ADA's requirement that entities offering licensing examinations provide reasonable accommodations to disabled individuals.[21] As Plaintiff points out, all she is asking for is a level playing field, and the ADA was intended to afford such to all citizens.

The Court's decision to grant the preliminary injunction today is based upon the applicable law, the facts established at the hearing of August 1, 2019, and its finding that Plaintiff was a credible witness in every respect of her testimony.

## CONCLUSION

Accordingly, for the foregoing reasons,

---

[20] *Rush, supra*, p. 678.
[21] Id.

9

19-30661.806

**IT IS ORDERED** that the National Board of Medical Examiners allow Plaintiff Meaghan Doherty testing accommodations of time and a half when she takes the Step 2 CK Examination on Tuesday, August 6, 2019.

This preliminary injunction is binding upon the National Board of Medical Examiners, its officers, agents, servants, employees, and attorneys, and upon those persons administering the Step 2 CK Examination who are under contract with the National Board of Medical Examiners or in active concert or participation with them who receive actual notice of this Order.

**New Orleans, Louisiana**, on this 5th day of August, 2019.

**GREG GERARD GUIDRY**
**UNITED STATES DISTRICT JUDGE**

19-30661.807

**TAB 4**

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**MEAGHAN DOHERTY**                                    **CIVIL ACTION**

**VERSUS**                                             **NO: 19-11790**

**NATIONAL BOARD OF MEDICAL**                          **SECTION: T**
**EXAMINERS**


## ORDER

Before the Court are the following: (1) Motion to Clarify and, If Necessary, for a Stay Pending Appeal filed by Defendant National Board of Medical Examiners ("NBME");[1] (2) Defendant NBME's Motion to Expedite Consideration of its Motion to Clarify and, If Necesssary, for a Stay Pending Appeal;[2] (3) Plaintiff Meghan Doherty's response/memorandum in opposition to Defendant's Motion to Clarify and, If Necessary, for a Stay Pending Appeal;[3] (4) Plaintiff's Motion to Clarify Order of August 5, 2019;[4] and (5) Plaintiff's Motion for Expedited Consideration of her Motion to Clarify Order of August 5, 2019.[5]

**IT IS ORDERED** that the Defendant's Motion to Clarify and, If Necessary, for a Stay Pending Appeal[6] is hereby DENIED for the following reasons.  Defendant NBME states that it has complied fully with the Court's Order of August 5, 2019,[7] by permitting Plaintiff to take the Step 2 CK Examination on August 6 and 7, 2019, with extra testing time. However, Defendant now asks the Court to clarify whether it also intended to order Defendant to release Plaintiff's score on the Step 2 CK Examination in ordinary course, which is expected to be released to

---

[1] R. Doc. 30.
[2] R. Doc. 31.
[3] R. Doc. 32.
[4] R. Doc. 33.
[5] R. Doc. 35.
[6] R. Doc. 30.
[7] R. Doc. 20.

19-30661.988

Plaintiff on or before September 4, 2019, as well as to the Electronic Residency Application Service ("ERAS") and other third parties thereafter at the request of Plaintiff. Otherwise, Defendant suggests that it has already fully complied with the Court's order and need not release Plaintiff's score to her or anyone she may in future authorize to receive it.

This Court finds the premise of Defendant's Motion to Clarify to be rather disingenuous, because the Court in its Order of August 5, 2019, specifically found that Plaintiff had demonstrated through uncontroverted evidence and testimony the irreparable harm she would suffer if she were not allowed to take the Step 2 CK Examination with accommodations on August 6, 2019. The Court found *inter alia* that, if Plaintiff were to take the exam any later than August 6, 2019, she would be at an irreparable disadvantage in securing residency interviews and obtaining a match, and she would incur a permanent blemish on her academic record, which could not be removed.[8] Plaintiff explained at length during her testimony[9] the importance of participating in the residency matching program at the earliest opportunity, that is, when ERAS begins sending out assembled applications and accompanying documents, including USMLE transcripts, to residency programs starting on or about September 15, 2019. Plaintiff testified in detail regarding the harm and disadvantages she would suffer if she were not permitted to take the examination, with accommodations, in enough time to participate in the earliest round of the residency application process. Defendant NBME has not demonstrated any basis for disturbing the Court's previous finding of irreparable harm, which harm would in effect be virtually certain to occur if the Court were to grant Defendant's motion to clarify in the manner sought by Defendant, or alternatively to grant Defendant's motion for a stay pending appeal.

---

[8] R. Doc. 20, p. 8.

[9] R. Doc. 34.

19-30661.989

Furthermore, the Court does not believe clarification of its order is necessary because that order obviously requires that Plaintiff's test score must be released in the same manner and at the same time as those of all other examinees taking the Step 2 CK Examination on or about August 6 and 7, 2019. It is the Court's view that the Defendant would be in violation of the Order of August 5, 2019, if it does otherwise. Accordingly, Defendant's Motion to Clarify and, If Necessary, for a Stay Pending Appeal is DENIED.

**IT IS FURTHER ORDERED** that Defendant's Motion to Expedite Consideration of the Motion to Clarify and, If Necessary, for a Stay Pending Appeal[10] is DENIED as MOOT.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Clarify the Order of August 5, 2019,[11] is hereby DENIED for the following reasons. Essentially, Plaintiff contends the score should be released to her by email by 4:00 p.m. on August 30, 2019, on the basis there was a posting by the NBME on its website that there could be delays in the posting of scores of examinees taking the examination between July 1, 2019, and August 8, 2019. However, Plaintiff has not demonstrated that release of her score to her any earlier than in ordinary course, that is, on or before September 4, 2019, as indicated by Defendant in its Motion to Clarify, would be necessary to prevent any irreparable harm. Accordingly, Plaintiff's Motion to Clarify is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Expedite Consideration of her Motion to Clarify[12] is DENIED as MOOT.

**New Orleans, Louisiana**, on this 27th day of August, 2019.

_____
**GREG GERARD GUIDRY**
**UNITED STATES DISTRICT JUDGE**

---

[10] R. Doc. 31.
[11] R. Doc. 33.
[12] R. Doc. 35.

19-30661.990

# TAB 5

Case 2:19-cv-11790-GGG-MBN *SEALED* Document 34 *SEALED* Filed 08/23/19 Page 46 of
46
Case: 19-30661    Document: 65-1108Page: 28    Date Filed: 10/01/2019

MEAGHAN DOHERTY - DIRECT

1    their reasoning?

2    **A.**    Yes.

3    **Q.**    If we look at page 2, the third to last paragraph, there's

4    a reference to the fact that they rejected your accommodation

5    because you didn't need an accommodation for MCAT, and you

6    scored better than 88 percent of a highly select sample of

7    medical school applicants.  Why do you disagree with that as a

8    rationale for denying your accommodation?

9    **A.**    Anyone can take the MCAT.  There is no qualifications that

10   have to be met.  You can take the MCAT many times.  This is a

11   very -- there are a lot of people who take the MCAT and never

12   go to medical school.  So to say it's a highly select group is

13   inaccurate.  As well as comparing it to the USMLE Step 1 or

14   Step 2 is also inaccurate because those people have been

15   successfully admitted to medical school and have successfully

16   completed the course work required to take those exams.  It's a

17   very different population of people.

18   **Q.**    What about the testing format?  And we've covered it, so I

19   don't want you to go -- but the testing format, why do you

20   disagree with this saying that MCAT is a barometer and that you

21   don't need an accommodation for the Step tests?

22   **A.**    On the MCAT, the questions were much shorter, as well as

23   there were occasional times where there were a passage of sorts

24   that were about two paragraphs long.  You would then answer six

25   to seven questions for that two paragraphs.  So it's like three

1    questions per -- I mean, three sentences per question as

2    opposed to approximately ten sentences per question on the Step

3    1 and Step 2.  And for that one, it's the same or more amount

4    of time on the MCAT.

5    Q.   Part of the MCAT test, is there a math section?

6    A.   Yes.  Math makes up -- or it used to make up about

7    approximately 25 percent of the MCAT.

8    Q.   And is your reading impairment implicated by the math

9    questions that are on MCAT?

10   A.   No, it is not.

11   Q.   There's also in that same paragraph as a rationale for

12   denying you an accommodation for Step 2, there's a statement:

13   "Our records show that you successfully completed the USMLE

14   Step 1 under standard test conditions without accommodations."

15   A.   Uh-huh.

16   Q.   Do you disagree with that?

17   A.   Yes.  I don't think there are many people in the medical

18   profession that would say that I successfully completed that

19   exam.  That was not a successful score.  I may have passed, but

20   that was barely, and that is not a successful score to get

21   anywhere with, as well as I was only six points above the

22   failure cutoff, and well below the range of the majority of

23   people that take this exam.

24   Q.   So for your score compared when we were looking at those

25   graphs indicate that you virtually have a very slim chance to

MEAGHAN DOHERTY - CROSS

1  **A.**   No one that I know personally.  I cannot testify to if
2  anyone at Tulane University has ever failed Step 2 CK in their
3  senior year.
4  **Q.**   Yeah.  Well, I assume if they hadn't, they wouldn't need
5  to rule.  In all events, am I correct that residency programs
6  are very competitive, including the residency programs that you
7  want to apply to?
8  **A.**   Yes.  All residency programs are very competitive.
9  **Q.**   And you'd agree, I take it, that if you get a position in
10  a given residency program, that means someone else who might
11  want to get that position is not going to be chosen?
12  **A.**   Yes, because only one person can have a single position.
13  **Q.**   You said based on your Step 1 CK score that your chances
14  of getting a residency position, I think the words you used
15  were pretty dismal?
16  **A.**   Yes.  If I were to submit my application to residency
17  programs by the September 15th deadline without my Step 2 CK
18  score, it would be highly unlikely that I would get any
19  interviews, other than the one that I am guaranteed by Tulane's
20  OBGYN program who interviews everyone from Tulane that is
21  interested in staying at Tulane.
22      And that is not a common feature in all departments
23  at Tulane, that just happens to be the policy of OBGYN's for
24  the approximately eight students per class that are going into
25  the field, and they want them to at least be able to interview

19-30661.82

Case 2:19-cv-11790-GGG-MBN *SEALED* Document 34 *SEALED* Filed 08/23/19 Page 79 of
Case: 19-30661    Document: 65-1108Page: 31    Date Filed: 10/01/2019

MEAGHAN DOHERTY - CROSS

1  there if they want to stay.

