No. 19-30661

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

MEAGHAN DOHERTY,

*Plaintiff - Appellee*

v.

NATIONAL BOARD OF MEDICAL EXAMINERS,

*Defendant - Appellant*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA, NO. 2:19-CV-11790,
HONORABLE GREG G. GUIDRY, PRESIDING

_____

**APPELLEE BRIEF OF MEAGHAN DOHERTY**

_____

Richard C. Stanley
Kathryn W. Munson
STANLEY, REUTER, ROSS,
  THORNTON & ALFORD, LLC
909 Poydras Street, Ste. 2500
New Orleans, LA  70112
Telephone: (504) 523-1580

*Counsel for Appellee Meaghan Doherty*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellee: | Counsel for Appellee: |
|---|---|
| Meaghan Doherty of New Orleans, LA | Richard C. Stanley of Stanley, Reuter, Ross, Thornton & Alford, L.L.C., New Orleans, LA |
| | Kathryn W. Munson of Stanley, Reuter, Ross, Thornton & Alford, L.L.C., New Orleans, LA |
| | Frances Olivier of Law Office of Frances M. Olivier, L.L.C., Metairie, LA |
| | William McGoey, Arabi, LA |

| Appellant: | Counsel for Appellant: |
|---|---|
| National Board of Medical Examiners | Eric Wolff of Perkins Coie, L.L.P., Seattle, WA |
| | Alison Caditz of Perkins Coie, L.L.P., Seattle, WA |
| | Robert Burgoyne of Perkins Coie, L.L.P., Washington, DC |

*/s/ Richard C. Stanley*
*Counsel of Record for Appellee*

i

## STATEMENT REGARDING ORAL ARGUMENT

The Court has directed that oral argument in this matter will be held on Monday, November 4, 2019.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS……………………………….i

STATEMENT REGARDING ORAL ARGUMENT…………………………ii

TABLE OF CONTENTS……………………………………………………iii

TABLE OF AUTHORITIES………………………………………………v

STATEMENT OF THE ISSUES………………………………………1

INTRODUCTION………………………………………………………… 2

STATEMENT OF THE CASE……………………………………………5

SUMMARY OF THE ARGUMENT………………………………………23

STANDARD OF REVIEW…………………………………………………24

ARGUMENT……………………………………………………………25

    I.    The district court properly exercised its discretion
to grant a preliminary injunction allowing Meaghan
Doherty a testing accommodation of time and a half
when taking the Step 2 CK exam…………………………….. 25

        A.    Meaghan's disability substantially limits her
reading and entitles her to a testing
accommodation under the ADA…………………………26

        B.    The time and a half accommodation was both
recognized and reasonable……………………………41

        C.    Meaghan demonstrated that being denied
accommodation cause her irreparable
harm that outweighed any harm to the NBME,
and that the accommodation would not

disserve the public interest or produce
any unfair advantage……………………………………..48

II.    The NBME's arguments to justify denying Meaghan
an accommodation for her reading disability are
unsupported by record evidence and inconsistent
with the legislative history of the ADA………………………..56

CONCLUSION……………………………………………………………63

CERTIFICATE OF SERVICE……………………………………………65

CERTIFICATE OF COMPLIANCE………………………………………66

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Badgley v. Law School Admission Council, Inc.*,
2000 WL 33225418 (N.D. Tex. Aug. 24, 2000)……………………………...34

*Bartlett v. New York State Bd. of Law Examiners*, 2001 WL 930792
(S.D.N.Y. Aug. 15, 2001)……………… 28, 31–32, 34, 37–38, 40, 43, 44, 62

*Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 WL 4040576
(S.D. Ohio Aug. 27, 2019)……..…………29-30, 33–34, 37, 48–49, 55, 60, 62

*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*,
2016 WL 1404157 (E.D. Pa. Apr. 11, 2016)…………………………………37

*Black v. Nat'l Bd. of Med. Exam'rs*,
281 F. Supp. 3d 1247 (M.D. Fla. 2017)……………………………………37

*Bonnette v. Dist. of Columbia Ct. of Appeals*,
796 F. Supp. 2d 164 (D.D.C. 2011)………………………………………...55

*Brock Servs., L.L.C. v. Rogillio*,
936 F.3d 290 (5th Cir. 2019)………………………………………………..24

*Doe v. Cape Elizabeth School District*,
832 F.3d 69 (1st Cir. 2016)…………………………………………………35

*Doe v. Skidmore College*,
2018 WL 3979588 (N.D.N.Y. Aug. 20, 2018)……………………………...41

*Glueck v. Nat'l Conf. of Bar Exam'rs*,
2018 WL 3977891 (W.D. Tex. Aug. 20, 2018)……………………………36

*Gonzales v. Nat'l Bd. of Med. Exam'rs*,
225 F.3d 620 (5th Cir. 2000)……………………………………..32–33, 40, 62

*Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*,
870 F. Supp. 2d 607 (S.D. Ind. 2012)................................................37

*K.P. v. City of Chicago SD #299*,
2015 WL 832355 (N.D. Ill. Feb. 25, 2015).....................................45

*Mancini v. City of Providence*,
909 F.3d 32 (1st Cir. 2018).............................................................38

*Mann v. La. High Sch. Athletic Ass'n*,
535 F. App'x 405 (5th Cir. 2013).....................................................37

*Martinez v. Matthews*,
544 F.2d 1233 (5th Cir. 1976)................................................25–26

*McKay v. Novartis Pharmaceutical Corp.*,
751 F.3d 694 (5th Cir. 2014)...........................................................56

*Mims v. Stewart Title Guar. Co.*,
590 F.3d 298 (5th Cir. 2009)...........................................................25

*Peters v. Univ. of Cincinnati*,
2012 WL 3878601 (S.D. Ohio Sept. 12, 2012)...............................30

*Rawdin v. Am. Bd. of Pediatrics*,
985 F. Supp. 2d 636 (E.D. Pa. 2013)..............................................45

*Robinson v. Hunt Cty., Texas*,
921 F.3d 440 (5th Cir. 2019)...........................................................25

*Rothberg v. Law Sch. Admission Council*,
102 F. App'x 122 (10th Cir. 2004)..............................................52–53

*Rush v. Nat'l Bd. of Med. Exam'rs*,
268 F. Supp 2d 673 (N.D. Tex. 2003).............30–31, 37, 42–43, 45, 60

*Speaks v. Kruse*,
445 F.3d 396 (5th Cir. 2006)...........................................................25

*Texans for Free Enter. v. Tex. Ethics Comm'n.*,
732 F.3d 535 (5th Cir. 2013)……………………………………………..24–25

## **LEGISLATIVE HISTORY**

ADA Amendments Act of 2008, Pub. L.
No. 110-325 § 2(b)(1) (2008)…………………………….……………….. 40, 57

154 CONG. REC. E1841-03 Sept. 18, 2008), 2008 WL 4272592…………..59

154 CONG. REC. H8286-03 (Sept. 17, 2008),
2008 WL 4240260……………………………………………....33, 58–59, 62

154 CONG. REC. S8342-01 (Sept. 11, 2008),
2008 WL 4180153………………………………………………………58

154 CONG. REC. S8475-01 (Sept. 12, 2008), 2008 WL 4185772…………...59

## **STATUTES**

42 U.S.C. § 12101………………………………………………………….27

42 U.S.C. § 12102………………………….……………...26–27, 29, 35, 39, 61

42 U.S.C. § 12189…………………………………………………………26

## **REGULATIONS**

28 C.F.R. § 35, App. C……………………………………………………36

28 C.F.R. § 36.105……………………..………27–29, 32, 34–36, 38–40, 57, 61

28 C.F.R. § 36.309……………………………………….28, 39–41, 56, 61

28 C.F.R. § 36, App. E……………………………………………………36

## **RULES**

Federal Rule of Appellate Procedure 41(b)…………………………………64

## **OTHER**

Suzanne E. Rowe, *Learning Disabilities and the American With Disabilities Act: the Conundrum of Dyslexia and Time*, 15 LEGAL WRITING: J. LEGAL WRITING INST. 165 (2009)…………………..35

# STATEMENT OF THE ISSUES

After an evidentiary hearing, the district court found that the "evidence and testimony clearly support that Plaintiff [Meaghan Doherty] has an impairment that substantially limits her in the major life activities of reading when compared to most people in the general population." ROA.804. Defendant, the National Board of Medical Examiners, argues this conclusion must be an abuse of discretion because a person who achieved the "elite" status of a medical student without earlier accommodations cannot be disabled under the ADA. The issues for this Court's review are threefold.

1.  Did the district court abuse its discretion in concluding that Meaghan Doherty was entitled to an accommodation under the ADA?

2.  Can a district court abuse its discretion by extending an additional time accommodation to a student with a reading disability where that accommodation is specifically identified in the regulatory text, and where the relevant examination is not intended to assess reading skills?

3.  May reasonable accommodations be denied to an individual with a reading impairment if she successfully self-accommodated her condition prior to entering medical school?

# INTRODUCTION

Starting as early as the fifth grade, Meaghan Doherty has spent her academic life seeking to overcome her learning disability. Early assessments showed that Meaghan performed poorly on reading-related tests even though she had mastered the relevant information. Though qualifying for accommodations, Meaghan refused to request them, preferring not to distinguish herself on account of her disability and instead to compensate for her deficiencies through a variety of adaptive self-help strategies. That only changed with her admission to medical school, and with Meaghan's discovery that her traditional self-help remedies left her lagging far behind her classmates. With updated testing and diagnostics, Meaghan applied for and received ADA accommodations from Tulane Medical School, including a time allowance of 150% time on certain tests. These accommodations allowed Meaghan to recover from a 20% deficit (on reading-intensive-prompt testing) to scores that were consistent with her performance on non-reading-intensive evaluations. In simple terms, the time allowance helped erase the limitation caused by Meaghan's reading disability. Given this history and life experience, she applied for (and the NBME denied) accommodations on her Step 1

examination. Predictably, the effect of her disability was evident in her Step 1 score of 200—a passing score, but only barely so, and well below the mean score on the exam.

