Appeal No. 19-30661

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

*MEAGHAN DOHERTY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

---

On Appeal from the United States District Court for the
Eastern District of Louisiana, Case No. 19-11790

---

**REPLY BRIEF OF DEFENDANT-APPELLANT
NATIONAL BOARD OF MEDICAL EXAMINERS**

---

Robert A. Burgoyne
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Eric B. Wolff
Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# TABLE OF CONTENTS

**Page**

Table of Contents........................................................i

Table of Authorities.................................................ii

Introduction .........................................................1

Argument ...............................................................3

    I.    Plaintiff tries to avoid the critical issue—whether she is substantially limited compared to most people. ...................................3

    II.   Plaintiff's other arguments on the merits are inconsequential.............................12

    III.   Any alleged harm to Plaintiff is not irreparable and cannot outweigh the harm to NBME, other test-takers, and the public if the injunction is granted. ................................25

Conclusion...............................................................31

Certificate Of Compliance.....................................32

Certificate Of Service .........................................33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bartlett v. N.Y. State Bd. of Law Exam'rs*,
  2001 WL 930792 (S.D.N.Y. Aug. 15, 2001).......9, 11, 19, 22

*Bartlett v. N.Y. State Bd. of Law Exam'rs*,
  226 F.3d 69 (2d Cir. 2000) ...................................................6

*Bartlett v. N.Y. State Bd. of Law Exam'rs*,
  970 F. Supp. 1094 (S.D.N.Y. 1997) ...........................passim

*Bercovitch v. Baldwin Sch., Inc.*,
  133 F.3d 141 (1st Cir. 1998) .................................................3

*Berger v. Nat'l Bd. of Med. Exam'rs*,
  2019 WL 4040576 (S.D. Ohio Aug. 27, 2019) ...........passim

*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*,
  2016 WL 1404157 (E.D. Pa. Apr. 11, 2016)........6, 8, 21, 24

*Black v. Nat'l Bd. of Med. Exam'rs*,
  281 F. Supp. 3d 1247 (M.D. Fla. 2017) ........................7, 24

*Cannon v. Jacobs Field Servs. N. Am., Inc.*,
  813 F.3d 586 (5th Cir. 2016)................................................4

*Collins v. Prudential Inv. & Ret. Servs.*,
  119 F. App'x 371 (3d Cir. 2005).........................................14

*Doe v. N.Y. Univ.*,
  666 F.2d 761 (2d Cir. 1981) ..............................................27

*EEOC v. Chevron Phillips Chem. Co., LP*,
  570 F.3d 606 (5th Cir. 2009)..............................................15

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

*Glueck v. Nat'l Conf. of Bar Exam'rs*,
　2018 WL 3977891 (W.D. Tex. Aug. 20, 2018) ..................24

*Gonzales v. Nat'l Bd. of Med. Exam'rs*,
　225 F.3d 620 (6th Cir. 2000) ...............................14

*Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.*,
　870 F. Supp. 2d 607 (S.D. Ind. 2012) ..........................15, 22

*Hetherington v. Wal-Mart, Inc.*,
　511 F. App'x 909 (11th Cir. 2013) .....................................14

*Mancini v. City of Providence*,
　909 F.3d 32 (1st Cir. 2018) ...................................3

*Mann v. La. High Sch. Athletic Ass'n*,
　535 F. App'x 405 (5th Cir. 2013) ........................4

*Martin v. Helstad*,
　699 F.2d 387 (7th Cir. 1983) ...............................27

*Neely v. PSEG Tex., Ltd. P'ship*,
　735 F.3d 242 (5th Cir. 2013) ...............................3

*Powell v. Nat'l Bd. of Med. Exam'rs*,
　364 F.3d 79 (2d Cir. 2004) ................................30

*Roth v. Lutheran Gen. Hosp.*,
　57 F.3d 1446 (7th Cir. 1995) ...............................28

*Rothberg v. Law Sch. Admission Council*,
　102 F. App'x 122 (10th Cir. 2004) .....................................27

*Ware v. Wyo. Bd. of Law Exam'rs*,
　973 F. Supp. 1339 (D. Wyo. 1997) ......................................25

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................25

**STATUTES**

42 U.S.C. § 12101, *et seq.* ............................................... passim

**RULES & REGULATIONS**

28 C.F.R. § 36.105 ........................................................ passim

28 C.F.R. § 36.309 ................................................................24

**OTHER AUTHORITIES**

A. Harrison & K. Harrison, *A Critical Analysis of
    the Nelson Denny Reading Test as a Method of
    Identifying Reading Impairment in Adults,"*
Psychological Injury & Law 17 (Jan. 2019) ....................6, 9

*Clinical Characteristics of Learning Disabilities*,
    National Center for Biotechnology Information,
    https://www.ncbi.nlm.nih.gov/books/NBK332886 ............17

## INTRODUCTION

Plaintiff Meaghan Doherty presents a lengthy personal narrative that tries to side-step the critical legal issue. The key question is this: Is this young woman, who scored so well on the ACT and MCAT and has achieved significant academic success without the need for any accommodations, disabled within the meaning of the ADA? The answer is clearly no. There is no evidence, not even from her own psychologist, that she reads below average compared to most people in the general population.