2  **Q.**  So you'll be able to interview there?

3  **A.**  That would be the only place I would likely be able to

4  interview if I submitted my application on September 15th

5  without my Step 2 CK score.

6  **Q.**  I can't recall if -- was that one of the residency

7  programs?  I saw a footnote somewhere to the effect that you

8  want to stay in New Orleans.  So is that one of the residency

9  programs you're interested in applying to?

10  **A.**  It is a residency program that I will apply to.

11  **Q.**  Bear with me here.  I'm still here.  I'm just looking

12  through my notes to see what else I needed to cover with you.

13        If you were to participate in next year's match

14  without -- rather than this year's match and simply delayed

15  taking the Step 2 CK exam, what information would residency

16  programs see beyond the fact that you didn't take the exam in

17  your fourth year of medical school?

18  **A.**  I would need to justify my leave of absence from school in

19  all of my residency applications; and in interviews, I will be

20  specifically asked about it, as I will already be asked about

21  my Step 1 score.

22  **Q.**  Are you aware whether students who take their Step 2 CK

23  exam after their fourth year of medical school get positions in

24  residency programs through the match?

25  **A.**  I have no idea.  I have not seen any data on that point.

1   case's reading impairment seriously decreased the speed at
2   which that plaintiff read with comprehension.  And the court
3   found that if they didn't grant the time extension
4   accommodation, the test will reflect the disability and not
5   that plaintiff's knowledge.  And we believe that's the same
6   thing here, and it's proven by once Tulane gave her the extra
7   time, her scores went up by 20 percent, which proves that
8   obviously this testing format shows her disability and not what
9   she actually knows.

10              And that's basically what Meaghan's asking for,
11  the chance to be able to show what she really knows, and to be
12  placed where she deserves to be placed.

13              So on those grounds, we believe that we've met
14  all of the burdens for showing likelihood of success, and the
15  irreparable injury factor to my client, and the fact that it
16  cases no damage to the National Board, and it serves the public
17  interest by effectuating the purposes and requirements of the
18  Americans with Disabilities Act.

19              **THE COURT:**  Thank you.

20              **MR. McGOEY:**  Thank you, Your Honor.

21              **THE COURT:**  Mr. Burgoyne.

22              **MR. BURGOYNE:**  Thank you, Your Honor.

23              I'll start with the standard, of course, since
24  we are here on an emergency motion.  Preliminary injunctions
25  have been described as a drastic and extraordinary remedy that

OFFICIAL TRANSCRIPT

 1 | can only be awarded on a clear showing that the plaintiff is
 2 | entitled to such relief under the Supreme Court's decision in
 3 | *Winter versus National Resource Defense Council.*

 4 |              And the claimed irreparable harm, Your Honor,
 5 | has to be actual and imminent, not speculative or
 6 | unsubstantiated.  It has to be shown that irreparable harm is
 7 | likely absent injunction, not just possible.

 8 |              In this case, Your Honor, we don't think she can
 9 | meet any of the standards for a preliminary injunction, and
10 | I'll start with the likelihood of success factor.  Under
11 | Section 12189 of the ADA, a testing company like the National
12 | Board of Medical Examiners has to administer its exams in a
13 | place and manner that is acceptable to individuals who have
14 | disabilities.

15 |              What that means as a practical matter is that if
16 | a plaintiff comes in and wants to take the bar exam or another
17 | licensing exam like the Step examinations administered by our
18 | client, you've got to establish a few things.

19 |              First, they have to show that they have a
20 | physical or mental impairment, and that's where the diagnosis
21 | comes in.  But having a physical impairment or mental
22 | impairment in itself is not sufficient to be disabled under the
23 | ADA.

24 |              Under the ADA, that physical or mental
25 | impairment has to substantially limit the person as compared to

1    most people in the general population.  And this gets back to

2    your question, Your Honor, about whether it's an objective or

3    subjective standard.

4          The standard set forth in the regulation is most

5    people in the general population.  It is not whether or not a

6    given individual is performing to the level of their IQ or

7    their anticipated level of performance, nor is it appropriate

8    to compare a student to their peer group, in this instance,

9    other students in medical school or getting ready to take a

10   licensure exam.

11         Here the objective evidence -- what she's saying

12   is, "I have a very difficult time reading, and my reading rate

13   is really slow, as evidenced by that one score on the

14   Nelson-Denny one-minute reading test."  Your Honor, that, we

15   submit, is flatly contradicted by her performance on the other

16   standardized tests which cannot be explained away by saying,

17   oh, well, they had much shorter questions, or they were much

18   easier.

19         In the first place, the MCAT, if you saw those

20   questions, you would appreciate that they are very challenging

21   questions, very difficult, require a great deal of mental

22   concentration and processing, and are not simply short

23   vignettes that can be answered without required reading speed,

24   required concentration, required knowledge.

25         Her performance on that very challenging exam as

1    compared to a very talented population, not the general

2    population, was in the 95th percentile when it came time to the

3    reading skills that are --

4            **THE COURT:**  Let me stop you there.  There was

5    testimony concerning the requirements of the MCAT, but there

6    are no academic requirements; correct?

7            **MR. BURGOYNE:**  For what, Your Honor?

8            **THE COURT:**  To apply to take the MCAT?

9            **MR. BURGOYNE:**  In order to take the MCAT, you have to

10   be a college graduate, and you have to be on a path that gets

11   you into medical school or another health care profession

12   school.

13           **THE COURT:**  Right.  I'm sorry, "academic" was not the

14   correct word.  There are no grade point average requirements.

15           **MR. BURGOYNE:**  There is no grade point average to

16   take it, Your Honor.  But as you can appreciate, people --

17   medical school is extremely competitive, and individuals with

18   low grade point averages from other colleges -- less well

19   regarded colleges are not applying and investing in going to

20   medical school and taking the MCAT.

21           **THE COURT:**  Right.  But the point is, is that

22   anyone -- there's no grade point requirements to sign up for it

23   and take it.  There's the degree requirements, and you have to

24   state your intention to pursue a career, but, obviously,

25   there's no commitment there.  And many people, I'm sure, take

19-30661.98

1 the MCAT -- many more take it than actually end up going to law

2 school, or certainly not all of them end up going to medical

3 school having taken the exam.

4       **MR. BURGOYNE:** Right. Well, it's certainly true,

5 Your Honor. Although I'd submit that, frankly, the cohort of

6 college graduates is already at a level that is higher than --

7 well above the reading and learning abilities of the general

8 population. I think that's fairly well established. So we've

9 already got not only have they gotten through college, but

10 these are individuals who are getting ready to go on to a

11 challenging profession.

12       **THE COURT:** But, Mr. Burgoyne, where I keep getting

13 hung up here is you talk about the general population, and to

14 me this has to be an objective inquiry not subjective. Because

15 you're not saying that if you're smarter or do better than the

16 bottom 50 percent of the general population that you're not

17 entitled to an accommodation. That can't be the standard.

18       **MR. BURGOYNE:** The standard, Your Honor, is we have

19 to determine is she substantially limited in her ability to

20 read or to think or to concentrate, which I assume are the

21 major life activities that are in play here. Is she

22 substantially limited compared to most people in the general

23 population. And that's the standard that the Department of

24 Justice has put in place and that Congress has put in place

25 under the ADA.

1              And so then the question is:  How do we

2    determine whether she is?  What do we look at?  And the answer

3    cannot be, Your Honor, let's look at a one-minute reading test

4    that suggests she's got a slow reading rate.

5              THE COURT:  No.  No.  But isn't the answer you look

6    at how the impairment affects her?  For example, a person could

7    operate between zero and ten.  Some people might operate at a

8    nine with a disability, some people may operate at a seven with

9    a disability, but they both have disabilities.

10             MR. BURGOYNE:  Well, yes.  Your Honor, they may well

11   both have diagnosed impairments --

12             THE COURT:  Right.

13             MR. BURGOYNE:  -- but the question is, is that --

14             THE COURT:  That affect them.  That affect them.  The

15   person who's operating at a six with an accommodation may then

16   rise to an eight.  A person who's operating at an eight with

17   the impairment might rise to a ten.  So you're not comparing

18   them against each other; you're comparing how the disability

19   affects them and their ability to function.

20             MR. BURGOYNE:  You absolutely have to look at how

21   they perform.  You have to look at them.  And so the question

22   is:  What evidence do we look at to evaluate how Meaghan

23   performs?  And our point is, as recognized in the cases, is in

24   order to determine if someone has a learning disability or

25   whether or not ADHD has impacted them, you must look at

OFFICIAL TRANSCRIPT

**19-30661.100**

1    objective real-world performance and see how the individual has

2    performed.

3         **THE COURT:**  Right.  Now, you made an emphasis of the

4    point that she never received an accommodation prior to medical

5    school and that she did well up until that point.

6         **MR. BURGOYNE:**  Extremely well.

7         **THE COURT:**  Right.  But where is the requirement that

8    you -- in other words, she may not have felt like she needed an

9    accommodation until that point.  She may have been suffering

10   from the impairment.  It may have been affecting her grades or

11   ability to perform, but it didn't matter to the point, or she

12   just those not to seek accommodation until later.

13             Where is the requirement that you have to do it

14   at the earliest possible point where you can or you somehow

15   lose that ability?

16        **MR. BURGOYNE:**  It isn't a use-it-or-lose-it

17   situation, Your Honor.  We're not contending that.  What we are

18   contending is that if you don't need it in those other

19   contexts, that your performance in demanding context is

20   evidence that you do not have functional limitations that rise

21   to the level of a substantial limitation in a major life

22   activity.

23             She's got to demonstrate substantial limitations

24   in those major life activities.  She's not being penalized for

25   not having requested accommodations before.  All we're saying

1    is, let's look at how she has performed in real-life context to

2    see if she is experiencing functional limitations that are, in

3    fact, substantially limiting.

4            **THE COURT:**  Or we're looking at how she's performing

5    at this point in her life in this situation that she's in in

6    medical school as opposed to how she performed when she was in

7    third grade at a -- or second grade at a French immersion

8    program in New Orleans.

9            **MR. BURGOYNE:**  Well, Your Honor, it isn't as if you

10   become learning disabled or your ADHD becomes a disability once

11   you get to medical school, but it wasn't one when you were a

12   child.  Those are impairments that are lifelong.  And in order

13   for her to be diagnosed -- properly diagnosed for those

14   impairments, she wouldn't be performing at this level.