Facing the even more consequential Step 2 CK exam, Meaghan again applied for accommodations. Consistent with an apparently restrictive view of granting accommodations to persons in "elite professional settings," *see* App. Br. at 26, the NBME again denied the requested accommodation on the ground that—in its view—Meaghan does not suffer from a disability under the ADA, and thus deserved no accommodation on the Step 2 CK. After a preliminary injunction hearing, including supplemental briefing, the district court granted the accommodation of increased testing time and ordered the NBME to release Meaghan's score. On a limited record, a motion panel of this Court stayed the district court's ruling pending this expedited appeal.

The record demonstrates that Meaghan has an impairment in her cognitive ability to read and decode writing, which impairment qualifies as a disability requiring a reasonable accommodation under the ADA. The district court did not err either in its analysis or its ruling. There are at least three assessments in the record that demonstrate Meaghan's

impairment and disability: (1) her reading rate in the 6th percentile (NDRT); (2) her reading rate at a pace slower than 90% of students her age (WIAT-III); and (3) her reading decoding at a rate slower than 75% of students her age (WIAT-III). The NBME does not counter this evidence with expert analysis or evidence of its own. It instead points to Meaghan's laudable success prior to medical school, which she achieved through her reliance on informal self-help strategies. The ADA, however, applies with equal force to high-performing students who have succeeded through self-help strategies. The ADA also contains no exception for those students who through hard work and determination earn admission to a professional school, where they, like Meaghan, for the first time may need the protections afforded by the ADA to be treated on an equal footing with their peers.

The district court properly understood and applied the ADA standards, found a qualified disability and ordered a reasonable accommodation. Meaghan took the Step 2 CK with an accommodation, but the NBME continues to withhold her score. With each passing day Meaghan falls behind her peers who were able to apply for medical residency positions on September 15th and who are already being

interviewed. Because the district court did not err on this record, the Court should affirm the ruling of the district court on an expedited basis.

## STATEMENT OF THE CASE

### I. Facts

This expedited appeal arises from a denial by the National Board of Medical Examiners ("NBME") of Meaghan Doherty's request for fifty percent extra time on the United States Medical Licensing Examination ("USMLE") Step 2 Clinical Knowledge ("CK") and, despite a preliminary injunction allowing her to take the exam with the requested accommodation, the NBME's continuing refusal to release the score for her to use on medical residency applications.

Since the fifth grade, Meaghan has been diagnosed with learning disabilities that directly impair her ability to read. *See* ROA.12. Specifically, in 2003, when Meaghan was ten years old, an evaluation conducted by Denise Nagim, M.C.D. CCC/SLP, revealed that, while Meaghan qualified as "gifted," she also displayed characteristics of dyslexia and dysgraphia based on a "grand discrepancy" between her intellectual and cognitive profile and her Phonological Awareness—a "necessary component in developing fluency in reading." ROA.12, 237-39,

242. Meaghan occasionally performed "poorly on reading related tests even though information has been mastered." ROA.238. The next year, Sister Sarah Ducey, Ph.D., noted that despite making "much improvement in phonetic awareness" Meaghan nonetheless displayed mild dyslexia, *see* ROA.235, as defined by the International Dyslexia Association as:

> [a] specific learning disability that is neurological in origin. It is characterized by difficulties with accurate and/or fluent word recognition and poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction. Secondary consequences may include problems in reading comprehension . . . .

ROA.235. Dr. Ducey's evaluation further indicated that based on the diagnosis of dyslexia, Meaghan may qualify for accommodations at school, including extended time on tests. ROA.235.

Despite these early diagnoses, Meaghan declined to seek the accommodations—including extended test time—she otherwise would have been entitled to because at her young age she did not want to be quarantined in a separate room during exams and feared the stigma surrounding those with learning disabilities. *See* ROA.14, 17. Meaghan instead overcame her disabilities in other ways. During elementary

-6-

school, Meaghan enrolled in tutoring services and used a computer more frequently in her classwork. ROA.14. In eighth grade she began taking Adderall to manage her ADHD. ROA.16. In high school she devoted additional time outside of school and in school by enrolling in additional study halls in lieu of other elective classes to fully read and comprehend her coursework. ROA.17. In college she also spent extended time in the library and at home preparing for her classes and for exams. ROA.18. For most of her academic career, these strategies were effective. Meaghan graduated from high school with a 3.75 GPA; she also took Advanced Placement classes and scored well enough on the associated exams to earn college credits. *See* ROA.63, 71. She attended the University of Wisconsin, graduating with a major in biology and minors in both global health and environmental studies. ROA.18. To pursue her goal of becoming a doctor, Meaghan took the MCAT and scored well enough to be admitted to both Tulane and LSU Medical Schools.[1] ROA.18. She

---

[1] Meaghan did not request an accommodation on the MCAT because the MCAT testing format provides for shorter questions and passages of paragraphs that apply to six or seven questions once read. ROA.50-51, 594. Using every second allowed, she was able to complete that test. ROA.19. Also, approximately one quarter of the MCAT is comprised of a math section that, as Meaghan testified, did not implicate her reading impairment. ROA.51.

returned home to New Orleans and enrolled at Tulane Medical School in August 2016. ROA.19.

The methods that Meaghan used previously to succeed despite her diagnosed disabilities, however, proved insufficient in the medical school environment. Meaghan immediately demonstrated a distinct disparity in the scores she earned on exams at Tulane, particularly exams with longer, vignette-style questions. ROA.19-20. These types of exams with longer "reading-intensive prompts" are referred to as "shelf" exams, and are comprised of questions from previous NBME-administered examinations, including the USMLE Step 1 and Step 2 CK. *See* ROA.22; *see also* ROA.121. A typical question on these types of examinations is provided below:

**Figure-1**

7.    A 9-year-old boy is brought to the physician because of progressive weakness and a purple-red discoloration over his cheeks and upper eyelids over the past 8 weeks. His symptoms began shortly after a camping trip, and he now is unable to climb stairs, walk long distances, comb his hair, or dress himself. His mother says that she was careful to apply his sunscreen on the trip and can recall no tick bites or exposure to poisonous plants. His only medication is a topical corticosteroid for several dry, scaly patches of the skin. He appears weak and lethargic. He is at the 75th percentile for height and 25th percentile for weight; he has had no change in his weight since his last examination 9 months ago. His temperature is 37.7°C (99.8°F), blood pressure is 110/68 mm Hg, pulse is 105/min, and respirations are 28/min. Examination of the skin shows a purple-red discoloration over the cheeks and eyelids, periorbital edema, erythematous plaques and scales over the elbows and knees, and flat-topped red papules over all knuckles. There is generalized weakness and atrophy of the proximal muscles. Which of the following is the most likely diagnosis?

    (A)  Dermatomyositis
    (B)  Duchenne's muscular dystrophy
    (C)  Eczema
    (D)  Lyme disease
    (E)  Psoriasis
    (F)  Rocky Mountain spotted fever
    (G)  Seborrhea
    (H)  Systemic lupus erythematosus

ROA.24, 121. Meaghan consistently scored almost twenty percentage points lower on these shelf exams in comparison with practical examinations comprised of shorter questions, even though both types of exams were administered on the same day, and both were meant to evaluate knowledge of the same substantive material. ROA.20. Meaghan traced the disparity in performance to the structure of the shelf exams, specifically, the amount of reading required in a short time frame on the shelf examinations. ROA.21.

Out of other options, Meaghan obtained in January 2017—for the first time and over thirteen years after first being diagnosed with a learning disability—an accommodation of additional time on examinations from Tulane. ROA.21, 190. In seeking this accommodation Meaghan submitted a letter from her treating physician, James G. Barbee, M.D. ROA.21, 224-25. Dr. Barbee began treating Meaghan in 2014, and reaffirmed Meaghan's diagnosis of ADHD. ROA.224. He recommended that Meaghan be granted "any available accommodations, specifically extra time for tests and an environment minimal of distractions." ROA.225. Meaghan also submitted the early evaluations of Denise Nagim and Dr. Ducey, conducted when she was in elementary

school, and a personal statement. ROA.21. Satisfied with this documentation, Tulane granted Meaghan time and a half on exams and further provided that she could take exams in a smaller, quiet testing area with other students who were receiving extended time and a proctor assigned for that time. ROA.21-22. Thereafter, Meaghan's test scores on the shelf exams improved almost twenty percent, placing her in line with the scores on her practical exams and "right in the middle of the class with everyone else." ROA.20, 26-27.

The ability to demonstrate one's aptitude on examinations in medical school, however, is only one component of becoming a licensed medical doctor. Prospective doctors also must pass a series of examinations administered by the NBME prior to becoming licensed: the USMLE Step 1, the Step 2 Clinical Skills ("CS"), the Step 2 CK at issue here, and the Step 3. ROA.22, 432. The USMLE assesses an examinee's ability to "apply knowledge, concepts, and principles and to demonstrate fundamental patient-centered skills." ROA.439. Once a student passes a step or step component, retakes are generally not allowed. ROA.434. Results from computer-based exams like the Step 2 CK are usually available three to four weeks after the test date. ROA.452. The NBME

advises that an examinee allow at least eight weeks to receive notification. ROA.452.

Advancement through Tulane Medical School likewise requires successful completion of the USMLE. Tulane students must pass Step 1 by the end of October in their third year. ROA.461. Those who fail must take a leave of absence until a passing Step 1 score is achieved. Students then must pass both Step 2 exams prior to graduating. ROA.461.[2] Those students who do not pass both Step 2 exams by April of their fourth year of medical school must take a leave of absence from Tulane until passing. ROA.461. While on leave, students are not eligible for federal financial aid, and leave is generally granted for only one year. ROA.464. At most, students may accumulate 24 months of leave for purposes of meeting the USMLE requirements. ROA.461. After 24 months of leave, Tulane will dismiss a student who has failed to meet the USMLE requirements. ROA.461.