NBME is not arguing that a person who has excelled academically cannot be disabled under the ADA. But the threshold standard requires a comparison to the general population, not college-educated students, medical students, medical exam takers, or one's own perception of her knowledge and abilities. Other students no doubt have any number of disadvantages or relative deficits, but they do not get accommodations either unless they can show that they are disabled under the clear standard set by the ADA.

Moreover, Plaintiff has not established it is *likely* that she will suffer *irreparable* harm without an injunction. She

fears delay in beginning the residency match process right now. But she offers no case law suggesting a modest delay, without more, qualifies as *irreparable* harm. And the modest delay she fears is not *likely*. She can take the test without accommodations now and likely pass, or interview for a residency with Tulane regardless of her Step 2 CK score.

What she fears is not modest delay. It is losing a potential advantage related to achieving a *higher* passing score. That theory of harm, however, is double-edged. By recognizing that a higher score is better, Plaintiff must concede that her advantage comes at the expense of other test-takers. She claims otherwise, but her insistence on the harm she may suffer—not getting the best residency match—demonstrates harm to others if Plaintiff receives an unfair advantage.

The Court should reverse the preliminary injunction. It is not a question of Plaintiff being penalized for not requesting accommodations over the course of her educational history. It is a question of applying a straightforward legal standard to facts that even her own psychologist agrees do not show substantial impairment relative to most people in the general population.

## ARGUMENT

**I.    Plaintiff tries to avoid the critical issue—whether she is substantially limited compared to *most people*.**

As set forth in NBME's opening brief, a "disability" under the ADA requires substantial impairment relative to the average person in the general population. NBME's Br. at 26-30. A mere diagnosis of a condition or impairment does not qualify as a "disability." *See* 28 C.F.R. § 36.105(d)(1)(v). Nor is a disability determined by comparison to a group of elite academic peers.

Rather, an "impairment is a disability" only "if it substantially limits the ability of an individual to perform a major life activity as *compared to most people in the general population*." *Id.* (emphasis added). That means to a greater degree than "the majority of people in the general population," *Mancini v. City of Providence*, 909 F.3d 32, 42 (1st Cir. 2018), or, put another way, "in relation . . . to what the average person does," *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 156 (1st Cir. 1998).

The ADA Amendments Act broadened the definition of "disability" in certain respects, *see* NBME's Br. at 29 n.6, but did not eliminate the need to prove one. *Neely v. PSEG Tex.,*

*Ltd. P'ship*, 735 F.3d 242, 245 & n.4 (5th Cir. 2013). "[A] plaintiff must still show substantial limitation[.]" *Mann v. La. High Sch. Athletic Ass'n*, 535 F. App'x 405, 410 (5th Cir. 2013) (per curiam) (unpublished) (citation omitted).

The question in "post amendment case[s] [remains] whether [the claimant's] impairment substantially limits his [or her] ability 'to perform a major life activity **as compared to most people in the general population**.'" *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 591 (5th Cir. 2016) (emphasis added) (citations omitted).

Plaintiff's brief presents 27 pages of narrative and argument before finally mentioning the standard, and 34 pages before turning to "the [proper] basis of comparison[.]" Plf's Br. at 27, 34. Plaintiff does not argue that the Department of Justice ("DOJ") regulation is invalid or non-binding. Instead, she purports to puzzle over it, asking, "Who exactly should be included in 'most people in the general population'?" and suggesting ambiguity, noting, "The statute and regulation do not specifically say." *Id.* at 35.

The regulation is not ambiguous in any way that could conceivably cover Plaintiff. "Most people in the general

population" clearly aims at an average-person-in-the-general-population standard. Courts have uniformly interpreted and applied the regulation consistent with that meaning, including in every case on which Plaintiff relies. *See id.* at 29-32; *see, e.g.*, *Berger v. Nat'l Bd. of Med. Exam'rs*, No. 1:19-CV-99, 2019 WL 4040576, at *20 (S.D. Ohio Aug. 27, 2019), *appeal docketed*, No. 19-3885 (6th Cir. Sept. 19, 2019). As *Berger* framed it (a case on which Plaintiff heavily relies): "The Court must compare an individual to those in the general population rather than 'an academic peer group, or, in the case of standardized tests, to other test-takers who are not representative of the general population.'" 2019 WL 4040576, at *20 (citations omitted).