15           But in all events, you don't need to get into

16   that issue, whether the diagnoses were proper, because it's

17   clear that her -- whatever functional impairment she's

18   experiencing don't rise to the level of a substantial

19   limitation.

20           You don't -- you don't just say, well, she's in

21   a very hard academic environment now so maybe now she does have

22   a disability.  And I could certainly, and have them right here,

23   could give the Court --

24           **THE COURT:**  Well, but the flip side of that is you

25   could say she's always had the disability, it's just the first

1    time she's chosen to seek an accommodation.

2          **MR. BURGOYNE:**  She may always have had a diagnosed

3    impairment, and I haven't -- you know, there is a question

4    whether those early diagnoses are, in fact, correct under the

5    DSM criteria.  But even if we accept they are, yes, she's had

6    these diagnoses, but are they resulting in functional

7    limitations that prevent her from accessing the exam?  And

8    that's what the ADA is getting at.

9          It is not intended as a vehicle for letting

10   someone maximize their performance on a licensure test.  And

11   that doesn't come without consequences for other individuals.

12         As she acknowledged, if she takes this exam and

13   ultimately gets a score where she's competing against someone

14   else, someone who is just as desirous of getting that residency

15   position, than that other person could end up not getting the

16   position.  And that shouldn't happen by way of extended testing

17   time unless the individual has shown that they're substantially

18   limited in their reading or concentrating or thinking.

19         And the thought that someone who performs at

20   this level is substantially limited under the Americans with

21   Disabilities Act, I have to say, Your Honor, it's one of the

22   more extreme cases I've seen.  And as I say, we're happy to --

23   you know, there are certainly cases in the Fifth Circuit where

24   people came in with ADHD diagnoses -- this is after the ADA was

25   amended in 2008, and they said, well, that's fine, but that's

1    not enough.

2              It isn't enough that you have this diagnosis

3    that has an impact on you.  It's got to be substantially

4    limiting as compared to most people.

5              And so in other testing context, we'll -- you

6    know, *Black versus National Board of Medical Examiners*, the

7    court went through and looked at a candidate whose profile is

8    very similar to Meaghan's profile and ruled as a matter of law

9    that she was not entitled to accommodations.  Ruled as a matter

10   of law that she was not substantially limited in any major life

11   activity.

12             There's the *Bibber* case that was decided in the

13   Eastern District of Pennsylvania where the individual who had

14   been diagnosed with dyslexia, and the court emphasized, you

15   know, it isn't a question of whether she performs up to her

16   abilities.  It isn't a question whether she's performing as

17   well as her medical school peers.  The question is whether or

18   not she's substantially limited as compared to most people in

19   the general population.

20             **THE COURT:**  Or I would imagine that there are many

21   medical students that have been awarded accommodations based

22   upon disabilities, as we sit here today.  Would you agree with

23   that?

24             **MR. BURGOYNE:**  Absolutely.  And those individuals --

25   many medical school students have, many college students have,

1   many people who take the USMLE exams have.  But they've been

2   awarded accommodations in the testing context because they

3   demonstrated a substantial limitation in a major life activity.

4           **THE COURT:**  But they've all managed to make it into

5   medical school.  So they obviously all had very good scores on

6   their MCATs, very good scores on their ACTs.  What is to

7   differentiate them from the plaintiff in this case?

8           **MR. BURGOYNE:**  Well, the question is, Your Honor,

9   what if they had those very good scores, but they got them

10   because when they took the ACT, they were accommodated?  That's

11   a very different profile than someone who performs in the 99th

12   percentile of everybody in this country without accommodations

13   and then later comes to -- comes to a more technical exam.

14           **THE COURT:**  Well, there you're saying -- we're coming

15   right back in full circle.  You're saying that if you don't

16   seek accommodation earlier, then somehow that fact will be used

17   against you later --

18           **MR. BURGOYNE:**  Right.

19           **THE COURT:**  -- and I just don't -- I just don't

20   understand that point.  It doesn't make logical sense to me.

21   Because this is apparently someone that has a very high IQ, was

22   able to overcome her disability to the point where she did well

23   on these prior exams, prior periods in school, and probably

24   could have done much better had she took advantage of the

25   accommodation that she might have been able to get at that

1    time.

2              **MR. BURGOYNE:**  Well, Your Honor, I'm not saying that

3    she should be disadvantaged in the slightest.  What I'm saying

4    is if she's able to perform at a level that puts her in the top

5    one percent of everyone who's gone to college in this country,

6    that is not the population that the ADA is intended to protect.

7    Simply because she is not -- reads slower than someone else

8    might read.  All of us have relative strengths and weaknesses,

9    Your Honor, but that isn't what the ADA is intended to do.

10             I don't doubt for a minute that Meaghan will be

11   a fabulous doctor.  I don't doubt for a minute that if she got

12   extra testing time, she might do better on the Step 2 CK exam.

13   But that's true of everybody, Your Honor.  I could go in and

14   take the bar exam, and if you gave me double time, I'd probably

15   do better than I would otherwise.  Research has shown that

16   everybody does better if they get extra testing time; it's not

17   just --

18             **THE COURT:**  But you're overlooking the point that she

19   has the medical documentation to establish a disability.

20             **MR. BURGOYNE:**  She has the medical documentation to

21   establish a diagnosed impairment.  What she doesn't have is a

22   record that establishes that she is substantially limited as

23   compared to most people in the general population, and I'm not

24   the one who set that standard.  That's what the Congress has

25   said when they set the ADA, it is not intended as a vehicle for

1    allowing people to maximize performance unless they meet the

2    standard to show that they're disabled within the meaning of

3    the statute.

4                    Again, there's a distinction between being

5    diagnosed with an impairment and having a disability that

6    entitles you to take a standardized test used for licensure for

7    physicians purposes with extended time or with other

8    accommodations.  It's a question of fairness to all examinees,

9    Your Honor, and it's a question of protecting the integrity of

10   the scores.

11                   I know it's temping because you have an

12   individual who's worked very hard, and, you know, everybody --

13   who wouldn't like extra time.  And that's just the merits, Your

14   Honor, on the irreparable harm part.  So we feel very strongly

15   that this is a case, and we'd be happy to submit a short brief

16   to Your Honor discussing all the cases that are directly

17   analogous in which courts have said, let's go through and look

18   at how this individual has actually performed in real-life

19   context in order to evaluate whether her diagnosed impairment

20   results in substantial limitation within the meaning of the

21   statute.

22                   Under irreparable harm, Your Honor, that has to

23   be immediate and non-speculative.  She said she has to take the

24   test by, I don't know, August 8th or 9th, and that's not

25   accurate.  She's got a testing window that extends, I think,

1  until -- I can't remember the exact date, but she don't have to

2  test on the date she currently has.  Her current window goes

3  until, it looks like, September 30th, 2019.

4              And then she could extend that, and she could

5  take this exam -- even if it's just a question of participating

6  in this year's match, she can still test all the way up, her

7  school says, until December and participate in this year's

8  match.  That's what Tulane recommends they test by.

9              And then even if she can't participate in the

10  match, it's not unheard of delay for an individual to not take

11  the Step exam in their fourth year.  We're not talking about an

12  aberrational delay here, the type of delay where her career is

13  getting unusually off track here.

14              Tulane has these provisions allowing for up to

15  24 months of time to take your Step 2 CK exam because that does

16  happen sometimes.  Which is just to say, Your Honor, you know,

17  and that's all in the context of it has to be immediate and

18  irreparable, and we're looking at a case here where, you know,

19  short notice to the opposing party with no discovery in the

20  case, and no opportunity for the Court to hear from NBME's

21  experts who separately evaluated her documentation and

22  concluded that she was not disabled and did not have

23  substantial limitations.  You know, we're facing the situation

24  where we're being told you have to do something to administer

25  an exam in a nonstandard format.

1           All we're saying, Your Honor, is that's not

2    immediate and irreparable harm sufficient to warrant a

3    mandatory preliminary injunction.  This isn't the standard

4    preliminary injunction which just preserves the status quo.

5    They want you to alter the status quo and affirmatively award

6    relief that she is otherwise entitled to under the ADA only if

7    she wins on the merits.

8           **THE COURT:**  All right.  Thank you.

9           I would like for you to submit a post-hearing

10   brief.  Mr. Burgoyne?

11          **MR. BURGOYNE:**  Yeah.  No, that would be great.  I'd

12   appreciate that opportunity, Your Honor.  As I say, we've been

13   at a little bit of a disadvantage, and I don't mean to say that

14   critically, just it's a short time frame.  And I certainly

15   understand why this is important to Meaghan and her family.

16          **MR. McGOEY:**  Your Honor, brief reply?

17          **THE COURT:**  Sure.

18          **MR. McGOEY:**  On the substantially limits a major life

19   activity as compared to the general population.  We've talked

20   about it a lot, 6th percentile.  The doctor in her report says

21   she got -- the 6th percentile was "slow learner range," and

22   that 90 percent of the students of her age would be faster, and

23   on decoding, 75 percent would be faster.  But the

24   6th percentile is slow learner range.  So we believe that shows

25   you the substantial limit of the major life activity of

1    reading.

2                    Also in the case I cited in the memo that we

3    filed with the original application, the *Root* case.  The expert

4    in that case, and the Court referred to it, said that anybody

5    below the 16th percentile would be lower than most of the

6    population.  So the 6th percentile qualifies Meaghan clearly.

7    I don't think an expert has to testify to that, but the

8    6th percentile is way below most of the population.

9                    So we believe we've addressed that.  Also, in

10   the doctor's report, Dr. Brockman, she in the addendum, which

11   is in the exhibit, she addresses this criticism of the Denny

12   test which yielded that 6th percentile result.  And she, in her

13   report, reveals that experts in her field generally rely on

14   that test, and it is a respected test.

15                   The other issue on the most -- the population

16   that she has to show that it substantially limits her major

17   life activity in comparison with the general population or most

18   of the population.  We beat that with the 6th percent.  But

19   also we've cited cases, and I don't have to win this point,

20   because I think we win it with the 6th percentile, but there

21   are cases that say you compare the person to the group that

22   they're in.  And so for Meaghan, that would be other med

23   students, not people who just have high school degrees.  So

24   there are two ways that you could rule in her behalf in that

25   regard.