USMLE scores also are considered when medical students apply for residency placement through the "Match" process, generally during their fourth year of medical school. ROA.34. While not technically required to

_____

[2] Step 3 is taken only after obtaining a medical degree. *See* ROA.434.

obtain a residency, most programs consider the score—or an explanation for the lack of a score—that a student obtains on the Step 1 and Step 2 CK exam. ROA.30-31. Not all medical students obtain matches with a residency program. ROA.78-79. Failure to complete a residency program generally means that, while obtaining a medical degree is still possible, practicing medicine is not. ROA.29. Residency applications generally open in September of each year and are reviewed on a rolling basis; this year, residency programs began accepting applications on September 15 and interviews are currently underway. ROA.78, 468. Invitations for interviews are generally extended throughout September and October, after which, students who have interviewed may "rank" their desired programs beginning in January and, finally, will be assigned to their matched program in March. ROA.78-79, 525.

Predictably, higher USMLE scores generally correlate with a higher likelihood of success in obtaining interviews and eventually matching within a preferred specialty. ROA.48-49, 474. Applying for residency with a low (or no) Step 2 CK score dramatically reduces the chances of a student obtaining interviews and their preferred (or any) match. *See* ROA.38-39. Unmatched students are eligible to participate in

the "scramble" (officially, the Supplemental Offer and Acceptance Program or "SOAP") wherein medical schools attempt to find placements for their unmatched students in a brief window of time in the following spring. ROA.79, 465. But the scramble process imposes additional limitations and procedural requirements and does not always lead to a residency placement. ROA.78-79.

In the light of the importance of the USMLE, the structural similarity of the Step 1 with those exams that Meaghan initially struggled with at Tulane, and because the extended time accommodation at Tulane enabled her to fairly display her knowledge and competence rather than her disability, Meaghan applied for an accommodation of additional time when registering for the USMLE Step 1. ROA.31. Meaghan submitted a personal statement, a Certification of Prior Test Accommodations from Tulane, and her medical records, including the evaluations of Denise Nagim, Dr. Ducey, and Dr. Barbee. ROA.255-58, 259.

In addition, prior to submitting this application, Meaghan was referred to M. Patricia Brockman, Ph.D., a Licensed Psychologist, for an "updated comprehensive psychological evaluation." ROA.195-218. Dr.

Brockman's assessment included a review of all previous medical records, diagnostic interviews with Meaghan and her father, self-assessments and questionnaires, observation throughout the assessment interviews and testing, and a battery of evaluations. Three findings on these evaluations revealed substantial impairments in Meaghan's reading skills:

(1)  The Nelson-Denny Reading Test (the "NDRT") provides a measure of vocabulary, reading comprehension, and reading rate, as well as an overall reading score. Meaghan's vocabulary placed her in the 41st percentile of students her age, but she could not complete the entire exam under standard timed conditions. ROA.205. When given extended time, her score improved modestly, placing her in 46th percentile. Her reading comprehension score in the 54th percentile placed her in the mid-average range. But the "most remarkable score" was her reading rate. That score, in the 6th percentile, placed Meaghan within the borderline or slow learner range and indicates a functional impairment that affects her ability to read in both day-to-day and complex learning situations. ROA.205, 218.

(2)    The Wechsler Individual Achievement Test-Third Edition ("WIAT-III") provides a "comprehensive measure of [Meaghan's] academic skills." ROA.206. The WIAT-III confirmed the "remarkable" impairment in reading rate: Meaghan's reading rate "was slower than 90% of students her age." ROA.211, 215.

(3)    The WIAT-III also identified problems with Meaghan's reading decoding in both speed and accuracy. The accuracy of her decoding was lower than 73% of students her age. Her reading decoding speed was slower than 75% of students her age. ROA.207, 215.

These scores reflected the persistence of Meaghan's "early and ongoing reading problems." ROA.206-07. The battery of examinations also revealed a link between timed conditions and Meaghan's ability to read effectively. In untimed settings where she could work at her own pace, Meaghan's reading comprehension on the WIAT-III improved to the high average range in the 87th percentile. ROA.208. Dr. Brockman noted Meaghan's overall intelligence and cognitive functioning otherwise fell in the "superior range," and many of her other scores assessing skills other than reading were indeed above average when compared to her age

-15-

group. *See* ROA.211-18. Even so, Dr. Brockman concluded that the test results, specifically the NDRT reading rate score in the 6th percentile, the WIAT-III reading rate score in the 10th percentile, and the WIAT-III reading decoding speed slower than 75% of students her age "indicated a Specific Learning Disorder with Impairment in Reading Rate (DSM-V 315.00 ICD-10 F81.0)." ROA.211. On the basis of this "Functional Impairment," Dr. Brockman recommended an accommodation of time and a half to compensate for Meaghan's learning disability to "produce fair and unbiased measures of Meaghan's skills on academic and daily tasks where reading is required." ROA.211-12.

The NBME denied Meaghan's accommodation request for the USMLE Step 1. ROA.251-52. In a two-page letter, the NBME's Disability Assessment Analyst characterized Meaghan's overall performance on the 2003, 2004, and 2017 evaluations as "within the Average to Above Average ranges and not indicative of impairment." ROA.251. The NBME also disputed the validity of the NDRT because its percentile scores use "a select group of about 500 college educated individuals" as a basis for comparison. ROA.251. Thus, the NBME disregarded Meaghan's reading rate score in the 6th percentile on the NDRT to conclude that she had not

demonstrated impaired reading skills. ROA.251-52. The NBME also cited Meaghan's previous academic successes without accommodations to support its conclusion that she does not have a substantial limitation in a major life activity as compared to most people, and thus should not be afforded any extra time. ROA.252. Notably, while the NBME cited the results of Meaghan's overall reading fluency on the WIAT-III, the letter did not address the reading rate or reading decoding results of that evaluation. ROA.252. While the letter is dated February 14, 2018, the NBME did not contact Meaghan with its rejection until six days later on February 20, 2018. ROA.43.

Rather than appeal that decision and risk delaying the start of her third year of medical school, Meaghan took the USMLE Step 1 without accommodations. ROA.32. The Step 1 scores measure "a student's understanding of important basic science concepts and the ability to apply that knowledge to the practice of medicine." ROA.483. The Step 1 score is "the only qualification that is universally acceptable for all applicants during interview season and prior to the [National Resident Matching Program]'s ranking deadline." ROA.483. The mean score for first-time examinees on that exam was 228 with a standard deviation of

21; USMLE set the passing score at 194. ROA.253. Meaghan scored a 200 on the Step 1 exam—6 points above passing but 28 points below the mean. ROA.253. And, this Step 1 score is essentially determinative of a student's ability to obtain a residency match:

**Figure-2**



Source: NRMP Data Warehouse

ROA.36, 483. As Figure-2 demonstrates,[3] across the board the range of Step 1 scores for applicants is markedly higher for students matched to

---

[3] Figure-2 depicts the interquartile ranges (the range of scores for applicants excluding the top and bottom quarters of the distribution) of Step 1 scores for medical students who gave consent to research. The

a preferred specialty, and Meaghan's score of 200 is *well below* the interquartile range scores of those matched to a preferred specialty in any field. ROA.483. For OB-GYN programs specifically, Meaghan's preferred residency placement, *see* ROA.35, her Step 1 score is well below that of matched students. Thus, Meaghan's unaccommodated score of 200 places her in the bottom quartile of all students and significantly hinders her chances of residency placement. Meaghan attributed her low Step 1 score not to a lack of knowledge or comprehension of the materials, but rather to her inability to read and process all the information in each question in the allotted time. ROA.32-33. Her score also was consistent with her pre-accommodation results at Tulane in similar tests, where her scores fell 20% below her scores on non-reading intensive tests. ROA.20. Matching students in 2018 scored "well above" the minimum passing score of 194. And the bottom quartile score of unmatched students in the OB-GYN specialty was above Meaghan's unaccommodated score. ROA.483.

---

horizontal bars represent median values for successful applicants and the vertical lines show the interquartile ranges. Figure-2 was reproduced from the original document with its original colorization, a black and white copy appears in the record on appeal. ROA.483.

Based on this low performance on Step 1, Meaghan again sought extended time on the USMLE Step 2 CK. ROA.180. She included in her April 22, 2019 application an addendum from Dr. Brockman noting "several important issues that [the NBME's letter] overlooked or failed to consider." ROA.219. First, while the NBME contended the NDRT's reliability is quite low because of its coefficient of 0.68, Dr. Brockman explained that coefficient only refers to test-retest reliability. ROA.219. Second, the NDRT is "one of the most widely administered reading tests in the nation and is used by many medical schools to gauge reading ability." ROA.219. Third, the addendum clarified that the percentile score is based on an educational level resembling the individual being tested, whereas other tests use general age norms as a basis for comparison. ROA.220. Fourth, the WIAT-III revealed reading and decoding speeds slower than 90% and 75% of students her age, respectively. ROA.223. These WIAT-III scores, along with the NDRT reading rate in the 6th percentile, fully support the conclusion that Meaghan is reading disabled. ROA.223.

But again, the NBME denied her request. ROA.178-79. And again, the NBME's almost three-month delay in reviewing and notifying

Meaghan of its decision created an additional hardship. The NBME notified Meaghan by email on July 15 that a decision had been reached, but it did not immediately advise her of the content of the decision. ROA.43, 317. Meaghan did not actually know that her request had been denied until the next day. ROA.44, 178. Even then she could not schedule her exam until she received a scheduling permit; which she obtained on July 18. ROA.45, 321. By then, the first available date for the USMLE Step 2 CK at a testing location within 300 miles of New Orleans was August 6, 2019. ROA.46. Meaghan immediately registered for that exam without accommodations. ROA.323.