Ultimately, Plaintiff does not articulate what she thinks the standard is (or should be). *See e.g.*, Plf's Br. at 38 (arguing that Plaintiff is disabled "as against *a* relative comparative group, whether it be the general population or her educated peers" (emphasis added)). But she apparently interprets the "general population" to mean "similarly situated." *See, e.g.*, *id.* at 34 ("The record evidence demonstrates that Meaghan's reading rate and decoding speed, when

*compared to students her own age*, is substantially limited[.]" (emphasis added)).

Plaintiff correctly observes that NBME believes that "similar-aged college graduates used as a basis of comparison on the NDRT . . . are not representative of the 'general population.'" *Id.* NBME takes that position because of the plain language of the DOJ regulation. *See* 28 C.F.R. § 36.105(d)(1)(v). Consistent with that language, the Second Circuit has noted that college freshman are not representative of the general population. *See Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 81-82 (2d Cir. 2000). And other courts have said college graduates certainly are not when over half the people in this country do not graduate from college. *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*, No. CV-15-4987, 2016 WL 1404157, at *8 (E.D. Pa. Apr. 11, 2016); *see also* NBME's Br. at 36-37 n. 8 (collecting cases).[1]

---

[1] *See also* A. Harrison & K. Harrison, *A Critical Analysis of the Nelson Denny Reading Test as a Method of Identifying Reading Impairment in Adults*" ("*Critical Analysis of the NDRT*"), Psychological Injury & Law 17, 27 (Jan. 2019) ("[If] the purpose is to identify a normative weakness relative to most other individuals in the general population, then one needs to determine how the person is performing relative to that broad reference group[.] . . . **The grade-based**

Plaintiff claims that the well-established "general population" standard is unworkable. Plf's Br. at 35. Since it is the plain language of the regulation, that criticism is irrelevant. But it is also untrue. The test—under which "average (or above-average) performance presumptively establishes the absence of a substantial limitation"—is straightforward and easy for courts to apply. *See Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d 1247, 1249 (M.D. Fla. 2017).

By contrast, Plaintiff's proposed standard (to the extent she even offers one) would require courts to make difficult and arbitrary choices about the relevant point of comparison. Here, for example, should Plaintiff be "compared to students her own age" (which presumably, but may not, mean other college graduates her age)? Plf's Br. at 34. Or perhaps fourth-year medical students who successfully matched with a residency program? *See id*. at 19 ("Meaghan's [passing] score of 200 is *well below* the interquartile range scores of those matched to a preferred specialty in any field."). Matching students in the OB-GYN

---

**postsecondary norms offered by the NDRT fail to provide this normative comparison**." (emphasis added)) (ROA.672).

specialty? *See id.* Or, as Dr. Brockman argues, "in comparison to her fellow medical students sitting for the USMLE Step 2 Test"? *See* ROA.222. Luckily, this Court need not answer those questions.

Under the controlling standard, Plaintiff cannot show a substantial limitation. The three subtest results on which she relies did not compare her to the general population and did not show substantial limitation in reading even as to the comparator group against which they are normed. Her evidence falls far short of demonstrating that her ability to read is significantly impaired relative to the average person.

As set forth previously, none of the three assessments Plaintiff identifies (and on which the district court relied) is sufficient. NBME's Br. at 33-39. Her reading rate in the 6th percentile on a one-minute subtest of the NDRT—which employs grade-based norms—cannot establish impairment relative to the general population, and Plaintiff inaccurately attempts to inflate the NDRT's significance as a diagnostic tool. The NDRT subtest at issue is a "one-minute test where [Plaintiff] was simply asked to place her finger on the spot where she finished reading." *Bibber*, 2016 WL 1404157, at

*8. The "[NDRT] merely give[s] a snapshot of where in a par-
agraph of text an individual is after a short period of time."
*Bartlett v. N.Y. State Bd. of Law Exam'rs*, 2001 WL 930792,
at *22 (S.D.N.Y. Aug. 15, 2001). Plaintiff asserts that "she
could not complete the entire [NDRT] under standard timed
conditions," Plf's Br. 14, but that is true for many non-disa-
bled individuals. *See Critical Analysis of the NDRT*, at 26
(ROA.671). Plaintiff also asserts that "the NDRT is an ac-
cepted method of diagnosing reading disabilities," Plf's Br. at
34 n.6, but the NDRT's "test manual specifically warns that
the NDRT should not be used to diagnose reading disabili-
ties," *Critical Analysis of the NDRT*, at 27 (ROA.672).