# **TAB 6**

H9237001-000013224

# The ACT® Plus Writing
## Student Report



STUDENT'S NAME: MEAGHAN O DOHERTY
HIGH SCHOOL NAME: BENJAMIN FRANKLIN HIGH SCHOOL
HIGH SCHOOL CODE: 192-006

ACT ID: -21371282
SSN: XXX-XX-6289
TEST DATE & LOCATION: JUN 2010 NATIONAL

## Your ACT Scores



Rank: Approximate percent of ACT-tested students at or below your score

|  | In Your State | In the U.S. |
|---|---|---|
| **Composite Score 32** | 99% | 99% |
| ENGLISH | 34* | 99% |
| Usage/Mechanics | 17 | 97% |
| Rhetorical Skills | 16 | 97% |
| MATHEMATICS | 33* | 98% |
| Pre-Algebra/Elem. Algebra | 17 | 96% |
| Algebra/Coord. Geometry | 15 | 96% |
| Plane Geometry/Trig. | 18 | 99% |
| READING | 31* | 93% |
| Social Studies/Sciences | 16 | 93% |
| Arts/Literature | 17 | 97% |
| SCIENCE | 28* | 94% |
| COMBINED ENGLISH/WRITING | 31 | 97% |
| Writing (score range 2 to 12) | 08 | 81% |

The Combined English/Writing score ranges from 1 to 36 and is a combined measure of the Writing and English tests. The Writing score ranges from 2 to 12. Your ranks for these two scores are based on recent ACT-tested students who took the Writing test.

COMMENTS ON YOUR ESSAY: YOUR ESSAY ACKNOWLEDGED COUNTERARGUMENTS ON THE ISSUE BUT DID NOT DISCUSS THEM. YOUR ESSAY ADEQUATELY SUPPORTED GENERAL STATEMENTS WITH SPECIFIC REASONS, EXAMPLES, AND DETAILS.

■ ACT® test scores and the Composite score range from 1 to 36; subscores range from 1 to 18.

■ Your Composite score is the average of your scores on the four subject area tests. Subscores do not necessarily add up to your score for a subject area test.

■ Your ranks tell you the approximate percentages of recent high school graduates in the U.S. and your state who took the ACT and received scores that are the same as or lower than yours. A rank of 70, for example, means that 70% of students received scores that are the same as or lower than your score.

■ Your test scores are only estimates, not precise measures, of your educational development. You will find more information about interpreting your scores in the booklet you received with this report and at www.actstudent.org.



Looking for more information about your individual strengths and test preparation? Go to www.actstudent.org.

*Your College Readiness: If your scores are at or above the following ACT benchmark scores, you will likely be ready for first-year college courses—English 18, Mathematics 22, Reading 21, Science 24.

## Your College Reports

At your direction, your scores from this test date are being reported to the colleges shown below. College planning information is provided for the first four choices you listed when you registered or tested. (Fifth and sixth choices, if any, appear just above your first choice.) Your GPA was calculated from the grades you reported. To view additional college planning information or to send additional reports, visit www.actstudent.org.

| College Name and Code | What is the profile of enrolled 1st-year students at this college? | | | Is the program of study you prefer offered? | What are the approximate annual tuition and fees? | | What percent of 1st-year students receive financial aid based on: | |
|---|---|---|---|---|---|---|---|---|
| | High School Class Rank | ACT Composite Score | High School Grade Point Average | | In-state | Out-of-state | Need? | Merit? |
| YOU DID NOT PROVIDE CODES FOR ANY COLLEGES TO WHICH TO REPORT SCORES. | | | | | | | | |

## Your Information ➤

| Your Class Rank | Your Composite Score | Your Calculated GPA | Your Selected Major |
|---|---|---|---|
| -- | 32 | 3.63 | MEDICINE (PRE-MEDICINE) |

Check with colleges for recent changes in information. A dash (—) indicates information was not provided or could not be calculated. *Comprehensive fee including room and board. © 2008 by ACT, Inc. All rights reserved.

H9237001-000013224

19-30661.228

**TAB 7**

# CollegeBoard SAT

## Student Answer Service for the SAT®

It's easy to re-register online at www.collegeboard.com.

| TEST DATE | FORM CODE | Critical Reading | 520 |
|---|---|---|---|
| 06-10 | AETW | Math | 550 |
| | | Writing | 560 Multiple Choice 67 |
| | | | Essay 08 |

SEQN        S465080910
MEAGHAN O DOHERTY
5603 HAWTHORNE PL
NEW ORLEANS LA 70124-1811

### KEYS TO THE SECTIONS BELOW

**Your Answer**
+ Your answer was correct.
− Your answer was incorrect
0 You omitted the question.

**Difficulty Level**
1−5 Difficulty of question, with 1 being the easiest level and 5 the hardest.

### TYPE OF QUESTION

**Critical Reading**
C Sentence Completion
R Passage-based Reading

**Writing**
S Improving Sentences
E Identifying Sentence Errors
P Improving Paragraphs

### TYPE OF CONTENT

**Math**
N Numbers & Operations
A Algebra & Functions
G Geometry & Measurement
D Data Analysis, Statistics, Probability

---

**SECTION 1 ESSAY**
Visit www.collegeboard.com to view your essay. If you do not have Web access, see reverse for details about requesting a copy of your essay.

---

**SECTION 2 MATH**

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | − | + | + | + |
| Type of Question ► | D | H | G | A | D | A | G | A |
| Difficulty Level ► | 1 | 1 | 1 | 3 | 3 | 3 | 3 | 4 |

**Student-Produced Responses**

| | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
|---|---|---|---|---|---|---|---|---|---|---|
| | + | + | + | + | + | + | + | − | + | − |
| | A | A | N | G | D | N | G | N | A | A |
| | 2 | 3 | 1 | 2 | 3 | 4 | 4 | 4 | 5 |

---

**SECTION 3 CRITICAL READING**

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | − | + | − | − | + | + | + | + | − | + | − | − | + | + | + | + | + | − | + | + | − |
| Type of Question ► | C | C | C | C | C | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R |
| Difficulty Level ► | 1 | 4 | 5 | 5 | 5 | 3 | 1 | 2 | 1 | 2 | 3 | 4 | 3 | 3 | 1 | 1 | 1 | 4 | 3 | 3 | 3 | 4 |

---

**SECTION 4 WRITING**

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | + | − | + | − | + | + | + | + | + | + | + | + | − | + | + | − | + | + | − | + | + | + | + | + | + | + | + | − | + | + |
| Type of Question ► | S | S | S | S | S | S | S | S | S | S | E | E | E | E | E | E | E | E | E | E | E | E | E | E | E | E | E | E | E | E | P | P | P | P | P |
| Difficulty Level ► | 1 | 1 | 1 | 2 | 2 | 3 | 3 | 3 | 3 | 5 | 1 | 1 | 3 | 2 | 3 | 2 | 3 | 3 | 3 | 3 | 6 | 4 | 3 | 4 | 4 | 5 | 5 | 2 | 2 | 2 | 3 | 3 | 3 |

---

**SECTION 5 MATH**

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | + | + | + | + | + | + | + | + | − | + | − | + | + | − | − |
| Type of Question ► | A | G | D | N | A | G | D | A | N | G | N | H | G | A | G | A | G | A | D | A |
| Difficulty Level ► | 1 | 1 | 1 | 1 | 2 | 2 | 2 | 1 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 5 | 5 | 5 |

---

**SECTION 6 CRITICAL READING**

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | − | + | − | + | + | + | + | + | + | + | − | + | + | + | + | + | + | + |
| Type of Question ► | C | C | C | C | C | C | C | C | R | R | R | R | R | R | R | R | R | R | R | R | R | R |
| Difficulty Level ► | 1 | 2 | 3 | 4 | 4 | 5 | 5 | 1 | 3 | 4 | 3 | 2 | 3 | 2 | 2 | 3 | 2 | 3 | 3 | 3 | 3 | 3 |

---

**SECTION 7 MATH**

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | + | + | + | + | + | + | − | + | + | − | + |
| Type of Question ► | A | H | A | D | G | A | A | D | N | A | G | A | G | N |
| Difficulty Level ► | 1 | 1 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 4 | 4 |

---

**SECTION 8 CRITICAL READING**

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | − | + | + | + | + | + | + | − | + | + | + | + | + | + |
| Type of Question ► | C | C | C | C | C | C | R | R | R | R | R | R | R | R | R | R | R |
| Difficulty Level ► | 1 | 2 | 3 | 4 | 5 | 4 | 5 | 1 | 2 | 3 | 3 | 1 | 3 | 4 | 3 | 3 | 4 | 3 |

---

**SECTION 9 WRITING**

| Question No. ► | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Your Answer ► | + | + | + | + | + | + | + | + | + | + | + | + | + |
| Type of Question ► | S | S | S | S | S | S | S | S | S | S | S | S | S | S |
| Difficulty Level ► | 1 | 1 | 1 | 2 | 2 | 3 | 3 | 3 | 4 | 4 | 4 | 5 | 5 |

S465080910

---

Visit www.collegeboard.com for detailed information about your scores and to view your essay.

19-30661.227

**TAB 8**

1/2/2018                                    Printable Score Report | MCAT Score Reporting

# MCAT Score Report

**Name** MEAGHAN DOHERTY                              AAMC ID 13744061
**Verification Code** FCB8-VDKE-ECVX-FTBY            Date of Birth 08/17/1993
**URL** * https://apps.aamc.org/score-reporting-web/#/report/verify
*\* This report will no longer be able to be verified after 04/02/2018*

In order to verify these scores, you will be directed to create a user name and password. When visiting this page, select "Register for an AAMC Account" to begin this process.

## MCAT Scores
### For exams taken after January 31, 2015
No Scores Available

## MCAT Scores
### For exams taken before January 31, 2015

|           |                | MCAT Total       |                                  | Physical Sciences |                                  | Verbal Reasoning |                                  | Writing Sample |                                  | Biological Sciences |                                  |
| --------- | -------------- | ---------------- | -------------------------------- | ----------------- | -------------------------------- | ---------------- | -------------------------------- | -------------- | -------------------------------- | ------------------- | -------------------------------- |
| Exam Date | Total Score    | Confidence Band [1] | Percentile Rank of Score [2]  | Score             | Percentile Rank of Score [2]     | Score            | Percentile Rank of Score [3]     | Score          | Percentile Rank of Score [2]     | Score               | Percentile Rank of Score [3]     |
| 06/13/2014 | 32            | 30 to 34         | 88%                              | 11                | 89%                              | 11               | 95%                              |                |                                  | 10                  | 76%                              |

### Notes

[1]Test scores, like other measurements, are not perfectly precise. The confidence bands that are shown for the Total Scores above mark the ranges in which the test taker's true scores probably lie. To obtain the confidence band for each section score, subtract one point from and add one point to the score (or, in the case of the Writing Sample, subtract and add one letter).