## II. Procedural History

Within one week of the NBME's decision, on July 22, 2019, Meaghan filed an Application for Temporary Restraining Order With Equitable Relief and Order to Show Cause Why a Preliminary Injunction Should Not Issue in the United States District Court for the Eastern District of Louisiana. ROA.127. The district court denied the request for a temporary restraining order, but ordered an evidentiary hearing on the preliminary injunction request. ROA.537. After the hearing and supplemental briefing, the district court granted a preliminary

injunction and ordered the NBME to accommodate Meaghan with time and a half on the August 6th Step 2 CK exam. ROA.3, 798-807. Meaghan sat for the exam with the time accommodation on August 6 and 7, 2019. ROA.937. The NBME filed the present appeal on August 9, 2019. ROA.808.

The NBME subsequently moved the district court to clarify whether the district court's order granting the preliminary injunction also required the NBME to release Meaghan's exam score to her. ROA.883. Finding the NBME's request to be "rather disingenuous," the district court denied the motion and ordered the NBME to release Meaghan's score to her "in the same manner and at the same time as those of all other examinees taking the Step 2 CK Examination on or about August 6 and 7, 2019." ROA.988-990. Rather than disclose the test score, however, the NBME moved to stay the injunction pending appeal. On a limited record, a motion panel of this court granted the stay 2–1. ROA.991. Thus, while Meaghan has taken the Step 2 CK with the requested accommodation, her score remains withheld and has not been released to her.

## SUMMARY OF THE ARGUMENT

The district court correctly recognized from the clinical evidence and testimony presented that Meaghan Doherty is an individual with a disability under the ADA because she suffers from specific learning disabilities affecting her ability to read, including dyslexia, ADHD, and generalized anxiety disorder. The evidence also demonstrated that Meaghan's impairments create a "grand disparity" between her cognitive profile and her reading fluency. This disparity caused by her disability requires a reasonable accommodation of time and a half in reading-intensive exams like the Step 2 CK. Because the Step 2 CK is designed to test clinical knowledge, not reading, Meaghan gains no unfair advantage with this accommodation. Rather, only with such an accommodation can Meaghan fairly be tested on her knowledge, and not her disability. The NBME's resistance to allowing this lawful accommodation and refusal to release Meaghan's accommodated Step 2 CK score irreparably harms Meaghan's efforts to obtain a medical residency—a requirement for becoming a licensed physician—and impedes her progress toward becoming a physician.

The NBME's argument that Meaghan is not entitled to accommodation because of her academic success prior to medical school ignores the record evidence and is inconsistent with the legislative history of the ADA. Prior to medical school, Meaghan found other ways to adapt and succeed academically despite her impaired reading ability, and the district court found her explanation for not seeking formal accommodation earlier credible. No contrary evidence was offered. Moreover, the legislative history of the ADA evidences the intent of Congress to ensure that individuals who successfully manage their disabilities through their own adaptive strategies are not later penalized when seeking protection under the ADA.

Meaghan is entitled to an accommodation under the ADA, the NBME's arguments to the contrary are without merit, and the district court's grant of a preliminary injunction should be affirmed in all respects and the mandate expedited.

## STANDARD OF REVIEW

A district court's grant of a preliminary injunction is reviewed for abuse of discretion. *Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 295 (5th Cir. 2019) (citing *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732

F.3d 535, 537 (5th Cir. 2013)). A district court abuses its discretion where it "bases its legal analysis on an erroneous understanding of the governing law[.]" *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 304 (5th Cir. 2009). No such abuse occurred here. The district court thoroughly developed the factual basis of Meaghan's claims, applied the correct legal analysis, and reached no factual conclusion that is clearly erroneous.

## ARGUMENT

**I. The district court properly exercised its discretion to grant a preliminary injunction allowing Meaghan Doherty a testing accommodation of time and a half when taking the Step 2 CK exam.**

To obtain a preliminary injunction, the moving party must establish (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Robinson v. Hunt Cty., Texas*, 921 F.3d 440, 451 (5th Cir. 2019); *see also Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006). Mandatory preliminary relief will be granted where the law "clearly favors" the movant. *See Martinez v.*

*Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). Meaghan has satisfied each part of the test, and the district court's grant of a mandatory preliminary injunction was proper both under the facts and clearly established law.

## A. Meaghan's disability substantially limits her reading and entitles her to a testing accommodation under the ADA.

Under Title III of the Americans with Disabilities Act ("ADA"), persons offering "examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. An individual is disabled under Title III of the ADA if she has "a physical or mental impairment that substantially limits one or more major life activities" or a "record of such impairment[.]" 42 U.S.C. § 12102 (1)(A)–(B). "[M]ajor life activities" include, *inter alia*, "learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Congress did not specifically define when an impairment "substantially limits" a major life activity, other than to clarify that it "shall be interpreted consistently with the findings and

purposes of the ADA Amendments Act of 2008." 42 U.S.C. § 12102(4)(B).

The findings and purposes of the ADA, as amended, make clear that

disabled individuals may be subject to various forms of discrimination,

including, *inter alia*, "exclusionary qualification standards and criteria."

42 U.S.C. § 12101(a)(5). The ADA thus provides both "a clear and

comprehensive national mandate for the elimination of discrimination"

against disabled individuals and "clear, strong, consistent, enforceable

standards addressing discrimination" against disabled individuals. 42

U.S.C. § 12101(b)(1)–(2).

The definition of "substantially limits" comes from Department of

Justice regulations implementing Title III of the ADA. Those regulations

provide that an impairment is a disability if it "substantially limits the

ability of an individual to perform a major life activity as compared to

most people in the general population." 28 C.F.R. § 36.105(d)(1)(v). The

regulations further clarify that "'[s]ubstantially limits' is not meant to be

a demanding standard" but rather "shall be construed broadly in favor of

expansive coverage, to the maximum extent permitted by the terms of

the ADA." 28 C.F.R. § 36.105(d)(1)(i). Accordingly, "[a]n impairment does

not need to prevent, or significantly or severely restrict, the individual

from performing a major life activity in order to be considered substantially limiting." 28 C.F.R. § 36.105(d)(1)(v). Instead:

> the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. . . . someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population."

28 C.F.R. § 36.105(d)(3)(iii); *see also Bartlett v. New York State Bd. of Law Examiners*, No. 93-4986, 2001 WL 930792, at *37 (S.D.N.Y. Aug. 15, 2001).

In making this individualized determination, the conditions, manner, and duration of time it takes the individual to perform the major life activity, as compared to most people in the general population, may be considered. 28 C.F.R. § 36.105(d)(3)(i). Considerable weight must be afforded to documentation of past accommodations or modifications received in similar testing situations when  considering a request for accommodations, 28 C.F.R. § 36.309(b)(1)(v), but the ameliorative effects of mitigating measures, including medication, assistive technology, reasonable accommodations, or learned behavioral modifications may not

be considered when determining whether an impairment substantially limits a major life activity. 42 U.S.C. § 12102(4)(E); *see also* 28 C.F.R. § 36.105(d)(1)(viii). Because the "primary object of attention in cases brought under Title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred . . . the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis." 28 C.F.R. § 36.105(d)(1)(ii).

This threshold issue is satisfied where a plaintiff claiming disability under the ADA provides evidence, including evaluations and diagnoses, indicating a substantial limitation in a major life activity. For example, in *Berger v. Nat'l Bd. of Med. Exam'rs*, No. 1:19-cv-99, 2019 WL 4040576 (S.D. Ohio Aug. 27, 2019), *appeal docketed*, No. 19-3885 (6th Cir. Sep 19, 2019),[4] the court relied in part on results from the NDRT as evidence showing "impairments in reading fluency, processing speed, and ADHD which substantially limit the major life activity of reading as compared to most people in the general population." *Id.* at *21. To obtain an

---

[4] According to the docket of the Sixth Circuit, this appeal has been set for mediation on November 19, 2019.

extended time accommodation on the Step 2 CK, Berger submitted the results of an extended-time NDRT revealing "significantly lower" reading comprehension when compared to the "national norms for these tests" not Berger's "intra-subjective comparison with his own abilities." *Id.* at *8 (internal quotations and emphasis removed). A subsequent NDRT, conducted with the standard time limitation, placed Berger "in the 1st percentile on the reading comprehension section." *Id.* at *10. The "consistently low scores on several assessments that tested Mr. Berger's reading comprehension, processing speed, and attention" established a substantial likelihood of success on the merits of an ADA claim. *Id.* at *21; *26; *see also Peters v. Univ. of Cincinnati*, 1:10–CV–906, 2012 WL 3878601, at *6 (S.D. Ohio Sept. 12, 2012) ("[T]he evidence put forth shows that Plaintiff's ADD affected her ability to learn and retain new information and that she struggled more than the average person with organizing her thoughts and registering information.").

Similarly, the court in *Rush v. Nat'l Bd. of Med. Exam'rs*, 268 F. Supp. 2d 673 (N.D. Tex. 2003), relied on the results of a Woodcock-Johnson III test to find the plaintiff established a substantial likelihood of success on the merits of an ADA claim. Specifically, the Woodcock-

Johnson III test showed that the plaintiff had "low reading efficiency caused by a very low or very weak reading processing and decision speed." *Id.* at 676–77. As in this case, no expert, other than the doctor who conducted the exams, clinically examined or assessed the plaintiff for a learning disability. *Id.* at 677. Based on that evidence the court found the plaintiff was "an individual with a disability under the ADA because he is substantially limited in the major life activities of reading and learning when compared to most people." *Id.* at 678.