As for her scores on the Wechsler Individual Achieve-
ment Test, Third Edition ("WIAT-III"), Plaintiff's statements
do not even appear to be accurate recitations of her scores,
much less scores that show anything vis-à-vis the general
population. While the cited testing fails as evidence because
none of it compares Plaintiff to the general population, it is
worth noting how Plaintiff inaccurately presents her score.[2]

---

[2] With respect to two subtests of the WIAT-III, Plaintiff says
her "reading rate 'was slower than 90% of students her age.'"
Plf's Br. at 15 (citing ROA.211, ROA.215). Her test results do

Nor has Plaintiff offered any evidence beyond her test scores—such as "clinical observations" or how she "engage[s] in major life activities"—that would support a disability finding. *See* Plf's Br. at 36 n.7. She references legislative history from the ADA Amendments Act that says "individuals with specific learning disabilities" might be covered by the statute even though they have done well in school, but her profile

---

not support that statement. There is an "Oral Reading Rate" subtest (she performed at the 61st percentile), a "Word Reading" subtest (she performed at the 77th percentile), a "Reading Comprehension" subtest (she performed at the 87th percentile), and an "Oral Reading Fluency" subtest (she performed at the 61st percentile). ROA.214, ROA.216. Those scores place her at solidly average or above average, even against age-based norms. Since there was no subtest on which she performed at the 10th percentile, the basis for her "slower than 90% of students" statement is lacking.

The more fundamental problem with her attempted reliance on the WIAT scores, however, is that she ignores her Composite Score Summary, which provides a far more relevant and reliable assessment of her reading abilities: Oral Language/99th percentile/Superior; Total Reading/66th percentile/Average; Basic Reading/50th percentile/Average; Reading Comprehension and Fluency/82nd percentile/Average. *See* ROA.215. Her WIAT-III scores thus do ***not*** show "substantial impairments in [her] reading skills," Plf's Br. at 14, even against the age-based comparator group used in the WIAT-III, much less against the ADA-required comparator group of the general population.

bears no resemblance to the individuals described there. *See id.* (referring to individuals whose reading ability has always been "word-by-word, and otherwise cumbersome, painful, deliberate and slow" (citation omitted)).

The plaintiff in *Bartlett*, for example, whose reading abilities were compared to "that of a child," used an index card with a hole to help her read, did not read for pleasure, and "trie[d] to find alternative routes around reading." 2001 WL 930792, at *12, *36. She struggled "with tasks that most people perform effortlessly, including reading short e-mails, using a telephone directory or electronic database, writing a shopping list, or following a recipe." *Id.* at *36; *see also* NBME's Br. at 43-44 (distinguishing *Bartlett* and *Berger*).

Here, Plaintiff urges the Court to look beyond "outcomes," but points to nothing other than her purported diagnoses and strong work ethic to support her alleged disability. Plf's Br. at 38. That Plaintiff *perhaps* reads more slowly than her medical school peers—though that is very questionable given her exceptional MCAT score overall and on the reading-intensive Verbal Reasoning section in particular—does not mean she is substantially impaired compared to the

average person, and the district court's contrary conclusion was an abuse of discretion.[3] *See* NBME's Br. at 33-39.

## II.  Plaintiff's other arguments on the merits are inconsequential.

Plaintiff raises other arguments to try to circumvent the controlling standard.

**Unfairness to "elites."** Plaintiff mischaracterizes NBME as arguing that "an individual who has performed well academically cannot be substantially limited in their reading ability," or that the ADA does not apply to "elite peer groups at college or medical schools." Plf's Br. at 58, 62. That

---

[3] Plaintiff attempts to minimize her stellar MCAT score (top five percent on Verbal Reasoning and top 12 percent overall, ROA.226) by suggesting that the "testing format provides for shorter questions [than the USMLE] and passages of paragraphs that apply to six or seven questions once read." Plf's Br. at 7 n.1. Plaintiff offers no support for that assertion, and a glance at the questions reveals the fallacy of the premise. *Compare* ROA.121 (sample Step 2 CK question), *with* ROA.615-30 (sample MCAT questions). MCAT questions frontload the reading but both exams require extensive reading and concentration under time pressure. Nor can she dismiss her exceptional MCAT score by saying the MCAT has a "math section" that "did not implicate her reading impairment." Plf's Br. at 7 n.1. Setting aside that there is no "math" section," ROA.226, her highest score was in Verbal Reasoning, the most reading-intensive section of the MCAT.

is not NBME's position. NBME seeks fair and consistent application of the regulatory standard. *All* ADA claimants—including high-achieving graduate students—must be substantially impaired in a major life activity compared to most people in the general population to be entitled to accommodations that clearly affect performance and that most examinees would love to receive.

The DOJ regulations explain that "someone with a learning disability may achieve a high level of academic success," but clarify that such a person is "substantially limited in one or more major life activities" only if they require "additional time or effort . . . to read . . . ***compared to most people in the general population***." *See* 28 C.F.R. § 36.105(d)(3)(iii) (emphasis added).