[2]The percentile ranks of scores are the percentages of test takers who received the same scores or lower scores. The percentile ranks are based on tests administered from January 2012 through September 2014.

Copyright Â©1995-2015 | Association of American Medical Colleges

0047

19-30661.226

**TAB 9**



**US·MLE**
United States
Medical
Licensing
Examination ®

# UNITED STATES MEDICAL LICENSING EXAMINATION ®

## STEP 1 SCORE REPORT

This score report is provided for the use of the examinee.
Third party users of USMLE information are advised to rely solely on official USMLE transcripts.

**EXHIBIT 5**

**Doherty, Meaghan Olivier**

**USMLE ID:  5-397-670-0**

**Test Date:  April 24, 2018**

The USMLE is a single examination program consisting of three Steps designed to assess an examinee's understanding of and ability to apply concepts and principles that are important in health and disease and that constitute the basis of safe and effective patient care. Step 1 is designed to assess whether an examinee understands and can apply important concepts of the sciences basic to the practice of medicine, with special emphasis on principles and mechanisms underlying  health, disease, and modes of therapy.  The inclusion of  Step 1 in the USMLE sequence is intended to ensure mastery of not only the sciences underlying the safe and competent practice of medicine in the present, but also the scientific principles required for maintenance of competence through lifelong learning. Results of the examination are reported to medical licensing authorities in the United States and its territories for use in granting an initial license to practice medicine. This score[§] represents your result for the administration of Step 1 on the test date shown above.



**PASS**

This result is based on the minimum passing score recommended by USMLE for Step 1. Individual licensing authorities may accept the USMLE-recommended pass/fail result or may establish a different passing score for their own jurisdictions.

**200**

This score is determined by your overall performance on Step 1. For  administrations between Jan 1, 2016 and Dec 31, 2016, the mean and standard deviation for first-time examinees from U.S. and Canadian medical schools were approximately 228 and 21, respectively, with most scores falling between 140 and 260. A score of 194 is set  by  USMLE to pass  Step 1. The standard error of measurement (SEM)[‡] for this scale is six points.

---

[§]Effective April 1, 2013, test results are reported on a three-digit scale only. Test results reported as passing represent an exam score of 75 or higher on a two-digit scoring scale.

[‡]Your score is influenced both by your general understanding of the basic biomedical sciences and the specific set of items selected for this Step 1 examination. The Standard Error of Measurement (SEM) provides an index of the variation in scores that would be expected to occur if an examinee were tested repeatedly using different sets of items covering similar content.

## INFORMATION PROVIDED FOR EXAMINEE USE ONLY

The Performance Profile below is provided solely for the benefit of the examinee.
These profiles are developed as self-assessment tools for examinees only and will not be reported or verified to any third party.

### USMLE STEP 1 PERFORMANCE PROFILE



The above Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area;
borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the
precision of measurement: narrower bands indicate greater precision. The band width for a given content area is the same for all examinees. An
asterisk indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should
not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because Step 1 is designed to be
integrative, many items contribute to more than one content area. As a consequence, caution should be used when interpreting differences in
performance across content areas.

This profile should not be compared to those from other Step 1 administrations.

Additional information concerning the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials*.

MK—Medical Knowledge; PC—Patient Care; PBLI—Practice-based Learning and Improvement

19-30661.254

# **TAB 10**

# WAIS-IV Integrated Tables and Graphs Report - (United States)

| | |
|---|---|
| EXAMINEE: | Meaghan Doherty |
| AGE: | 23 years |
| DATE OF BIRTH: | 08/17/1993 |
| SCHOOL | Tulane School of Medicine |
| GENDER | Female |

REPORT DATE: 03/29/2017

EXAMINER: M. Patricia Brockman, Ph. D.

**Test Administered:** WAIS-IV Core/Supplemental (03/29/2017)

Age at Testing: (23 years)

## Composite Scores Summary

| Scale | Sum of Scaled Scores | Composite Score | Percentile Rank | 90% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|
| Verbal Comprehension (VCI) | 52 | 145 | 99.6 | 138-148 | Very Superior |
| Perceptual Reasoning (PRI) | 43 | 125 | 95 | 119-129 | Superior |
| Working Memory (WMI) | 23 (26)* | 108 (117)* | 70 (87)* | 102-113 (110-122)* | Average (High Average)* |
| Processing Speed (PSI) | 18 | 94 | 34 | 96 | Average |
| Full Scale (FSIQ) | 136 (114)* | 126 (128)* | 96 (97)* | 122-129 (124-131)* | Superior (Superior)* |

## Verbal Comprehension Subtest Score Summary (Total Raw Score to Scaled Score Conversions)

| Subtest | Raw Score | Scaled Score | Percentile Rank |
|---|---|---|---|
| Similarities | 35 | 18 | 99 |
| Vocabulary | 54 | 19 | 99 |
| Information | 21 | 15 | 95 |

## Perceptual Reasoning Subtest Score Summary (Total Raw Score to Scaled Score Conversions)

| Subtests | Raw Score | Scaled Score | Percentile Rank |
|---|---|---|---|
| Block Design | 64 | 17 | 98 |
| Matrix Reasoning | 19 | 10 | 50 |
| Visual Puzzles | 24 | 16 | 98 |

## Working Memory Subtest Score Summary (Total Raw Score to Scaled Score Conversions)

| Subtests | Raw Score | Scaled Score | Percentile Rank |
|---|---|---|---|
| Digit Span | 27 | 9 | 37 |
| Arithmetic | 19(21)* | 14(17)* | 91(98)* |

## Processing Speed Subtest Scores Summary (Total Raw Score to Scaled Score Conversions)

| Subtests | Raw Score | Scaled Score | Percentile Rank |
|---|---|---|---|
| Coding (CD) | 73 | 10 | 50 |
| Symbol Search (SS) | 29 | 8 | 25 |

** Extended Time

0034

19-30661.213

# WIAT–III

## Clinician Report

| Student Name: | Meaghan Doherty | Date of Report: | 4/3/2017 |
|---|---|---|---|
| School: | Tulane Univerity | Program: | School Of Medicine |
| Date of Birth: | 8/17/1993 | Home Language: | English |
| Gender: | Female | Handedness: | Right |
| Race/Ethnicity: | White | Examiner Name: | M. Patricia Brockman, Ph.D. |

| Test Administered: | WIAT–III (3/31/2017) | Age at Testing: 23 years 7 months | Retest? No |
|---|---|---|---|

WIAT–III Comments: Standard Administration

## WIAT–III

Age Based Scores

### Subtest Score Summary

| Subtest | Raw Score | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Grade Equiv. | Age Equiv. | Growth Score |
|---|---|---|---|---|---|---|---|---|---|
| Listening Comprehension | — | 118 | 111–125 | 88 | 75 | 7 | N/A | N/A | N/A |
| Reading Comprehension | 46* | 117 | 107–127 | 87 | 74 | 7 | N/A | N/A | N/A |
| Math Problem Solving | 64 | 115 | 109–121 | 84 | 71 | 7 | N/A | N/A | N/A |
| Sentence Composition | — | 101 | 91–111 | 53 | 51 | 5 | N/A | N/A | N/A |
| Word Reading | 71 | 111 | 105–117 | 77 | 65 | 7 | N/A | N/A | N/A |
| Essay Composition | — | 115 | 106–124 | 84 | 71 | 7 | N/A | N/A | N/A |
| Pseudoword Decoding | 35 | 91 | 87–95 | 27 | 37 | 4 | N/A | N/A | N/A |
| Numerical Operations | 57 | 131 | 127–135 | 98 | 94 | 9 | N/A | N/A | N/A |
| Oral Expression | — | 140 | 132–148 | 99.6 | >99 | 9 | N/A | N/A | N/A |
| Oral Reading Fluency | 156* | 104 | 98–110 | 61 | 56 | 6 | N/A | N/A | N/A |
| Spelling | 56 | 114 | 109–119 | 82 | 70 | 7 | N/A | N/A | N/A |
| Math Fluency—Addition | 48 | 116 | 106–126 | 86 | 72 | 7 | N/A | N/A | N/A |
| Math Fluency—Subtraction | 47 | 117 | 110–124 | 87 | 74 | 7 | N/A | N/A | N/A |
| Math Fluency—Multiplication | 39 | 116 | 108–124 | 86 | 72 | 7 | N/A | N/A | N/A |

— Indicates a subtest with multiple raw scores (shown in the Subtest Component Score Summary).

\* Indicates a raw score that is converted to a weighted raw score (not shown).

† Indicates that a raw score is based on a below grade level item set.

### Supplemental Subtest Score Summary

| Score Name | Raw Score | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Grade Equiv. | Age Equiv. | Growth Score |
|---|---|---|---|---|---|---|---|---|---|
| Essay Composition: Grammar and Mechanics | 183 | 119 | 109–129 | 90 | 77 | 8 | N/A | N/A | N/A |
| Oral Reading Accuracy | 372* | 94 | 81–107 | 34 | 42 | 4 | N/A | N/A | N/A |
| Oral Reading Rate | 143* | 104 | 97–111 | 61 | 56 | 6 | N/A | N/A | N/A |

\* Indicates a raw score that is converted to a weighted raw score (not shown).

Copyright © 2009 NCS Pearson, Inc. All rights reserved.
Produced in the United States of America.