And in *Bartlett*, 2001 WL 930792, then-Second Circuit Judge Sotomayor (sitting by designation in the Southern District of New York) found a dyslexic student was entitled to an extra-time accommodation on the New York Bar Exam because she exhibited a substantial limitation in the major life activity of reading. *Id.* at *51. In analyzing the issue, the court specifically disputed the assertion that disability should be based on the "quantitative outcomes alone." *Id.* at *37. Rather than rely merely on the "comfort of a test score," diagnoses of reading and learning disabilities must instead by supplemented with "clinical judgments[.]" *Id.* at *41. Accordingly, test scores alone cannot foreclose disability, where

"clinical observations more than sufficiently evidence . . . reading rate problems." *Id.* at *51.

The district court in this case correctly found that the "totality of the evidence and testimony presented in this case establishes that [Meaghan] is an individual with a disability under the ADA because she is substantially limited in the major life activities of reading when compared to most people in the general population." ROA.802. This finding is based upon the record evidence and clearly established law. Since the fifth grade, Meaghan has demonstrated diagnoses of dyslexia and struggles with reading based on a "grand disparity" between her cognitive profile and her reading fluency. *See* ROA.12, 237-39, 242. She achieved high levels of academic success throughout elementary school, high school, and college, without formal accommodations but rather through her determination to expend additional time or effort as needed to effectively read and comprehend the assigned materials. ROA.14, 16-17. But this does not mean she is not disabled. *See* 28 C.F.R. § 36.105(d)(3)(iii); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 633

(5th Cir. 2000) (Gilman, J., dissenting)[5] ("[I]f a student with severe reading difficulties can get reasonably high marks in school even though it takes him three times as long as the average person to read the required course materials, it would make little sense to say that he does not have a disability in reading."); *Berger*, No. 2019 WL 4040576, at *21.

Rather, Meaghan is disabled under the ADA because she is substantially limited in her reading ability, as the substantial weight of record evidence shows and as the district court properly concluded. The NDRT, using a basis of comparison of similar-aged college graduates, placed Meaghan in the 6th percentile. ROA.205-06, 218. This finding alone specifically places her within the borderline or slow learner range. ROA.205, 218. The findings of the WIAT-III evaluation separately demonstrate and support this conclusion: Meaghan's reading rate on that exam placed her as slower than 90% of students her age. ROA.211, 215. And, the WIAT-III showed that Meaghan's reading decoding speed is

---

[5] In enacting the 2008 amendments to the ADA, Congress rejected the findings of the majority in *Gonzales*. 154 Cong. Rec. H8286-03, H8291, 2008 WL 4240260 (response of Rep. Miller)("As such, we reject the findings in *Price v. National Board of Medical Examiners*, *Gonzales v. National Board of Medical Examiners*, and *Wong v. Regents of University of California*.").

slower than 75% of students her age. ROA.207, 215. That Meaghan's
other overall reading scores were generally within the average range is
no matter. A substantial impairment does not have to prevent, or even
"significantly or severely restrict, the individual from performing a major
life activity in order to be considered substantially limiting." 28 C.F.R. §
36.105(d)(1)(v). The record evidence demonstrates that Meaghan's
reading rate and decoding speed, when compared to students her own
age, is substantially limited within the meaning of the ADA, its
implementing regulations, and precedent.

The NBME neither objected to "nor for that matter controverted,"
ROA.53-55, 804, this medical evidence. Instead, the NBME now argues
that the basis of comparison renders these evaluations meaningless
within the context of the ADA. The NBME apparently asserts that the
similar-aged college graduates used as a basis of comparison on the
NDRT, and the similar-aged students on the WIAT-III, are not
representative of the "general population."[6] But neither the text of Title

---

[6] The NBME appears to dispute the applicability of the NDRT in general.
But the NDRT is an accepted method of diagnosing reading disabilities.
*See Berger*, 2019 WL 4040576, at *21; *Bartlett*, 2001 WL 930792, at *28;
*Badgley v. Law School Admission Council, Inc.*, No. CIV.A. 4:99-CV-
0103, 2000 WL 33225418, at *3 (N.D. Tex. Aug. 24, 2000) (finding results

III of the ADA nor its implementing regulations specifically define "most

people in the general population." *See* 42 U.S.C. § 12102(1)(A); §

12102(4)(B); 28 C.F.R. § 36.105(d)(1)(v), (vii). And the NBME offers no

workable definition either. It would make little sense, given the goal of

construing the term "'[s]ubstantially limits' . . . broadly in favor of

expansive coverage, to the maximum extent permitted by the terms of

the ADA" to essentially raise the bar for establishing disability by

requiring testing that uses a basis of comparison across the entire

population. 28 C.F.R. § 36.105(d)(1)(i). Who exactly should be included in

"most people in the general population"? The statute and regulation do

not specifically say.[7] The basis for the "substantially limits" comparison,

---

of NDRT and Woodcock-Johnson test "confirmed that previous
recommendations of double time on all sections of the LSAT . . . were
justified"); *see also Doe v. Cape Elizabeth School District*, 832 F.3d 69,
82–83 (1st Cir. 2016) (finding district court erred in disregarding*, inter
alia*, NDRT, without making any judgment as to the relevance of its
measures to identifying a specific learning disability); Suzanne E. Rowe,
*Learning Disabilities and the Americans With Disabilities Act: the
Conundrum of Dyslexia and Time*, 15 LEGAL WRITING: J. LEGAL WRITING
INST. 165, 191 (2009) (noting the NDRT is one of two "popular tests for
determining a subject's reading ability").

[7] To the extent the regulatory scheme provides guidance on this issue, a
finding of disability in this case is consistent. Title III's implementing
regulations, promulgated by the DOJ, endorse the guidance provided in

however, is not meant to be a "demanding standard" and "usually will

not require scientific, medical, or statistical evidence" to satisfy. *See* 28

C.F.R. §§ 36.105(d)(1)(i)–(vii).

The outcomes of Meaghan's performance on these evaluations

demonstrate that she is substantially limited in the major life activity of

reading as compared to most people in the general population.[8] *See*

_____

an appendix to Title II's implementing regulations. *See* 28 C.F.R. Pt. 36, App. E (citing 28 C.F.R. Pt. 35, App. C). That appendix states that "the ADA's protections should encompass people for whom the nature of their impairment requires an assessment that focuses on how they engage in major life activities, rather than the ultimate outcome of those activities." 28 C.F.R. Pt. 35, App. C. In reaching this finding, the DOJ quotes legislative history from the 2008 ADA Amendments providing that "[f]or the majority of the population, the basic mechanics of reading and writing do not pose extraordinary lifelong challenges; rather, recognizing and forming letters and words are effortless, unconscious, automatic processes. Because specific learning disabilities are neurologically-based impairments, the process of reading for an individual with a reading disability (e.g., dyslexia) is word-by-word, and otherwise cumbersome, painful, deliberate and slow—throughout life. The Committee expects that individuals with specific learning disabilities that substantially limit a major life activity will be better protected under the amended Act." *Id*.

[8] Plaintiffs who fail to demonstrate a likelihood of success on the merits fail generally because they do not set forth clinical diagnoses to demonstrate their claim of substantial impairment, which is not the case here. *See, e.g.*, *Glueck v. Nat'l Conf. of Bar Exam'rs*, No. SA-17-CV-451-XR, 2018 WL 3977891, at *5 (W.D. Tex. Aug. 20, 2018) ("The results consistently show Plaintiff demonstrated some deficiencies, but the

*Berger*, 2019 WL 4040576, at \*21; *Rush*, 268 F. Supp. 2d at 678; *Bartlett*, 2001 WL 930792, at \*36. *But see Mann v. La. High Sch. Athletic Ass'n*, 535 F. App'x 405, 412 (5th Cir. 2013) (reversing preliminary injunction where plaintiff submitted one doctor's report finding an anxiety disorder, and failed to "articulate or describe any particular way that [plaintiff] is substantially limited in any of these major life activities due to his anxiety disorder"). Thus, the "evidence showing that she has a history of impairment in reading based on current professional evaluations in accordance with the accepted standard of clinical review," ROA.802-03, established that Meaghan is disabled within the meaning of the ADA.

---

evaluators never concluded that these deficiencies substantially impair Plaintiff's abilities."); *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d 1247, 1251 (M.D. Fla. 2017) (finding no disability where, *inter alia*, none of plaintiff's providers' "reports or diagnoses show[ed] a 'substantial' limitation in comparison to the average person"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.*, No. CV 15-4987, 2016 WL 1404157, at \*10 (E.D. Pa. Apr. 11, 2016) (the "failure to produce sufficient evidence that her reading process is slow, labored, and difficult when compared to the general population is fatal to [the plaintiff]'s case"); *Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012) (finding that plaintiff did not show a substantial limitation as compared to general population, based on both plaintiff's "stellar academic record" in the absence of accommodations and psychologist testifying that his reading process skills were average).

Furthermore, the evidence supports the district court's conclusion that Meaghan's disability extends both to her "outcomes" and her "limitation" as against a relevant comparative group, whether it be the general population or her educated peers. *See* 28 C.F.R. § 36.105(d)(3)(iii) ("the focus is on *how a major life activity is substantially limited*, and not on what outcomes an individual can achieve") (emphasis added); *Mancini v. City of Providence*, 909 F.3d 32, 42 (1st Cir. 2018) ("whether this 'substantially limits' requirement has been satisfied calls for a comparison between the plaintiff's *limitations* and those of the majority of people in the general population.") (emphasis added); *Bartlett*, 2001 WL 930792, at *37 ("A definition of disability based on *outcomes* alone, particularly in the context of learning disabilities, would prevent a court from finding a disability in the case of any individual . . . who is extremely bright and hardworking, and who uses alternative routes to achieve academic success.") (emphasis added).