Here, there is ***no evidence*** that Plaintiff takes more time or must exert more effort to read than the average person. And while Plaintiff's consistent achievement in school and on standardized tests without accommodations—including her scores in the top 1 percent on the ACT and top 12 percent on the MCAT—is not determinative, it is strong and compelling evidence that she is not substantially impaired

by an alleged reading impairment. *See* NBME's Br. at 40 & n.10; *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 630 (6th Cir. 2000) (noting that non-disabled plaintiff achieved "an average [SAT] score" and a "high enough" score on the MCAT, both without accommodations); *Collins v. Prudential Inv. & Ret. Servs.*, 119 F. App'x 371, 378 (3d Cir. 2005) (unpublished) ("[Plaintiff's] testimony about her work, academic [background], and community involvement contradicts her claim that her [ADHD] substantially limits her abilities to think, learn, remember and concentrate."); *Hetherington v. Wal-Mart, Inc.*, 511 F. App'x 909, 912 (11th Cir. 2013) (unpublished) (plaintiff employee was not substantially limited in his ability to think, learn, or read where he was able to read "at a junior high level" and had "completed 12 years of school"). That likely explains why Plaintiff's brief largely ignores her scores on those tests. She does not, for example, even mention her top 1 percent ACT score. ROA.228.

Individuals who perform exceptionally well with no extra testing time on other high-stakes, reading-intensive exams, taken over multiple hours, cannot reasonably be said to be substantially limited in their ability to read as compared

to the general population. To suggest that NBME or the Court should rely on scores achieved on three diagnostic subtests, taken for purposes of obtaining accommodations in medical school—while ignoring her real-world performance on other standardized tests in high school and in college—makes no sense and is certainly not required by the ADA, even as amended.

**Diagnosis vs. disability.** Plaintiff, like the district court, conflates a diagnosis with a disability. *See, e.g.*, Plf's Br. at 37 ("[T]he 'evidence showing that she has a history of impairment in reading based on current professional evaluations in accordance with the accepted standard of clinical review' . . . established that Meaghan is disabled[.]").

"Merely having an impairment . . . does not make one disabled for purposes of the ADA" unless the alleged impairment substantially limits the individual compared to most people. *See EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 614 (5th Cir. 2009); *see also* 28 C.F.R. § 36.105(d)(1)(v) ("[N]ot every impairment will constitute a disability[.]"); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012)

(distinguishing between a clinical diagnosis "based on an internal referent" (*i.e.*, the plaintiff's intellectual ability or IQ versus his achievement, as reflected on diagnostic assessments) and the ADA's definition of disability, which calls for a comparison with the general population).

Here, Plaintiff is not disabled—irrespective of her various evaluations and purported impairments. Not one of her professional evaluations contain a single below-average test result in reading relative to most people. Nor do any of them conclude that she is substantially impaired compared to the general population. *See* ROA.222 (argument in Brockman addendum that Plaintiff should be compared with "other college educated students, not the general population"). If anything, the reports show the opposite: that she is not disabled. *See* ROA.237-42 (Nagim evaluation: above-average to superior reading scores); ROA.229-36 (Ducey evaluation: average to superior reading scores); ROA.223 (Brockman evaluation: Plaintiff's "superior intelligence places her overall scores above that of the general population").

Plaintiff asserts she "has been diagnosed with dyslexia . . . since the fifth grade." Plfs' Br. 38. The "diagnosis"

was purportedly made by Denise Nagim, a speech-language pathologist, *id.* at 5, but it is not clear that Ms. Nagim diagnosed Plaintiff with dyslexia. *See* ROA.304 ("Meaghan is diagnosed with an oral reading problem, which has intermittent characteristics of dyslexia."). A dyslexia diagnosis would be at odds with Plaintiff's achievements and the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), under which "[c]urrent academic skills must be well below the average range of scores in . . . appropriate tests of reading, writing, or mathematics[.]"[4]

Plaintiff also notes that she has taken Adderall to manage her ADHD, Plf's Br. at 7, but the purported ADHD diagnosis and related treatment are irrelevant for purposes of this appeal. Plaintiff identified the ADHD diagnosis as her basis for initially seeking a distraction-free testing room (not for seeking extra testing time, which she said was needed because of her learning disorder). ROA.193. But she testified that she does not need a separate room on the Step 2 CK because it is taken in a cubicle. *See* NBME's Br. at 16; ROA.41.

---

[4] *Clinical Characteristics of Learning Disabilities*, National Center for Biotechnology Information, https://www.ncbi.nlm.nih.gov/books/NBK332886/.

**Disparity between intellect and test results.** Plaintiff asserts that her "impairments create a 'grand disparity' between her cognitive profile and her reading fluency," and that "[t]his disparity *caused by her disability* requires a reasonable accommodation of time and a half in reading-intensive exams like the Step 2 CK." Plf's Br. at 23 (emphasis added); *see also id.* at 32 (citing ROA.12, ROA.237-39, ROA.242). That argument fails for multiple reasons.