**WIAT-III**

## Cumulative Percentages

| | |
|---|---|
| **Word Reading Speed** | The score is the same as or higher than the scores obtained by 10% of students in the normative sample; 90% of students in the normative sample scored higher than this score. |
| **Pseudoword Decoding Speed** | The score is the same as or higher than the scores obtained by 25% of students in the normative sample; 75% of students in the normative sample scored higher than this score. |

## Subtest Component Score Summary

| Subtest Component | Raw Score | Standard Score | Percentile Rank | Normal Curve Equivalent | Stanine | Qualitative Description |
|---|---|---|---|---|---|---|
| Listening Comprehension | | | | | | |
| Receptive Vocabulary | 18 | 120 | 91 | 78 | 8 | Above Average |
| Oral Discourse Comprehension | 23 | 114 | 82 | 70 | 7 | Average |
| Sentence Composition | | | | | | |
| Sentence Combining | 17 | 97 | 42 | 46 | 5 | Average |
| Sentence Building | 26 | 105 | 63 | 57 | 6 | Average |
| Essay Composition | | | | | | |
| Word Count | 196 | 121 | 92 | 79 | 8 | Above Average |
| Theme Development and Text Organization | 11 | 106 | 66 | 58 | 6 | Average |
| Oral Expression | | | | | | |
| Expressive Vocabulary | 17 | 126 | 96 | 87 | 9 | Above Average |
| Oral Word Fluency | 58 | 144 | 99.8 | >99 | 9 | Superior |
| Sentence Repetition | 27 | 120 | 91 | 78 | 8 | Above Average |

## Composite Score Summary

| Composite | Sum of Subtest Standard Scores | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Qualitative Description |
|---|---|---|---|---|---|---|---|
| Oral Language | 258 | 134 | 128–140 | 99 | 98 | 9 | Superior |
| Total Reading | 423 | 106 | 103–109 | 66 | 58 | 6 | Average |
| Basic Reading | 202 | 100 | 97–103 | 50 | 50 | 5 | Average |
| Reading Comprehension and Fluency | 221 | 114 | 107–121 | 82 | 70 | 7 | Average |
| Written Expression | 330 | 112 | 106–118 | 79 | 67 | 7 | Average |
| Mathematics | 246 | 125 | 122–128 | 95 | 85 | 8 | Above Average |
| Math Fluency | 349 | 118 | 112–124 | 88 | 75 | 7 | Above Average |
| Total Achievement | 1143 | 121 | 118–124 | 92 | 79 | 8 | Above Average |

Copyright © 2009 NCS Pearson, Inc. All rights reserved.
Produced in the United States of America.

Meaghan Doherty
Page 2 of 5

#  WIAT-III

| Clinician Report | | | |
|---|---|---|---|
| Student Name: | Meaghan Doherty | Date of Report: | 4/3/2017 |
| School: | Tulane University | Program: | School of Medicine |
| Date of Birth: | 8/17/1993 | Home Language: | English |
| Gender: | Female | Handedness: | Right |
| Race/Ethnicity: | White | Examiner Name: | M. Patricia Brockman, Ph.D. |

| Test Administered: | WIAT–III (3/31/2017) | Age at Testing: 23 years 7 months | Retest? No |
|---|---|---|---|

| WIAT–III Comments: | Accommodations – Calculator on Mathematics tasks |
|---|---|

## WIAT–III

Age Based Scores

### Subtest Score Summary

| Subtest | Raw Score | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Grade Equiv. | Age Equiv. | Growth Score |
|---|---|---|---|---|---|---|---|---|---|
| Listening Comprehension | — | 118 | 111–125 | 88 | 75 | 7 | N/A | N/A | N/A |
| Reading Comprehension | 46* | 117 | 107–127 | 87 | 74 | 7 | N/A | N/A | N/A |
| Math Problem Solving | 66 | 120 | 114–126 | 91 | 78 | 8 | N/A | N/A | N/A |
| Sentence Composition | — | 101 | 91–111 | 53 | 51 | 5 | N/A | N/A | N/A |
| Word Reading | 71 | 111 | 105–117 | 77 | 65 | 7 | N/A | N/A | N/A |
| Essay Composition | — | 115 | 106–124 | 84 | 71 | 7 | N/A | N/A | N/A |
| Pseudoword Decoding | 35 | 91 | 87–95 | 27 | 37 | 4 | N/A | N/A | N/A |
| Numerical Operations | 59 | 137 | 133–141 | 99 | >99 | 9 | N/A | N/A | N/A |
| Oral Expression | — | 140 | 132–148 | 99.6 | >99 | 9 | N/A | N/A | N/A |
| Oral Reading Fluency | 156* | 104 | 98–110 | 61 | 56 | 6 | N/A | N/A | N/A |
| Spelling | 56 | 114 | 109–119 | 82 | 70 | 7 | N/A | N/A | N/A |
| Math Fluency–Addition | 48 | 116 | 106–126 | 86 | 72 | 7 | N/A | N/A | N/A |
| Math Fluency–Subtraction | 47 | 117 | 110–124 | 87 | 74 | 7 | N/A | N/A | N/A |
| Math Fluency–Multiplication | 39 | 116 | 108–124 | 86 | 72 | 7 | N/A | N/A | N/A |

— Indicates a subtest with multiple raw scores (shown in the Subtest Component Score Summary).
* Indicates a raw score that is converted to a weighted raw score (not shown).
† Indicates that a raw score is based on a below grade level item set.

### Supplemental Subtest Score Summary

| Score Name | Raw Score | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Grade Equiv. | Age Equiv. | Growth Score |
|---|---|---|---|---|---|---|---|---|---|
| Essay Composition: Grammar and Mechanics | 183 | 119 | 109–129 | 90 | 77 | 8 | N/A | N/A | N/A |
| Oral Reading Accuracy | 372* | 94 | 81–107 | 34 | 42 | 4 | N/A | N/A | N/A |
| Oral Reading Rate | 143* | 104 | 97–111 | 61 | 56 | 6 | N/A | N/A | N/A |

* Indicates a raw score that is converted to a weighted raw score (not shown).

Copyright © 2009 NCS Pearson, Inc. All rights reserved.
Produced in the United States of America.

Meaghan Doherty
Page 1 of 5

19-30661.216

 **WIAT-III**

## Cumulative Percentages

| | |
|---|---|
| **Word Reading Speed** | The score is the same as or higher than the scores obtained by 10% of students in the normative sample; 90% of students in the normative sample scored higher than this score. |
| **Pseudoword Decoding Speed** | The score is the same as or higher than the scores obtained by 25% of students in the normative sample; 75% of students in the normative sample scored higher than this score. |

## Subtest Component Score Summary

| Subtest Component | Raw Score | Standard Score | Percentile Rank | Normal Curve Equivalent | Stanine | Qualitative Description |
|---|---|---|---|---|---|---|
| Listening Comprehension | | | | | | |
| Receptive Vocabulary | 18 | 120 | 91 | 78 | 8 | Above Average |
| Oral Discourse Comprehension | 23 | 114 | 82 | 70 | 7 | Average |
| Sentence Composition | | | | | | |
| Sentence Combining | 17 | 97 | 42 | 46 | 5 | Average |
| Sentence Building | 26 | 105 | 63 | 57 | 6 | Average |
| Essay Composition | | | | | | |
| Word Count | 196 | 121 | 92 | 79 | 8 | Above Average |
| Theme Development and Text Organization | 11 | 106 | 66 | 58 | 6 | Average |
| Oral Expression | | | | | | |
| Expressive Vocabulary | 17 | 126 | 96 | 87 | 9 | Above Average |
| Oral Word Fluency | 58 | 144 | 99.8 | >99 | 9 | Superior |
| Sentence Repetition | 27 | 120 | 91 | 78 | 8 | Above Average |

## Composite Score Summary

| Composite | Sum of Subtest Standard Scores | Standard Score | 90% Confidence Interval | Percentile Rank | Normal Curve Equiv. | Stanine | Qualitative Description |
|---|---|---|---|---|---|---|---|
| Oral Language | 258 | 134 | 128–140 | 99 | 98 | 9 | Superior |
| Total Reading | 423 | 106 | 103–109 | 66 | 58 | 6 | Average |
| Basic Reading | 202 | 100 | 97–103 | 50 | 50 | 5 | Average |
| Reading Comprehension and Fluency | 221 | 114 | 107–121 | 82 | 70 | 7 | Average |
| Written Expression | 330 | 112 | 106–118 | 79 | 67 | 7 | Average |
| Mathematics | 257 | 131 | 128–134 | 98 | 94 | 9 | Superior |
| Math Fluency | 349 | 118 | 112–124 | 88 | 75 | 7 | Above Average |
| Total Achievement | 1154 | 123 | 120–126 | 94 | 82 | 8 | Above Average |

Calculator

Copyright © 2009 NCS Pearson, Inc. All rights reserved.
Produced in the United States of America.

0038

19-30661.217

Meaghan Doherty
Birthdate 08/17/1993
Test Score Summary 03/20-30/2017
Page 4

# Wide Range Assessment of Memory and Learning-Second Edition (WRAML2)

|  | Standard Score | Percentile | Range |
|---|---|---|---|
| Verbal Learning | 13 | 84 | High Average |
| Delayed Recall | 13 | 84 | High Average |
| Verbal Learning Recognition | 13 | 84 | High Average |
| Story Memory | 11 | 63 | Average |
| Delayed Recall | 12 | 75 | High Average |
| Story Memory Recognition | 12 | 75 | High Average |

## Nelson Denny Reading Test

|  | Standard Score | Percentile | Grade Equiv. |
|---|---|---|---|
| Vocabulary | 233 | 41 | 15.9 |
| (with 150% time) | 235 | 46 | 16.3 |
| Comprehension | 235. | 54 | 17.1 |
| Total | 236 | 46 | 16.6 |
| (with 150% time) | 233 | 41 | 16.1 |
| Reading Rate | 181 | 6 | Borderline/Slow Learner |

# **TAB 11**

Addendum:
April 19, 2019

Meaghan Doherty
Psychological /Educational Evaluation of March 31, 2017

I have reviewed the letter of February 14, 2018 in which the NBME rejected Meaghan Doherty's request for accommodations for the USMLE Step 1 test (USMLE ID#:5-397-670-0). There are several important issues that that report overlooked or failed to consider.

Meaghan's Nelson Denny Reading Test (NDRT) Reading Rate score fell at the 6th percentile, placing her in the borderline or slow learner. The NBME letter then stated that the NDRT Reading Rate "is not considered by experts to be a reliable measure of reading efficiency because, as your evaluator acknowledges, it is determined on the basis of a single, one-minute sample of words-per-minute." The letter went on to state that the NDRT Technical Report for Forms G & H (1993) reports that Reading Rate reliability to be quite low, with a coefficient of only 0.68." These concerns about the NDRT are misplaced since the 0.68 coefficient refers to test-retest reliability. The claim that "experts" do not consider the NDRT "to be a reliable measure of reading efficiency" because it is based on a one-minute reading sample is false. The NDRT is one of the most widely administered reading tests in the nation and is used by many medical schools to gauge reading ability.