Meaghan has been diagnosed with dyslexia—a neurological impairment—since the fifth grade. ROA.237-39. That condition manifests itself by limiting Meaghan's ability to effectively convey and demonstrate her intellect which, as substantial evidence in the record

shows, is superior. The record supports that Meaghan has demonstrated a "grand disparity" in this regard for well over a decade, *i.e.*, the difference between Meaghan's actual intellect and her ability to convey it due to her reading disability. *See* ROA.12, 84, 237, 239, 242. Most people in the general population, of course, do not demonstrate this limitation. Meaghan's impairment, therefore, substantially limits her reading ability as compared to the general population.

Moreover, while the determination of whether Meaghan has substantial limitations must be made without regard to the effects, if any, of her prescribed medications or past reasonable accommodations, *see* 42 U.S.C. § 12102(4)(E); 28 C.F.R. § 36.105(d)(1)(viii), the NBME was required to give "considerable weight" to the documentation of past accommodations Meaghan received in similar testing situations—*i.e.*, the shelf exams at Tulane. 28 C.F.R. § 36.309(b)(1)(v). The NBME conflates these separate requirements, reasoning that Meaghan cannot be disabled because she did not seek accommodations prior to medical school at Tulane. But the question of whether an impairment substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population does not and cannot

depend on whether an individual sought prior accommodations. *See* 28 C.F.R. § 36.105(d)(3)(iii); *see also Bartlett*, 2001 WL 930792, at *37; *Gonzales*, 225 F.3d at 633. Though seeking and obtaining past accommodations should be considered to ensure that a broad scope of protection is afforded disabled individuals, the inverse does not follow. Nothing in the statute or regulations supports a reading that a failure to consistently seek accommodations in the past may be held against a disabled student in the present. *See* 28 C.F.R. § 36.309(b)(1)(v). Reading such a requirement into the law would defeat the "broad scope of protection" the ADA affords disabled individuals. ADA Amendments Act of 2008, Pub. L. No. 110-325 § 2(b)(1).

The district court properly concluded that, in denying her request for accommodation, the NBME erred by "ignor[ing] the record medical evidence documenting Plaintiff's disability, the description in evidence of how overcoming her disability inspired her activities, and more importantly her credible explanation for not seeking accommodations earlier in her academic career." ROA.804. The district court thus used the proper legal standard for assessing a disability under the ADA and properly applied its factual findings in this context. The court's

conclusion that Meaghan demonstrated a substantial likelihood of success of being deemed disabled under the ADA therefore is correct, and the NMBE has failed to submit anything that would warrant disturbing this finding on appeal.

### B. The time and a half accommodation was both recognized and reasonable.

"Reasonable accommodations are affirmative accommodations to ensure that facially neutral rules do not in practice discriminate against individuals with disabilities." *Doe v. Skidmore College*, No. 1:17-CV-1269, 2018 WL 3979588, at *4 (N.D.N.Y. Aug. 20, 2018) (internal quotations omitted). The ADA's implementing regulations specifically identify "changes in the length of time permitted for completion of the examination" as an accommodation that may be required by exam-offering entities. 28 C.F.R. § 36.309(b)(2). Unsurprisingly, the NBME provides a process for disabled examinees to receive extended time—that, of course, does "not change the testing format or the time-based system as applied to students without a documented disability within the meaning of the ADA." ROA.806. Nor is the cost and effort to provide an extra time accommodation burdensome. As the district court noted, it is "minimal." ROA.806. Extra-time accommodations are well recognized

under the law, and, as explained below, the NBME's refusal to accommodate Meaghan absent court intervention was irreparably harmful and contrary to the weight of the evidence presented.

An accommodation of extra time on the Step 2 CK also was appropriate because, like Step 1, the exam evaluates a student's mastery of the subject matter. "With a mastery test, the test taker either knows the material and passes the exam, or he does not know the tested-for material and fails the exam." *Rush*, 268 F. Supp. 2d at 675; *see also* ROA.452 ("Recommended performance standards for the USMLE are based on a specified level of proficiency. As a result, no predetermined percentage of examinees will pass or fail the examination."). The stated purpose of Step 2 CK is to assesses "the examinee's ability to apply the medical knowledge, skills, and understanding of clinical science essential for the provision of patient care under supervision, with an emphasis on health promotion and disease prevention."[9] ROA.440. In other words,

---

[9] Likewise, Step 1 "is designed to assess whether an examinee understands and can apply important concepts of the sciences basic to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy." ROA.253. Scores on the Step 1 are "influenced both by [an examinee's] general understanding of the basic biomedical sciences and the specific set of items selected for this Step 1 examination." ROA.253.

these examinations evaluate an examinee's understanding of "the basic science underlying medicine and one's ability to utilize that knowledge." *Rush*, 268 F. Supp. at 675. What the examinations do not measure, however, is reading comprehension or speed. *See id.*; *see also Bartlett*, 2001 WL 930792, at *42 ("the bar is not a reading rate test"). The Step 2 CK consists of approximately 316 multiple-choice questions, divided into eight 60-minute blocks. ROA.440.

While time constraints are "not of major consequence" for the majority of examinees, who possess the reading and processing efficiency needed to work through the test and the set of possible answers within the time constraints provided, "[t]his is not true . . . for individuals with reading disabilities." *Rush*, 268 F. Supp. at 675 (discussing the Step 1). For reading-disabled individuals, the time constraints effectively act as a barrier and limit the ability of a reading-disabled individual to be tested on one's knowledge or mastery—which the NBME acknowledges is the only purpose of the Step 2 CK—and instead reveals one's disability. *See id.* As the court in *Rush* explained:

> Decreasing the time needed to take a mastery test such as the USMLE by, for example, refusing a time accommodation for a person such as Plaintiff, is tantamount to increasing the difficulty of that test. By forcing an individual with a reading

> disability to adhere to prescribed time limits that do not allow him adequate time to process test information in effect makes the testing situation more difficult for him than for his peers. Another result of a lack of accommodation is that the exam does not test the person's mastery of the subject but instead tests the level of disability. Accommodating the needs of an individual with such a disability is a means of equalizing test demands and ensuring that he has a fair chance to display his mastery, or lack thereof, of the required medical materials.

*Id.* at 677; *see also Bartlett*, 2001 WL 930792, at *42 ("the extra time provided to learning disabled applicants merely levels the playing field and allows these individuals to be tested on their knowledge; it does not provide them with an unfair advantage"). Extended time accommodations are thus especially appropriate on exams such as the Step 2 CK, where the sole purpose of the examination is to assess clinical knowledge.

Nothing in the record supports the contention that the Step 2 CK is designed to assess reading comprehension or speed. *See* ROA.439, 484. The NBME submitted no evidence that the requested accommodation of time and a half was unreasonable, untenable, inappropriate, or would otherwise alter the fundamental nature of the examination for reading-disabled individuals, or that there is any correlation between the length of time an examinee has to complete the exam, and that examinee's

mastery of the subject matter. *Cf. K.P. v. City of Chicago SD #299*, No. 14 C 7296, 2015 WL 832355, at *10 (N.D. Ill. Feb. 25, 2015) (explaining that, unlike the accommodation in *Rush*, requesting an accommodation of a calculator on a math test designed to test computation skills defeats the very purpose of the exam and is unreasonable); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 655 (E.D. Pa. 2013) (explaining that testing agency presented evidence showing that requested accommodations of changing the format of an exam or allowing examinee to take it open-book would alter and lower the standard for certification). Nor could it. "With a mastery test, the test taker either knows the material and passes the exam, or he does not know the tested-for material and fails the exam." *Rush*, 268 F. Supp. 2d at 675. Extra time on a mastery test does not give the taker who does not know the material any advantage. But for an individual with a reading disability— specifically a reading disability stemming from impaired processing and decoding speeds—insufficient time essentially increases the difficulty of the exam, because the individual cannot process all the information within the allotted time and thus cannot demonstrate their mastery. *See id.*

The NBME cites legislative history indicating, by way of analogy, that "[a] person who can walk for ten miles continuously is not substantially limited in walking merely because on the eleventh mile, he or she begins to experience pain because most people would not be able to walk eleven miles without experiencing some discomfort." App. Br. at 29; *see also* 28 C.F.R. Pt. 36, App. C. The analogy is inapposite. Meaghan's reading ability is impaired from the first word to the last on every exam, but some kinds of testing scenarios exacerbate this impairment more than others. This hypothetical walker also is, presumably, being evaluated on their walking ability. If the Step 2 CK was meant to evaluate reading speed, comprehension, or some other skill relating to reading, the analogy may apply. But as explained above, the Step 2 CK is intended to evaluate mastery of clinical knowledge, not the ability to read rapidly. If a disabled individual is prevented from demonstrating clinical knowledge due to a life-long disability that substantially limits her reading speed and decoding ability, she is entitled to an accommodation under the ADA. Such an accommodation does not grant an unfair advantage when reading speed is not the object and purpose of the test.

Meaghan's performance in medical school is illustrative of this point. On practical exams and in clerkships she routinely exceeded expectations and demonstrated knowledge of the subject matter, *i.e.*, mastery. ROA.20, 55-56; *see generally* ROA.351-429. When afforded additional time on "shelf" exams—those modeled after the Step 1 and Step 2 CK—she likewise scored in line with her performance on these other practical exams. ROA.20, 26-27. If the NBME's argument were true—that extra time confers some benefit with respect to the individual's subject-matter knowledge, and thus affording extra time renders the exam unfair—one would expect that after obtaining additional time, Meaghan's shelf scores in medical school would exceed that of her practical exams, and likely that of her classmates. But the record reveals the opposite in Meaghan's case; after accommodations, she performed consistently with the class average and her practical exams. *See* ROA.20, 26-27, 28. An accommodation of extra time afforded her the ability to demonstrate the level of her mastery of the subject matter (which the law requires), rather than be discriminated against based on her reading disability (which the law forbids). That is all Meaghan requested. ROA.52. The accommodation granted by the district court is

recognized by the law, supported by the weight of the evidence, and wholly uncontroverted by anything submitted by the NBME, either here or in the proceedings below.