As an initial matter, it hinges on the incorrect assumption that Plaintiff is disabled. But regardless, a disparity in test scores does not prove a disability. In *Bartlett*—a case on which Plaintiff relies heavily—then-judge Sotomayor cast serious doubt on the "discrepancy theory," reasoning that a "standard that adopts a purely self-referential measure of an impairment's severity . . . is fraught with danger[.]" *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 970 F. Supp. 1094, 1115 (S.D.N.Y. 1997), *vacated in part on other grounds*, 226 F.3d 69 (2d Cir. 2000). She stressed that the lack of any uniform measure "undermined the discrepancy theory's validity," and that, even assuming score deviations are valid, they "do not,

standing alone, identify a learning disabled person." *Id.* at 1115-16; *see also Bartlett*, 2001 WL 930792, at \*25.

Here, Plaintiff relies on a "grand disparity" between her intellect and certain test scores, quoting the 2003 Nagim evaluation. Plf's Br. at 39. But she omits critical language. The Nagim evaluation found "a cognitive/achievement profile of an **above average** student with a grand discrepancy**, although average**, in auditory processing relating to phonological awareness, or the ability to hear single units of sounds and manipulate sounds quickly in blending and in writing." ROA.242 (emphasis added); *see also* ROA.237 ("Although [her weakest cluster score] is an **average** score, it is significantly below Meaghan's ability level[.]" (emphasis added)); ROA.239 ("A grand discrepancy in the **average** range occurs in Auditory Processing[.]" (emphasis added)). With regard to the reading skills that are relevant here, Ms. Nagim found that Plaintiff performed at the 75th percentile. ROA.241-42 ("[T]he GORT-4, a high-volume, timed reading assessment of passage reading and comprehension in a multiple choice format, indicates (75%) in both Reading Rate and Reading Comprehension.").

Plaintiff also discusses at length a purported 20 percent disparity between her scores on NBME-style "shelf" exams, which are reading intensive, and "practical examinations comprised of shorter questions." *See, e.g.*, Plf's Br. at 8-9, 47. That purported disparity was supported only by Plaintiff's conclusory assertions. Plaintiff did not offer a sample "practical" exam into evidence. Nor does she point to any testimony regarding the differences between these types of tests other than to note that "*Meaghan* trace[s] the disparity in [her] performance to the structure of the shelf exams, specifically, the amount of reading required in a short time frame on the shelf examinations." *Id.* at 9 (emphasis added). Whatever can be gleaned from this "intra-subjective comparison," *id.* at 30 (quoting *Berger*, 2019 WL 4040576, at *8), if anything, it does not show a substantial impairment compared to most people.

Even assuming the discrepancy theory and these various test results are valid, the record unambiguously reveals an average or above-average reader. While "[a]ll persons have some mental or physical deviations from the norm"—relative strengths and weaknesses—these "inherent

limitations or deviations . . . do not automatically constitute handicaps." *Bartlett*, 970 F. Supp. 1094 at 1116.

**Mitigating measures.** Plaintiff contends that she excelled academically (and overcame the purported discrepancies, discussed above) because of "her determination to expend additional time or effort as needed to effectively read and comprehend the assigned materials." Plf's Br. at 32; *see* 28 C.F.R. § 36.105(d)(1)(viii) ("The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures."). Specifically, Plaintiff testified that she enrolled in tutoring, used a computer more frequently, and devoted additional time to studying at home and in extra study halls. ROA.14-18; *see* Plf's Br. at 7.

In assessing whether mitigating measures explain an individual's success (rather than evincing the absence of a substantial impairment), courts consider whether "the *reading strategies* [the person] has utilized for years improve her reading so significantly that without them she would be substantially limited when compared to the general population." *Bibber*, 2016 WL 1404157, at *9 (emphasis added).

For example, *Bartlett* found that the plaintiff had uti-
lized mitigating measures where she asked classmates to
read to her, used an index card with a hole in it and note-
takers to help her read, avoided classes with timed exams,
took a prep course that taught a "hit and move on" reading
strategy, and "avoid[ed] reading at all costs." 2001 WL
930792, at *39-40. But not all reading strategies are "miti-
gating measures" under the ADA, and courts have reached
the opposite conclusion absent the sort of substantial and
specific evidence presented in *Bartlett. See, e.g., Healy*, 870
F. Supp. 2d at 621 (insufficient evidence of mitigation where
the plaintiff simply reported skimming test questions).

Here, Plaintiff has presented *no evidence of a single
reading strategy* she has ever needed or employed to cope
with her alleged reading impairment. That she purportedly
spent more time studying and met with a tutor "simply de-
scribes good study habits"; it does not evidence a substantial
limitation in reading. *Id.*

**Past accommodations (or lack thereof).** Plaintiff faults
NBME for emphasizing that she never received accommoda-
tions before medical school, and for giving insufficient weight

to the accommodations she received for the first time as a medical student. She effectively asks the Court to ignore her success without accommodations—from grade school through college—and focus exclusively on the accommodations she received at Tulane. Plf's Br. at 40 ("Though seeking and obtaining past accommodation should be considered to ensure that a broad scope of protection is afforded disabled individuals, the inverse does not follow.").