The validity of the NDRT in relationship to medical school performance has a long history. In their 1985 study, Jackson and Brooks found that the NDRT "was a "better single predictor than the MCAT reading score" on basic science and clinical science GPA and total scores on various parts of the NBME exam. See Jackson JR, Brooks CM. *Relationship among the MCAT reading subtest, Nelson-Denny Reading test, and medical school achievement.* J Med Educ. 1985; 60:478–80, in particular at p. 479. Lastly, a review of the findings by Jackson EW, Dawson-Saunders R, Jackson JE. *The predictive validity of the Nelson-Denny Reading Test for scores on the reading subtest of the MCAT.* Advisor. 1984; 5:7–11, make clear that the NBME's view of the NDRT is unfounded.

The appropriateness of NDRT results in determining Meaghan's disability are supported by the literature. NDRT has been validated in a study of the correlation in the performance of health science students on the Pharmacy College Admissions Test (PCAT), which concluded a 'close correlation of the PCAT and NDRT scores, which were administered almost four years apart, implies that the PCAT does a good job of possibly predicting the reading skills of students." See *Pharmacy Students' Reading Ability and the Readability of Required Reading Materials*, Stephen Fuller, PharmD, et al., Am J Pharm Educ. 2007 Dec 15; 71(6): 111.

Another study examined students (N = 730) who took the Nelson-Denny Reading Test (current forms G or H) during orientation to medical school. Stepwise regression analyses showed the Nelson-Denny Reading Vocabulary, Comprehension, and Rate were significant predictors of MCAT (taken prior to admission to medical school) verbal reasoning. Reading Vocabulary was a significant predictor of USMLE Step 1 score (taken at the end of the second year of medical school). Pearson correlation analyses demonstrated significant positive relationships among the various subtests of the three instruments. The significant positive relationships between reading test performance and the MCAT and USMLE for medical students have been shown across

1

Addendum:
April 19, 2019

Meaghan Doherty
Psychological /Educational Evaluation of March 31, 2017

regions of the country and two decades of time. See Haught PA, Walls RT. Relationships of reading, MCAT, and USMLE Step 1 test results for medical students. Reading Psychol. 2004; 25:83–92.

The Nelson Denny Reading test is a valid reading measure that has some unique features that are useful diagnostically. In Meaghan's case, comparison of the three scores on this test (Vocabulary, Comprehension, and Reading Rate) yielded important information. There was a significant difference between her mid-average Vocabulary and Reading Comprehension scores, which fell at the 41st percentile (46th percentile with extended time) and 54th percentiles, respectively. Her Reading Rate fell at the 6th percentile in the borderline or slow learner range. This difference is significant.

The NDRT is also unique in that the percentile scores are not based on the normal population but the educational level that most closely resembles the individual being tested. Other tests generally use age norms so you are compared with others close to your age group, usually included balanced samples of males/females, regions of the country, racial/ethnic groups.

The NDRT is administered using standardized time limits but there are separate norms based on scores obtained when extended (150%) time is provided. This is often useful to determine whether the extra time will yield significant differences in an individual's performance and how well these measures compare with other measures of intelligence and academic performance. Since Meaghan was able to complete almost all of the items in the Vocabulary section and all of the Comprehension section within the standardized time, giving her extended time did not yield big difference. It should be noted that her accuracy was very strong (90% correct), but Meaghan's percentile fell in the mid-average range because she was compared with other college graduates NOT the "normal" population like measure of her intelligence and other measures of her achievement, which are age based.

The NBME letter notes that, despite Meaghan's diagnosis of Specific Learning Disorder and ADHD, her record "does not demonstrate a developmental history of significant problems with reading or learning that impaired her academic functioning or that currently limits a major life activity." This is inaccurate. Although Meaghan she was a highly motivated and bright student with exceptional communication skills, she started to experience some difficulties with her early reading skills in elementary school. A psychoeducational evaluation was conducted by Denise Nagim, M.C.D., at Jefferson Speech and Language in 2003 indicated significant variability in Meaghan's academic skills with relative weakness noted in her reading skills, including sound blending, word attack, and phonological awareness. These dyslexic deficiencies also impacted Meaghan's written language, especially her spelling and story composition, where her score fell in the borderline or slow learner range. This weakness was even more remarkable given Meaghan's very superior intelligence. Some dysgraphia was also reported and Meaghan tended to omit words when writing sentences and she had difficulty copying and maintaining appropriate spacing between letters and words.

2

19-30661.220

Addendum:
April 19, 2019

Meaghan Doherty
Psychological /Educational Evaluation of March 31, 2017

Meaghan received interventions to address her learning disabilities, including a multisensory reading program to build phonological awareness, phonology, as well as reading and writing fluency. It was also suggested that Meaghan become proficient in computer keyboarding to address her dysgraphia.

Meaghan also received accommodations to address her dyslexia and dysgraphia. She sometimes did poorly on tests due to her reading issues, even though she had mastered the information at exceptional level. Meaghan's scores on standardized tests in elementary school also were not consistent with her cognitive potential and academic achievement as she progressed through elementary school.

Meaghan was reassessed as a sixth grader. Her overall intelligence again fell in the very superior range but her working memory was average and specific difficulties were noted with her auditory processing. The educational re-evaluation indicated a significant improvement in Meaghan's phonemic awareness as a result of the tutoring. However, the psychoeducational testing indicated mild dyslexia characterized by difficulties with accurate/fluent word recognition, poor spelling, and decoding. Meaghan's attention was also a concern and she also suffered with headaches.

Accommodations recommended to address Meaghan's dyslexia included extended time on tests, previewing instructional content, and not being penalized for misspelled words in content subjects. To address Meaghan's issues with written expression and dysgraphia, it was recommended that she receive copies of lecture notes so that she can check her notes for accuracy. Interventions included the LindaMoodBell and software programs designed to improve Meaghan's writing skills as well as the use of a laptop computer when completing written assignments and tests. In eighth grade, Meaghan transitioned to Dominican High School where she started to experience more attentional issues. She then attended Ben Franklin High School.

Many of Meaghan's issues in high school were the result of her testing into ninth grade honors classes when she was in eighth grade. Because of her dysgraphia and dyslexia, this significant increase in academic expectations resulted in her struggling to address them independently. To better meet these demands, Meaghan began taking medication. She was evaluated by Dr. James Barbee, M.D. and diagnosed with Attention Deficit/Hyperactivity Disorder. Medication, including Adderall was prescribed when she began high school. Meaghan is currently taking Adderall XR 30mg twice a day prescribed by Dr. Barbee. A short acting stimulant (dextroamphetamine 10 mg) was also prescribed for late afternoon to aid studying in the evenings. An Anxiety Disorder was diagnosed in 2014 and fluoxetine was prescribed to address Meaghan's mild anxiety.

After graduating from high school, Meaghan attended the University of Wisconsin, where she majored in biology and minored in environmental studies and global health. Meaghan stated that

3

Addendum:
April 19, 2019

Meaghan Doherty
Psychological /Educational Evaluation of March 31, 2017

she managed her attentional issues by carefully selecting her classes and reducing her course load to keep things manageable. Meaghan also earned 21 credits by taking Advanced Placement classes in high school. She stated that, although she did exceptionally well in school, she reported the most difficulty in classes where the exams included writing essays in a blue book in a very traditional fashion. Meaghan struggled to complete these exams satisfactorily and she tended to earn lower grades in these classes.

Meaghan has always been highly motivated and accustomed to being one of the best students in her class. During the interview, she reported that her self-esteem has been closely entwined with her academic success. As she matured, Meaghan became more comfortable with the diagnosis of Attention Deficit/Hyperactivity Disorder and dyslexia. She has addressed the challenges she experienced in proactive ways rather than trying to deny them.

Meaghan's challenges with test performance have been exacerbated since she began medical school. Because of the increased complexity and amount of information she's expected to learn and recite on tests, her grades have not reflected her learning. She is requesting accommodations so that testing will yield fair and unbiased measures of her learning.

In effect, the NBME is holding Meaghan's superior intelligence and hard work over the years to compensate for her attentional and learning disabilities against her. Meaghan has intuitively devised her own coping skills to succeed academically and in her daily life, is a testament to her superior intelligence and strong work ethic. Yet the NBME disregards that clear aspect of record to justify its determination that her own record militates against her receiving accommodations at this stage of her academic career, now that she faces high stakes testing of specialized knowledge, as the Step 2 Test.

The NBME concluded that Meaghan has no reading impairment by comparing her reading rate to the national average. The NBME based this conclusion on its view that the ADA determines disability in comparison to "most people in the general population." This is an outdated interpretation of the ADA. In fact, the ADA Amendments Act of 2008 made clear that Congress abandoned the "demanding standard" of strictly interpreting the ADA in favor of assessing an individual's disability in order to provide coverage under the act "to the maximum extent."

The correct comparison of Meaghan's reading rate is with the cohort on which the NDRT reading percentile scores are based, namely, other college educated students, not the general population. More specifically, she should be assessed in comparison to her fellow medical students sitting for the USMLE Step 2 Test. Again, the NBME is holding Meaghan's intelligence against her. The purpose of the ADA Amendments Act was to provide ADA coverage for disabilities, not block to accommodations for those with a diagnosed disability.

Meaghan's overall intelligence fell in the superior range, as would be expected by her MCAT score and pre-medical school academic record. However, in contrast to her superior intellectual

4

19-30661.222

Addendum:
April 19, 2019

Meaghan Doherty
Psychological /Educational Evaluation of March 31, 2017

abilities is the significant variability in her cognitive profile. A prime example of this is seen in her overall weakest score was noted in Processing Speed Scale, on a visually complex task, where she was asked to discriminate between symbols. Although her accuracy was perfect, Meaghan slowed her work speed in order to do her best. Timed measures have consistently underestimated her skills, even in areas where she was successful.

Significant variability was also noted in Meaghan's reading skills on the Wechsler Individual Achievement Test – Third Edition. The accuracy of her sight vocabulary fell in the high average range but Meaghan's decoding skills fell at the low end of the average range. The most remarkable observation was her slow reading and decoding speeds on these basic reading tasks. On the measure of her sight vocabulary, Meaghan's reading speed was slower than 90% of the students her age and her decoding speed was slower than 75% of students her age. These scores in addition to the measure of her Reading Speed on the NDRT, which fell in the borderline or slow learner range, indicated a Specific Learning Disorder with Impairment in Reading Rate (DSM-V 315.00 ICD-10 F81.0). Meaghan's slow reading speed resulting from her dyslexia creates a Functional Impairment for which the accommodation of extended time is needed to produce fair and unbiased measures of her skills on academic and daily tasks where reading is required.