> **C. Meaghan demonstrated that being denied an accommodation caused her irreparable harm that outweighed any harm to the NBME, and that the accommodation would not disserve the public interest or produce any unfair advantage.**

The NBME not only wrongfully denied Meaghan's request for accommodations, it now continues to deprive her of her lawfully obtained score. As the district court correctly recognized, taking the exam without accommodations would irreparably harm Meaghan: (1) "in securing residency interviews and obtaining a match;" (2) "financially [by] having to pay for an additional year of tuition, as well as the delay in earning an income as a resident for an entire year;" (3) by "incur[ring] a permanent blemish on her academic record, which could not be removed;" and (4) by placing her "in very real danger of not being able to complete medical school." ROA.805.

Meaghan already has expended the time and effort of studying for and taking the Step 2 CK and this alone demonstrates irreparable harm. *See Berger*, 2019 WL 4040576, at *28 (noting irreparable harm exists

where delay in receiving accommodation would forego "the time and effort [plaintiff] has already expended in preparing for the exam and by the delay in his ability to apply for a residency program and practice his chosen profession."). Time is of the essence because residency placement is crucial—indeed necessary—to become a licensed physician. ROA.29. A delay in applying to programs could be (and possibly already has been) fatal to her placement during this cycle, as applications are reviewed on a rolling basis. ROA.78. Contrary to the NBME's assertion, waiting and applying through the "scramble" process or waiting until next year after taking a leave of absence to apply is likewise irreparably harmful, because Meaghan must always thereafter explain the reason for not applying in her fourth year of medical school, as her peers are doing now. *See Berger*, 2019 WL 4040576, at *28–29. The other harms identified by the district court become increasingly realized with each passing day.

The NBME did not mitigate the above-identified harms in the district court proceedings. Nothing it submits here changes that conclusion. The NBME attempts to dismiss the real and immediate harms to Meaghan's career and ability to one day practice medicine that would arise from a failure to match by noting that "Tulane

'recommend[s]' that students take the Step 2 CK before December 31 of their senior year to participate in the Match." App. Br. at 46 (quoting ROA.461). The NBME thus submits that it would be "difficult to imagine a medical school would recommend taking the exam by December 31, 2019 if, as Plaintiff asserts, doing so would irreparably harm her prospects in the application process." App. Br. at 46. This misconstrues Tulane's Medical Student Handbook. Tulane recommends that all students take *both* the Step 2 CS and Step 2 CK before December 31. These are two separate exams, and both should be taken by that date "to participate in the Match" at all, not necessarily to be successful in match placement. *See* ROA.461. Further, placement in the residency match, while required to become a licensed physician, is not necessarily required to graduate with a medical degree from Tulane. Thus, in addition to providing information concerning the ideal timeline for participation in the Match, Tulane's Handbook also provides information on graduation requirements that are wholly independent of the Match. *See* ROA.461. The Handbook further provides that students who do not pass the USMLE Step 1 prior to their third year must take a leave of absence until they do so, and students who do not pass both Step 2 exams by April of

their fourth year must also take a leave of absence until they pass. ROA.461. Conflating the timeline of the Match program with Tulane's somewhat more lenient graduation policies misses the immediate source of the irreparable and ongoing harm to Meaghan, that is, the inability to fully participate in the Match program now, with her lawfully-obtained Step 2 CK score.[10] The Tulane handbook acknowledges this difference, by informing students that interview season for residency matches runs from October to January. ROA.463.

At various points, the NBME also speculates that Meaghan is "likely to pass" the Step 2 CK, even without accommodations. App. Br. at 47–50. This argument misses the point. As explained above, the Step 2 CK is a mastery exam that serves multiple purposes. The passing score

---

[10] The NBME also asserts that Meaghan cannot establish harm because she "has until February 26, 2020 to verify her credentials for the 2020 Match, including a passing Step 2 CK score[.]" App. Br. at 46. This assertion appears to be based on the 2020 Main Residency Match Calendar issued by the National Residency Matching Program. ROA.465. The February 26 deadline is for the Rank Order List certification, *i.e.*, the deadline for students and programs to submit their rank order list. *See* ROA.78. The same document includes an "applicant late registration and Match withdrawal deadline" on that date. Although not explained in the record, it appears to refer to possible late registration to participate in the "scramble," or SOAP, which opens March 9. *See* ROA.465.

is used by medical schools, including Tulane, as a bare minimum requirement to graduate. *See* ROA.461. But the actual raw score is used to determine overall performance, and this score (or lack thereof) is considered by residency programs during the matching process. ROA.30-31. And, of course, the failure to complete a residency means one cannot become a licensed practicing physician. ROA.29. Therefore, the immediate, irreparable harm to Meaghan stems from her diminished chances of obtaining a residency without her score as achieved with the use of the extra-time accommodation she is afforded by law. The harm to Meaghan is irreparable and substantial, and increases every day that her score is withheld as she continues to fall further behind in the residency placement process. Time, therefore, is of the essence and the immediate release of the score is the only way to stop this accruing harm.[11]

---

[11] The present case is wholly distinguishable from *Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122 (10th Cir. 2004), which the NBME relies upon for the proposition that Meaghan "[a]t best, then, . . . can only allege a delay of her application [for residency positions], the next part of her graduate medical education." App. Br. at 48 (quoting *Rothberg*, 102 F. App'x at 126). As explained, whether Meaghan obtains a residency is not directly related to her enrollment in Tulane Medical School. Step 1 and Step 2 CK are both considered on residency applications, and failure to submit a Step 2 CK score must be explained. Furthermore, low Step 1 scores correlate with a low likelihood of successfully obtaining a match. Meaghan needed to take the Step 2 CK in August specifically because she

In contrast to the very real and personal irreparable harm accruing even now to Meaghan, harm to the NBME—let alone irreparable harm—has not been demonstrated at all. The NBME argues hypothetically that other test-takers will be disadvantaged if Meaghan's score is released to her, and that the validity of the exam somehow will be undermined. But as explained above, and as acknowledged in the NBME's filings, the Step 2 CK is not a curved exam, it is a mastery exam specifically designed to measure a student's proficiency in a given subject. A student's ability to demonstrate proficiency is independent and irrespective of the score of any other student. Meaghan has already taken the exam with accommodations. She either passed, or she did not. A different non-disabled student has already taken the exam without accommodations. They either passed, or they did not. One's failure does not open an additional spot for another to pass, nor does one's passing foreclose the

_____

was denied accommodations on the Step 1 and that score does not fairly reflect her abilities. ROA.523-25. An application with only her Step 1 score likely will not result in interviews or in a match placement. Meaghan needed her accommodated Step 2 CK score to balance the low Step 1 score and have a chance at receiving interviews during the interview season. ROA.39. Whereas in *Rothberg*, nothing required the plaintiff to apply to law schools now, failure to submit complete exam scores will impede Meaghan's ability to match now and irreparably harm her opportunities to pursue her chosen career path.

possibility of the other doing the same. And as explained above, the NBME submitted nothing to prove that the exam is meant to test reading speed or comprehension, or that extended time confers some unfair benefit on a disabled student. An accurate representation of the construct to be tested—here, mastery of clinical knowledge—is therefore crucial to the validity of the examination. It is the NBME's decision to deny Meaghan the opportunity to display that mastery that undermines the validity of the exam in her case, and in general by denying reasonable accommodations to disabled students and failing to comply with the ADA.

In an attempt to show harm, the NBME extends itself beyond its position as a neutral test administrator and holds itself out as an arbiter of the "fairness of the residency selection process." App. Br. at 52. The residency selection process, however, is administered by the National Resident Match Program. *See* ROA.465. Nothing in the record indicates that the National Resident Match Program is directly associated with the NBME. *See* ROA.465, 903. It is unclear how any harm (and, as explained above, there is none) arising from some hypothetical unfairness in the residency selection process is the NBME's to assert. Even taking this argument at face value, however, it fails. Hypothetically, Meaghan could

obtain a residency match in lieu of some other student. But this is not the type of imminent, concrete harm that, as the NBME acknowledges, courts require for a showing of irreparable harm. *See Berger*, 2019 WL 4040576, at *28; *Bonnette v. Dist. of Columbia Ct. of Appeals*, 796 F. Supp. 2d 164, 187 (D.D.C. 2011). It certainly cannot be true that obtaining a residency based on an accurate representation of one's mastery of a given subject (which, again, is all the Step 2 CK evaluates) is either unfair or harmful to another, less-qualified student, or to the NBME. *See also* ROA.94 (arguing that effectuating the purpose of the ADA serves the public interest). And finally, the NBME's argument regarding fairness to other test-takers contradicts its own position. The NBME acknowledges irreparable harm to other students should they be denied the opportunity to obtain their desired program in the residency match, yet blindly denies that precisely that same harm exists with respect to Meaghan if examined unfairly due to her disability.

The NBME has failed to identify any irreparable harm it would suffer in the district court and fares no better here.[12] But with each

---

[12] Also irrelevant are the NBME's repeated references to the fact that Meaghan turned to her mother, a practicing attorney, for immediate help with pursuing this case on an expedited basis in the district court. The

passing day, the substantial, irreparable harm to Meaghan identified by

the district court over two months ago continues to accrue.

## II. The NBME's arguments to justify denying Meaghan an accommodation for her reading disability are unsupported by record evidence and inconsistent with the legislative history of the ADA.

Just as the NBME's arguments regarding irreparable harm fail, so

too do its other attempts to establish some ground for reversal.[13]

---

district court filing was done within a week of the announcement by the NBME of its decision to deny accommodations to Meaghan, and reliance on a family member who was a lawyer was both a logical and natural decision under the circumstances. If the NBME's intended point was that her mother's appearance as counsel somehow affected the outcome, that suggestion is both baseless and unprofessional.