First, this Court can and should consider Plaintiff's performance without accommodations, particularly on other standardized tests like the ACT, SAT, MCAT, and Step 1.[5] Plaintiff claims that the disability inquiry "does not and cannot depend on whether an individual sought prior accommodations," citing 28 C.F.R. § 36.105(d)(3)(iii). *Id.* at 39-40. Setting aside that the cited regulation says nothing of the sort, it is *not* NBME's position that Plaintiff "cannot be disabled because she did not seek accommodations prior to medical

---

[5] Plaintiff attributes her passing but lower-than-desired Step 1 score "to her inability to read and process all the information in each question in the allotted time," Plf's Br. at 19, but she notably does not address NBME's point that her score "reflected her relatively poor performance on three subjects, not a shortage of time," NBME's Br. at 15; ROA.254.

school at Tulane." *Id.* at 39. It is not her failure to seek accommodations that is critical, but her stellar scores earned without them. *See Glueck v. Nat'l Conf. of Bar Exam'rs*, No. SA-17-CV-451-XR, 2018 WL 3977891, at *6 (W.D. Tex. Aug. 20, 2018) (considering the plaintiff's strong performance without accommodations and relying on that evidence in holding that she was not disabled); *Black*, 281 F. Supp. 3d at 1250 (same); *Bibber*, 2016 WL 1404157, at *7-9 (same).

As NBME clarified at the preliminary injunction hearing, Plaintiff is not "being penalized for not having requested accommodations before." ROA.101. Rather, Plaintiff's consistently exceptional scores earned on challenging, reading-intensive tests without any accommodations are strong evidence that her reading abilities do not rise to the level of a "disability" under the ADA.

Second, as to NBME's alleged failure to give "considerable weight to documentation of past . . . accommodations," 28 C.F.R. § 36.309(b)(1)(v), that documentation necessarily includes recognizing the *absence* of past accommodations. And that Tulane chose to give her accommodations despite the absence of a disability in no way compels NBME to do so.

"Each testing agency has an independent duty under the ADA to determine reasonableness on a case-by-case basis." *See Ware v. Wyo. Bd. of Law Exam'rs*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997) ("Although information regarding past accommodations may be helpful to [NBME], the fact that a person has been granted a particular accommodation in the past does not mean that such accommodations are presumably reasonable."), *aff'd*, 161 F.3d 19 (10th Cir. 1998).

**III.   Any alleged harm to Plaintiff is not irreparable and cannot outweigh the harm to NBME, other test-takers, and the public if the injunction is granted.**

Setting aside the various deadlines and requirements for the residency Match process, the fundamental question is whether Plaintiff "is *likely* to suffer *irreparable* harm" if she cannot participate in that process now. *See Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (emphasis added). Those are two separate issues: what harm is *likely*, and is the cited harm *irreparable*?

The harm Plaintiff fixates on is "the inability to *fully* participate in the [residency] Match *now*." Plf's Br. at 51 (emphasis added); *see id.* at 49 ("A delay in applying to programs could be . . . fatal to her placement *during this cycle*."

(emphasis added)); *id.* at 53 n. 11 ("[F]ailure to submit complete exam scores will impede Meaghan's ability to match *now*[.]" (emphasis added)). NBME believes she has already applied to residency programs as part of the current Match cycle, which can be confirmed at argument. But assuming otherwise, the delay at issue is not irreparable harm.

Plaintiff cites a single case (*Berger*) suggesting that such a theory of harm—slightly delayed entry into a medical residency program—qualifies as *irreparable* harm for purposes of receiving extraordinary relief from a federal court (in this case, a mandatory injunction involving a licensing exam that was awarded before any discovery had been taken and with no meaningful opportunity to present evidence in opposition to the motion). Plf's Br. at 48-49. But *Berger* (now on appeal) involved a student who was likely to fail without accommodations and then be dismissed from medical school. 2019 WL 4040576, at *28.

To the extent mere delay in applying for the residency match program was considered, it was as an afterthought in the wake of the far graver harm of dismissal from medical school. *See id.* at *28-29. Plaintiff here is not in such dire

circumstances, and she has cited no case where modest delay in pursuing a residency match and nothing more sufficed to demonstrate irreparable harm.