The essence of Meaghan's disability is the impact her slow reading rate has on her executive functions. On the Behavior Rating of Executive Function – Adult Version, her overall score fell at the 95th percentile indicating clinically significant problems. Most of these were noted on the Metacognitive Scale where Meaghan's rating ranged from the 97th to the 99th percentile in the clinically significant range. The testing time limits of the Step 2 test exacerbate the effect of her disability.

In conclusion, Meaghan's superior intelligence places her overall scores above that of the general population. But that fact, taken in isolation, gives a distorted picture of the disability. Specifically, were Meaghan on average intelligence, the impact of her disability on her scores would be stark – placing her in the low range in overall performance and in the poor range for reading comprehension. It is her superior intelligence that makes it appear her reading disability has little impact on her ability to perform.

Contrary to what one would expect, given her overall intelligence level, Meaghan did poorly on the Step 1 Test, scoring at just passing. But that is not surprising given the fact that the NBME denied her accommodations request. In fact, her poor performance confirms the original evaluation findings.

It is indeed a shame that the NBME would construe the ADA Amendments in such a manner as to minimize this young lady's disability and hence penalize her for her superior intelligence as well as her excellent work ethic.

5

# TAB 12

MEAGHAN DOHERTY

## PESONAL STATEMENT REGARDING DISABILITIES
## AND THE ACCOMODATIONS REQUESTED TO ADDRESS THEM

I have been diagnosed with these disabilities:

a) Specific Learning Disorder with impairment in Reading rate (DSM-V 315.00 ICD-10 F81.0)
b) Attention Deficit/Hyperactivity Disorder-Combined Type (DSM-v 314.01 ICD-10F*)
c) Generalized Anxiety Disorder (DSM-V 300.02 ICD-10 F41.1)

I am requesting the following accommodations to address these disabilities:

1. Extended (150%) time for testing.
2. Testing room conditions that are free from distractions.

These diagnoses and accommodation requests are the result of the findings of M. Patricia Brockman, Ph.D., Louisiana Psychologist License No. 574, based on her psychological and educational evaluation in 2017 and the Addendum issued in April 2019.

Dr. Brockman's findings did not surprise me. As a child, the discrepancy between my high intellectual ability and my low reading and spelling ability was a source of serious consternation for my parents. I assumed they were overdramatic or hyper-critical because my grades were always excellent and I didn't think that my way of learning or writing was different from hat of my friends. I attributed any inadequacy that bothered me to my unique beginning and school. Specifically, I was tested and certified as gifted at the age of four. I spent kindergarten through second grade in a French Immersion program for half the day and gifted classes the other half. However, by the end of second grade my parents felt my English reading skills were not progressing adequately compared to my other abilities, so in third grade they enrolled me in a new school with the hope that I would benefit from the smaller class size. I was no longer in French Immersion or gifted. When the discrepancies in my performance on standardized tests, particularly spelling, did not improve, my parents decided to have me evaluated.

I vigorously resisted the evaluations. I was afraid I would be put in a separate program and treated differently than my classmates. I could not understand why they felt something was wrong with me even though I always made honor roll and my teachers told me I was a great student. The evaluation showed I had some learning disabilities -- dyslexia, ADHD, and low phonemic/grapheme awareness. My parents were satisfied that this accounted for the discrepancy in my performance, but oddly, minimized the impact they had on my performance. I refused all the accommodations the school offered me. I didn't think they would help. To me, the only positive result of my diagnosis was that my parents now had their answer and would leave me alone.

And this was how I continued for the next three years until I entered eight grade at Dominican High School and immediately tested into nine grade honors classes. This leap in

Page 1 of 4

19-30661.186

academic expectations was the first time I struggled in school and I was unable to keep up on my own. Though I feared I just wasn't smart enough to do well no matter how hard I tired, my parents recognized that I might be time for me to have some accommodation due to my learning disabilities. Reluctantly, I began taking Adderall for ADHD. I quickly realized it was a big help.

As a highly motivated student, accustomed to also being a top performer, my self-worth had become entwined with my academic performance. I only became comfortable admitting my diagnoses in high school when I realized that some classmates with ADHD needed accommodation in addition to their medication. I turned my learning disabilities into a badge of honor: I was smart enough to do well even without the recommended accommodations for people with ADHD. Though I didn't see it as such at the time, this was a counter-productive mentality. But it was reinforced by the skepticism I routinely encountered from people who could not understand how person with ADHD and dyslexia could also be gifted and a high achiever. I never felt comfortable asking for accommodations. To me, accommodations, and the stigma they carry, was an admission that there was something wrong with me; that I was inadequate compared to my classmates.

I have always believed in my ability to master anything and that if I just work hard enough I can improve academically without accommodation. But based on my performance on the exams in medical school, I know that it is not a lack of preparation, knowledge, or understanding, but a lack of time that is responsible for my poor performance (compared to the rest of my academic career).

The basis for my belief is the correlation between my performance on a medical school exam and the type of questions on the exam. On exams where the majority of questions were "NB<E" style (usually a paragraph long) my average score was around a 67 – which is failing. However, for exams that were mostly short questions (a sentence or two) my average score was an 85, which is the class average exam result. When I noticed this disparity in my performance, I realized that extra-time may be an accommodation that would help my academic performance and, more importantly, one that would more accurately reflect my knowledge and ability.

My testing style has always been to leave myself enough time at the end of an exam to return to the questions that may have caused me to "zone out" or become distracted. Unfortunately, with the time constrictions and question style on our exams, I wound up rushing through the whole exam and then guessing on the questions that I skipped on my first pass, simply because I have run out of time.

It took me the first semester of medical school to realize that my uncharacteristically poor performance on examination sis not due to lack of preparation or lack of knowledge of the material or poor test taking skills. I believe that I am now in a high performance educational environment in which I can no longer compensate for my ADHD on my own. Since my study habits and preparation are the same for all my exams, the disparity in my grades seems directly related to time and the type of questions on the exam. While part of me still fears that asking for accommodations may be held against me and diminish my accomplishments, I refuse to let ADHD or dyslexia stand between me and my becoming a doctor.

0008

19-30661.187

In January 2017, Tulane granted test taking accommodations to me. The results were positive. Based on the accommodation results and Dr. Brockman's findings, I formally requested test taking accommodation for STEP 1 from the NBME.

In January 2018, the NBME denied my request for accommodations. The results of my STEP 1 test were that I barely passed. In fact, the results jeopardized the likelihood of my obtaining an internship and residency program. Ironically, my STEP 1 results are the strongest proof of the factual validity of my original accommodations request and are the best evidence as to why the NBME should grant my present request for accommodations.

This is supported by my grades and clinical reviews during the ensuing eighteen months in medical school that have passed since I requested accommodations for STEP 1. I have attached my clinical evaluations and make them a part of my personal statement hereto.

I have been evaluated thirty-three times during the past year by faculty members and residents, based on a standard series of either seventeen or twenty-five questions, on which the possible score ranged from "excellent" to "meets expectations" to "does not meet expectations." I was evaluated by twenty-two Tulane Medical School Faculty members and ten Tulane Residents at three different hospitals.

In summary, based on these series of questions, of the twenty-three physician faculty members evaluators, twenty gave me scores of "excellent," nine gave me scores of "meets expectation," and no evaluators scored me at "does not meet expectation"; which means of the total raw questions, I received a score of "excellent" on 59% and a score of "meets expectations" on 40% of the questions. 0% were scored as "does not meet expectations."

Of the ten residents who evaluated my clinical performance, five gave me scores of "excellent," seven scored me at "meets expectations," and no evaluators scored me at "does not meet expectations." The percentage breakdown here was I received an "excellent" score on 53% of the questions and a "meets expectations" on 46%; 0% were scored as "does not" meet expectations."

These evaluations were done following two to six week rotations in which the evaluator observed and questioned me on a regular basis. These scores reflect my abilities as would be indicated by my performance on the MCAT and the ACT, which are the opposite of my score on STEP 1.

Throughout all my clerkships I have consistently performed well on the wards. More significantly, I have performed well on the end of Clerkship NBME Shelf exams, which I have taken with accommodations of 150% of time. During my third year of medical school my shelf exam scores ranged from 40th percentile to the 76th percentile. This is in stark contrast to the approximately 10th percentile I scored on STEP 1, for which I received no accommodations.

When the NBME denied my request for accommodations for the STEP 1, it could still be argued that my request was based on speculation; but a lot has changed since then. When evaluated one-on-one by medical school faculty and residents, my record is strong. The

0009

19-30661.188

significance of this is that it highlights both my learning style and my disability. When interacting one-on-one with my professors (or patients), I do not have to work through the barrier of mentally processing the written word in order to determine the nature of the issue at hand and how to respond to it. In contrast, the format of a STEP test question interposes the barrier (for me) of the written word, which requires extra attention and focus on my part to work my way through analyzing the issue and determining my response.

My performance on STEP 1 left me convinced that I don't have what it takes to be a doctor. However, my experience in clinical rotations and evaluations from faculty and residents lead me to see I am capable and that I can be a doctor. My shelf test results (for which I did receive accommodations) were good. I find myself in the unfortunate predicament of now having done well in my course work, clinical rotations, evaluations, and shelf exams, yet I do not perform up to that level on the STEP test question format.

So, I have asked myself again, "can I be a good doctor?" Looking at my first STEP score, one could conclude probably not. But I think that would be an inaccurate conclusion. It is also the opposite conclusion of twenty-three medical faculty members and ten practicing residents. The only difference between these two contrasting conclusions is that one is based on a standardized testing format for which my diagnoses handicaps my performance and the other is based on an evaluation format wherein my diagnoses do not come into play.

My request for accommodations is based on my diagnoses, Dr. Brockman's evaluation and addendum to her original evaluation, my STEP 1 score, my clinical evaluation scores, and my shelf exam results for which I did receive accommodations. For these reasons and the documentation I have submitted and attach hereto, I respectfully request accommodations for the STEP 2 test.

Meaghan Doherty
May 17, 2019

0010

19-30661.189