[13] The NBME spends over six pages of its brief with criticism of the nature of the proceedings below but did not identify (or argue in its briefing) anything in the procedural history of this case that warrants reversal. Any potential argument in this regard is thus appropriately deemed waived. *See McKay v. Novartis Pharmaceutical Corp.*, 751 F.3d 694, 706 n.6 (5th Cir. 2014) ("[A]n appellant abandons all issues not raised *and argued* in its initial brief on appeal[.]") (quotation omitted) (emphasis added). Moreover, the NBME reviewed Meaghan's request for over 80 days before rendering a decision. *See* 28 C.F.R. § 36.309(b)(1)(vi) (requiring a test-administering entity to respond "in a timely manner to requests for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities"). Any inconvenience from this expedited process was due in large part to the NBME's delay. Meaghan, by contrast, was unsure of her accommodation status, unregistered for any exam, and unaware of the impending need to retain counsel. The NBME had more than two months to consider and propose

Considering the NBME's arguments in light of the current state of the law, affirmance is the only way to ensure compliance with the ADA. Most troubling, the NBME makes passing concessions that it is subject to the ADA, but its arguments nonetheless evince a very thinly-veiled disregard for the statute as written and with its clearly established intent. Congress amended the ADA in 2008 to restore a "broad scope of protection for individuals with disabilities." ADA Amendments Act of 2008, Pub. L. No. 110-325 § 2(b)(1). The amendments clarified the standard for "substantially limits" and rejected the "inappropriately high" level of limitation necessary to obtain coverage previously established by the Supreme Court. *Id.*; *see also* 28 C.F.R. § 36.105(d)(1)(vi) ("the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for substantially limits applied prior to the ADA Amendments Act.").

---

its own justification for denying the requested accommodation. Any implication that the NBME was caught off guard and unprepared to submit evidence in support of its position, or somehow prejudiced by the temporary sealing of the case, is untenable in the light of this timeline.

In doing so, Congress specifically rejected the notion that an individual who has performed well academically cannot be substantially limited in their reading ability—a position that the NBME nonetheless promotes repeatedly in this appeal. *See* 154 CONG. REC. S8342-01, at *S8346 (Sept. 11, 2008), 2008 WL 4180153 ("it is critical to reject the assumption that an individual who has performed well academically cannot be substantially limited in activities such as learning, reading, writing, thinking, or speaking"); 154 CONG. REC. H8286-03, at *H8290 (Sept. 17, 2008) (question of Rep. Stark and response of Rep. Miller), 2008 WL 4240260; 154 CONG. REC. H8286-03, at *H8296 (Sept. 17, 2008) (statement of Rep. Courtney), 2008 WL 4240260 ("Too many individuals with documented learning disabilities, including dyslexia, are denied access to easily administered and often low-cost accommodations that would make the critical difference in allowing them to demonstrate their knowledge. These amendments to the ADA do not provide any special treatment, but rather, ensure that each individual with a learning disability has every opportunity to apply for and receive a reasonable accommodation so he/she can move forward in his/her chosen educational and career paths."). And, the House committee report specifically

explained that "an individual with an impairment that substantially limits a major life activity should not be penalized when seeking protection under the ADA simply because he or she managed their own adaptive strategies or received informal or undocumented accommodations that have the effect of lessening the deleterious impacts of their disability." 154 Cong. Rec. H8286-03, at *H8291 (Sept. 17, 2008) (statement of Rep. Miller), 2008 WL 4240260.

Moreover, the 2008 amendments did not impose heightened ADA standards for licensure and professional certifications: "nothing in the legislation affects the standards for professional certifications; and, . . . the legislation itself does not require that accommodations be extended where to do so would alter the fundamental nature of the services being provided." 154 Cong. Rec. S8475-01 (Sept. 12, 2008) (statement of Sen. Enzi), 2008 WL 4185772; 154 Cong. Rec. E1841-03, at *E1842 (Sept. 18, 2008) (extended remarks of Rep. Miller), 2008 WL 4272592 ("[w]e expect that the less demanding standard applied to the definition of disability will allow students and *licensure candidates* with documented disabilities to more readily access appropriate accommodations on examinations when needed.") (emphasis added).

As explained above, the NBME has submitted nothing to show that extending Meaghan the accommodation she has requested would alter the fundamental nature of the exam.[14] The NBME otherwise submits two general arguments for denying Meaghan an accommodation: first, the NBME seeks to hold Meaghan's perseverance in spite of her diagnosed disabilities and her refusal to request accommodations until it was absolutely necessary against her. This argument misconstrues the statutory and regulatory framework of the ADA. The determination of disability is separate and distinct from the question of whether an accommodation is reasonable, and the ADA and its implementing

---

[14] Both in its motion for a stay and again in its brief to this court, the NBME refers to the undergraduate college admissions scandals recently reported in the news. This open and outside-of-the-record allusion to the undergraduate admissions scandals underscores that the NBME has no substantive basis in the record to support its position, instead choosing to align itself with off-point media. As the Court likely knows, those scandals involved, *inter alia*, unlawful payments by parents to officials associated with undergraduate admissions and had nothing to do with a disabled student seeking a reasonable accommodation. In fact, that the NBME would equate a request for an ADA accommodation with plainly unlawful conduct illustrates an implicit bias against compliance with the standards that the ADA requires of it. More to the point would be the reported cases in which the NBME must repeatedly (and often unsuccessfully) defend its denials of ADA accommodations in court. *See Berger*, 2019 WL 4040576, and *Rush*, 268 F. Supp. 2d 673.

regulations do not establish a "use it or lose it" scheme. Past reasonable accommodations may not be considered when determining whether an impairment substantially limits a major life activity, *i.e.*, whether an individual is disabled. 42 U.S.C. § 12102 (4)(E); *see also* 28 C.F.R. § 36.105(d)(1)(viii). But past documentation of such accommodations, in similar testing situations, must be afforded considerable weight when considering whether to grant an accommodation. 28 C.F.R. § 36.309(b)(1)(v). Meaghan made that showing here. As explained above, her performance on the shelf exams at Tulane pre- and post-accommodation, and on the Step 1 exam, all support the conclusion that an accommodation of extended time on examinations that are not designed to test reading speed or other reading skills is reasonable given her disability.

Second, the NBME argues that Meaghan's prior success throughout her academic career, and status in "elite peer groups at college or medical school or elite professional settings," App. Br. at 26, somehow establishes that she cannot be disabled in her reading ability when measured against the general population. Apart from its surprising tone, this argument has been expressly repudiated by Congress, the DOJ's implementing

regulations, and by subsequent courts construing the ADA. While the Court need not reach the issue here, the NBME is wrong to say that the ADA has no relevant application in the context of "elite peer groups at college or medical schools or elite professional settings." App. Br. at 26. If accepted, this argument would both render the "general population" language meaningless in these settings and effectively create an exception for impaired-though-high-performing individuals that is found nowhere in the statute. Learning- and reading-disabled students often find ways to succeed academically, utilizing other strategies, expending additional time on their own, and, when necessary, seeking accommodations to ensure that their knowledge, not disability, is displayed. *Gonzales*, 225 F.3d at 633 (Gilman, J., dissenting); *Berger*, 2019 WL 4040576, at *23; *Bartlett*, 2001 WL 930792, at *38. Congress specifically sought to ensure that individuals are not "penalized when seeking protection under the ADA simply because he or she managed their own adaptive strategies." 154 CONG. REC. H8286-03, at *H8291 (Sept. 17, 2008) (statement of Rep. Miller), 2008 WL 4240260. The ADA seeks to correct for and accommodate limitations caused by disabilities—including reading and learning disabilities—not relegate the disabled to

second-tier status within "elite professional settings" because they have achieved higher outcomes than those not within those elite peer groups. A conclusion that the plain language of the ADA applies to all, notwithstanding their academic success, removes the stigma surrounding learning disabilities, incentivizes students with those disabilities to further their academic careers by all available means (both through their own ingenuity and with the accommodations afforded under the law), ensures that limitations, not outcomes, are determinative, and restores the "broad scope of protection" Congress sought when it implemented the ADA and reinforced in the 2008 amendments.

## CONCLUSION

The district court properly exercised its discretion to grant a preliminary injunction allowing an accommodation under the ADA for Meaghan Doherty and ordering the National Board of Medical Examiners to release her accommodated score. As harm to Ms. Doherty continues from the NBME's actions in initially denying her this accommodation and then refusing to release her lawfully obtained score, Ms. Doherty respectfully requests that the district court promptly be

affirmed in all respects, the stay lifted, and, pursuant to Federal Rule of

Appellate Procedure 41(b), requests that the Court expedite the mandate.

Respectfully submitted,

*/s/ Richard C. Stanley*
Richard C. Stanley, La. Bar No. 8487
Kathryn W. Munson, La. Bar No. 35933
STANLEY, REUTER, ROSS, THORNTON
   & ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile: (504) 524-0069
rcs@stanleyreuter.com
kwm@stanleyreuter.com

*Attorneys for Meaghan Doherty*

## CERTIFICATE OF SERVICE

I certify that on October 15, 2019, the foregoing document was served, via the Court's CM/ECF Document Filing System, on all counsel of record.

/s/ *Richard C. Stanley*
Richard C. Stanley, La. Bar No. 8487
Kathryn W. Munson, La. Bar No. 35933
STANLEY, REUTER, ROSS, THORNTON
  & ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile: (504) 524-0069
rcs@stanleyreuter.com
kwm@stanleyreuter.com

*Attorneys for Meaghan Doherty*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) this document contains 12,974 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in New Century Schoolbook LT size 14 font.

*/s/ Richard C. Stanley*