NBME cited several cases finding such delays are *not* irreparable harm. Plaintiff either ignores or fails to distinguish them. *See Doe v. N.Y. Univ.*, 666 F.2d 761, 773 (2d Cir. 1981) (no irreparable harm caused by delay in obtaining graduate-school admission); *Martin v. Helstad*, 699 F.2d 387, 391-92 (7th Cir. 1983) (same); *Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122, 125 (10th Cir. 2004) (unpublished) (same); *see also* NBME's Br. at 47-48.[6]

Plaintiff also fails to establish that the harm she fears is *likely*. She is guaranteed an interview with Tulane's residency program in her chosen field and geographic location.

---

[6] Plaintiff argues that *Rothberg* is distinguishable because "[w]hereas in *Rothberg*, nothing required the plaintiff to apply to law schools now, failure to submit complete exam scores will impede Meaghan's ability to match now and irreparably harm her opportunities to pursue her chosen career path. Plf's Br. at 53 n.11. That is not a distinction. Whether one is at the front end or back end of a professional program, delay at either end delays one's "career path." And although a lower score might impede Plaintiff's "ability to match now," she does not explain why she must do so during this cycle.

ROA.83. And given her past performance, she will likely pass without accommodations (unlike *Berger*), and will not be dismissed from medical school (unlike *Berger*). She also has options other than the general Match for obtaining a residency position. *See Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1460 (7th Cir. 1995) (discussing residency positions available after the Match in holding plaintiff did not face a risk of irreparable harm). So if the acute fear is that she will not secure a residency position if she does not pass the Step 2 CK now, she has not established likely harm.

But what Plaintiff actually fears is that she may not be as *competitive* as she would like. Plaintiff argues that she will be harmed because "the actual raw [Step 2 CK score] is used to determine overall performance, and . . . considered by residency programs[.]" Plf's Br. at 52. She is seeking an *advantage* in the competition for residencies over her fellow students and applicants. That theory of harm—which would seem to be at the heart of Plaintiff's case—has a fatal flaw. It recognizes that an advantage to Plaintiff will be a disadvantage to someone else. That is, if Plaintiff improperly receives the advantage she seeks, it will harm others.

Plaintiff seems to recognize this at some level because she attempts to argue that favoring her *will not* harm other test-takers. She asserts that the test is a mastery exam, and "[t]hey either passed, or they did not." *Id.* at 53 ("A student's ability to demonstrate proficiency is independent and irrespective of the score of any other student."). If that were all that is at issue, then Plaintiff herself ought to be content with simply passing the exam. She plainly is not. She wants a higher score so that she can beat out other students in seeking a residency.

Plaintiff cannot have it both ways. If "obtain[ing] a residency match in lieu of some other student . . . is not . . . imminent, concrete harm" for other test-takers, then it is not for Plaintiff either. *Id.* at 55.

Plaintiff's arguments regarding harm undercut her case in another respect. In a different attempt to disclaim any pursuit of an advantage, Plaintiff asserts that "[b]ecause Step 2 CK is designed to test clinical knowledge, not reading, Meaghan gains no unfair advantage with this accommodation." *Id.* at 23; *id.* at 46 ("Such an accommodation does not grant an unfair advantage when reading speed is not the

object and purpose of the test."). But an unwarranted accommodation remains an advantage. Other test-takers may also have any number of impairments that do not rise to the level of a disability. That Plaintiff's claimed impairment gets special treatment is not fair, regardless whether it is or isn't germane to the "object and purpose of the test." *See id.* at 46.

Lastly, recognizing that there is harm to other test-takers (as she acknowledged in her testimony below, ROA.82), Plaintiff argues that this Court should not consider harm to other residency applicants because "[n]othing in the record indicates that the National Resident Match Program is directly associated with the NBME." *Id.* at 54. In other words, the NBME should not have standing to raise harm to other test-takers as it may arise in the *residency* process. But Plaintiff's entire theory of her own harm hinges on the residency application process, and harm to others is always relevant to the preliminary injunction analysis. Regardless, courts have recognized that NBME has a "duty to ensure that its examination is fairly administered to all those taking it." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 89 (2d Cir. 2004). And this Court considers the public's interest

in ensuring the fair administration of standardized tests, particularly those used for licensing purposes.

## CONCLUSION

Plaintiff has failed to show that she is substantially impaired in reading compared to *most people in the general population*, or that she will *likely* be *irreparably* harmed absent an injunction. NBME requests that this Court reverse the district court's mandatory preliminary injunction.

DATED: October 21, 2019

Robert A. Burgoyne
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

/s/ Eric B. Wolff
Eric B. Wolff
Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Attorneys for Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

*Counsel of Record for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,936 words, excluding the parts exempted by Rule 32(a)(7)(B)(iii); and (2) the typeface and type style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook and Palatino Linotype fonts.

/s/ Eric B. Wolff
Eric B. Wolff

*Counsel of Record for Defendant-Appellant*

# CERTIFICATE OF SERVICE

On October 21, 2019, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Eric B. Wolff
Eric B. Wolff